UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

THE ESTATE OF JAMES FRANKLIN PERRY,
by BETTIE A. RODGERS, Special Administrator,
and JAMES FRANKLIN PERRY JR. (a Minor),

       Plaintiffs,

v.                                                                                                       Case No. 12-C-0664

CHERYL WENZEL, R.N., DEPUTY KICKBUSH, NICOLE
VIRGO, R.N., TINA WATTS, R.N., SERGEANT FATRENA
HALE, SHERIFF DAVID A. CLARK, KELLY KIECKBUSCH,
ABIE DOUGLAS, ANTHONY ARNDT, SHEILA JEFF,
DARIUS HOLMES, RICHARD E. SCHMIDT, RICHARD LOPEZ,
FRANK SALINSKY, STEPHON BELL, MARGARITA
DIAZ-BERG, ALEXANDER C. AYALA, FROILAN SANTIAGO,
KARL ROBBINS, CRYSTAL JACKS, COREY KROES,
RICK BUNGERT, LUKE LEE, JACOB IVY, SHANNON D.
JONES, RICHARD MENZEL, EDWARD FLYNN, ROMAN [sic]
GALAVIZ, VICTOR E. BEECHER, THE CITY OF
MILWAUKEE, MILWAUKEE COUNTY, WISCONSIN COUNTY
MUTUAL INSURANCE CORPORATION, AURORA SINAI
MEDICAL CENTER, PAUL J. COOGAN, BECKY POTTERTON,
ABC INSURANCE COMPANY, and WISCONSIN PATIENTS
COMPENSATION FUND,

       Defendants.

---

### AFFIDAVIT OF JAMES H. MACGILLIS IN SUPPORT OF
### THE CITY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

---

STATE OF WISCONSIN    )
                                  ) ss:
MILWAUKEE COUNTY    )

      JAMES H. MACGILLIS, being first duly sworn upon oath, does depose and state as follows:

1. I am currently employed as a Lieutenant of Police with the Milwaukee Police Department, and have been employed by the MPD since 1995.

2. I have personal knowledge of the information averred to herein.

3. I have previously testified in the Milwaukee County Circuit Court, the United States District Court for the Eastern District of Wisconsin, and at quasi-judicial hearings before the Board of Milwaukee Fire and Police Commissioners, as an expert witness regarding use of force and other police-related topics.

4. Attached hereto as Exhibit A is a copy of my current curriculum vitae.

5. I have formerly served as the Master Firearms Instructor for the City of Milwaukee Police Department and I am a Tactical Skills Advisory Committee Member for the Wisconsin Law Enforcement Standards Board. I have served in several capacities at the MPD and most recently, I was assigned as the lieutenant in charge of recruit and in-service training.

6. Also, I am certified as a use of force expert with the Wisconsin Department of Justice, and I am a Wisconsin Law Enforcement Standards Board certified Master Instructor for Tactical Response and Firearms. Being a Master Instructor means that I teach instructors how to teach law enforcement officers regarding these topics.

7. Attached as Exhibit B is a copy of file number 10-0532, which was generated as a result of the critical incident investigation that was conducted by the Milwaukee Police Department, with regard to the September 13, 2010 in-custody death of James F. Perry.

8. Exhibit B is a true and correct copy of that file, which is kept in the ordinary course of business by the Milwaukee Police Department.

9. The Milwaukee Police Department conducts a thorough and complete investigation of all critical incidents, including incidents which involve the death of a subject or a prisoner in MPD custody.

10. Generally, such investigations are assigned to the MPD's most skilled and experienced investigators.

11. Each such critical incident and the related investigation are reviewed by supervisors, to determine if the subject events present the basis for either potential criminal charges, or internal charges related to violations of MPD rules and procedures. Additionally, command staff supervisors review same to determine if the underlying event suggests the need for more or different training, the revision of existing SOPs or the creation of new SOPs, to provide guidance to officers should they encounter similar situations in the future.

12. Furthermore, the chief of police is briefed with regard to all critical incidents, and the results of their related investigations.

13. Attached as Exhibit C is a copy of a two-page Milwaukee Police Department property inventory number 00529965, which reflects property that was inventoried in the context of the MPD investigation that was conducted relative to the in-custody death of James Perry on September 13, 2010.

14. Included among those items inventoried are Item Number 1, which is a packet of six order-for-release forms, relative to Mr. Perry's processing through the MPD Prisoner Processing Section.

15. A copy of Item Number 1 is attached to this affidavit as Exhibit F, and the pages are marked F-1 through F-6.

3

16. The order-for-release forms contained in Exhibit F illustrate that Mr. Perry was time-stamped into the PPS at 5:36 a.m. on September 13, 2010 (Page F-1.)

17. Mr. Perry was removed from his cell at 10:14 a.m. by an investigating detective, and returned to his cell at 11:19 a.m. (Pages F-2 through F-3.)

18. The documents also indicate that Mr. Perry was released from jail at 3:21 p.m. to be taken to Sinai hospital, and that he was returned to the jail at 6:55 p.m. (Pages F-4 through F-5.)

19. Finally, the order-for-release documents illustrate that Mr. Perry was released from the PPS to be transferred to the CJF, at 8:34 p.m. on September 13, 2010. (Page F-6.)

20. With regard to Item Number 2, which is described as a packet containing miscellaneous forms, those items are copied and attached to this affidavit as Exhibit D, and the pages are marked D-1 through D-12. Those 12 pages are copies of the discharge paperwork provided to Mr. Perry by representatives of Aurora Sinai Medical Center.

21. The police inventory document notes an Item Number 3, which is a one-page cell block check form.

22. A copy of that cell block check form is attached as Exhibit E.

23. The daily cell block check form, or Exhibit E, indicates that on September 13, 2010, between the hours of 7:00 p.m. and 8:33 p.m., cell rows A and B, which included cell A3, which was the cell that contained Mr. Perry, was checked by matrons and/or jailers seven times.

24. Attached as Exhibit G is a copy of Milwaukee Police Department Standard Operating Procedure (SOP) 090-Prisoners, which became effective on May 19, 2010, and which was in effect on September 13, 2010.

25. SOP 090 defines the responsibilities of department members, along with various procedures, as they relate to prisoners and the processing of persons in custody, and it is part of training received by all MPD personnel.

26. SOP Section 090.10 relates to the physical restraint of prisoners.

27. Subsection E of that section relates to expectorant shields (or spit masks). However, officers are not trained that expectorant shields are a means of physically restraining prisoners. Rather, subsection E was placed in this section of SOP 090 because it was an item that is often used in the context of the handling and detention of prisoners.

28. An expectorant shield is a large mesh head covering which is very loose-fitting and lightweight. The back of the expectorant shield is made of black mesh, and the area of the front of the shield, which would cover the prisoner's mouth, is made of a paper-towel-like material that is blue in color.

29. I personally have worn an expectorant shield, to experience how it feels, and it is very lightweight and does not inhibit breathing whatsoever.

30. When wearing such an expectorant shield, the subject can see and hear easily.

31. The shield is a barrier, and simply prevents the subject from being able to expel bodily fluids from his mouth and striking other people with same.

32. Section 090.40 relates to prisoners in need of medical attention.

33. That section provides that prisoners conveyed to a medical facility for non-emergency medical care may be conveyed by a police patrol unit.

34. Furthermore, that subsection provides that prisoners who have experienced and injury or an apparent emergency physical illness are to be conveyed to a medical facility by ambulance or a fire department paramedic unit.

35. The State of Wisconsin Department of Justice Law Enforcement Standards Board does not mandate any specific training, either for the treatment of prisoners in a temporary holding facility, or with regard to providing medical assistance to prisoners.

36. However, the Milwaukee Police Department provides such training for its officers, and SOP 090-Prisoners is part of that training.

37. Attached as Exhibit H is a photocopy of the cover of a training video which was shown to all members of the Milwaukee Police Department during recruit and in-service training from roughly 2001 to 2010. A similar training video is still currently used by the MPD.

38. That training video is provided to the MPD by the American Heart Association, and provides personnel with information regarding when to administer first aid and CPR, and how to administer same properly.

39. In the context of that American Heart Association training, personnel are trained to be aware of the ABC's of the subject, which relates to the airway, breathing, and circulation of the subject.

40. In the context of that training, I have heard American Heart Association trainers tell personnel that one indicator that a person is breathing is if they are talking.

41. However, officers are taught that talking is not the only factor that personnel are trained to consider if a subject or a prisoner is having difficulty breathing.

42. The phrase "if you are talking, you are breathing," is something I have heard in the context of law enforcement training and training related specifically to healthcare issues for prisoners.

43. Attached as Exhibit I is a copy of a Power Point presentation provided to officers through in-service training, from roughly 2000 to 2010.

44. The specific Power Point at Exhibit I is a copy of the Power Point that was presented during session two of in-service training, which was presented to all MPD personnel from November 12, 2007 to January 8, 2008.

45. The Power Point presentation is an overview of the tenets of the emergency medical services system, and it discusses acting as a first responder.

46. A form of this training is still presented to Milwaukee Police recruits and other personnel during their training.

47. As noted on page 3 of that exhibit, the first responder is to check the scene, call for additional resources, and provide care for life-threatening conditions.

48. All Milwaukee Police Department officers have been and are trained that they should act as a first responder when they observe any subject, including prisoners and citizens alike, experience a life-threatening condition or a medical emergency.

49. Some examples of a life-threatening condition or medical emergencies provided to officers in training are stroke, seizure, diabetic emergency, poisoning, and allergic reaction.

50. Officers are trained that they should provide first responder care to individuals experiencing life-threatening conditions or medical emergencies, but that they

should do so only until medical providers who have a higher level of training arrive on scene. Also, officers are trained that if a prisoner experiences a life-threatening condition or medical emergency, emergency medical care is to be summoned to provide more advanced medical care for the prisoner and/or transport that prisoner to a medical facility for treatment as soon as practicable. Officers are trained that they cannot give medications to prisoners, and that they should only treat to their level of training.

51. Attached as Exhibit J is a copy of the timeline of events relative to the September 13, 2010 in-custody death of Mr. Perry. This timeline was prepared by Milwaukee Police Department investigators, in the context of conducting investigation number 10-0532.

52. I have reviewed the documents contained in that investigatory file, and the timeline that is presented on Exhibit J comports with the documentary evidence and witness statements gathered within the context of that investigation.

53. Attached as Exhibit K is a copy of documents generated as a result of the critical incident review, which was conducted relative to incidence number 10-256-0219, and which stemmed from the in-custody death of James F. Perry on September 13, 2010.

54. Upon completion of the critical incident investigation, supervisory staff, which included the chief of police, conducted an analysis of the information generated by the investigation for the purposes of evaluating employee performance, and evaluating whether or not the event suggested the need for reviewing and perhaps revising any training or SOPs.

55. The Prisoner Processing Section of the Milwaukee Police Department is located on the fifth floor of the Police Administration Building, and it is a temporary lockup facility. It is not a long-term detention facility.

56. There are no state-mandated guidelines, relative to the training of officers who perform various functions and responsibilities at a temporary lockup facility which includes the PPS.

57. The training of officers who are assigned to the PPS is done through a temporary holding facility class, and by on-the-job training.

58. PPS personnel, as with any personnel attending to any assignment, are trained relative to first responder, first aid and CPR training.

59. Furthermore, the personnel assigned to the PPS are trained during the Temporary Holding Facility Class regarding SOP 090-Prisoners, and they are given hands-on instruction relative to properly searching prisoners, properly moving prisoners from one location to another within the PPS, properly admitting and releasing inmates from the PPS, and properly monitoring inmates who are located in the PPS.

60. One of the many things that are trained to PPS personnel are how to conduct wellness checks of the cell block areas.

61. In short, PPS personnel are trained that they are responsible for conducting wellness checks and that they should check on the status of each and every prisoner at least four times an hour. They are trained that they should stagger the times that they conduct their wellness checks so that prisoners cannot anticipate when PPS personnel

will be coming by, and thus they are deterred from engaging in inappropriate activity for fear that they might be caught in the context of a wellness check.

63. PPS personnel initial a card to indicate what times they conduct their wellness checks. Attached to this affidavit as Exhibit C is a copy of the daily cell block check that was prepared from the timeframe of 4:00 a.m. on September 13, 2010 to 10:46 p.m. on September 13, 2010, which indicates that between 7:00 p.m. and 8:43 p.m., Mr. Perry's cell was checked seven times.

63. Attached as Exhibit L is a copy of the course materials used to teach officers during the Temporary Holding Facility Class. Those materials are numbered pages MPD 01109 – MPD 01377.

s/James H. MacGillis
                                                            JAMES H. MACGILLIS

Subscribed and sworn to before me
this 1st day of December, 2015.

Susan E. Lappen
NOTARY PUBLIC, State of Wisconsin
My Commission is permanent.


1032-2012-1529.001:223031

11
Case 2:12-cv-00664-JPS   Filed 12/01/15   Page 11 of 11   Document 95