## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

_____

THE ESTATE OF JAMES FRANKLIN PERRY,
by BETTIE A. RODGERS, Special Administrator,
and JAMES FRANKLIN PERRY JR. (a Minor),

              Plaintiffs,

v.                                                  Case No. 12-C-0664

CHERYL WENZEL, R.N., DEPUTY KICKBUSH, NICOLE
VIRGO, R.N., TINA WATTS, R.N., SERGEANT FATRENA
HALE, SHERIFF DAVID A. CLARK, KELLY KIECKBUSCH,
ABIE DOUGLAS, ANTHONY ARNDT, SHEILA JEFF,
DARIUS HOLMES, RICHARD E. SCHMIDT, RICHARD LOPEZ,
FRANK SALINSKY, STEPHON BELL, MARGARITA
DIAZ-BERG, ALEXANDER C. AYALA, FROILAN SANTIAGO,
KARL ROBBINS, CRYSTAL JACKS, COREY KROES,
RICK BUNGERT, LUKE LEE, JACOB IVY, SHANNON D.
JONES, RICHARD MENZEL, EDWARD FLYNN, ROMAN [sic]
GALAVIZ, VICTOR E. BEECHER, THE CITY OF
MILWAUKEE, MILWAUKEE COUNTY, WISCONSIN COUNTY
MUTUAL INSURANCE CORPORATION, AURORA SINAI
MEDICAL CENTER, PAUL J. COOGAN, BECKY POTTERTON,
ABC INSURANCE COMPANY, and WISCONSIN PATIENTS
COMPENSATION FUND,

              Defendants.

_____

### BRIEF IN SUPPORT OF THE MOTION FOR SUMMARY JUDGMENT OF DEFENDANTS CITY OF MILWAUKEE, RICHARD LOPEZ, FRANK SALINSKY, STEPHON BELL, MARGARITA DIAZ-BERG, ALEXANDER C. AYALA, FROILAN SANTIAGO, KARL ROBBINS, CRYSTAL JACKS, COREY KROES, RICK BUNGERT, LUKE LEE, JACOB IVY, SHANNON D. JONES, RICHARD MENZEL, EDWARD FLYNN, RAMON GALAVIZ AND VICTOR E. BEECHER

_____

## I.    INTRODUCTION

      This case stems from events which occurred on September 13, 2010, and involved the

decedent, James Franklin Perry.  These events occurred in the Prisoner Processing Section of the

Milwaukee Police Department (PPS), which is located in the Police Administration Building (PAB), Aurora Sinai Medical Center (Sinai), and the Milwaukee County Criminal Justice Facility (CJF), all of which are located in the City of Milwaukee, Wisconsin. Mr. Perry was lawfully arrested at approximately 2:30 a.m. on September 10, 2013 regarding the armed robbery of an automobile, and booked into the PPS at approximately 5:36 a.m.. At approximately 3:00 p.m., Mr. Perry experienced a seizure while he was located in the male bullpen, which is a large cell that holds several arrestees. MPD personnel assigned to the PPS immediately attended to Mr. Perry and called for the assistance of emergency medical technicians (EMTs), who arrived within minutes. Mr. Perry was transported to Sinai, where he received medical treatment and was given medication for his seizure activity. Officers who accompanied Mr. Perry to Sinai noticed that he was lethargic and had difficulty walking and dressing himself, but they were assured by hospital personnel that these symptoms were the result of the anti-seizure medication that was given to Mr. Perry, and that he was ready to be released from their care. Mr. Perry was transported back to the PPS, so that his paperwork could be completed, and then he was transported to the CJF. Within minutes after Mr. Perry arrived at the CJF, his condition deteriorated and he collapsed. Mr. Perry died at the CJF, due to the effects of cardiovascular disease.

This brief is submitted on behalf of defendants City of Milwaukee (hereinafter "City"), Richard Lopez (hereinafter "Officer Lopez"), Frank Salinsky (hereinafter "Officer Salinsky"), Stephon Bell (hereinafter "Officer Bell"), Margarita Diaz-Berg (herein after "Officer Diaz-Berg"), Alexander C. Ayala (hereinafter "Officer Ayala"), Froilan Santiago (hereinafter "Officer Santiago"), Karl Robbins (hereinafter "Lieutenant Robbins"), Crystal Jacks (hereinafter "Officer Jacks"), Corey Kroes (hereinafter "Officer Kroes") , Rick Bungert (hereinafter "Officer

Bungert"), Luke Lee (hereinafter "Officer Lee"), Jacob Ivy (hereinafter "Officer Ivy"), Shannon

D. Jones (hereinafter "Detective Jones"), Richard Menzel (hereinafter "Officer Menzel"),

Edward Flynn (hereinafter "Chief Flynn"), Ramon Galaviz (hereinafter "DI Galaviz") and Victor

E. Beecher (hereinafter "Captain Beecher", (collectively, "City defendants"), in support of their

motion for summary judgment. Said City defendants respectfully assert that all of plaintiffs'

claims against them involve legal standards and undisputed facts, and that they thus may now be

resolved via the summary judgment process.

## II.     STATEMENT OF THE CASE

The Amended Complaint was filed in this Court by plaintiffs on March 25, 2013.

Plaintiffs are the Estate of Mr. Perry and his son, James Franklin Perry, Jr. Plaintiffs raised

various federal and state law claims against the City defendants, Milwaukee County, Sheriff

Clark, and various county employees (hereinafter the "County defendants). The plaintiffs have

since dismissed the claims they initially pleaded against Aurora Sinai Medical Center, Dr.

Coogan, Nurse Potterton, and their insurance providers.

As to the City defendants, plaintiffs' primary claim is that they violated Mr. Perry's 8th

and 14th Amendment rights by being deliberately indifferent to Mr. Perry's "serious-acute-

obvious medical condition," that they failed to provide him with necessary medical assistance,

and that Mr. Perry died as a result. Plaintiffs claim that the actions of the various City defendants

also violated state law. Additionally, plaintiffs claim that the violations of law committed by

individual City defendants were caused by unlawful policies, customs, training and supervision

promulgated by the City's policymakers. Plaintiffs claim that they were injured and damaged as

a result of the claimed violations of federal and state law.

The City defendants assert that Milwaukee police personnel all have been trained regarding the current and standard policies and procedures regarding caring for arrestees in the custody of the MPD, including those which pertain specifically to providing medical care to an arrestee who appears to be experiencing a "serious-acute-obvious" medical condition. Therefore, no policymaker was "deliberately indifferent" to the medical needs of the citizens with whom MPD officers would come into contact. Furthermore, the City defendants assert that Mr. Perry had been brought to Sinai for medical treatment after he experienced a seizure at the PPS, he was provided with medication and other medical treatment by medical practitioners there, and he was subsequently medically cleared and released back into the custody of MPD officers. While still at the hospital, Mr. Perry could not dress or walk by himself, and he was not fully responsive to the transporting officers, but they were reassured by Sinai personnel that his condition was due to the effects of the anti-seizure medication. Mr. Perry was resistive and combative upon arrival back at the PPS, and he had to be carried to a single-person cell. He was held there for approximately and hour and fifteen minutes, while his paperwork was completed. Mr. Perry was then transported to the CJF, where his condition began to rapidly deteriorate, and ultimately, he collapsed. The City defendants assert that from the time that Mr. Perry was released from Sinai hospital, until he collapsed at the CJF, his condition did not appear to change. No officer perceived during that time that Mr. Perry had lost consciousness, was bleeding profusely, or was otherwise experiencing a "serious-acute-obvious" medical condition, which required additional medical care. The City defendants therefore assert that they were not "deliberately indifferent" to Mr. Perry's medical needs, and that they are entitled to summary judgment and dismissal at this time regarding all claims raised against them.

## III. DEFENDANTS' PROPOSED FINDINGS OF FACT

**The Parties**

1.      The Estate of Mr. Perry and his minor son, James Franklin Perry, Jr., claim that certain of Mr. Perry's constitutional rights were violated by Milwaukee police personnel. (Amended Complaint.)

2.      Chief Flynn has been employed as the Chief of Police for the Milwaukee Police Department since January, 2008.  (Amended Complaint; Answer.)

3.      Ramon Galaviz retired in 2013 as a Deputy Inspector, after more than 30 years of service with the Milwaukee Police Department.. (Amended Complaint; Galaviz Aff., ¶ 1.)

4.      Victor Beecher is currently employed as a captain for the Milwaukee Police Department, and from May 16, 2010 until September 19, 2011, he was assigned as a lieutenant to the training academy. (Amended Complaint; Beecher Aff., ¶¶ 1-3.)

5.      Karl Robbins retired in 2013 after more than 25 years of MPD service, but, at all times relevant to the subject matter of this litigation, he was employed as a police lieutenant with the Milwaukee Police Department,  (Amended Complaint; Robbins Aff., ¶¶ 1-3.)  Shannon Jones was a detective who also retired in 2013 after 25 years of service, and at all times relevant to the subject matter of this litigation, he was acting within the scope of his employment with the MPD (Amended Complaint; Jones Aff., ¶ 1-3.)

6.      Richard Lopez, Frank Salinsky, Stephon Bell, Margarita Diaz-Berg, Alexander C. Ayala, Froilan Santiago, Crystal Jacks, Corey Kroes, Rick Bungert, Luke Lee, Jacob Ivy, and Richard Menzel were at all times material hereto the subject matter of this litigation employed as police officers for the Milwaukee Police Department. (Amended Complaint; Lopez Aff. ¶¶ 1-3; Salinsky Aff. ¶¶ 1-3; Bell Aff. ¶¶ 1-3; Diaz-Berg Aff. ¶¶ 1-3; Ayala Aff. ¶¶ 1-3; Santiago Aff. ¶¶

5

1-3; Jacks Aff. ¶¶ 1-3; Kroes Aff. ¶¶ 1-3; Bungert Aff. ¶¶ 1-3; Lee Aff. ¶¶ 1-3; Ivy Aff. ¶¶1-3; Menzel Aff. ¶¶ 1-3.)

7.     The City of Milwaukee is a municipal corporation, which currently employs Chief Flynn, Richard Lopez, Frank Salinsky, Stephon Bell, Margarita Diaz-Berg, Alexander C. Ayala, Froilan Santiago, Crystal Jacks, Corey Kroes, Rick Bungert, Luke Lee, Jacob Ivy, Richard Menzel and Victor E. Beecher, and which at all times relevant to this litigation employed Karl Robbins, Shannon D. Jones and Ramon Galaviz, who are now retired.  All City defendants at all times material to the subject events were acting within the scope of their employment and under color of law.  (Amended Complaint; Answer.)

**MPD Policies and Training**

8.     The MPD training academy staff trains officers using its own Standard Operating Procedures (SOPs) and Code of Conduct, state statutes, and pertinent caselaw, along with state-board-mandated training guides, which are published by the Wisconsin Department of Justice, to present officers with MPD policies regarding many subject matter areas, including the provision of medical assistance to prisoners, and conducting investigations regarding deaths of arrestees which occur while they are in MPD custody.  (Flynn Aff., ¶ 3.)

9.     All City of Milwaukee police officers receive extensive training, which is consistent with the mandates of the Wisconsin Department of Justice Law Enforcement Standards Board.  (Flynn Aff., ¶ 4.)

10.     All MPD officers complete a 22 to 23-week intensive police recruit training course at the Milwaukee Fire and Police Training Academy.  (Flynn Aff., ¶ 5.)

11.     After a police officer successfully completes recruit training at the training academy, the officer is assigned to a district police station, where field training officers are assigned to work with the new officer.  (Flynn Aff., ¶ 6.)

12.     During field training, the officer receives on-the-job training regarding Milwaukee Police Department SOPs, policies, and various techniques utilized by officers. (Flynn Aff., ¶ 7.)

13.     Field training officers ensure that their trainees are familiar with Milwaukee Police Department SOPs, policies and trained techniques.  (Flynn Aff., ¶ 8.)

14.     In addition to the training received during both recruit training and field training, officers also receive annual continuing or "in-service" training on various topics, including the provision of medical assistance to prisoners, and other issues related to search and seizure laws. (Flynn Aff., ¶ 9.)

15.     Milwaukee Police Department officers are provided with any updates or revisions of MPD policies shortly after they are issued.  (Flynn Aff., ¶ 10.)

16.     Also, officers routinely receive additional training regarding various policies and procedures during both roll call announcements and debriefings regarding incidents that may have occurred involving department members.  (Flynn Aff., ¶ 11.)

17.     Representatives of the Milwaukee Police Department routinely evaluate issues, and reevaluate existing policies and SOPs, to determine if any revisions are warranted by existing circumstances or events.  (Flynn Aff., ¶ 12.)

18.     The Milwaukee Police Department has established policies and Standard Operating Procedures (SOPs) to provide guidance to officers regarding a variety of issues, like

providing first responder assistance, which includes first aid and CPR, and conducting investigations regarding in-custody deaths. (Flynn Aff., ¶ 13.)

19.     MPD SOP 090 governs prisoners, and it is part of training received by all MPD personnel. (Flynn Aff. ¶ 16; MacGillis Aff. ¶ 25 and attached Exhibit G, which is a copy of SOP 090-Prisoners that was in effect on September 13, 2010.)

20.     Milwaukee Police Department officers are provided with first responder training and CPR training, and that their duties as first responders include 1.) checking the scene; 2.) calling for additional resources; and 3.) provide care for life-threatening conditions until more advanced medical caregivers arrive. (Flynn Aff., ¶¶ 17-20; Lopez Aff., ¶ 5; Salinsky Aff., ¶ 5; Bell Aff., ¶ 5; Diaz-Berg Aff., ¶ 5; Ayala Aff., ¶ 5; Santiago Aff., ¶ 5; Robbins Aff., ¶ 5; Jacks Aff., ¶ 5; Kroes Aff., ¶ 5; Bungert Aff., ¶ 5; Lee Aff., ¶ 5; Ivy Aff., ¶ 4; MacGillis Aff. ¶ 43-50 and Exhibit I.)

21.     Milwaukee Police Department officers are trained that some examples of life-threatening conditions or medical emergencies include stroke, seizure, diabetic emergency, poisonings, allergic reaction, and shock. (Flynn Aff. ¶¶ 20-21; Lopez Aff., ¶ 5; Salinsky Aff., ¶ 5; Bell Aff., ¶ 5; Diaz-Berg Aff., ¶ 5; Ayala Aff., ¶ 5; Santiago Aff., ¶ 5; Robbins Aff., ¶ 5; Jacks Aff., ¶ 5; Kroes Aff., ¶ 5; Bungert Aff., ¶ 5; Lee Aff., ¶ 5; Ivy Aff., ¶ 4; MacGillis Aff. ¶ 43-50 and Exhibit I.)

22.     Milwaukee Police Officers are trained that they cannot give medication to prisoners, and also that they can only render first aid or other first-responder-type-assistance if a subject, including prisoners and citizens alike, is experiencing a life-threatening condition or medical emergency, but that they should do so only until medical providers who have a higher level of training arrive on scene. (Flynn Aff. ¶¶ 21-25; Lopez Aff., ¶ 9; Salinsky Aff., ¶ 9; Bell

Aff., ¶ 9; Diaz-Berg Aff., ¶ 9; Ayala Aff. ¶, 9; Santiago Aff., ¶ 9; Robbins Aff., ¶ 9; Jacks Aff., ¶ 9; Kroes Aff., ¶ 9; Bungert Aff., ¶ 9; Lee Aff., ¶ 9; Ivy Aff., ¶ 8; MacGillis Aff. ¶ 50 and Exhibit I.)

23.    All defendant officers successfully completed their MPD recruit training, field training, and in-service training, and throughout their careers, they maintained their certifications to act as a law enforcement officers in the State of Wisconsin.  (Lopez Aff., ¶ 4; Salinsky Aff., ¶ 4; Bell Aff., ¶ 4; Diaz-Berg Aff. ¶ 4; Ayala Aff., ¶ 4; Santiago Aff., ¶ 4; Robbins Aff., ¶ 4; Jacks Aff., ¶ 4; Kroes Aff., ¶ 4; Bungert Aff., ¶ 4; Lee Aff., ¶ 4; Ivy Aff., ¶, 3.)

**MPD Supervision**

24.    It is the policy of Chief Flynn and the Milwaukee Police Department that any suspension or discipline administered to an employee is based on fairness, and is consistent with the mandates of Wisconsin law.  (Flynn Aff., ¶ 26.)

25.    Formal discipline may be imposed to punish employee behavior and/or to deter future behavior which violates Milwaukee Police Department SOPs, rules, regulations, or Code of Conduct.  (Flynn Aff., ¶ 27.)

26.    The types of discipline which might be issued to a Milwaukee Police Department officer include a district level written reprimand, an official reprimand, suspension without pay, demotion, and termination.  (Flynn Aff., ¶ 28.)

27.    Milwaukee Police Department officers and supervisory staff are evaluated and reviewed on a regular basis. (Flynn Aff., ¶ 29.)

28.    If a supervisor determines that an officer has not complied with policies or procedures, that supervisor evaluates whether the violation warrants discipline and/or retraining,

and the officer would be informed of the violation, and may be retrained on the policy or procedure or formally disciplined. (Flynn Aff., ¶ 30.)

29.    Chief Flynn, as Chief of Police for the Milwaukee Police Department, is responsible for the leadership, performance, efficiency, and general good conduct of the Milwaukee Police Department. (Flynn Aff., ¶ 31.)

30.    Chief Flynn is not involved in, nor does he have knowledge of, the investigation of all complaints raised against, disciplinary issues involving, or the specific day to day operations or activities, of each and every employee of the Milwaukee Police Department. (Flynn Aff., ¶ 32.)

31.    Currently, there are approximately 2550 people employed by the Milwaukee Police Department, and approximately 1900 of them are sworn officers. (Flynn Aff., ¶ 33.)

32.    Staffing has been at this level fairly consistently since 2008. (Flynn Aff., ¶ 34.)

33.    Chief Flynn is not aware of any incident wherein Milwaukee police officers demonstrated that they did not understand either Milwaukee Police Department policies, or Wisconsin law, related to the provision of medical care to prisoners in their custody, including those prisoners held at the PPS, or that additional training was needed by officers regarding related issues. (Flynn Aff., ¶ 42.)

34.    MPD policy and training requires that officers provide first responder medical care to any person experiencing a life-threatening condition or medical emergency, and that if a prisoner experiences a life-threatening condition or medical emergency, emergency medical care is to be summoned to provide more advanced medical care for the prisoner and/or transport that prisoner to a medical facility for treatment as soon as practicable. (Flynn Aff., ¶ 43; MacGillis Aff., ¶ 50 and Exhibits G and I.)

35.    All critical incidents, which includes in custody deaths, are thoroughly investigated by the most experienced and well trained investigators of the Milwaukee Police Department. (Flynn Aff., ¶¶ 35-37, 41; MacGillis Aff. ¶¶ 9-10.)

36.    Specifically with regard to in custody deaths, a thorough investigation is conducted, and supervisory staff then meet to discuss the information gathered through the course of the investigation. (Flynn Aff., ¶¶ 38-41; MacGillis Aff. ¶ 11.)

37.    During the course of his tenure, Chief Flynn has been advised of critical incidents almost immediately after they occur. (Flynn Aff., ¶¶ 40-41; MacGillis Aff. ¶¶ 11-12.)

38.    He is briefed throughout the course of the investigations which stem from critical incidents. (Flynn Aff., ¶¶ 40-41; MacGillis Aff. ¶¶ 11-12.)

39.    Furthermore, he is briefed regarding the information gathered from the investigations, and also any recommendations made by supervisors who have reviewed the investigations. (Flynn Aff., ¶¶ 40-41; MacGillis Aff. ¶¶ 11-12.)

40.    Supervisory staff, including the chief, review critical incident investigations to determine if any criminal charges might potentially be issued, or if any disciplinary action should be taken. (Flynn Aff., ¶ 41; MacGillis Aff. ¶¶ 11-12.)

41.    Furthermore, each critical incident is evaluated to determine if the underlying events suggest a need for different or additional training, or for the revision of existing policies or the development of new policies, which would provide guidance to personnel involved in similar situations in the future. (Flynn Aff., ¶ 41; MacGillis Aff. ¶¶ 11-12.)

42.    There are no state-mandated guidelines, relative to the training of officers who perform various functions and responsibilities at a temporary lockup facility which includes the PPS. (MacGillis Aff. ¶ 56.)

11

43.     The training of officers who are assigned to the PPS is done through a temporary holding facility class, and by on-the-job training. (MacGillis Aff. ¶ 57 and Exhibit L, which is a copy of the materials used to teach the temporary holding facility class.)

44.     PPS personnel, as with any personnel attending to any assignment, are trained relative to first responder, first aid and CPR training. (MacGillis Aff. ¶ 58.)

45.     Furthermore, the personnel assigned to the PPS are trained during the Temporary Holding Facility Class regarding SOP 090-Prisoners, and they are given hands-on instruction relative to properly searching prisoners, properly moving prisoners from one location to another within the PPS, properly admitting and releasing inmates from the PPS, and properly monitoring inmates who are located in the PPS. (MacGillis Aff. ¶ 59 and Exhibit L.)

46.     One of the many things that are trained to PPS personnel are how to conduct wellness checks of the cell block areas. (MacGillis Aff. ¶ 60.)

47.     In short, PPS personnel are trained that they are responsible for conducting wellness checks and that they should check on the status of each and every prisoner at least four times an hour. They are trained that they should stagger the times that they conduct their wellness checks so that prisoners cannot anticipate when PPS personnel will be coming by, and thus they are deterred from engaging in inappropriate activity for fear that they might be caught in the context of a wellness check. (MacGillis Aff. ¶ 61; Bell Aff., ¶¶ 11-12; Ayala Aff., ¶ 12.)

48.     PPS personnel initial a card to indicate what times they conduct their wellness checks. Attached to the MacGillis as affidavit as Exhibit C is a copy of the daily cell block check that was prepared from the timeframe of 4:00 a.m. on September 13, 2010 to 10:46 p.m. on September 13, 2010, which indicates that between 7:00 p.m. and 8:43 p.m., Mr. Perry's cell was checked seven times. (MacGillis Aff. ¶ 62.)

**The Events of September 13, 2010**

49.    On September 13, 2010 at approximately 2:12 a.m., Milwaukee police officers stopped a motor vehicle in which James F. Perry was a passenger.  (MacGillis Aff. ¶ , Exh. B, p. MPD 00039.)

50.    The motor vehicle matched the description of a vehicle that was stolen in the context of an armed robbery which had happened within hours of the time of the stop. (MacGillis Aff. ¶ , Exh. B, p. MPD 00039.)

51.    Subsequently, Mr. Perry was taken into custody regarding the officers' suspicion that he was the perpetrator of the armed robbery.  (MacGillis Aff. ¶ , Exh. B, p. MPD 00039.)

52.    Mr. Perry was booked into the Milwaukee Police Department Prisoner Processing Section (PPS or "City Jail") at approximately 5:36 a.m..  (MacGillis Aff. ¶ , Exh. F, p. F-1)

53.    While Mr. Perry was being booked into the PPS, a booking officer filled in a medical screening form, pursuant to information he received directly from Mr. Perry, and the form indicated that Mr. Perry told the booking officer that he suffered from seizures, that he takes medication two times a day, and that he had not taken his nightly dosage.  (MacGillis Aff. ¶ , Exh. B, p. MPD 00039, Exh. D, p. D-12.)

54.    Mr. Perry was placed into the male "bullpen", which is a large cell that holds several male prisoners at the PPS.  (MacGillis Aff. ¶ , Exh. B, p. MPD 00039.)

55.    Mr. Perry suffered a seizure while in the bullpen, fell and hit his head.  (MacGillis Aff. ¶ , Exh. B, p. MPD 00039.)

56.    An ambulance was summoned to the PPS, and emergency medical technicians responded to the medical needs of Mr. Perry.  (MacGillis Aff. ¶ , Exh. B, pp. MPD 00039-40.)

57.     At approximately 3:21 p.m. Mr. Perry was then transported by Bell Ambulance to the Aurora Sinai Medical Center (Sinai) for treatment.  (MacGillis Aff. ¶ , Exh. F, p. F4; Exh. B, pp. MPD 00039-40.)

58.     Officers Crystal Jacks and Corey Kroes accompanied Mr. Perry to the hospital, and Officer Kroes rode in the ambulance with Mr. Perry, while Officer Jacks followed in their squad car.  (Jacks Aff., ¶¶ 10-16; Kroes Aff., ¶¶ 10-15.)

59.     When Mr. Perry was first being treated at the hospital, he was able to walk on his own, he was alert, and he was responsive to the officers and hospital personnel.  (Jacks Aff., ¶¶ 16-24; Kroes Aff., ¶¶ 16-23.)

60.     While at the hospital, Mr. Perry experienced at least two additional seizures.  (Jacks Aff., ¶¶ 24-34; Kroes Aff., ¶¶ 24-30.)

61.     Mr. Perry was medicated with Dilantin, which is a common anti-seizure medication. (Jacks Aff., ¶ 28; Kroes Aff., ¶ 31; see also Perry's hospital discharge records at MacGillis Aff., Exhibit D.)

62.     During the course of time that Mr. Perry was being treated at the hospital, the officers perceived that his condition was getting worse, rather than better.  (Jacks Aff., ¶¶ 25-44; Kroes Aff., ¶¶ 27-39.)

63.     When they first arrived at the hospital, Mr. Perry was conscious, talking, appropriately responsive to their questions, and able to walk by himself.  (Jacks Aff., ¶¶ 16-24; Kroes Aff., ¶¶ 16-23.)

64.     By the time he recovered from his second seizure, it appeared to be difficult for Mr. Perry to comprehend and then respond to questions, he appeared drowsy, and he ultimately was unable to walk or dress by himself.  (Jacks Aff., ¶¶ 25-44; Kroes Aff., ¶¶ 27-39.)

65. Officers Jacks and Kroes questioned hospital personnel about Mr. Perry's condition, and they were advised that Mr. Perry's symptoms were a result of the effects of the Dilantin in his body. (Jacks Aff., ¶ 36; Kroes Aff., ¶¶ 33, 35.)

66. The medical personnel advised the officers that they could expect that Mr. Perry would become sleepy, and want to sleep.  (Jacks Aff., ¶ 36; Kroes Aff., ¶ 33.)

67. The practitioners at Sinai medically cleared Mr. Perry for release back into police custody.  (See hospital discharge papers at MacGillis Aff., Exh. D; Jacks Aff., ¶ 37; Kroes Aff., ¶ 33.)

68. Officers Kroes and Jacks assisted Mr. Perry with putting on his clothes and shoes, took him to their squad car in a wheelchair, and assisted him into the squad car.  (Jacks Aff., ¶¶ 38-44; Kroes Aff., ¶¶ 34-39.)

69. The officers then drove a few minutes to return to the PPS.  (Jacks Aff., ¶ 45; Kroes Aff., ¶ 40.)

70. Mr. Perry's condition did not change from the time he left the hospital room until the time he was in the PAB parking garage.  (Jacks Aff., ¶ 46; Kroes Aff., ¶ 41.)

71. The officers waited a few minutes in the basement parking area of the PPS building until Officers Bungert and Santiago came to assist them with Mr. Perry.  (Santiago ¶¶ 10-12; Jacks Aff., ¶ 45; Kroes Aff., ¶ 40.)

72. Officers Kroes, Jacks, Bungert and Santiago had to carry Mr. Perry onto the elevator which brought them up to the floor on which the PPS is located.  (Santiago ¶¶ 20-25; Jacks Aff., ¶¶ 44-45; Kroes Aff., ¶¶ 42-43; Bungert ¶¶ 11-12.)

15

73.     The officers then sat Mr. Perry on the floor near a bench located in the hallway area outside of the booking room at the PPS.  (Santiago ¶ 29; Jacks Aff., ¶ 49; Kroes Aff., ¶¶ 43-44.)

74.     While Mr. Perry was seated on the floor outside of the booking room, officers heard him grunting, making noises and making statements, observed that he did not respond to their directions, saw him kicking, felt resistive tension in his arms and legs, and smelled the odor of feces and/or urine.  (Santiago ¶¶ 29-34; Jacks Aff., ¶¶ 51, 55; Kroes Aff., ¶¶ 46, 49; Bungert ¶¶ 17-18; Diaz-Berg Aff., ¶ 12; Lee Aff., ¶ 15; Robbins Aff., ¶¶ 17-19; Ayala Aff., ¶¶ 16-19.)

75.     Officers perceived that Mr. Perry was being resistive or combative with regard to their efforts to detain him at the PPS.  (Diaz-Berg Aff., ¶¶ 12, 16; Lee Aff., ¶ 15; Santiago ¶ 32; Ivy Aff., ¶ 11; Ayala Aff., ¶ 24.)

76.     Also, while Mr. Perry was in a seated position, he began to spit and drool.  (Jacks Aff., ¶ 50; Kroes Aff., ¶ 45.)

77.     In response to the potential biohazard that this action created, an expectorant shield (also often referred to as a "spit mask") was placed over his head.  (Jacks Aff., ¶ 52; Kroes Aff., ¶ 47; Ayala Aff., ¶ 21.)

78.     Police Aide Ivy obtained an expectorant shield from a storage room, and assisted officers in placing it over Mr. Perry's head.  (Diaz-Berg Aff., ¶ 15; Ivy Aff. ¶ 13.)  (Photographs of the expectorant shield worn by Mr. Perry are attached to the Lappen Affidavit as Exhibit D.)

79.     The expectorant shield is made out of lightweight and flexible mesh, and there is a paper-towel-like material that is placed over the mouth area.  An expectorant shield does not inhibit hearing or vision.  Rather, it is a barrier, and simply prevents the subject from being able

to expel bodily fluids from his mouth and striking other people with same. (MacGillis Aff., ¶¶ 28-31; Lappen Aff., ¶ 6 and Exhibit D.)

80. Ultimately, Lieutenant Robbins, the PPS supervisor, along with the officers assigned to the jail, determined that they would place Mr. Perry in a single cell, because by that time, he was perceived as being combative, and they did not want to risk any injury to other prisoners. (Diaz-Berg Aff., ¶¶ 13-18; Robbins Aff. ¶ 25.)

81. Another reason why Mr. Perry was placed in the cell was because earlier in the day, when he had suffered his seizure in the bullpen, he had fallen off the bench and hit his head on the floor. (Diaz-Berg Aff., ¶¶ 13-18.)

82. Therefore, the jailers chose cell A3 for Mr. Perry's use, because it was a cell that had no bed or bench from which he could fall. (Diaz-Berg Aff., ¶ 18.)

83. Mr. Perry was carried from the bench area outside of the booking room to cell A3 by Officers Kroes, Jacks, Bungert, and Santiago. (Jacks Aff., ¶ 57; Kroes Aff., ¶ 50.)

84. Officer Lee, who happened to be at the PPS when Mr. Perry arrived, also assisted in carrying Mr. Perry into cell A3. (Lee Aff., ¶¶ 10-18.)

85. Officer Ayala was assigned to the PPS that night, he assisted in monitoring Mr. Perry while he was seated on the floor outside the booking room, and he followed other officers as they carried Mr. Perry to cell A3. (Ayala Aff., ¶¶ 10-11, 15-29.)

86. From the time the above-noted officers first observed Mr. Perry at the PPS, until the time he was placed in cell A3, they did not observe any change in Mr. Perry's condition which suggested to them that he was experiencing a life-threatening condition or medical emergency. (Jacks Aff., ¶ 60; Kroes Aff., ¶ 53; Diaz-Berg Aff., ¶ 16; Lee Aff., ¶ 20; Santiago Aff., ¶ 36; Bungert Aff., ¶¶ 21-22; Ivy Aff., ¶ 15; Robbins Aff., ¶¶ 18, 23, 33-34.)

87. Officers Kroes and Jacks attributed Mr. Perry's change in condition while he was still at the hospital to the fact that he had experienced several seizures that day, and he had been given anti-seizure medication. (Jacks Aff., ¶¶ 60-63; Kroes Aff., ¶¶ 53-56.)

88. Mr. Perry's handcuffs and leg shackles were removed when he was placed in cell A3. (Krones Aff., ¶ 51.)

89. Officer Margarita Diaz-Berg was assigned as the assistant jailer at the PPS on the subject date. (Diaz-Berg Aff., ¶ 10 )

90. Among Officer Diaz-Berg's job responsibilities was conducting regular wellness checks of each prisoner kept at the PPS. (Diaz-Berg Aff., ¶ 17; Ayala Aff., ¶ 12.)

91. Officer Diaz-Berg conducted those regular cell checks of Mr. Perry, and did not observe that he was experiencing any life-threatening condition while he was incarcerated in cell A3 at the PPS, and Officer Bell and Officer Ayala also checked on Mr. Perry, and did not observe any such condition. (Diaz-Berg Aff., ¶ 17.; See also Bell Aff., ¶¶ 17-20; Ayala Aff., ¶¶ 27-39.)

92. Even though Mr. Perry was placed into cell A3 with the spit mask still on his head, he had apparently removed same because when Officer Diaz-Berg made her cell checks, she was able to see his face. (Diaz-Berg Aff., ¶¶ 19-20.)

93. Mr. Perry was kept in cell A3 until approximately 8:34 p.m. on September 13, 2010. (Diaz-Berg Aff., ¶ 22; Salinsky Aff., ¶¶ 11-12; Lopez Aff., ¶¶ 11-12.)

94. At that time, he was removed from his cell by Officers Frank Salinsky and Richard Lopez, who then transferred Mr. Perry to the nearby Milwaukee County Criminal Justice Facility (CJF), which was located approximately one block, or a one-minute drive, from the PPS. (Diaz-Berg Aff., ¶ 23; Salinsky Aff., ¶¶ 11-12, 23; Lopez Aff., ¶ 29.)

18

95.     When Mr. Perry was removed from cell A3, officers observed that his spit mask was still secured around his neck, but that he had removed it from his face.  (Salinsky Aff., ¶ 18; Lopez Aff., ¶¶ 13.)

96.     As Mr. Perry was moved from cell A3 to the elevator which would take him and the officers to their conveyance vehicle in the parking garage, he was walking on his own, but was escorted with an officer on each side.  (Diaz-Berg Aff., ¶¶ 26-27; Ayala Aff., ¶¶ 34-40; Salinsky Aff., ¶ 21; Lopez Aff., ¶¶ 25-27; Lappen Aff. ¶ 8 and Exh. F.)

97.     While Mr. Perry was at the PPS, he did not appear to officers to have experienced a life-threatening condition or medical emergency.  (Diaz-Berg Aff., ¶¶ 29-30; Ayala Aff., ¶ 39; Salinsky Aff., ¶¶ 14-24; Lopez Aff., ¶¶ 39-48.)

98.     In fact, his overall condition appeared to improve by the time he left for the CJF.  (Lappen Aff. ¶ 8 and Exh. F; Ayala Aff., ¶ 39.)

99.     During the elevator trip down to the parking area, Mr. Perry continued to be ambulatory.  ( Salinsky Aff., ¶¶ 21-25 ; Lappen Aff. ¶ 8 and Exh. F.)

100.    Upon arrival in the CJF sally port area, Mr. Perry emerged from the conveyance vehicle.  (Salinsky Aff., ¶ 26; Lopez Aff., ¶ 35.)

101.    At first, Mr. Perry walked under his own power, but just after he passed through the doors into the "pre-book" area of the CJF, Mr. Perry's knees buckled.  (Salinsky Aff., ¶ 28 ; Lopez Aff., ¶¶ 35-39; Lappen Aff. ¶ 8 and Exh. F.)

102.    Officers, with the assistance of CJF personnel, brought Mr. Perry over to the nurse's desk.  (Bell Aff., ¶¶ 28-29; Salinsky Aff., ¶ 29; Lopez Aff., ¶¶ 39-40.)

103.    Mr. Perry was then brought to and seated on a bench which was located across from the nurse's desk.  (Bell Aff., ¶¶ 28-29; Lopez Aff., ¶ 39.)

104. Up until this point in time, Officers Salinsky and Lopez did not perceive that Mr. Perry was experiencing a life-threatening condition. (Salinsky Aff., ¶ 24; Lopez Aff., ¶¶ 39-48.)

105. Rather, Officer Lopez believed Mr. Perry was simply being uncooperative, because he had seen this type of behavior exhibited before in prisoners as they were being brought into the CJF. (Lopez Aff., ¶ 39.)

106. Police Officer Stephon Bell was present at that CJF pre-book area because his assignment at that time was to act as the liaison officer between MPD and the CJF booking staff. (Bell Aff., ¶ 10.)

107. Officer Bell observed Mr. Perry as he was brought into the pre-book area, and ultimately as he was placed on the bench by the nurse's desk, and at no time did Officer Bell believe that Mr. Perry was experiencing a life-threatening condition. (Bell Aff., ¶¶ 28-35.)

108. Mr. Perry was examined by CJF nursing staff who concluded that they would not admit him into the CJF until he was medically cleared again. (Salinsky Aff., ¶¶ 29-31; Lopez Aff., ¶ 42.)

109. Therefore, Officer Salinsky called for an ambulance to bring Mr. Perry to a medical facility for medical clearance. (Salinsky Aff., ¶ 32.)

110. While CJF and MPD personnel were waiting for the ambulance to arrive, Mr. Perry became unresponsive and unconscious. (Salinsky Aff., ¶¶ 33-34; Lopez Aff., ¶ 43.)

111. Mr. Perry died at the scene. (Salinsky Aff., ¶ 37; Lopez Aff., ¶ 46.)

112. An autopsy was conducted of Mr. Perry on September 14, 2010 by Christopher K. Poulos, M.D., who was an Assistant Medical Examiner at that time, and he found that Mr. Perry died of Coronary Artery Thrombosis (a blood clot in the heart) due to Artherosclerotic

Cardiovascular Disease (hardening of the arteries) and that the manner of death was "natural." (Lappen Aff., Exh. C, Exh. E.)

     113.    Dr. Poulos concluded that Mr. Perry did not have any significant injuries related to his cause of death. (Id., Exh. E, Poulos Depo., pp. 23-24)

     114.    Dr. Poulos found no evidence of 1.) bruising to Mr. Perry's head, either on the surface or below the scalp; 2.) chipped teeth; or 3.) petechiae in his eyes. (Id., pp. 23-24, 49-51; Exh. C. pp. MPD 00250, 0254.)

     115.    Neither Chief Flynn, DI Galaviz, Captain Beecher, Detective Jones, nor Officer Menzel had any contact whatsoever with Mr. Perry. (Flynn Aff., ¶ ; Jones Aff., ¶¶ 1-7; Menzel Aff., ¶¶ 1-4; Galaviz Aff., ¶¶ 2-5; Beecher Aff., ¶¶2-4.)

     116.    Neither Detective Jones nor Officer Bell engaged in any communication for the purpose of conspiring to deprive anyone, including Mr. Perry, of their constitution rights. (Jones Aff., ¶ 7; Bell Aff., ¶ 36.)

## IV.    STATEMENT OF THE ISSUES

     1.    Should any claims raised against Chief Flynn, DI Galaviz, Captain Beecher, Detective Jones and Officer Menzel be dismissed, because they were not personally involved with the events which allegedly caused plaintiffs' damages and injuries?

     2.    Should any personal liability claims raised against Chief Flynn regarding supervision fail as a matter of law?

     3.    Does plaintiffs' 8th Amendment claim fail?

     4.    Does plaintiffs' claim under Section 6 of the Wisconsin Constitution fail?

     5.    Can plaintiffs maintain a *Monell* training and/or supervision claim against the City of Milwaukee?

6.      Does any negligence claim fail under Wisconsin law?

7.      Does plaintiffs' wrongful death claim raised under Wis. Stats. Sec. 895.03 fail as a matter of law?

8.      Does plaintiffs' conspiracy claim against Detective Jones and Officer Bell fail?

9.      Are defendants entitled to the defense of either qualified immunity or discretionary act immunity regarding any of plaintiff's claims?

## V.      STANDARD OF REVIEW

### A.      Summary Judgment Generally

The City defendants seek summary judgment, pursuant to Rule 56, Fed.R.Civ.P.  That rule reads in relevant part:

> (a)      . . . The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

A party seeking summary judgment must demonstrate that no genuine issue of material fact exists for trial and that the movant is entitled to judgment as a matter of law.  *Hannon v. Turnage*, 892 F.2d 653, 656 (7th Cir. 1990).  If that showing is made and the motion's opponent would bear the burden at trial on the matter that forms the basis of the motion, the opponent must come forth with evidence to show what facts are in actual dispute.  *Whetstine v. Gates Rubber Co.*, 895 F.2d 388, 392 (7th Cir. 1990).  If he or she fails to do so, summary judgment is proper. *National Diamond Syndicate, Inc. v. UPS*, 897 F.2d 253, 260 (7th Cir. 1990).  A genuine factual issue exists only when there is sufficient evidence for a jury to return a verdict for the motion's opponent.  *Santiago v. Lane*, 894 F.2d 218, 221 (7th Cir. 1990).  Speculation, hearsay or conclusory allegations will not suffice to defeat summary judgment. *Stagman v. Ryan,* 176 F.3d

986, 995 (7th Cir. 1999)  Summary judgment should be granted if no reasonable jury could return a verdict for the motion's opponent.  *Krist v. Eli Lilly and Co.*, 897 F.2d 293, 296 (7th Cir. 1990).

The parties cannot rest on mere allegations in the pleadings, *Koclanakis v. Merrimac Mut. Fire Ins. Co.*, 899 F.2d 673, 675 (7th Cir. 1990), or upon conclusory allegations in affidavits.  *Palucki v. Sears, Roebuck & Co.*, 879 F.2d 1568, 1572 (7th Cir. 1989).  The court must draw any permissible inferences from the materials before it in favor of the non-moving party, *Johnson v. Pelker*, 891 F.2d 136, 138 (7th Cir. 1989), as long as the inferences are reasonable.  *Spring v. Sheboygan Area School District*, 865 F.2d 883, 886 (7th Cir. 1989).  The non-moving party must show that the disputed fact is material, or outcome-determinative, under applicable law.  *Local 1545, United Mine Workers v. Inland Steel Coal Co.*, 876 F.2d 1288, 1293 (7th Cir. 1989) (emphasis added).  "As to materiality, the substantive law will identify which facts are material.  Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202, 211 (1986).  Furthermore, summary judgment is proper against a plaintiff who fails to establish an element of his claim on which he will bear the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265, 273 (1986).

Justice White, in *Anderson*, set forth the Supreme Court's position on what constitutes a genuine issue of material fact which precludes the entry of summary judgment.  Justice White stated "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  477 U.S. at 247-248.  There is no issue for trial unless there is

23

sufficient evidence favoring the non-moving party for a jury to return a verdict for that party. *Id*. at 248.

The Court also indicated in *Anderson* that it has long been the law that judges are not required to submit a question to the jury merely because some evidence has been introduced by the party bearing the burden of proof. Such issues need only be submitted where the evidence is sufficient to warrant a jury verdict in favor of the party in question. This mandate requires more than a scintilla of evidence. Rather, it requires an inquiry by the court before submitting matters to juries as to whether there is sufficient evidence upon which a jury could properly proceed to find a verdict for the party bearing the burden of proof. *Id*. at 251. It is incumbent upon this court to grant summary judgment if there is no genuine issue as to any material fact, and if the moving defendants are entitled to judgment as a matter of law.

### B. Summary Judgment and Qualified Immunity

The threshold question of qualified immunity is properly resolved on summary judgment because its analysis is ostensibly objective. *See Rakovich v. Wade*, 850 F.2d 1180, 1203-04 (7th Cir. 1988). Although intertwined with the facts of a case, the qualified immunity issue is a question of law for the court. *Alvarado v. Picur*, 859 F.2d 448, 452 (7th Cr. 1988).

In *Hunter v. Bryant*, 502 U.S. 224, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991), the United States Supreme Court stressed the importance of resolving immunity questions at the earliest possible stage of litigation. *Id*., 116 L.Ed.2d at 595. The Supreme Court reversed the Ninth Circuit's denial of summary judgment, holding

> [t]he decision of the Ninth Circuit ignores the import of these decisions. The court of appeals' confusion is evident from its statement that '[w]hether a reasonable officer could have believed he had probable cause is a question for the trier of fact, and summary judgment … based on lack of probable cause is proper only if there is only one reasonable conclusion a jury could reach.' This statement of law is wrong for two reasons. First, it routinely places the question

of immunity in the hands of the jury. Immunity ordinarily should be decided by the court long before trial. Second, the court should ask whether the agents acted reasonably under settled law in the circumstances, not whether another reasonable, or more reasonable, interpretation of the events can be constructed five years after the fact. *Id.* at 595-96 (citations omitted).

## VI. ARGUMENT

### A. Any Claims Raised Against Chief Flynn, Deputy Inspector Galaviz, Captain Beecher, Detective Jones and Officer Menzel Must Be Dismissed, Because They Were Not Personally Involved With The Events Which Allegedly Caused Mr. Perry's Damages and Injuries.

"[I]ndividual liability under § 1983 can only be based on a finding that the defendant caused the deprivation at issue." *Kelly v. Mun. Courts of Marion County, Inc.*, 97 F.3d 902, 909 (7th Cir. 1996). A viable § 1983 claim against individuals must be supported by evidence of personal involvement in the alleged constitutional deprivation. *Zentmyer v. Kendall County, Ill.*, 220 F.3d 805, 811 (7th Cir. 2000). "A causal connection, or an affirmative link, between the misconduct complained of and the official sued is necessary." *Wolf-Lillie v. Sonquist*, 699 F.2d 864, 869 (7th Cir. 1983). Clearly, neither Chief Flynn, DI Galaviz, Captain Beecher, Detective Jones nor Officer Menzel personally participated in the events which form the basis for plaintiffs' claims. (DPFOF 115.) All of plaintiffs' claimed damages and injuries stem from their allegation that MPD personnel failed to provide proper medical assistance to Mr. Perry. However, none of the above-listed City defendants were personally involved with anything that happened during the course of events which occurred at the PPS, Sinai, and CJF on September 13, 2010, which involved Mr. Perry. (DPFOF 115.) Therefore, all claims raised against Chief Flynn, DI Galaviz, Captain Beecher, Detective Jones and Officer Menzel must be dismissed at this time.

**B. Any Official Capacity Claim Raised Against Chief Flynn, DI Galaviz and Captain Beecher Are Redundant And Should Therefore Be Dismissed.**

Plaintiffs appear to sue Chief Flynn, DI Galaviz and Captain Beecher in both their official and individual capacities. The claims raised against these defendants in their individual capacities were addressed in Section A, above. The claims raised against these defendants in their official capacities appear to be based on allegations of improper supervision and training regarding MPD officers. However, these are the same types of claims contained in plaintiff's *Monell* claims against the City. (See Amended Complaint, ¶¶ 178-227.) Thus, the official capacity claims against Chief Flynn, DI Galaviz and Captain Beecher are equivalent to claims against the City. *See Hafer v. Melo*, 502 U.S. 21, 25 (1991) (Official capacity claims "represent another way of pleading an action against an entity of which an officer is an agent," and are the legal equivalent of claims against the governmental entity). When faced with actions alleging both municipal and official capacity claims, the latter are properly dismissed as redundant. *Smith v. Metro. Sch. District*, 128 F.3d 1014, 1020 n. 3 (7th Cir. 1997); *Tabor v. City of Chicago*, 10 F.Supp. 2d 988, 991 (N.D. Ill. 1998)("claims against ... individuals in their official capacities are redundant because suits against municipal agents in their official capacities are actually suits against the municipality.") Therefore, to the extent that plaintiffs have pleaded any official capacity claims against Chief Flynn, DI Galaviz and Captain Beecher, which essentially allege Monell claims against the City, those official capacity claims should be dismissed.

### C.     Any Personal Liability Claims Raised Against Chief Flynn Regarding Supervision Fail as a Matter of Law.

The plaintiffs' complaint appears to allege a supervisory liability claim against Chief Flynn in his individual capacity.  (See generally, Am. Compl. ¶ 34.)  However, the question of municipal liability and supervisory liability <u>are separate and distinct</u>:

> <u>Supervisory liability is a form of personal liability</u>, while municipal liability entails entity liability.  When dealing with liability of supervisory officials, the question is whether the <u>supervisor's own conduct</u> subjected the § 1983 claimant to the deprivation of a federally protected right.  Thus, like any other official sued under § 1983, supervisory officials may be found liable on the basis of their <u>own personal participation</u> in the wrongful conduct, or for setting the wheels of the unconstitutional conduct in motion.  Nevertheless, the fact that a supervisor is liable for a wrong does not necessarily mean that the municipality should also be found liable because the supervisor's conduct may not reflect municipal policy.  Conversely, the fact that local government is found liable based on enforcement of municipal policy does not necessarily mean that a particular supervisor is liable.  (Martin A. Schwartz, Sec. 1983 Claims & Defenses s. 7.19(2014).)

*Ashcroft v. Iqbal*, 129 S.Ct. 1937 (2009) is the seminal case addressing supervisory liability.  Plaintiff there was detained pending trial, and asserted constitutional claims against various federal officers arising out of treatment received during his detention.  *Id.* at 1942-43. The officials named as defendants in the lawsuit ranged from "the correctional officers who had day-to-day contact with [plaintiff] during the term of his confinement, to the warden of the [facility], all the way" to Mr. Ashcroft, the former Attorney General of the United States, and Mr. Mueller, the Director of the FBI.  *Id.*  Plaintiff claimed that, under a theory of supervisory liability, defendants Ashcroft and Mueller were liable for "knowledge and acquiescence in their subordinates' use of discriminatory criteria to make classification decisions among detainees." *Id.* at 1949.  In other words, he argued that "a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution."  *Id.*

Case 2:12-cv-00664-JPS   Filed 12/01/15   Page 27 of 59   Document 111

The Supreme Court rejected plaintiff's argument, jettisoned the very concept of supervisory liability, and held that a supervisor may be found liable under § 1983 only when the supervisor actually engaged in the unconstitutional conduct. *Id.* the Court explained that "the term supervisory liability is a <u>misnomer</u>," and held that because there is no *respondeat superior* liability under § 1983, a supervisor cannot be held liable for the constitutional wrongs of subordinate employees. *Id.* at 1949 (emphasis added). As with any other government official, supervisors may only be found liable on the basis of their own unconstitutional conduct, *Id.*, and they "cannot be held liable unless they themselves acted on account of a constitutionally protected characteristic." *Id.* at 1952.

Post-2009 decisions from the Seventh Circuit have recognized the stringent requirements set forth in *Iqbal*, and have explained that supervisors may only be held liable if they were "personally responsible for the deprivation of the constitutional rights." *Matthews v. City of East St. Louis*, 675 F.3d 703, 708 (7th Cir. 2012). "To show personal involvement, the supervisor must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see." *Id.* (emphasis added); *see Jones v. City of Chicago*, 856 F.2d 985, 992 (7th Cir. 1988) ("Gross negligence is not enough either. The supervisors must know about the conduct and facilitate it, approve it, approve it, condone it. . . ."); see *Backes v. Vill. of Peoria Heights, Ill.*, 662 F.3d 866 (7th Cir. 2011) (refusing to find supervisory liability despite the fact that the police chief was consulted in the formulation of the plan at issue, gave a recommendation on how to proceed with the plan, and ultimately agreed with the chosen course of action). Based upon this well-established body of law, any supervisory liability claim raised against Chief Flynn cannot survive in the present case. Plaintiffs cannot prove that Chief Flynn

himself engaged in the constitutional conduct, or that he was personally involved in, or observed situations involving, any officer failing to provide proper medical care to a prisoner.

Should the Court allow such a claim to proceed, the City defendants assert that it is a personal liability claim, and as such, it would be subject to the defense of qualified immunity. The defense of qualified immunity shields "government officials performing discretionary functions * * * from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (citations and footnote omitted). The principle behind the doctrine is that if the law at the time was not clearly established, an official could not reasonably be expected to anticipate subsequent legal developments, nor could he or she fairly be said to know that the law forbade conduct not previously identified as unlawful. *Id*. The Seventh Circuit has noted that "[w]hat is important, in the final analysis, is 'whether the legal norms governing [the government official's] behavior were clearly established at the time of the challenged actions.'" *Upton v. Thompson*, 930 F.2d 1209, 1212 (7th Cir. 1991) (citations omitted).

Qualified immunity thus affords a government official broader protection than does the merits defense that no constitutional violation occurred. Regardless of whether the constitutional violation occurred, the government official should prevail if the right asserted by the plaintiff was not clearly established, in the particularized sense that "[t]he contours of the right [were] sufficiently clear that a reasonable official would understand that what he [or she] is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). Even where the rights allegedly violated may be clear at some level of abstraction, the government official should prevail if a reasonable officer could have believed that his or her particular conduct was lawful.

29

*Id.* at 641. This is a fact-specific, objective test. *Id.*; *Harlow*, 457 U.S. at 819. Furthermore, the Seventh Circuit has held that the question asked must be "whether the law was clear in relation to the specific facts confronting the public official when he or she acted." *Apostol v. Landau*, 957 F.2d 339, 341 (7th Cir. 1992) (citations omitted).

Accordingly, the question of whether qualified immunity applies is made up of three analytic components: (1) the identification of the specific right allegedly violated, (2) the determination of whether that right was so "clearly established" as to alert a reasonable official to its constitutional parameters, and (3) the ultimate determination of whether a reasonable official could have believed lawful the particular conduct at issue. *See Gooden v. Howard County*, 917 F.2d 1355, 1361 (4th Cir. 1990); *Burns v. Loranger*, 907 F.2d 233, 235-36 (1st Cir. 1990); *Robison v. Via*, 821 F.2d 913, 920-21 (2d Cir. 1987).

In revisiting the defense of qualified immunity, the United States Supreme Court held that, even assuming that a constitutional right may have been violated, a lower court must review the second question – whether the right was clearly established – in a case-specific manner. *Saucier,* 121 S.Ct. 2151. The Court held that this inquiry,

> it is vital to note, must be undertaken in light of the specific context of the case, not as a broad general proposition; and it too serves to advance understanding of the law and to allow officers to avoid the burden of trial if qualified immunity is applicable.
>
> * * *
>
> The relevant dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was lawful in the situation he confronted.
>
> * * *
>
> If the law did not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate (*Id.*, 121 S.Ct. at 2156-57) (citations omitted.)

Furthermore, the Court also held that even if the officer's mistake as to what the law requires is reasonable, the officer is entitled to the immunity defense. (*Id.* at 2158.)

The Seventh Circuit has stated with respect to qualified immunity that it is "designed to shield from civil liability 'all but the plainly incompetent or those who knowingly violate the law.'" *Hughes v. Meyer*, 880 F.2d 967, 971 (7th Cir. 1989). It should be applied unless "it has been authoritatively decided that certain conduct is forbidden." *Upton*, 930 F.2d at 1212 (quoting *Alliance to End Repression v. City of Chicago*, 820 F.2d 873, 875 (7th Cir. 1987)). Qualified immunity thus provides officers with an additional layer of protection against civil liability. *Hughes*, 880 F.2d at 970. There is no allegation that Chief Flynn condoned any failure to provide medical care by any defendant officer with regard to Mr. Perry on September 13, 2010, or for that matter, any such failure committed by any officer. It is undisputed that Chief Flynn was not on the scene regarding any event involving Mr. Perry. (DPFOF 115.) Therefore, he is entitled to the defense of qualified immunity, should the Court somehow allow a "supervisory liability" claim to proceed against him.

### D.    Plaintiffs' 8th and 14th Amendment Claims Fail

The Amended Complaint alleges as to all individual City defendants except for Chief Flynn, DI Galaviz, Captain Beecher, and P.O. Menzel "[t]hat defendants' deliberate indifference to and complete failure to address Perry's serious-acute-obvious medical emergency was a substantial cause of Perry's avoidable pain, suffering, embarrassment and subsequent, horrific death" and "[t]hat defendants' policies, practices, acts, and/or omissions evidence and constitute deliberate indifference to the serious health care needs of all inmates in their custody, including Perry, and violate the cruel and unusual punishment clause of the Eight Amendment, made

applicable to the States through the Fourteenth Amendment to the United States Constitution."
(Amended Complaint, ¶¶ 170-171.)

The 8th Amendment to the United States Constitution does protect against cruel and unusual punishment. However, it protects prisoners after conviction, and not pretrial detainees. (See *Graham v. Connor*, 490 U.S. 386, 398-99, 109 S. Ct. 1865, 104 L.Ed 2d 443 (1989); *Richman v. Sheahan*, 512 F.3d 876, 882-83 (7th Cir. 2008). Also, while the Due Process Clause of the 14th Amendment applies to pretrial detainees, it "protects against only abusive conduct that is more than negligence or even gross negligence." *Kingsley v. Hendrickson*, 744 F.3d 443, 449-50 (7th Cir. 2014) The acts at issue "must be at least reckless." Id. at 450. The 8th Amendment is specifically concerned with the unnecessary and wanton infliction of pain in penal institutions." *Whitley v. Albers*, 475 U.S. 312, 327 (1986) In the context of a conditions of confinement claim, a pretrial detainee is entitled to be free from conditions that amount to "punishment," *Bell v. Wolfish*, 441 U.S. 520, 535, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), while a convicted prisoner is entitled to be free from conditions that constitute "cruel and unusual punishment." *Farmer v. Brennan*, 511 U.S. 825, 832, 114 S. Ct. 1970, 128 L.Ed.2d 811 (1994). In both cases, however, the alleged conditions must be objectively serious enough to amount to a constitutional deprivation, and the defendant prison official must possess a sufficiently culpable state of mind. *See, e.g., Sain v. Wood*, 512 F.3d 886, 893-94 (7th Cir. 2008); *Board v. Farnham*, 394 F.3d 469, 478 (7th Cir. 2005); *Cavalieri v. Shepard*, 321 F.3d 616, 620 (7th Cir. 2003). An adverse condition amounts to a constitutional deprivation when it results in the denial of a basic human need. *Rice ex rel. Rice v. Corr. Med. Servs.*, 675 F.3d 650, 664 (7th Cir. 2012), such as "adequate food, clothing, shelter, and medical care," *Farmer*, 511 U.S. at 832, 114 S. Ct. 1970. Mr. Perry was not a convicted prisoner. Rather he was a pretrial detainee after he was taken into

police custody on September 13, 2010 regarding his purported involvement with an armed robbery. (DPFOF 49-51) Therefore, any 8th Amendment claim raised against any individual City defendant fails as a matter of law, and must be dismissed.

In the alternative, the City defendants acknowledge that courts have established that a pretrial detainee must be afforded certain protections under the 14th Amendment, including access to adequate medical care. *Jackson v. Ill. Medi-Car, Inc.*, 300 F.3d 760, 764 (7th Cir. 2002) (citations omitted). Due process rights are at least as great as the protections afforded a convicted prisoner under the 8th Amendment. *Id*. Accordingly, when considering a pretrial detainee's claim of inadequate medical care, the analogous standards under the 8th Amendment are often used. *Id*. To establish liability under the 8th Amendment regarding medical care, a prisoner must show: (1) that his medical need was objectively serious; and (2) that the official acted with deliberate indifference to his health or safety. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Chapman v. Keitner*, 241 F.3d 842, 845 (7th Cir. 2001); *see also Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976); *Zentmyer v. Kendall County, Ill.*, 220 F.3d 805, 810 (7th Cir. 2000).

The undisputed facts clearly establish that in September, 2010, Milwaukee Police Department officers were not authorized to dispense medication of any kind to prisoners. (DPFOF 22) They could provide first-responder-type of assistance, but only to prisoners who exhibit signs of a life-threatening condition or medical emergency. (DPFOF 22) When Mr. Perry returned from being medically cleared by medical staff at a hospital located a few blocks away, he did not exhibit any sign of a life-threatening condition or medical emergency. (DPFOF Nos. 70, 85) He did not lose consciousness or stop breathing . (DPFOF Nos. 73-91) He did appear to be combative or resistive. (DPFOF 75) He did not follow officers' directives. (DPFOF 74) He kicked at them and spat at them. (DPFOF Nos. 74-76) While he was carried

into the PPS, Mr. Perry walked out of the PPS under his own power (DPFOF Nos. 85-97), and his overall condition appeared to improve by the time he left for the CJF. (DPFOF 97). Mr. Perry did not show signs of any life-threatening condition or medical emergency while he was at the PPS. (DPFOF 70-103) Therefore, no MPD officer who had any contact with Mr. Perry that night was aware of any objectively serious medical need, and so they were not deliberately indifferent to his medical needs. Thus, any 14th Amendment claim regarding cruel and unusual punishment due to lack of medical treatment must be dismissed as against the above-noted City defendants.

As an added point of consideration, the City defendants note that there is absolutely no causal connection between any alleged unconstitutional act of any individual defendant and Mr. Perry's death. The autopsy of his body revealed no significant injuries related to his cause of death, including no evidence of injury to his head. (DPFOF Nos. 112-113) The fact of the matter is that Mr. Perry died of natural causes – he died from a blood clot in his heart and hardening of the arteries. (DPFOF 112) No City defendant who came into contact with Mr. Perry on September 13, 2010 could have been aware of these physical ailments. Therefore, they could not anticipate them and they were thus not deliberately indifferent to Mr. Perry's medical needs.

E.  **Any Claim Raised Against Any Individual Defendant Under Section 6 of the Wisconsin Constitution Fails As A Matter of Law.**

In "Count Two" of their Amended Complaint, plaintiffs allege against all City defendants that: "defendants' policies, practices, procedures, acts, and/or omissions evidence and constitute deliberate indifference to the serious health care needs of all inmates in their custody, including Perry, and violate the cruel and unusual punishment clause of Section Six of the State of Wisconsin Constitution," and that "defendants' policies, practices, procedures, acts, and/or

34

omissions placed Perry at an unreasonable, continuing and foreseeable risk of substantial pain and suffering and death." (Amended Complaint, ¶¶ 175-176.) All claims raised against Chief Flynn, DI Galaviz, Captain Beecher, Detective Jones, and Officer Menzel are addressed in Sections A-C, above and any claims which involve municipal policies, practices and procedures are discussed in Section I, below.

As to the state constitutional claims raised, the remaining individual City defendants assert that the eighth amendment of the federal constitution, and article I, section 6 of the *Wisconsin Constitution,* both prohibit cruel and unusual punishments. The eighth amendment and article I, section 6 of the Wisconsin Constitution are concerned with "[t]he fixing of penalties for crimes. . ." *State v. Pratt,* 36 Wis. 2d 312, 322, 153 N.W. 2d 18, 22 (1967) (citing *Hayes v. United States,* 238 F. 2d 318, 322 (10th Cir. 1956), *cert. denied*, 353 U.S. 983, 77 S. Ct. 1280, 1 L. Ed. 2d 1142 (1957)). Further, cases involving the eighth amendment have dealt with post conviction treatment, *State v. Seraphine,* 266 Wis. 118, 62 N.W.2d 403 (1954), and post conviction sentences, *State v. Morales,* 51 Wis. 2d 650, 187 N.W.2d 481 (1971), but not with "treatment" before conviction. "The primary purpose of [the cruel and unusual punishments] clause has always been considered, and properly so, to be directed at the method or kind of punishment imposed for the violation of criminal statutes. . ." *Steeno v. State,* 85 Wis. 2d 663, 669, 271 N.W.2d 396, 399 (1978.)

The City defendants respectfully refer the court to their argument as presented in Sections D and E, above, as their response to this claim. Furthermore, to the extent that the Court would entertain any claim against any individual defendant, under Article 1, Section 6 of the Wisconsin Constitution, the City defendants assert that they are entitled to the defense of discretionary

immunity under Wis. Stat. sec. 893.80(4), as discussed in Section F, below.  Therefore, this claim must be dismissed as against all defendants.

### F.     Any Negligence Claim Fails Outright Under Wisconsin Law, And Because Of The Defense Of Discretionary Act Immunity

The Amended Complaint asserts a state law negligence claim against all defendants. (Amended Complaint, ¶¶ 228-230.)  Plaintiffs allege "that the defendants, were negligent at all times material hereto in that they, among other things, failed to provide Perry assistance, medical or otherwise, despite his serious-acute-obvious medical emergency, failed to appropriately train MPD and MCSD employees to deal with individuals with acute-serious-obvious medical emergencies, failed to address open and obvious deficiencies in health care, failed to address open and obvious deficiencies regarding officers making medical decisions and were otherwise negligent." (Amended Complaint, ¶ 229.)  All claims raised against Chief Flynn, DI Galaviz, Captain Beecher, Detective Jones, and Officer Menzel are addressed in Sections A to C, above, and any claims which involve municipal policies, practices and procedures are discussed in Section I, below.  However, any negligence claim fails outright under Wisconsin law, and also because of the protection of discretionary act immunity.

Wisconsin uses a four-element analysis to determine an actionable claim for negligence. To constitute a cause of action for negligence there must be: (1) a duty to conform to a certain standard of conduct to protect others against unreasonable risks; (2) a failure to conform to the required standard; (3) a causal connection between the conduct and the injury; and (4) actual loss or damage as a result of the injury.  *Thomas v. Kells,* 53 Wis. 2d 141, 144, 191 N.W.2d 872 (1971).  The standard of conduct or duty is "ordinary care."  *Hocking v. City of Dodgeville,* 2009 WI 70, ¶ 11. 318 Wis. 2d 681, 768 N.W.2d 552; *Dixson v. Wisconsin Health Org. Ins. Corp.,* 2000 WI 95, ¶42, 237 Wis.2d 149, 612 N.W.2d 721 (Abrahamson, C.J., dissenting).  Using this

standard, we are to make an assessment of what ordinary care requires under the circumstances. *Hocking,* 318 Wis.2d 681, ¶ 11, 768 N.W.2d 552, and *Dixson,* 237 Wis.2d 149, ¶42, 612 N.W. 2d 721.

Every person has a duty to use ordinary care in all of his or her activities, and a person is negligent when that person fails to exercise ordinary care. *Gritzner*, 235 Wis. 2d 781, ¶¶20 & 22, 611 N.W.2d 906. In Wisconsin, a duty to use ordinary care is established whenever it is foreseeable that a person's act or failure to act might cause harm to some other person. *Id., ¶20.* Under the general framework governing the duty of care, a " 'person is not using ordinary care and is negligent, if the person, without intending to do harm does something (or fails to do something) that a reasonable person would recognize as creating an unreasonable risk of injury or damage to a person or property.' 354" *Id., ¶ 22* (quoting Wis JI-Civil 1005).

As made clear in the City defendants' Proposed Findings of Fact, no City defendant who had contact with Mr. Perry on September 13, 2010 perceived that he was experiencing a life-threatening condition or medical emergency. (DPFOF Nos. 67, 70, 86, 97-98) Clearly, when Mr. Perry experienced his first seizure that day, while in the male bullpen at the PPS, he was attended to by MPD personnel, an ambulance was called, he was subsequently attended to by emergency medical technicians, he was transported to Sinai hospital for further care, he was treated there, he was medicated there, and he was medically cleared. (DPFOF Nos. 49-67) When he was released from the hospital, he was somewhat drowsy, unresponsive, and unable to walk or dress by himself. (DPFOF Nos. 34-67 ) However, the transporting officers were reassured by medical professionals that Mr. Perry's condition was due to the anti-seizure medication that he had been given while in the hospital. (DPFOF Nos. 65-67) Mr. Perry did not exhibit any life-threatening condition or medical emergency from the time that he was still in his

room at the hospital, until he collapsed in front of the nursing station at the CJF later that evening. (DPFOF Nos. 67-110) Therefore, no City defendant failed to provide Mr. Perry with necessary medical assistance. Furthermore, the training materials attached to the MacGillis Affidavit, including SOP 090-Prisoners and the Temporary Holding Facility Training manuals, along with the affidavits of Lieutenant MacGillis and Chief Flynn, clearly establish that considerable training was provided to officers relative to appropriate first responder care for individual exhibiting observed life-threatening conditions or medical emergencies, as well as generally how to deal with medical situations involving prisoners. (DPFOF Nos. 18-23; 42-48) Finally, as discussed in Section C, above, Mr. Perry died of heart disease, and so no action or omission of any City defendant could have caused his death. Thus, the necessary causal connection between conduct and injury needed to sustain a negligence claim is sorely lacking in this case. Therefore, the plaintiffs' state law negligence claim fails as a matter of law. Should the Court determine that there is a basis for allowing such a claim to proceed against any individual City defendant, they further assert that regardless, they are entitled to the defense of discretionary immunity, as articulated in Wis. Stat. Sec. 893.80(4).

Sec. 893.80(4), Stats. bars suit "against [any political] corporation, subdivision or agency ... or against its officers, officials, agents or employees for acts done in the exercise of legislative, quasi-legislative, judicial or quasi-judicial functions." "In *Scarpaci v. Milwaukee County*, 96 Wis. 2d 663, 683, 292 N.W.2d 816, 826 (1980), the court stated that the terms 'quasi-judicial or quasi-legislative' and 'discretionary' were synonymous." *Sheridan v. City of Janesville*, 164 Wis. 2d 420, 425, 474 N.W.2d 799 (Ct. App. 1991). *See also Lifer v. Raymond*, 80 Wis. 2d 503, 512, 259 N.W.2d 537 (1977).

"A quasi-judicial or quasi-legislative or discretionary act ""involves the exercise of discretion and judgment."""  *Sheridan*, *quoting Harkness v. Palmyra-Eagle School Dist*., 157 Wis. 2d 567, 575, 460 N.W.2d 769, 772 (Ct. App. 1990).  In particular, "a quasi-legislative act under [what is now sec. 893.80(4), Stats.], involves the exercise of discretion or judgment in determining the policy to be carried out or the rules to be followed."  *Maynard v. City of Madison*, 101 Wis. 2d 273, 282, 304 N.W.2d 163 (Ct. App. 1981), citing *Lifer*, 80 Wis. 2d at 511-12.  A quasi-judicial act involves the exercise of discretion and judgment in applying a rule to a specific set of facts.

As a general rule, a public officer is not personally liable to one injured as a result of an act performed within the scope of official authority and in the line of official duty.  *Lister v. Bd. of Regents*, 72 Wis. 2d 282, 300, 240 N.W.2d 610 (1976).  An officer may be held liable for damages resulting from the negligent performance of a purely ministerial duty.  *Id*., 72 Wis. 2d at 300-1.  A duty is ministerial only when absolute, certain and imperative, involving merely the performance of a specific task when the law imposes, prescribes, and defines a time, mode and occasion for its performance with such certainty that nothing remains for judgment or discretion.  *Id*. 72 Wis. 2d at 301.

The Wisconsin Supreme Court in *Cavanaugh v. Andrade*, 202 Wis. 2d 290, 550 N.W.2d 103 (1996) overturned the decision of the court of appeals in that case as it related to the city's police pursuit policy.  Id., 202 Wis. 2d at 315.  It neither addressed nor overturned the decision of the lower court as to the separate issues of training and supervision.

As the court of appeals held with respect to that issue, "[t]raining and supervision involve governmental discretion that entitles the City to immunity."  *Estate of Cavanaugh v. Andrade*, 191 Wis. 2d 244, 253, 528 N.W.2d 492 (Ct. App. 1995), citing *Sheridan v. City of Janesville*, 164 Wis. 2d 420, 430, 474 N.W.2d 799, 803 (Ct. App. 1991).  "Therefore, we conclude that, consistent with

established precedent, the decisions regarding training and supervision in the instant case are acts involving governmental discretion that entitle the City to immunity." *Cavanaugh*, 191 Wis. 2d at 253. *See also Salerno v. City of Racine*, 62 Wis. 2d 243, 246-9, 214 N.W.2d 446 (1974) (city immune from liability on negligent supervision claim based on assertion that it failed to fire a police officer who had allegedly shown a propensity to use excessive force).

Clearly, decision-making relative to evaluating behaviors of a person, to determine if they are experiencing any type of life-threatening condition, medical emergency, or other medical issues, involves the application of training and experience to current observations, which involves discretionary acts. Furthermore, decisions as to how to train police officers regarding the provision of medical care to prisoners also involves discretion, and there is no precedent establishing that the Chief of Police was required to institute any particular training other than that which was articulated in his affidavit, and the affidavit of Lieutenant MacGillis, and the attachments thereto. The manner by which subject matter regarding prisoners, first responder care and areas of significance in this case is trained is left within the sound discretion of MPD academy training staff. Therefore, the City defendants respectfully assert that they are entitled to discretionary immunity, relative to any state law negligence claim.

### G. Plaintiffs' Wrongful Death Claim Raised Under Wis. Stat. § 895.03 Fails as a Matter of Law

In their Amended Complaint, plaintiffs allege against all City defendants at paragraph 232 that "Perry's death was caused by defendants' wrongful acts, negligence and/or improper conduct." Wis. Stat. § 895.03 provides that whenever the death of a person shall be caused by a wrongful act, neglect or default, and the act, neglect or default is such as would, if death had not ensued, have entitled the party injured to maintain an action and recover damages in respect thereof, then and in every such case the person who would have been liable, if death had not

ensued, shall be liable to an action for damages notwithstanding the death of the person injured; provided, that such action shall be brought for a death caused in this state. Wis. Stat. Ann. § 895.03 (West) However, wrongful death actions are derivative tort actions. *Ruppa c. Am. States Ins. Co.,* 91 Wis.2d 628, 646, 284 N.W.2d 318 (1979.) Thus, even though the wrongful death statute creates a "new action" and "allows a person to recover his or her own damages sustained because of the wrongful death of another," *Miller,* 170 Wis.2d at 435-36, 489 N.W.2d 651, the person's right of action depends not only upon the death of another person but also upon that other person's entitlement to maintain an action and recover if his death had not occurred. Stated differently, for a wrongful death claim to exist, the decedent must have had a valid claim for damages against the defendant at the time of his death. *Id.* At 439-40, 489 N.W. 2d 651. See also Wis. Stat. § 895.03.

The City defendants respectfully refer the Court to the argument presented above, as their response to the plaintiffs' wrongful death claim, and assert that the wrongful death claim fails as well, because even if Mr. Perry had survived, he would not have been successful in maintaining any action against any City defendant.

**H.      Detective Jones and Officer Bell did not Engage in Any Unlawful Conspiracy, they are protected by the Intracorporate Conspiracy Doctrine, and in the Alternative, they are Entitled to Qualified Immunity Regarding Any Conspiracy Claim.**

Plaintiffs very generally assert that "[a]s a direct and proximate result of the aforementioned defendants' actions perpetrating a conspiracy to cover up the unconstitutional treatment suffered by Perry, said defendants are liable for their actions under Sec. 1983 for damages." (Am. Compl., ¶ 249.) However, plaintiffs utterly fail to present any specific description of the circumstances by which these two City defendants engaged in any such conspiratorial act. In this circuit, the principle element of an unlawful civil conspiracy is an

agreement between the parties to inflict a wrong against or injury upon another. *Bell v. City of Milwaukee*, 746 F.2d 1205 (7ᵗʰ Cir. 1984). "In order to establish the existence of a conspiracy . . . a plaintiff must demonstrate that the conspirators have an agreement to inflict injury or harm upon him." *Hernandez v. Joliet Police Dep't*, 197 F.3d 256, 263 (7th Cir. 1999) (citing *Hampton v. Hanrahan*, 600 F.2d 600, 621 (7th Cir. 1979), *rev'd in part on other grounds*, 446 U.S. 754, 100 S. Ct. 1987, 64 L. Ed. 2d 670 (1980)). "The conspirators must act with a single plan, the general nature and scope of which is known to each would-be conspirator." *Hernandez*, 197 F.3d at 263 (citing *Hampton*, 600 F.2d at 621, *rev'd in part on other grounds*, 446 U.S. 754). "The agreement may be inferred from circumstantial evidence, but only if there is sufficient evidence that would permit a reasonable jury to conclude that a meeting of the minds had occurred and that the parties had an understanding to achieve the conspiracy's objectives." *Hernandez*, 197 F.3d at 263 (citing *Hampton*, 600 F.2d at 621, *rev'd in part on other grounds*, 446 U.S. 754). The principal element of a civil conspiracy is an agreement among the parties to inflict a wrong or injury against another. *Hernandez*, 197 F.3d at 263. Detective Jones participated in the investigation of the armed robbery which was the basis for the arrest of Mr. Perry, but never had any contact with Mr. Perry on September 13, 2010. (Jones Aff., ¶¶ 1-7) Furthermore, Detective Jones was assigned to notify Mr. Perry's mother of his death. (Id.) Also, Officer Bell was assigned to the PPS as an assistant jailer and to the CJF as a liaison officer between the MPD and CJF staff, to assist with coordinating the receipt and booking of MPS prisoners into the CJF system. (Bell Aff., ¶¶ 1-35) No evidence was either described in the amended complaint, or produced during discovery, which even suggested that defendants Jones and Bell engaged in any conspiracy to violate the rights of Mr. Perry. They both adamantly deny

any such claim (Jones Aff., ¶ 7; Bell Aff., ¶ 36)  Therefore, any conspiracy-related claim raised against them must be dismissed outright at this time.

Additionally, City defendants Jones and Bell are protected by the intracorporate conspiracy doctrine.  The intracorporate conspiracy doctrine bars conspiracy claims against an entity and its employees so long as the employees are "acting within the scope of their employment." *Travis v. Gary Comm. Mem. Health Ctr., Inc.,* 921 F.2d 108, 110 (7th Cir. 1991). Moreover, this doctrine has applied to dismiss conspiracy claims against law enforcement.  See e.g. *Breese v. Todd,* 35 Fed. Appx. 241 (7th Cir. 2002) (dismissing a section 1985 conspiracy claim because "the plaintiffs alleged that the defendants were all members of . . . the Wisconsin Department of Corrections and that they were all working in the Department's interest."); *Grider v. City of Auburn, Ala,* 618 F.3d 1240 (11th Cir. 2010) (barring conspiracy claims against officers for conduct that, although allegedly wrongful, was related to official duties.); *Jones v. City of Milwaukee,* 2005 WL 2922191 (E.D. Wis. 2005) (barring conspiracy claims against officers because they were all employees of the City of the Milwaukee at the time of the issue).

In the case at hand, Officer Bell and Detective Jones were employees of the Milwaukee Police Department, and were acting within the scope of their employment during the time of the event at issue.  (DPFOF No. 7.)  The intracorporate conspiracy doctrine bars a conspiracy claim under plaintiff's own allegations that defendants Bell and Jones engaged in the subject conduct under color of state law and in the course and scope of their employment with the Milwaukee Police Department.  (Amended Complaint, ¶¶ 22, 32.)  Finally, Detective Jones and Officer Bell are entitled to the defense of qualified immunity (as discussed in Section C, above) to any conspiracy claim, because no action of theirs constituted a conspiratorial act which was clearly determined to violate the constitution.

I. **The City of Milwaukee Is/Was Not Deliberately Indifferent, Regarding Either Its Policies, Training or Supervision of its Police Officers in the Area of Providing Medical Care to Prisoners; Therefore, Plaintiffs Cannot Support Their *Monell* Claims.**

In their complaint, plaintiffs raise *Monell* claims. Their claims appear to be that the City, through its police department, maintained unlawful policies related to the training and supervision of its officers, regarding the provision of medical care to prisoners. (Amended Complaint, ¶¶ 178-219.) Plaintiffs claim that "[t]hat the defendants failed to adequately train officers, correctional employees, and medical employees at all times relevant to this complaint, on how to deal with inmates suffering from serious-acute-obvious medical conditions and individuals in custody in need of immediate medical care, how to perform life-saving procedures, how to recognize serious medical emergencies, how to react to serious medical emergencies, how to conduct wellness checks on individuals in custody, and how to conduct intake screenings, amongst other failures." (Amended Complaint, ¶ 179.) That the actions of the defendants, correctional employees, law enforcement employees, and medical staff including ignoring individuals in custody with serious-acute-obvious medical emergencies and simply calling for an ambulance or relying on the fact that the individual had earlier visited a hospital, but taking no action to assist the individual, medically or otherwise were done in accordance with the defendants' de facto policy regulation, decision or custom condoning the use of these procedures to deal with inmates suffering from serious-acute-medical emergencies. That these de facto policies were officially adopted, expressly, or implicitly, and promulgated or practiced by the defendants, even though such custom may not have received written formal approval by the defendants, and even through such de facto policies were inconsistent with or violated written policies." (Amended Complaint, ¶ 184.); "The MPD and MCSD failed to formulate and execute an internal administrative review policy for prisoner deaths and discipline those who had

44

been found to have mistreated individuals or failed to provide appropriate medical care or call for medical attention."(Amended Complaint, ¶ 192.); "That the actions of the defendants, correctional employees, and law enforcement employees, of allowing untrained correctional officers to conduct medical screens and made decisions concerning the need for medication or other appropriate medical care were done in accordance with the defendants' regulation, decision or custom condoning the use of thee procedures to deal with all inmates. That this policy was officially adopted."; (Amended Complaint, ¶ 201.); "That the actions of the defendants, correctional employees, and law enforcement employees, of providing no medical care, emergency or otherwise at the Police Processing section of the Police Administration Building was done in accordance with the defendants' regulation, decision or custom condoning the use of these procedures to deal with all inmates. The policies were officially adopted and/or ratified by the MPD." (Amended Complaint, ¶ 207.) ; and "The MPD developed a policy of responding to individuals in Custody whom faced a medical emergency documented by difficulty breathing with, "If you are talking you are breathing," and providing no medical care." (Amended Complaint, ¶ 213.)

To state a § 1983 claim against a municipality, the complaint must allege that the constitutional deprivation was caused by an official municipal policy, custom, or practice. *Oklahoma City v. Tuttle*, 471 U.S. 808, 810, 105 S.Ct. 2427, 2429, 85 L.Ed.2d 791, 796 (1985); *Monell v. Dept. of Social Services,* 436 U.S. 658, 694, 98 S.Ct. 2018, 2037, 56 L.Ed.2d 611, 638 (1978); *Henry v. Farmer City State Bank*, 808 F.2d 1228, 1237 (7th Cir. 1986). "To establish a municipal policy or custom, the plaintiff must allege a specific pattern or series of incidents that support the general allegation of a custom or policy." *Henry*, 808 F.2d at 1237. A single incident, when unaccompanied by supporting history, does not provide an adequate basis for

inferring a policy. *McKee v. City of Rockwell*, 877 F.2d 409, 416 (5th Cir. 1989). Furthermore, "[i]t is the plaintiff's difficult burden to establish the municipality's imprimatur on the unconstitutional conduct, . . . [and] he may attempt to meet that burden by looking to 'the official pronouncements of (the) municipal or legislative bod(y), actions by individuals with final decision-making authority, inaction or custom.' Moreover, the plaintiff must show a 'direct causal link between the municipal policy and the constitutional deprivation.'" *McNabola v. Chicago Transit Authority*, 10 F.3d 501, 509-10 (7th Cir. 1993). "[F]ailing to eliminate a practice cannot be equated to approving it." *Wilson v. City of Chicago*, 6 F.3d 1233, 1240 (7th Cir. 1993), (cert. den. 511 U.S. 1088, 114 S.Ct. 1844, 128 L.Ed.2d 470 (1994).

Recovery from a municipal entity is "limited to acts that are, properly speaking, acts 'of the municipality'--that is, acts which the municipality has officially sanctioned or ordered." *Pembauer v. City of Cincinnati*, 475 U.S. 469, 480, 106 S.Ct. 1292, 1298, 89 L.Ed.2d 452 (1986); *see also Fiorenzo v. Nolan*, 965 F.2d 348, 350 (7th Cir. 1992). It is the plaintiff's burden to establish the municipality's imprimatur on the unconstitutional conduct. *McNabola v. Chicago Transit Authority*, 10 F.3d at 509 (7th Cir. 1993). The plaintiff may attempt to meet that burden by looking to "the official pronouncements of [the] municipality or legislative bod[y], agency action in accordance with delegated authority, actions by individuals with final decision making authority, inaction or custom." *Cornfield v. Consolidated High School Dist. No. 230*, 991 F.2d 1316, 1324 (7th Cir. 1993).

The decisions of an employee without authority to set official policy provide an insufficient basis for the imposition of liability against the governmental entity under section 1983. *Louis v. Praprotnik*, 485 U.S. 112, 123, 108 S.Ct. 915, 924, 99 L.Ed. 107 (1988); *Pembaur*, 475 U.S. at 483, 106 S.Ct. at 1300. "Municipal liability attaches only where the

decision maker possesses final authority to establish municipal policy with respect to the action ordered." *Pembaur*, 475 U.S. at 481, 106 S.Ct. at 1299; *see also Fiorenzo*, 965 F.2d at 350; *Woods v. City of Michigan City, Indiana*, 940 F.2d 275, 278 (7th Cir. 1991). Courts must look to state law in ascertaining the identity of policy-making officials. *Praprotnik*, 485 U.S. at 124-25, 108 S.Ct. at 924-25; *McNabola*, 10 F.3d at 510; *Cornfield*, 991 F.2d at 1325; *Fiorenzo*, 965 F.2d at 350.

To demonstrate that a municipality "is liable for a harmful custom or practice, the plaintiff must show that [municipal] policymakers were deliberately indifferent as to the known or obvious consequences." *Thomas*, 604 F.3d at 303. "In other words, they must have been aware of the risk created by the custom or practice and must have failed to take appropriate steps to protect the plaintiff." *Id.* Under this stringent standard, "it is not enough to demonstrate that policymakers could, or even should, have been aware of the unlawful activity because it occurred more than once." *Phelan v. Cook Cnty.*, 463 F.3d 773, 790 (7th Cir. 2006). Rather, there must be "evidence demonstrating that the unlawful practice was so pervasive that acquiescence on the part of policymakers was apparent and amounted to a policy decision." *Id.*

According to Wis. Stat. sec. 62.50(lm), the Milwaukee Board of Fire and Police Commissioners is the policymaker for the Milwaukee Police Department, although the Commission can delegate authority to the police chief. Also, pursuant to Section 312-03.1 of the Milwaukee Code of Ordinances (copied and attached to the Lappen Aff., as Exhibit C), the Chief of Police is a policymaker with regard to the general good conduct of the police department. Therefore, neither DI Galaviz nor Captain Beecher are proper party defendants, with regard to any Monell claim, and such claims must be dismissed as against them. Given that there are no other claims pleaded against either DI Galaviz or Captain Beecher, they must be dismissed as

party defendants in this suit. Furthermore, as noted in Section "D," above, the *Monell* policy, training and supervision claims are properly raised against the City, and not Chief Flynn. There is no evidence which establishes that Chief Flynn personally created or put into effect any of the alleged unlawful policies or training involved with this case, or that he personally and directly supervised any of the defendant police officers. This makes sense, given that the MPD employs approximately 2550 people, and approximately 1900 of them are sworn officers. (DPFOF 31) Therefore, to the extent that the *Monell* claims asserting explicit unlawful policies could be perceived as being raised directly against Chief Flynn, such claims must be dismissed.

Plaintiffs cannot support an allegation that an express decision or ratification by Chief Flynn ultimately gave rise to an official policy which caused Mr. Perry's alleged deprivations. The record does not reveal that he ever witnessed any officer fail to provide a citizen with appropriate medical assistance, or that he was aware of any other officer or supervisor who expressed concern about such activity by officers, or that the Chief had received information suggesting that MPD officers did not understand, or were violating, either departmental policies or Wisconsin law regarding same. (DPFOF 33) In fact, all of the defendant officers have indicated that prior to September 13, 2010, they had been trained, and clearly understood their responsibilities regarding providing first responder care to individuals experiencing a life-threatening condition or medical emergency, and also how to screen and monitor prisoners. Thus, there are no facts in this case which demonstrate that Chief Flynn was involved in, or ratified, any unconstitutional conduct, and so plaintiffs' *Monell* claims against Chief Flynn cannot proceed under a final-policymaker theory.

48

1.      **Training**

Plaintiff very generally suggests that Mr. Perry was subjected to an unlawful seizure because the City failed to properly train its officers. (Amended Complaint, ¶ 36(a).) The United States Supreme Court, addressing the issue of use of force in the context of a substantive due process claim, has held "there are limited circumstances in which an allegation of 'failure to train' can be the basis for liability under § 1983." *City of Canton v. Harris*, 489 U.S. 378, 387, 109 S.Ct. 1197, 1204, 106 L.Ed.2d 412, 426 (1989). However,

> "the inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *Id.*, 489 U.S. at 388. "Only where a municipality's failure to train its employees in a relevant respect evidences 'deliberate indifference' and only to the rights of its inhabitants can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983. *Id.* at 389. "'[M]unicipal liability under § 1983 attaches where – and only where – a deliberate choice to follow a course of action is made from among various alternatives, by city policy makers. Only where a failure to train reflects a 'deliberate' or 'choice' by a municipality – 'policy' as defined by our prior cases – can a city be liable for such a failure under § 1983." *Id.* at 389 (citations omitted).

In resolving the issue of a city's liability regarding training its police officers, the focus must be on the adequacy of the training program in relation to the task the particular officers must perform. *Id.* at 390. In fact, for liability to attach in this circumstance, the identified deficiency in a city's training program must be closely related to the ultimate injury. *Id.* at 391. "That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program." *Id.* at 390-91. "[P]lainly, adequately trained officers occasionally make mistakes; the fact that they do says little about the training program or the legal basis for holding

the city liable." *Id.* at 391. The Court summed-up its analysis with the following <u>word of caution</u>:

> To adopt lesser standards of fault and causation would open municipalities to unprecedented liability under § 1983. In virtually every instance where a person has had his or her constitutional rights violated by a city employee, a § 1983 plaintiff will be able to point to something the city 'could have done' to prevent the unfortunate incident. Thus, permitting cases against cities for their 'failure to train' employees to go forward under § 1983 on a lesser standard of fault would result in *de facto respondeat superior* liability on municipalities – a result we rejected in *Monell.* . . . It would also engage the federal courts in an endless exercise of second-guessing municipal employee-training programs. This is an exercise we believe the federal courts are ill suited to undertake, as well as one that would implicate serious questions of federalism.

*Id.* at 391-92.

The Seventh Circuit Court of Appeals has further defined the meaning of "deliberate indifference" in the due process context. "[G]overnment generally has no constitutional duty to provide rescue services to its citizens, and if it does provide such services, it has no constitutional duty to provide competent services to people not in its custody." *Salazar v. City of Chicago*, 940 F.2d 233, 237 (7th Cir. 1991). "[O]nly intentional or criminally reckless conduct implicates the due process clause." *Id.* at 238. In this circuit, deliberate indifference is merely a synonym for intentional or criminally reckless conduct. *Id.* at 238.

The case of *Tapia v. City of Greenwood*, 965 F.2d 336 (7th Cir. 1992) discusses the legal effect of complying with state-mandated training requirements. *Tapia* involved an allegedly warrantless search into the plaintiff's home. Plaintiff brought a lawsuit against the involved police officers, and the municipality which employed them, alleging § 1983 violations. However, defendants demonstrated that the officers received training at their police academy, relative to conducting warrantless searches of homes. The defendant municipality also illustrated that it adhered to minimum state standards for training police officers under state law.

In *Tapia*, the Seventh Circuit Court of Appeals held that the plaintiff failed to show that the defendant municipality was deliberately indifferent regarding its training of officers regarding conducting warrantless searches, because the police officers had received training on the conducting of warrantless searches that complied with minimum state training requirements. Thus, the plaintiff was not allowed to maintain any related claims against the municipality/employer.

*City of Canton, Salazar,* and *Tapia* define the legal standard to be applied to judge an allegation of "failure to train" in the context of allegations that the failure to train government employees violated substantive rights. These cases define "deliberate indifference" to mean either intentional or criminally reckless conduct. Thus, to maintain their cause of action on the issue of training, plaintiffs must overcome this difficult burden. Furthermore, it is not sufficient to prove the existence of an illicit policy, to establish liability, unless the policy is the "moving force" behind the constitutional violation. *Tuttle*, 471 U.S. at 824; *Monell*, 436 U.S. at 694. Thus, even if plaintiffs could establish that the City, via its police chief or some other representative of the Milwaukee Police Department, was criminally reckless in the training of MPD officers regarding the provision of medical care to prisoners, they must also establish that such deliberate indifference was the moving force behind the alleged unconstitutional deprivations suffered by Mr. Perry.

The training of Milwaukee Police Department officers, as well as all other police officers in the state, is governed by § 165.85, Wis. Stats., which establishes the Law Enforcement Standards Board, and empowers it to establish minimum curriculum requirements for police officer training, ranging from traditional subjects, such as techniques of arrest and firearms, to complex problems, such as human relations, civil rights, and constitutional law. Sec.

165.85(3)(d). (See Lappen Affidavit, Exh. B.) The Board has issued regulations governing police officer training standards. LES. 3.04, Wis. Adm. Code. (See Lappen Affidavit, Exh. A.)

The affidavits of Chief Flynn and Lieutenant MacGillis, along with the training materials attached to the MacGillis affidavit at Exh. G, H, I and L, clearly illustrate that the trainers at the Milwaukee Police Department provide appropriate training to all personnel, regarding acting as a first responder, and responding to life-threatening conditions or medical emergencies. All police department officers are trained regarding the emergency medical services system, and that they should act as a first responder when they observe individuals suffering from a life-threatening condition or emergency medical situation. (MacGillis Aff., ¶¶ 43-50 and Exh. I, pp. 1-2.) The role of the first responder is to check the scene, call for additional resources, and provide care for life-threatening conditions. (Id., pp. 3-4) Furthermore, Milwaukee police officers are continually updated, with regard to their first aid and CPR training. (DPFOF 23) Therefore, the City of Milwaukee is not deliberately indifferent, with regard to any training regarding how to deal with inmates suffering from "serious-acute-obvious medical conditions" or individuals in need of immediate medical care, how to perform life saving procedures, or how to recognize serious medical emergencies or how to react to them. Additionally, the Temporary Holding Facility Course training, as evidenced by Exh. L to the MacGillis Affidavit, provides officers who are assigned to the PPS with training regarding the booking process, conducting searches, prisoner safety searches, medical monitoring, cell assignments, and the release process, among other topics. (See generally index of module 3, found at Exh. L, pp. MPD 01111 to 01112.) PPS officers are provided training on conducting medical intake screening of prisoners (see Exh. L, p. MPD 01155). Page D12, as contained with MacGillis Exh. D, is a copy of the "medical receiving screening form" that was prepared, relative to Mr. Perry, as he was admitted into the

PPS at 5:45 a.m. on September 13, 2010. The document clearly reflects Mr. Perry's signature. Therefore, an initial medical screening was conducted of Mr. Perry as he was being admitted into the PPS. Furthermore, consistent with the affidavits of Officer Diaz-Berg and Officer Ayala, they were trained to conduct periodic wellness checks of all prisoners, and conducted about four wellness checks per hour at staggered times. Exhibit E attached to the MacGillis Affidavit is a copy of the daily cell block check form that was prepared on September 13, 2010, and it clearly reflects that cell row A, which contained Mr. Perry, was checked seven times between 7:00 p.m. to 8:33 p.m. Therefore, PPS personnel were trained relative to conduct medical intake screenings and wellness checks, and the MPD did not fail with regard to providing appropriate training to PPS personnel for screening and monitoring PPS prisoners. Regarding the policies relative to the review of prisoner deaths, the policy of the MPD is to conduct a thorough investigation relative to any critical incident, including in-custody deaths. (DPFOF Nos. 35-41) As evidenced by the investigation into the in-custody death of Mr. Perry, all witnesses are interviewed, and all evidence is gathered. (See Exh. B to MacGillis Affidavit for a copy of the investigatory file prepared, relative to the critical incident investigation that stem from the in-custody death of Mr. Perry.) Furthermore, as illustrated by Exhibit K, as copied and attached to the MacGillis Affidavit, a critical incident review was conducted of Mr. Perry's in-custody death. Furthermore, as noted by Chief Flynn and Lieutenant MacGillis, the Chief of Police is informed of a critical incident almost immediately after it happens, he is briefed during the course of the investigation that stems from the critical incident, and he ultimately is involved with the process of reviewing the information gathered by the investigators, to determine if criminal or internal charges should be issued, and to determine if the underlying event suggests

the need for additional or other training, or revision of policy, or the creation of new policy, to provide personnel with guidance should they experience a similar event in the future.

Thus, plaintiffs cannot satisfy the stringent deliberate indifference standard that governs a failure-to-train theory. As a fundamental matter, the record in no way supports a finding that the MPD's training regarding the subject matter at issue in this case is or was defective. On the contrary, the record clearly reveals that MPD trainers provided appropriate training to its police personnel at all times relevant to this case.

As illustrated by the above-noted trained policies, the MPD does not train its officers that it approves of officers denying anyone access to needed medical assistance, and not just PPS prisoners. Thus, Milwaukee police policy and training are constitutionally sound, and plaintiffs cannot establish that the City was deliberately indifferent – or criminally reckless – with reference to police training regarding the subject matter areas of significance to this case. Because the City was not criminally reckless regarding its policies and training, the plaintiff's "failure-to-train" claim must fail.

### 2.   Supervision

Finally, the plaintiff's *Monell* "failure-to-supervise" claim fails as well. Very generally, plaintiff appears to assert that Chief Flynn failed to supervise MPD officers regarding the implementation of policies and training regarding the screening and monitoring of prisoners, and the provision of first responder services to individuals experiencing life-threatening conditions or medical emergencies. In limited circumstances, failure-to-investigate/discipline/supervise can give rise to municipal liability under § 1983 because a policy of condoning abuse may embolden a municipal employee and facilitate further abusive acts. *Sigle v. City of Chicago*, 2013 WL 1787579 (N.D. Ill. Apr. 25, 2013). However, the mere fact that a policymaker failed to

investigate, discipline or supervise its employees is insufficient for establishing municipal liability. *Monfils v. Taylor*, 165 F.3d 511, 517 (7th Cir. 1998). A plaintiff must show that the governmental body caused the deprivation and must satisfy the deliberate indifference standard adopted in *Canton*. *See Abraham*, 12 F. Supp. 2d at 881; *Sigle*, 2013 WL 1787579, *2.

The deliberate indifference standard is "a high threshold," and "[e]ven where significant evidence has been presented indicating flawed investigatory, [disciplinary or supervisory] procedures courts still reject [such a theory] where plaintiffs cannot demonstrate 'tacit authorization by city policymakers.'" *Id.* Courts have explained that:

> A custom of failing to discipline, [investigate or supervise] police officers can be shown to be deliberately indifferent if the need for further discipline, [investigation or supervision] <u>is so obvious and [established] procedures so inadequate as to be likely to result in the violation of constitutional rights</u> such that a jury could attribute to the policymakers a deliberate indifference to the need to discipline, [investigate or supervise].

*Id.*, *3 (emphasis added). Evidence of statistics and complainants registering allegations alone are insufficient to support a *Monell* claim. *Strauss v. City of Chicago*, 760 F.2d 765, 769 (7th Cir. 1985) (dismissing *Monell* claim where the record was devoid of any evidence other than statistical summaries of complaints filed with the police department and stating that the number of complaints alone "does not indicate that the policies that [plaintiff] alleges do in fact exist and did contribute to his injury."); *Bryant v. Whalen* 759 F. Supp. 410, 412 (N.D. Ill. 1991) (granting summary judgment for City because "the fact that a low percentage of cases are ultimately sustained cannot in and of itself be read to establish a policy of indifference.").

For example, in *J.G. ex rel. Koss v. Lingle*, 2014WL 4273269 (W.D. Wis. Aug 28, 2014), the court dismissed a § 1983 municipal liability claim premised on a failure-to-investigate and failure-to-discipline theory. Plaintiff in that case brought an excessive force claim under the

Fourth and Fourteenth Amendment against a police officer, and a *Monell* claim against the City

for failing to investigate and discipline. *Id.*, *1. The court explained:

> In support of his claim, [plaintiff] generally contends that defendants do not have
> very much experience dealing with children with developmental delays, failed to
> conduct a thorough investigation of [defendant officer's] use of force against
> [plaintiff] (by not interviewing other students), failed to investigate [defendant
> officer's] three previous takedown of middle-schoolers in one month to examine
> whether there was a pattern of excessive use of force and determined that only
> one out of 30 to 50 uses of force by the Sun Prairie police was excessive.

*Id.*, * 9.

> As defendants point out, [plaintiff] has not provided any context with respect to
> the 30 to 50 incidents involving a use of force or [defendant officer's] previous
> three takedowns. The undisputed facts show that the Sun Prairie Police
> Department investigated all instances involving an officer's use of force,
> including the incident [at issue], and the department found no excessive force.
> Apart from criticizing the investigation of the incident in the instant case,
> [plaintiff] has presented no facts from which a jury could conclude that any of the
> department's previous investigations were lacking or that the investigated
> incidents actually involved use of excessive force. . . . Without such evidence, a
> reasonable jury could not conclude that there was an <u>obvious problem</u> with
> excessive force investigations of which city officials like defendants . . . should
> have been aware.

*Id.*, * 10 (emphasis added).

As noted above, the MPD did not fail to promulgate policies and provide training to

guide its officers regarding the proper methods for screening or monitoring prisoners or the

provision of first responder care. Additionally, Plaintiffs cannot demonstrate that the MPD had

an established practice of failing to investigate the in-custody deaths of prisoners. Plaintiff

cannot demonstrate on this record that an "obvious," "pervasive" and "apparent" deficiency

existed such that it placed municipal policymakers on notice that the in-custody death of Mr.

Perry would likely result.

Plaintiffs' failure-to-discipline/supervise theory is also baseless. MPD policymakers did/do not have deficient practices regarding police officer discipline or supervision. Its practices included the following:

First, the MPD's practices were based on fairness and complied with departmental Standard Operating Procedures, the Code of Conduct, and Wisconsin statutes. (DPFOF 24.)

Second, MPD procedures required supervision of police officers and authorized formal discipline in order to rectify improper behavior which had not been corrected by counseling, or which constituted a more serious violation of the Department's Standard Operating Procedures or Code of Conduct. (DPFOF 27.) The types of discipline included district level written reprimand, official reprimand, suspension without pay, demotion and termination. (DPFOF 28.)

Third, MPD procedures required supervisors to monitor police officer conduct and review the same on a regular basis. (DPFOF 27.) If supervisors determined, or were notified, that an officer violated departmental policies or procedures, they were first required to consider whether the violation warranted discipline or retraining. (DPFOF 28.) Supervisors were then required to inform the officer of any issues, ensure that the officer was appropriately retrained on the applicable policy or procedure, and take the appropriate disciplinary action. (DPFOF 30.)

Based on the aforementioned procedures, no fact finder could conclude that MPD policymakers had an unsound practice of supervising or disciplining police officers. Furthermore, plaintiffs cannot demonstrate that municipal policymakers were on notice of, and disregarded, an "obvious," "pervasive" or "apparent" deficiency regarding the same.

As described above, MPD policymakers provided constitutionally sound instruction to all personnel regarding providing prisoners with appropriate medical assistance, and screening and monitoring prisoners. Furthermore, they thoroughly investigated in-custody deaths. Thus,

representatives of the Milwaukee Police Department were not deliberately indifferent to the medical needs of prisoners and citizens alike.

Therefore, any *Monell* claim raised against the City of Milwaukee, that the City fails to properly train or supervise its police officers, is without merit. The City defendants assert that not only did Chief Flynn implement policies and procedures which provided for the proper training of MPD officers in relevant subject matter areas, there is no evidence that he failed to supervise MPD officers accordingly. Also, as discussed in the above sections, Mr. Perry died of heart disease, and there is no causal connection between any alleged training or supervision deficiency and Mr. Perry's injury. This is yet another factor which defeats plaintiffs' *Monell* claims. Therefore, the City defendants assert that all of plaintiffs' *Monell* claims may be dismissed as a matter of law at this time.

## VII. CONCLUSION

Based upon the above discussion, defendants City of Milwaukee, Richard Lopez, Frank Salinsky, Stephon Bell, Margarita Diaz-Berg, Alexander C. Ayala, Froilan Santiago, Karl Robbins, Crystal Jacks, Corey Kroes, Rick Bungert, Luke Lee, Jacob Ivy, Shannon D.

Jones, Richard Menzel, Edward Flynn, Roman Galaviz, and Victor E. Beecher respectfully assert that they are entitled to summary judgment and dismissal of all claims raised against them.

Dated and signed in Milwaukee, Wisconsin this 1st day of December, 2015.

GRANT F. LANGLEY
City Attorney


s/SUSAN E. LAPPEN
SUSAN E. LAPPEN
Assistant City Attorney
800 City Hall
200 East Wells Street
Milwaukee, WI 53202
(414) 286-2601
Fax: (414) 286-8550
slappe@milwaukee.gov

Attorneys for Defendants
City of Milwaukee, Richard Lopez,
Frank Salinsky, Stephon Bell,
Margarita Diaz-Berg, Alexander C. Ayala,
Froilan Santiago, Karl Robbins, Crystal Jacks,
Corey Kroes, Rick Bungert, Luke Lee,
Jacob Ivy, Shannon D. Jones, Richard Menzel,
Edward Flynn, Roman Galaviz, and
Victor E. Beecher

1032-2012-1529.001:222837