# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

THE ESTATE OF JAMES FRANKLIN PERRY,
by BETTIE A. RODGERS, Special Administrator,
and JAMES FRANKLIN PERRY JR. (A Minor)

        Plaintiffs,

        v.

CHERYL WENZEL, R.N., et al,

        Defendants.

Case No. 12-CV-0664

---

**PLAINTIFFS' PROPOSED FINDINGS OF FACT IN RESPONSE TO MILWAUKEE CITY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND RESPONSES TO MILWAUKEE CITY DEFENDANTS' PROPOSED FINDINGS OF FACT**

---

## PLAINTIFFS' PROPOSED FINDINGS OF FACT

NOW COME the Plaintiffs, The Estate of James Franklin Perry by Bettie A. Rodgers and James Franklin Perry I, and pursuant to Civil L.R. 56 of the United States District Court for the Eastern District of Wisconsin, submit the following proposed findings of fact in support of their Opposition to Milwaukee City Defendants' Motions for Summary Judgment.

## I.    PERRY'S FIRST SEIZURE

1.    At approximately 5:36 a.m., more than three hours after being taken into custody by the Milwaukee Police Department (MPD), Perry was booked into the MPD's Prisoner Processing Section (PPS) of the Police Administration Building (PAB) located at 951 N. James Lovell Street, Milwaukee, Wisconsin 53233. (Katers Declaration ("Katers Decl.") ¶3, **Ex. A** at Supplement 0002 at 6; Supplement 0004 at 2.)

1

2. At approximately 5:45 a.m., MPD Officer Chaquila Peavy, a non-medical MPD employee, completed a Medical Receiving Screening Form (Form) for Perry, on which he noted that Perry expressly informed him that Perry required seizure medication twice a day and that he had not taken his evening dosage prior to his arrest. (Katers Decl. ¶4, **Ex. B**.)

3. Rather than taking the necessary steps to ensure Perry received his prescribed seizure medication, the MPD ignored Perry's serious medical needs and put him in the bullpen, where at approximately 2:33 p.m., Perry suffered a full body seizure that caused him to fall and strike his head on the concrete. (Katers Decl. ¶3, **Ex. A** Supplement 0004 at 2; Katers Decl. ¶5, **Ex. C**; Gende Decl. ¶3, **Ex. A** at Kimber Dep. 6:13-7:10.)

4. Five minutes after the onset of Perry's seizure in the bullpen, MPD personnel contacted the Milwaukee Fire Department (MFD) to request an ambulance. (Id. ¶3, **Ex. A** at Kimber Dep. 8:13-15; Katers Decl. ¶5, **Ex. C**.)

5. Jarod Kimber, one of the MFD Paramedic First Responders on the scene, noted that, "Upon arrival found 41 year old male patient lying supine on floor of holding cell with cushion under his head. Per police, patient had suffered approximately one minute long full body seizure, fell of bench and hit head on floor." (Id.¶5, **Ex. C**.)

6. While Perry was being treated by the MFD, MPD Lieutenant Karl Robbins (Robbins) spoke with Perry, who answered his questions and advised him that he suffered from seizures requiring medication twice a day, but he had not taken his medication for some time. (Id. ¶3, **Ex. A** Supplement 0004 at 2; Gende Decl. ¶4, **Ex. B** at Robbins Dep. 21:4-7.) Throughout this interaction with Robbins and the MFD, Perry was conscious, coherent, not resistant or combative and responsive to verbal inquiries. (Id. ¶4, **Ex. B** at Robbins Dep. 21:13-25.)

7. At approximately 3:02 p.m., Perry was transported from PPS to Aurora Sinai Medical Center Emergency Room (the Hospital) via ambulance, in which MPD Officer Corey Kroes (Kroes)

rode with Perry and MPD Defendant Officer Crystal Jacks (Jacks) followed in a squad car. (Katers Decl. ¶5, **Ex. C** at 2; Gende Decl. ¶5, **Ex. C** at Jacks Dep. 11:21-23.) Perry was neither resistant nor combative and had not urinated or defecated on himself at this time. (Id. ¶5, **Ex. C** at Jacks Dep. 13:13-23.)

8.      Jacks and Kroes believed Perry's condition had significantly declined, but expressed no concern to the Hospital staff about the deterioration in condition, made no request that a doctor re-examine Perry, or take any action whatsoever to seek additional medical assistance before Perry's discharge, as any concerns regarding Perry's condition at the time of discharge would have been documented within Perry's hospital records and none were noted. (Id. ¶5, **Ex. C** at Jacks Dep. 31:10-12, 33:22-25, 34:10-14, 34:19; Id. ¶6, **Ex. D** at Kroes Dep. 61:-20-23, 62:12-63:1, 13-14; Id. ¶7, **Ex. E** at Potterton Dep. 66:15-25, 67:1-25, 68:1-22; Katers Decl. ¶8, **Ex. F**.)

9.      Perry was discharged at approximately 6:45 p.m., and while he was assisted into the squad car for transport back to PPS by Jacks and Kroes. He was not resistive or combative, but received a Glasgow score of 15 and was "alert and oriented" upon discharge from the Hospital. (Gende Decl. ¶6, **Ex. D** at Kroes Dep. 44-45:11-5; Id. ¶5, **Ex. C** at Jacks Dep. 31:10-12, 42:16, 44:21-24, 47:14-17; Katers Decl. ¶8, **Ex. F** at 23.)

10.    Kroes and Jacks were provided with detailed discharge instructions regarding Perry's treatment and warning signs that required immediate follow up medical care. (Discharge Instructions (Id. ¶8, **Ex. F** at 23, 27-33.)

11.    These discharge instructions detailed the importance of seeking prompt medical attention for ongoing seizure symptoms and side effects from the medication which included wobbly gait, poor balance or coordination, slurred speech, unusual irritability, drowsiness and confusion. (Id. ¶8, **Ex. F** at 31-32.)

3

12.   Prior to Kroes, Jacks, and Perry's departure from the Hospital, Jacks called their supervisor Robbins, for instructions on whether they should bring Perry back to PPS or take directly to the Milwaukee County Criminal Justice Facility (CJF), and Robbins ordered Perry's return to PPS as certain paperwork had not been completed. (Gende Decl. ¶5, **Ex. C** at Jacks Dep. 39:16-19, 40:3-7, 21-23, 41:21-25, 42:1-14; Id. ¶4, **Ex. B** at Robbins Dep. 31:1-18.)

13.   At no time after leaving the hospital, did Kroes or Jacks seek to take Perry to another hospital for further evaluation of his condition or do anything to determine whether Perry was suffering from a medical emergency.  (Id. ¶5, **Ex. C** at Jacks Dep. 41:6-8; Id. ¶8, **Ex. F** at MacGillis Dep. 95-96:19-4.)

## II.   PERRY'S RETURN TO PPS

14.   Robbins was the supervisor at PPS responsible for the well-being of all prisoners there, and had the authority to reject prisoners for medical reasons pursuant to MPD Standard Operating Procedure (MPD SOP) 090.55.  (Id. ¶4, **Ex. B** at Robbins Dep. 14:1-19)

15.   If an MPD arrestee suffers a medical emergency after being cleared from the Hospital they are to be taken back to the hospital, which in fact occurs often.  (Id. ¶4, **Ex. B** at Robbins Dep. 17:11-25, 18:1-25, 19:1-17).

16.   Kroes and Jacks arrived in the PAB garage and waited in the squad car with Perry for assistance in carrying Perry upstairs. (Id. ¶5, **Ex. C** at Jacks Dep. 48:16-22)

17.   At this time, Perry was not moaning and groaning in pain, was not calling out for help, had not complained of difficulty breathing, had not urinated or defecated on himself, was not bleeding or spitting, and had not complained that the officers were "killing him."  (Id. ¶5, **Ex. C** at Jacks Dep. 43-44:8-13, 48:16-17.)

4

18.   MPD Officers Froilan Santiago (Santiago) and Rick Bungert (Bungert) were dispatched to assist Kroes and Jacks in carrying Perry up to PPS. (Id. ¶9, **Ex. G** at Santiago Dep. 31:3-6; Katers Decl. ¶3, **Ex. A** Supplement 0002 at 5.)

19.   Kroes, Jacks, Santiago and Bungert then waited with Perry in the PAB garage for directions on how and where to proceed with Perry, who was now incoherent, grunting groaning, and unable to move under his own physical control.  (Katers Decl. ¶3, **Ex. A** Supplement 0002 at 5; Gende Decl. ¶9, **Ex. G** at Santiago Dep. 38:4-13.)

20.   While awaiting orders, Jacks and Kroes failed to advise Bungert or Santiago that Perry had suffered from seizures earlier in the evening or that he had struck his head on the concrete floor. (Gende Decl. ¶10, **Ex. H** at Bungert Dep. 12:5-10.)

21.   At approximately 6:50 p.m., Kroes, Jacks, Santiago, and Bungert were instructed to bring Perry up to PPS, and they dragged Perry by his shackled arms and legs from the squad car into the PAB elevator, placed him on the floor of the elevator, and had to hold him in a seated position to ensure he would not fall backward. (Katers Decl. ¶6, **Ex. D**; Id. ¶3, **Ex. A** Supplement 0002 at 5; Gende Decl. ¶9, **Ex. G** at Santiago Dep. 37: 18-20, 20, 23, 25; 39:18-19; 44:5-7.)

22.   Kroes, Jacks, Bungert and Santiago then carried Perry out of the elevator by his shackles and put him on the floor of the hallway outside the adult booking area as he was unable to control his body or sit on the bench.  (Id. ¶6, **Ex. D** at Kroes Dep. 48:1-5; Id. ¶9, **Ex. G** at Santiago Dep. 39:18-19; Katers Decl. ¶3, **Ex. A** Supplement 0002 at 3). At that point, one of the four identified officers says to Perry "you're faking it." (Id. ¶6, **Ex. D**.)

23.   Jacks heard Perry moaning and groaning after they exited the elevator, but did not inquire as to why he was moaning and groaning.  (Gende Decl. ¶5, **Ex. C** at Jacks Dep. 102:3-5, 15-18.)

24.   Shortly after arriving in PPS and after being placed on the floor of the hallway, Perry urinated and defecated on himself, the odor causing Jacks to become ill and vomit, but neither

Kroes, Jacks, Santiago, nor Bungert offered Perry any assistance, medical or otherwise, at this point. (Katers Decl. ¶3, **Ex. A** Supplement 0004 at 2; Gende Decl. ¶6, **Ex. D** at Kroes Dep. 85:12-14; 87:16-21; Id. ¶5, **Ex. C** at Jacks Dep. 56-57:24-4, 61:5-7; Id. ¶9, **Ex. G** at Santiago Dep. 49:12-15; Katers Decl. ¶6, **Ex. D**; Id. ¶9, **Ex. G** at 4-5.)

25.    Although cognizant that urination and defecation could indicate a change in Perry's condition, Kroes did not try to determine the cause of the same. (Gende Decl. ¶6, **Ex. D** at Kroes Dep. 37:13-20, 70:3-8.)

26.    When Robbins first came upon Perry in the hallway of PPS, he laughed, turned and walked away.  (Id. ¶4, **Ex. B** at Robbins Dep. 128:13-129:3.)

27.    Defendant Officer Alexander Ayala (Ayala) joined Kroes, Jacks, Bungert and Santiago in forcefully restraining Perry on the PPS floor. (Katers Decl. ¶3, **Ex. A** Supplement 0002 at 3.)

28.    Perry cried out that he couldn't breathe, but Bungert placed a compression hold on Perry and Ayala continued to hold Perry down, pushing forward on his shoulder, pressing his chest toward his knees.  (Gende Decl. ¶11, **Ex. I** at Ayala Dep. 21:7-13; 28:12-16; Id. ¶8, **Ex. F** at MacGillis Dep. 31:19-25; Id. ¶6, **Ex. D** at Kroes Dep. 95:16-17.)

29.    The MPD officers near Perry at that time, including Santiago, Bungert, Jacks, Kroes, and Ayala, were required by MPD policy and procedure to immediately call for an ambulance and alert their supervisor when Perry was in distress, stating "I can't breathe," "You're killing me" and "Help me", but they did not do so. (Id. ¶4, **Ex. B** at Robbins Dep. 119:21-120:21, 121:14-25, 132:9-133:6; Id. ¶13, **Ex. K** at Bell Dep. 60:24-61:1, 102:5-12; Id. ¶10, **Ex. H** at Bungert Dep. 27:20-23; Id. ¶5, **Ex. C** at Jacks Dep. 61:8-10.)

30.    As Ayala was pushing Perry forward while holding him down in the hallway of PPS for approximately twenty minutes, Perry told him, "That we were killing him" and would grunt and moan, but none of the officers restraining Perry, including Ayala, Kroes, Jacks and Bungert, did

6

anything to determine if he was suffering from a medical emergency at that time or offered Perry any medical assistance. (Id. ¶11, **Ex. I** at Ayala Dep. 22:17-18, 22L24-23:3, 23:25-4, 30:12-31:1, 36:7-9, 39:14-17; Id. ¶6, **Ex. D** at Kroes Dep. 67:13-20; Id. ¶8, **Ex. F** at MacGillis Dep. 193:1-12).

31.    Santiago thought Perry might be faking his condition, but in spite of his training as an emergency medical technician in the Air Force Guard, as well as his responsibility to Perry as an arrestee under his control, Santiago continued to forcefully restrain Perry and did nothing to determine whether Perry was suffering from a medical emergency.  (Id. ¶9, **Ex. G** at Santiago Dep. 40:15-16, 42:1-9.)

32.    While restrained on the PPS floor, Ayala witnessed Perry tense up and try to push his head back, then lower his head and begin spitting into his own lap, but did not see him attempt to spit at any officers. (Katers Decl. ¶3, **Ex. A** Supplement 0002 at 4; Gende Decl. ¶11, **Ex. I** at Ayala Dep. 61:18-24, 62:17-22.)

## III.    APPLICATION OF SPIT MASK

33.    MPD SOP 090 was in full force and effect on September 13, 2010 and articulated MPD's obligations and procedures in regard to prisoners and the monitoring of persons in custody while physically restrained.  (Katers Decl. ¶10, **Ex. H**.)

34.    Under MPD SOP 090.10, flexi-cuffs, leg irons, the body guard restraint system, and expectorant shields (spit masks) are all defined as physical restraints that require special precautions to be taken when utilized, and defines spit masks as a physical restraint "used for persons spitting at officers", but does not discuss using the restraint for arrestees spitting into their own lap. (Katers Decl. ¶10, **Ex. H**; Gende Decl. ¶5, **Ex. C** at Jacks Dep. 73:7-74:3, 75:20-22.)

35.    Pursuant to MPD SOP 090.10(F)(1), when an individual in MPD custody is in physical restraints, MPD officers are required to "continually monitor" said person. (Katers Decl. ¶10, **Ex. H** at 2.)

7

36.     Due to the potential hazards of the use of physical restraints, SOP 90.10(F)(2) addresses medical emergencies by stating, "Members shall remain cognizant of any changes in the condition of an arrestee that would require medical treatment.  If medical treatment becomes necessary, members shall immediately request assistance by telephone or radio.  It cannot be overemphasized that members shall continually monitor and remain cognizant of the condition of the person in custody, especially when he/she is in restraints.  The arrestee may encounter immediate or delayed physical reactions that may be triggered by the change in physical or environmental factors.  Therefore, caution and awareness on the part of the officer is constantly required."  (Id. ¶10, **Ex. H** at 3.)

37.     MPD SOP 090 is mandatory, and MPD officers are required to remain constantly cautious and aware of any person in physical restraints. (Gende Decl. ¶5, **Ex. C** at Jacks Dep. 72-73:3, 78:3-7.)

38.     Michelle Sandry (Sandry), MPD's designated expert witness and an individual employed by the Wisconsin Department of Justice as a jail training consultant, defined "continual monitoring" as, "Uninterrupted in time, sequence, substance or extent."  (Id. ¶14, **Ex. L** at Sandry Dep. 83:21-84:13.)

39.     Despite Perry's complaints that he was having difficulty breathing and that Perry was only spitting into his lap and not at the officers, Ayala and Defendant Jacob Ivy (Ivy) applied the spit mask over Perry's face in violation of MPD SOP 90.10(E). (Id. ¶11, **Ex. I** at Ayala Dep. 19:2-4; Id. ¶15, **Ex. M** at Ivy Dep. 18:3-9; Katers Decl. ¶10, **Ex. H**)

40.     Ivy never asked Perry if he was in medical distress or offered him medical assistance, because it was Ivy's understanding that if a person is released from the Hospital "it usually means they're going to be okay for a while." (Gende Decl. ¶15, **Ex. M** at Ivy Dep. 26:22-23, 43:8-23.)

8

41.    Prior to and after securing the spit mask on Perry's face, Ayala observed blood in Perry's saliva and a blood stain in his chin area, but did not report this to anyone. (<u>Id.</u> ¶12, **Ex. J** at Ayala Dep. 11:11-14, 12:7-10, 14:13-17, 80:3-18, 81:11-15.)

42.    While Perry was wearing the spit mask, one was not able to see through the spit mask and look at his eyes, nor look at his nose or mouth to see where he was bleeding.  (<u>Id.</u> ¶4, **Ex. B** at Robbins Dep. 43:17-22; <u>Id.</u> ¶16, **Ex. BB** at Lee Dep. 12:5-6.)

43.    After the spit mask was placed over Perry's head, Perry continued to beg for help and screamed that he couldn't breathe, to which Kroes responded, "If you're talking, you're breathing", but did not check Perry's vital signs, render first aid, or do anything to determine whether Perry was in pain or discomfort.  (<u>Id.</u> ¶6, **Ex. D** at Kroes Dep. 74:15-25, 80:1-17, 91:8-9.)

44.    Prior to and leading up to Perry's in-custody death, there was a long-standing understanding and unwritten policy in the MPD that a prisoner who complained of difficulty breathing is okay if he is able to talk.  (<u>Id.</u> ¶17, **Ex. O** at Flynn Dep. 85:8-24; <u>Id.</u> ¶10, **Ex. H** at Bungert Dep. 19:16-22.)

45.    Despite Ayala, Jacks and Kroes also being aware that Perry was at the Hospital prior to his return to PPS, and Kroes' prior training as a certified emergency medical technician and paramedic, neither Ayala, Kroes, Jacks nor Bungert did anything to determine whether Perry suffered from a medical emergency or offer him any assistance when he began spitting into his own lap, had urinated and defecated on himself, was calling out for help, stating the officers were "killing" him and that he could "not breathe." (<u>Id.</u> ¶11, **Ex. I** at Ayala Dep. 22:13-18, 22:24-23:3, 25:11-17; <u>Id.</u> ¶6, **Ex. D** at Kroes Dep. 12:18-19, 80:1-17; <u>Id.</u> ¶5, **Ex. C** at Jacks Dep. 61:8-10; <u>Id.</u> ¶10, **Ex. H** at Bungert Dep. 25:21-23.)

46.    While Perry was being restrained on the PPS floor after returning from the Hospital, Robbins observed Perry to be incoherent, moaning with a spit mask over his head, and that he had

urinated and defecated on himself, as his clothing was soiled and an odor was emitting from him, but did not do anything to determine whether Perry was suffering from a medical emergency at that point. (Katers Decl. ¶3, **Ex. A** Supplement 0004 at 2; Gende Decl. ¶4, **Ex. B** at Robbins Dep. 44:11-16.)

47.   Instead of offering assistance to Perry or instructing his officers to provide Perry medical assistance, Robbins told Perry that, "if he was going to act like an animal, he would be treated like he was in prison", then ordered Perry be put in cell A3 with no additional monitoring other than intermittent 15 minute checks. (Katers Decl. ¶3, **Ex. A** Supplement 0004 at 2; Gende Decl. ¶4, **Ex. B** at Robbins Dep. 44:11-16, 48:16-25; Id. ¶18, **Ex. P** at Diaz-Berg Dep. 20:17-23.)

48.   Robbins did not do an assessment of Perry before he was placed in cell A3, and Kroes testified that he could not think of anything Robbins did to protect Perry's health, safety and welfare. (Id. ¶6, **Ex. D** at Kroes Dep. 102:25-103:2, 103:21-24.)

49.   Up to the point in time that Perry was carried into cell A3, no one offered Perry medical assistance, attempted to comfort or reassure Perry, offered him assistance in removing his soiled garments, or allowed him the opportunity to clean up. (Id. ¶4, **Ex. B** at Robbins Dep. 56:9-16; Id. ¶5, **Ex. C** at Jacks Dep. 59-60:15-5.)

50.   Despite Perry's deteriorated condition, cries for help and statements that he could not breathe, Perry was then carried by Kroes, Jacks, Santiago, Bungert and Defendant Luke Lee (Lee) by his shackled arms and legs, while he was bleeding, had a spit mask over his head, and covered in his own feces and urine, into cell A3 - one of the cells furthest in the back at PPS, difficult to see, and far from the Lieutenant's office. (Gende Decl. ¶4, **Ex. B** at Robbins Dep. 41:4-10, 42:10-12; Id. ¶16, **Ex. N** at Lee Dep. 10:6-10, 11:4-14; Katers Decl. ¶3, **Ex. A** Supplement 0022 at 2.)

51.    Cell A3 is used for "problematic inmates", and has a solid door with a skinny window that, only if you look through the window, you can see into the cell. (Gende Decl. ¶13, **Ex. K** at Bell Dep. 18:5-10, 19:24-20:7).

52.    While Perry was being carried to cell A3, Robbins was aware that Perry had urinated and defecated on himself but he did not inquire as to the cause, nor did Ayala, Kroes, Jacks, Lee, Santiago, or Bungert inquire about the same or whether Perry needed medical attention, offer Perry medical attention, or inquire as to whether Perry should be returned to the hospital. (Id. ¶4, **Ex. B** at Robbins Dep. 44:14-19, 45:12-20; Id. ¶16, **Ex. N** at Lee Dep. 13:12-13, 14:14-21; Id. ¶11, **Ex. I** at Ayala Dep.52:8-18; Id. ¶16, **Ex. N** at Lee Dep. 17-18:6-1; Id. ¶10, **Ex. H** at Bungert Dep. 35:25-2; Id. ¶19, **Ex. Q** at Lopez Dep. 26:2-11, 12-16.)

53.    While carrying Perry into cell A3 by his shackled arms and legs with the spit mask still on his face, Ayala, Kroes, Jacks, Lee, Santiago, and Bungert dropped Perry twice from about two feet above the floor, causing him to strike his head on the concrete. This was witnessed by other arrestees at PPS. (Katers Decl. ¶3, **Ex. A** Supplement 0002 at 4; Supplement 0022 at 2; Id. ¶10, **Ex. H** at 3; Gende Decl. ¶17, **Ex. O** at Flynn Dep. 38: 5-17, 52:12-15; Id. ¶20, **Ex. R** at Davis Dep. 46:3-9.)

54.    After Perry was dropped on the floor, arrestee Tyrone Evans observed blood on the floor in front of the cell where Perry had been dropped, and could hear Perry moaning from inside cell A3. (Katers Decl. ¶3, **Ex. A** Supplement 0022 at 2.)

55.    Defendant Margarita Diaz-Berg (Diaz-Berg), the assistant jailer at PPS on September 13, 2010, was responsible for conducting regular wellness checks of the prisoners, which consisted of checking on prisoners in their cells every fifteen minutes to make sure they were ok and breathing. (Gende Decl. ¶18, **Ex. P** at Diaz-Berg Dep. 8:1-17; Katers Decl. ¶11, **Ex. I**.)

11

56.   Diaz-Berg had never seen any written polices or procedures on the proper way to perform wellness checks, but it is common practice at PPS to use other inmates as a warning system to alert MPD officers if an inmate is suffering from a medical emergency.  (Gende Decl. ¶18, **Ex. P** at Diaz-Berg Dep. 8:1-24, 16:7-16, 20:3-9.)

57.   Diaz-Berg, as assistant jailer, was primarily responsible for checking Perry in his cell after he returned from the hospital, but Diaz-Berg was not provided with Perry's Discharge Instructions nor did she make any attempt to familiarize herself with said Instructions. (Id. ¶18, **Ex. P** at Diaz-Berg Dep. 20:3-9, 26:9-14.)

58.   While Diaz-Berg conducted intermittent wellness checks of Perry, she heard Perry grunting and saw him rolling around on the cell floor, but took no action whatsoever to distinguish whether Perry was suffering from a medical emergency at that point.  (Id. ¶18, **Ex. P** at Diaz-Berg Dep. 56:7-16.)

59.   Robbins testified that he expedited Perry's paperwork to have him conveyed over to the CJF for "medical reasons" as the CJF had nurses to help Perry for his medical "crisis", but he did not inform anyone at the CJF of the blood observed in Perry's cell or Perry's discharge instructions. (Id. ¶4, **Ex. B** at Robbins Dep. 81:17-82:14, 99:14-22; Id. ¶8, **Ex. F** at MacGillis Dep. 86:2-11.)

## III. TRANSPORT TO THE CJF

60.   At approximately 8:08 p.m., Defendants Richard Lopez (Lopez) and Frank Salinsky (Salinsky) were dispatched to PPS to convey Perry to the CJF.  (Katers Decl. ¶3, **Ex. A** Supplement 0008 at 1.)

61.   Robbins instructed several officers to remove Perry from cell A3 because Perry was ill, and at approximately 8:20 p.m., Lopez, Salinsky, Lee, Ayala, Diaz-Berg, Ivy, and Robbins proceeded to cell A3 where shackles were placed on Perry's arms and legs and the spit mask that had come off in the cell was reapplied, even though it was saturated with blood and spit.  (Gende Decl. ¶16, **Ex. N**

at Lee Dep. 20-21:8-4; <u>Id.</u> ¶21, **Ex. S** at Salinsky Dep. 38:11-20, 51:11-13; <u>Id.</u> ¶11, **Ex. I** at Ayala Dep. 47:7-9; Lopez 55:24-25; Katers Decl. ¶12, **Ex. J** (Doc. 72-2) at 5; <u>Id.</u> ¶3, **Ex. A** Supplement 0012 at 3.)

62.  As Perry was picked up from the cell floor, Lopez noticed blood on the spit mask that covered Perry's face, but despite acknowledging that this could indicate a medical emergency, neither he nor any other officer offered Perry any medical assistance and did nothing to determine whether Perry was suffering from a medical emergency at that point. (Katers Decl. ¶3, **Ex. A** Supplement 0008 at 2; Gende Decl. ¶19, **Ex. Q** at Lopez Dep. 22:2-5, 23:13-18, 26:17-25)

63.  Salinsky observed upon entering the cell that Perry had defecated on himself, but did nothing to determine whether Perry was suffering from a medical emergency or ask him if he required medical assistance.  (<u>Id.</u> ¶21, **Ex. S** at Salinsky Dep. 39:4-16).

64.  Following Perry's removal from cell A3, both Diaz-Berg and Robbins observed blood on the cell floor, but did nothing to determine where or why Perry was bleeding nor did they relay this information to anyone, including the CJF, even though they recognized that observing blood on the cell floor after an inmate is removed is suggestive of a medical emergency and had an obligation to inquire as to the source of the blood.  (Katers Decl. ¶3, **Ex. A** Supplement 0002 at 3, Supplement 0004 at 2; Gende Decl. ¶18, **Ex. P** at Diaz-Berg Dep. 65-67; <u>Id.</u> ¶4, **Ex. B** at Robbins Dep. 61:6-18, 83:2-7, 91:18-23, 92:7-18, 92:23-93:1, 95:4-13; 107:1-22, 110:2-9, 110:10-17; <u>Id.</u> ¶8, **Ex. F** at MacGillis Dep. 60:8-13, 86:2-11; <u>Id.</u> ¶19, **Ex. Q** at Lopez Dep. 14:15-19.)

65.  Diaz-Berg summoned custodial worker Andrew Puechner (Puechner) to clean cell A3, and Puechner immediately noticed "gobs of spit, blood and fecal matter" on the floor where Perry had earlier laid moaning and groaning.  (Katers Decl. ¶3, **Ex. A** Supplement 0002 at 3; Gende Decl. ¶22, **Ex. T** at Puechner Dep. 47:3-6.)

13

66. Lopez and Salinsky carried Perry from cell A3 to the elevator by his arms because he was unable to walk on his own and had wobbly legs as if he was "intoxicated", firmly holding onto him for fear that he would fall. (Katers Decl. ¶3, **Ex. A** Supplement 0008 at 2; Gende Decl. ¶19, **Ex. Q** at Lopez Dep. 66:16-24, 67:1-4, 8-10.)

67. Lopez could smell a strong odor of fecal matter emitting from Perry, but did not try to determine whether Perry voluntarily defecated on himself, despite acknowledging that a Prisoner who urinates or defecates on himself involuntarily could indicate they are suffering from a medical emergency. (Gende Decl. ¶19, **Ex. Q** at Lopez Dep. 26:2-11, 12-16, 58:7-11) Lopez did not feel any urgency to inquire as to Perry's state of health, offer him any assistance or do anything to determine whether Perry was suffering from a medical emergency at this point. (Katers Decl. ¶3, **Ex. A** Supplement 0008 at 2; Gende Decl. ¶19, **Ex. Q** at Lopez Dep. 17:1-4, 25:13-18, 67:14-19.)

68. At approximately 8:23 p.m. Lopez, Salinsky and Ayala dragged Perry into the elevator, and nearly nine minutes later, at 8:34 p.m., Lopez and Salinsky left the PAB with Perry in the rear of the conveyance van to transport him to the CJF. (Katers Decl. ¶6, **Ex. D**; Id. ¶3, **Ex. A** Supplement 0002 at 6).

## IV. ARRIVAL AT CJF

69. When Perry arrived at the CJF and was removed from the transport wagon, blood was emanating from his head, and there was blood in the rear of the conveyance wagon. (Gende Decl. ¶14, **Ex. L** at Sandry Dep. 51:11-15; Id. ¶19, **Ex. Q** at Lopez Dep. 78:21-25; Katers Decl. ¶3, **Ex. A** Original at 6.)

70. Lopez and Salinsky failed to advise the Milwaukee County Sherriff's Office (MCSO) officers at the CJF, including Defendants Arndt and Kieckbusch who assisted Lopez and Salinsky drag Perry into the CJF, of Perry's acute medical condition. (Gende Decl. ¶23, **Ex. U** at Arndt Dep. 12:10-23; Id. ¶25, **Ex. W** at Kieckbusch Dep. 9:2-14.)

14

71.     As Perry was dragged into the pre-booking room at 8:41 p.m. unable to walk or stand, Defendants Lopez, Salinsky, Arndt and Kieckbusch placed him on the floor. (Katers Decl. ¶6, **Ex. D**.) Defendant Officer Stephon Bell (Bell) did not attempt to do anything to determine whether Perry was suffering from a medical emergency at this point. (Gende Decl. ¶13, **Ex. K** at Bell Dep. 70:14-17; 71:9-12.)

72.     At approximately 8:44 p.m., while Perry was still shackled and wearing a bloody spit mask, with soiled undergarments and pants around his ankles, Defendants Lopez, Salinsky, Kieckbusch and Arndt picked Perry up off of the floor and dragged him over to a bench across from the nurse's station as Perry was unable to walk on his own. (Katers Decl. ¶6, **Ex. D**; Gende Decl. ¶19, **Ex. Q** at Lopez Dep. 70:4-7.)

73.     Lopez testified that he advised a MCSO deputy at the CJF that Perry needed medical attention at this time, however neither Lopez nor Salinsky informed MCSO nurse Nichole Virgo (Virgo), who performed the pre-screening of Perry at 8:45 p.m., that Perry had complained of an inability to breathe earlier in the evening. (Id. ¶19, **Ex. Q** at Lopez Dep. 71:1-4; Id. ¶24, **Ex. V** at Virgo Dep. 116:8-11.) Perry's needs were too serious upon his arrival at CJF to accept him. (Id. ¶24, **Ex. V** at Virgo Dep. 80:16-22.)

74.     Shortly thereafter, Perry slid off the bench onto the pre-booking room floor, but neither Salinsky, Lopez, nor Bell provided Perry any assistance and failed to continually monitor him despite the physical restraints placed on Perry and in violation of SOP 090.10. Lopez testified he was unaware of a higher level of monitoring required for a person in physical restraints. (Id. ¶25, **Ex. W** at Kieckbusch Dep. 95:8-17; Id. ¶13, **Ex. K** at Bell Dep. 76:5-10, 77:1-4; Id. ¶19, **Ex. Q** at Lopez Dep. 18:1-22.)

75.     Despite their duty to continually monitor Perry, in the minutes before Perry died on the floor of the CJF, Salinsky, Lopez, and Bell turned their backs and left Perry unattended, and took no

action to determine if Perry was suffering from a medical emergency. (Gende Decl. ¶26, **Ex. X** at Hale Dep. 107:24-25, 108:1-10; Id. ¶25, **Ex. W** at Kieckbusch Dep. 98: 8-22, 99: 1-23.)

## V.    POLICY, PROCEDURE AND TRAINING

76.    Prior to and in effect on the date of Perry's in-custody death, September 13, 2010, there was a paradigm shift in MPD training entitled "Struggling and resistance can indicate an immediate MEDICAL EMERGENCY and not a criminal act." (Katers Decl. ¶13, **Ex. K** Paradigm Shift; Gende Decl. ¶17, **Ex. O** at Flynn Dep. 81:7-25, 82:2-7.)

77.    Although all MPD officers were expected to be conversant with this paradigm shift, understand it and implement it prior to and on the date of Perry's in-custody death, neither Diaz-Berg, Bungert nor Bell were familiar with or recalled receiving training on this paradigm shift. (Id. ¶17, **Ex. O** at Flynn Dep. 82:8-10; Id. ¶18, **Ex. P** at Diaz-Berg Dep. 30:10-21; Id. ¶10, **Ex. H** at Bungert Dep. 28:9-15; Id. ¶13, **Ex. K** at Bell Dep. 55:12-23.)

78.    Kroes was familiar with the concept that struggling and resistance can indicate an immediate medical emergency as opposed to a criminal act, but never considered that Perry could have been suffering from a medical emergency prior to his death. (Id. ¶6, **Ex. D** at Kroes Dep. 91:10-14, 92:5-13.)

79.    No MPD officers, including Ivy, Bell, Kroes, Bungert, Ayala and Diaz-Berg, did anything to determine whether Perry's actions and behavior, including struggling and appearing resistive, were voluntary or due to the fact that Perry was suffering from a medical emergency requiring prompt medical attention. (Id. ¶17, **Ex. O** at Flynn Dep. 82:11-83:18; Id. ¶6, **Ex. D** at Kroes Dep. 91:10-92:13; Id. ¶18, **Ex. P** at Diaz-Berg Dep. 30:22-31:9; Id. ¶10, **Ex. H** at Bungert Dep. 28:21-25; Id. ¶15, **Ex. M** at Ivy Dep. 19:17-21; Id. ¶13, **Ex. K** at Bell Dep. 55:22-56:7, 58:18-21; Id. ¶11, **Ex. I** at Ayala Dep 25:3-10; Id. ¶14, **Ex. L** at Sandry Dep. 142:6-11.)

16

80.    MPD Officers are trained in recognizing a medical emergency "to an extent", and are trained that a medical emergency is when someone is "unconscious and not breathing."  (Id. ¶6, **Ex. D** at Kroes Dep. 78:12-21.)

81.    "Officers are trained to ascertain what type of bleeding it is, if it is profuse, if it's a drop of blood, does it require a Band-Aid, does it require more advanced medical intervention", but no MPD officer did anything to assess Perry's bleeding at PPS or anytime thereafter or inquire as to the cause of the gobs of blood, spit, and feces on the floor of cell A3.  (Id. ¶14, **Ex. L** at Sandry Dep. 154:17-25, 155:2-10; Id. ¶21, **Ex. S** at Salinsky Dep. 20:4-21:13; Id. ¶8, **Ex. F** at MacGillis Dep. 57:12-20; 66:17-23, 74:16-24, 78:11-16).

82.    MPD policy and procedure does not allow MPD officers to rely on somebody not affiliated with the MPD to constantly monitor an inmate's medical condition, but are required to continually monitor persons in their custody.  (Id. ¶8, **Ex. F** at MacGillis Dep. 204:16-24; Katers Decl. ¶10, **Ex. H**).

83.    Perry was not continually monitored after he was placed in cell A3 by himself in violation of MPD's own policy and procedures.  (Id. ¶14, **Ex. L** at Sandry Dep. 86:22-24, 137: 13-25, 138:1-11.)

84.    Salinsky did not stay by Perry's side, did not continually monitor Perry for a change in condition, and did not ask Perry if he needed medical assistance the entire time he was with him. (Id. ¶21, **Ex. S** at Salinsky Dep. 69:3-8, 72:1-21.)

85.    MPD personnel, including Jacks, Kroes and Robbins, were required to read, understand and follow Perry's discharge instructions so that they would know how to properly care for him, and were obligated to pass on that information to other officers who would be responsible for Perry's health, welfare, and safety.  (Id. ¶14, **Ex. L** at Sandry Dep. 72:6-8, 116:20-117:3, 120:4-13, 121:13-122:1; Id. ¶17, **Ex. O** at Flynn Dep. 77:7-13.)

17

86.     No MPD officers thoroughly read or understood Perry's discharge instructions that required getting prompt medical attention in certain situations, and this failure violated Wisconsin Department of Justice policies and procedures, the Wisconsin Constitution, the United States Constitution as it relates to the humane treatment of a prisoner by getting him prompt medical attention.  (Id. ¶14, **Ex. L** at Sandry Dep. 132-33:20-19; Id. ¶8, **Ex. F** at MacGillis Dep. 100:1-3, 102-103:20-7; Id. ¶5, **Ex. C** at Jacks Dep. 62:25-63:1).

87.     Lopez was not concerned that there may be special instructions in Perry's discharge instructions or warnings that if Perry exhibited certain signs of distress or confusion or unbalanced gait, that he should be immediately returned to the emergency room.  (Id. ¶19, **Ex. Q** at Lopez Dep. 34:8-17.)

88.     MPD officers have the discretion to determine what assistance a prisoner may need on the continuum of care, but do not have discretion to ignore the medical needs of inmate under their care, custody and control and must immediately request assistance by phone or radio in the event of a medical emergency or if an individual's medical condition rises to the level of requiring medical assistance.  (Id. ¶8, **Ex. F** at MacGillis Dep. 118:10-21, 154:4-9; Id. ¶6, **Ex. D** at Kroes Dep. 90:10-16; Id. ¶11, **Ex. I** at Ayala Dep 43-44:21-1.)

89.     Lopez testified that anyone suffering from a medical emergency, including where a person is in "obvious distress, or giving us a verbal clue that they're in any kind of medical distress" is not to be conveyed to the CJF, but an ambulance should be called.  (Id. ¶19, **Ex. Q** at Lopez Dep. 5:15-24.)

90.     MPD policy and procedure requires, *inter alia:* (1) "Once arrested, the PO is responsible for monitoring arrestee's physical condition;" (2) "Throughout the arrest, conveyance, and transport of prisoners, there's an overriding concern to monitor arrestee health;" (3) "Any medical emergency should be immediately reported to Dispatch and transported to appropriate medical facility;" and (4)

18

"Once transferred to a conveying PO, he/she is responsible for monitoring prisoner physical condition." (Katers Decl. ¶14, **Ex. L** at 26-27; Gende Decl. ¶8, **Ex. F** at MacGillis Dep. 191-192:3-5.)

91.   If an individual in the custody of the MPD has been medically cleared, that does not alleviate an officer's duty to continue to observe and protect the health, safety, and welfare of an individual in their custody.  (Id. ¶21, **Ex. S** at Salinsky Dep. 15:17-23)

92.   MPD policy and procedure requires that inmates released from an emergency room be monitored for any change in condition, such as when a person goes from not bleeding to bleeding, or has difficulty breathing.  (Id. ¶8, **Ex. F** at MacGillis Dep. 103-104:9-3; Id. ¶5, **Ex. C** at Jacks Dep. 79:19-24, 82:4-15, 83:23-84:1).

93.   It is not standard operating procedure to take someone who needs medical attention to the CJF, but if someone needs medical attention they will be taken to a hospital and any MPD officer could have done so for Perry.  (Id. ¶13, **Ex. K** at Bell Dep. 53:8-12; Id. ¶5, **Ex. C** at Jacks Dep. 78:16-24; Id. ¶19, **Ex. Q** at Lopez Dep. 15:5-12, 28:15-18.)

94.   MPD officers have an obligation to inform the CJF staff of inmates who are suffering from a medical condition, but did not do so prior to Perry's arrival, only advising that he was "combative."  (Id. ¶13, **Ex. K** at Bell Dep. 98-99:23:1; Id. ¶26, **Ex. X** at Hale Dep. 20:13-16, 17-23; Id. ¶27, **Ex. Y** at Holmes Dep. 33:10-16.)  A quicker assessment of Perry would have occurred at the CJF if MPD would have informed the CJF that Perry had been at the emergency room earlier in the evening, and if MPD personnel had informed the CJF that Perry was in need of medical attention, the CJF would have required MPD take him to the hospital.  (Id. ¶26, **Ex. X** at Hale Dep. 59:20-25; 60:1-11; 85: 17-25.)

## VI.   MISCELLANEOUS

95. While Perry was at the CJF and until the time of his death, he was in the joint custody of the Milwaukee County Sheriff's Office (MCSO) and MPD, and the MCSO and MPD were jointly responsible for Perry's health, safety, and welfare. (Id. ¶8, **Ex. F** at MacGillis Dep. 199:19-25, 200:1-4, 210:2-8.)

96. Perry was never combative, such as physically fighting or using large amounts of force against any officers, during his transport from the Hospital to PPS, while at PPS, during his conveyance to the CJF, or anytime thereafter. (Id. ¶6, **Ex. D** at Kroes Dep. 15:24-16:4; Id. ¶9, **Ex. G** at Santiago Dep. 85:11-12; Id. ¶5, **Ex. C** at Jacks Dep. 36:8-12; 47:14-17; Id. ¶11, **Ex. I** at Ayala Dep. 45:21-23; Id. ¶21, **Ex. S** at Salinsky Dep. 23:17-23, 49:25-50:2; Id. ¶28, **Ex. Z** at Schmidt Dep. 55:8-16; Id. ¶26, **Ex. X** at Hale Dep. 96:11-21; Id. ¶25, **Ex. W** at Kieckbusch Dep. 75:2-3; Id. ¶29, **Ex. AA** at Jeff Dep. 17:12-14; Id. ¶13, **Ex. K** at Bell Dep. 62:10-11.)

97. The MPD Defendants including Kroes, Jacks, Robbins, Ayala, Salinsky, Lopez, Ivy, Bungert, Diaz-Berg, Lee and Bell exacerbated Perry's underlying cardiac condition by failing to distinguish between voluntary behavior and signs and symptoms of myocardial infarction, pulmonary edema, and severe respiratory distress, and failing to seat him in a comfortable position or call for an ambulance until it was too late and Perry died on the CJF floor. (Katers Decl. ¶12, **Ex. J** (Doc. 72-2) at 4-6; Gende Decl. ¶17, **Ex. O** at Flynn Dep. 82:11-83:18; Id. ¶6, **Ex. D** at Kroes Dep. 91:10-92:13; Id. ¶18, **Ex. P** at Diaz-Berg Dep. 30:22-31:9; Id. ¶10, **Ex. H** at Bungert Dep. 28:21-25; Id. ¶15, **Ex. M** at Ivy Dep. 19:17-21; Id. ¶13, **Ex. K** at Bell Dep. 55:22-56:7, 58:18-21; Id. ¶11, **Ex. I** at Ayala Dep 25:3-10; Id. ¶14, **Ex. L** at Sandry Dep. 142:6-11) If any one of the people responsible for Perry had recognized what was clearly a medical emergency, they could have changed the outcome of Perry's death. (Katers Decl. ¶12, **Ex. J** (Doc. 72-2) at 6.)

98. In 2012, MPD Internal Affairs determined that Robbins "inhumanely" spoke to Perry. Robbins subsequently retired to avoid a demotion. (Gende Decl. ¶8, **Ex. F** at MacGillis Dep. 178:1-

4; ¶4, **Ex. B** at Robbins Dep. 124:7-21; 125:1-3; <u>Id.</u> ¶17, **Ex. O** at Flynn Dep. 25:13-25; 26:1-4; Katers Decl. ¶15, **Ex. M**.)

99.    No MPD officer did anything to obtain medical assistance for Perry before, during or after he was placed in cell A3 or before his death at the CJF, though there were actions the officers could have taken to prevent Perry's death including getting him prompt medical treatment while at PPS. (Gende Decl. ¶14, **Ex. L** at Sandry Dep. 155-156:7-16; <u>Id.</u> ¶13, **Ex. K** at Bell Dep. 108:15-22, 109:7-15; Katers Decl. ¶12, **Ex. J** (Doc. 72-2) at 5.)

100.   At the time of the investigation of Perry's in-custody death, the detectives did not look for evidence of wrongdoing, did not attempt to determine if Perry was dropped intentionally or not, did not attempt to determine the cause of Perry's in-custody death, did not investigate whether Perry was suffering from a medical emergency prior to his death, and did not watch any video or do any independent investigation other than interviewing witnesses. (Gende Decl. ¶30, **Ex. BB** at Bormann Dep. 14:3-11, 20:12-20; <u>Id.</u> ¶20, **Ex. R** at Davis Dep. 28:12-17, 37:19-23, 51:20-52:10; <u>Id.</u> ¶31, **Ex. CC** at Thomas Dep. 75:3-23; <u>Id.</u> ¶32, **Ex. DD** at Allen Dep. 34:21-22.)  It is not in the reports of any investigating officer that there was any inquiry into the use of physical restraints in regard to Perry's in-custody death, (<u>Id.</u> ¶14, **Ex. L** at Sandry Dep. 91:6-20) and a Critical Incident Review Board, instituted to review policy and training issues in the department, was not instituted by the City of Milwaukee until nearly two years after Perry's death. (<u>Id.</u> ¶17, **Ex. O** at Flynn Dep. 131:17-25, 132:19-23.)

# PLAINTIFFS' RESPONSES TO MILWAUKEE CITY DEFENDANTS' PROPOSED FINDINGS OF FACT

NOW COME the Plaintiffs, The Estate of James Franklin Perry by Bettie A. Rodgers and James Franklin Perry I, and pursuant to Civil L.R. 56 of the United States District Court for the Eastern District of Wisconsin, submit the following responses to the Milwaukee City Defendants' Proposed Findings of Fact.

## The Parties

1. The Estate of Mr. Perry and his minor son, James Franklin Perry, Jr., claim that certain of Mr. Perry's constitutional rights were violated by Milwaukee police personnel. (Amended Complaint.).

**RESPONSE**: **ADMIT** and note that Plaintiffs also advanced claims of Negligence and Wrongful Death, against Milwaukee police personnel as well as employees of the Milwaukee County Sheriff Department. Plaintiffs also brought Monell claims against the City and County of Milwaukee. Additionally, Perry's minor son James Franklin Perry prayed for damages for his loss of support and society and companionship with his with this father. (Am. Compl. (Docket No. 60) ¶ 3)

2. Chief Flynn has been employed as the Chief of Police for the Milwaukee Police Department since January, 2008. (Amended Complaint; Answer.)

**RESPONSE**: **DENY.** As no specific citation is set forth to the record Plaintiffs must deny. Plaintiffs' Complaint alleges that Flynn was the Chief of Police for the Milwaukee Police Department, but is silent as to when Flynn's tenure started; further the City of Milwaukee Defendants Answer alleges that Flynn was employed as a law enforcement officer and is silent as to when said tenure began. (Am. Compl. (Docket No. 60) ¶ 34; City Defendants' Answer to Am. Compl. (Docket No. 30) ¶ 34 ).

22

3.     Ramon Galaviz retired in 2013 as a Deputy Inspector, after more than 30 years of service with the Milwaukee Police Department. (Amended Complaint; Galaviz Aff., ¶ 1.)

**RESPONSE**:  **ADMIT.**

4.     Victor Beecher is currently employed as a captain for the Milwaukee Police Department, and from May 16, 2010 until September 19, 2011, he was assigned as a lieutenant to the training academy. (Amended Complaint; Beecher Aff., ¶¶ 1-3.)

**RESPONSE**:  **ADMIT.**

5.     Karl Robbins retired in 2013 after more than 25 years of MPD service, but, at all times relevant to the subject matter of this litigation, he was employed as a police lieutenant with the Milwaukee Police Department, (Amended Complaint; Robbins Aff., ¶¶ 1-3.). Shannon Jones was a detective who also retired in 2013 after 25 years of service, and at all times relevant to the subject matter of this litigation, he was acting within the scope of his employment with the MPD (Amended Complaint; Jones Aff., ¶ 1-3.)

**RESPONSE**:  **DENY** as to Lieutenant Robbins. Robbins was forced to retire from the MPD after the death of James Perry or face a demotion.  During Perry's tragic decline to death at the Police Processing Section (PPS), Robbins inhumanely spoke to Perry, "if you're going to act like an animal we're going to treat you like you're in prison."   A subsequent investigation of Robbins occurred as the result of said statement and according to Robbins, the result of that investigation was, "Well, I was basically told to retire or I'll be demoted."   Robbins was given a month by a Captain of Internal Affairs to retire or be demoted from lieutenant to sergeant, which would have negatively affected Robbins pension benefits.   According to Chief Flynn, Robbins was facing significant discipline, which prompted his retirement. The Internal Affairs investigation concluded that Robbins had spoken inhumanely to Perry.  (Gende Decl. ¶17, **Ex. O** at Flynn Dep. 25:21-26:4, 29:15-18; Id. ¶4, **Ex. B** at Robbins Dep. 123:18-125:21).  **ADMIT** as to Shannon Jones.

23

6. Richard Lopez, Frank Salinsky, Stephon Bell, Margarita Diaz-Berg, Alexander C. Ayala, Froilan Santiago, Crystal Jacks, Corey Kroes, Rick Bungert, Luke Lee, Jacob Ivy, and Richard Menzel were at all times material hereto the subject matter of this litigation employed as police officers for the Milwaukee Police Department. (Amended Complaint; Lopez Aff. ¶¶ 1-3; Salinsky Aff. ¶¶ 1-3; Bell Aff. ¶¶ 1-3; Diaz-Berg Aff. ¶¶ 1-3; Ayala Aff. ¶¶ 1-3; Santiago Aff. ¶¶ 1-3; Jacks Aff. ¶¶ 1-3; Kroes Aff. ¶¶ 1-3; Bungert Aff. ¶¶ 1-3; Lee Aff. ¶¶ 1-3; Ivy Aff. ¶¶1-3; Menzel Aff. ¶¶ 1-3.)

**RESPONSE**: **DENY** as to Jacob Ivy being employed as a police officer at all times material to the subject matter of this litigation. The events underlying this litigation took place on September 13, 2010, at which time Ivy was employed as a police aide, not a police officer, for the MPD. (Gende Decl. ¶15, **Ex. M** at Ivy Dep. 6:6-7.)

7. The City of Milwaukee is a municipal corporation, which currently employs Chief Flynn, Richard Lopez, Frank Salinsky, Stephon Bell, Margarita Diaz-Berg, Alexander C. Ayala, Froilan Santiago, Crystal Jacks, Corey Kroes, Rick Bungert, Luke Lee, Jacob Ivy, Richard Menzel and Victor E. Beecher, and which at all times relevant to this litigation employed Karl Robbins, Shannon D. Jones and Ramon Galaviz, who are now retired. All City defendants at all times material to the subject events were acting within the scope of their employment and under color of law. (Amended Complaint; Answer.)

**RESPONSE**: **ADMIT.**

**MPD Policies and Training**

8. The MPD training academy staff trains officers using its own Standard Operating Procedures (SOPs) and Code of Conduct, state statutes, and pertinent caselaw (sic), along with state-board-mandated training guides, which are published by the Wisconsin Department of Justice, to present officers with MPD policies regarding many subject matter areas, including the provision of

medical assistance to prisoners, and conducting investigations regarding deaths of arrestees which occur while they are in MPD custody. (Flynn Aff., ¶ 3.)

**RESPONSE**:  **DENY.**  The MPD trains officers inconsistent with Wisconsin DOJ Standards in regard to continual monitoring of inmates in physical restraints.  According to Michelle Sandry, an expert designated by the MPD in this case and an individual employed by the Wisconsin DOJ as a jail training consultant, continual monitoring means, "Uninterrupted in time, sequence, substance or extent."  (Gende Decl. ¶14, **Ex. L** at Sandry Dep. 83:21-84:13.)  In fact Sandry agreed the MPD defendants failed to continually monitor Perry while he was wearing a spit mask and housed in cell A3 oin violation of MPD policy and procedure.  (Id. ¶14, **Ex. L** at Sandry Dep. 84:14-85:6.)  Sandry also testified, "I believe there should have been further monitoring on Mr. Perry while he was in the single cell [at PPS]."  (Id. ¶14, **Ex. L** at Sandry Dep. 137:25-138:2.)  This is directly contrary to MPD training provided to its officers, who are trained that continual monitoring means monitoring every fifteen minutes or less. (Id. ¶8, **Ex. F** at MacGillis Dep. 130:17-19.)  Further, MPD training academy staff does not train officers on providing medical assistance, but rather focuses on how to recognize injury and illness in others and when to obtain medical assistance.  (Id. ¶14, **Ex. L** at Sandry Dep. 153:14-16.)  Flynn testified that the MPD officers involved had first aid training, but was unsure as to the training regarding medical emergencies.  (Id. ¶17, **Ex. O** at Flynn Dep. 8:25-9:6, 73:22-25.)

9.     All City of Milwaukee police officers receive extensive training, which is consistent with the mandates of the Wisconsin Department of Justice Law Enforcement Standards Board. (Flynn Aff., ¶ 4.) Sandry overview.

**RESPONSE**:  **DENY.**  The classification of "extensive" is subjective.  Affirmatively allege that Flynn lacks the requisite knowledge to testify to the level of training, as he testified, "I have not personally taken the training that accompanies the policies that we have, so I couldn't tell you." (Gende Decl. ¶17, **Ex. O** at Flynn Dep. 11:10-12.)

10.   All MPD officers complete a 22 to 23-week intensive police recruit training course at the Milwaukee Fire and Police Training Academy. (Flynn Aff., ¶ 5.)

**RESPONSE**:  **DENY.**  The classification of "extensive" is subjective.  Affirmatively allege that Flynn lacks the requisite knowledge to testify to the level of training, as he testified, "I have not personally taken the training that accompanies the policies that we have, so I couldn't tell you." (Gende Decl. ¶17, **Ex. O** at Flynn Dep.11:10-12.)

11.   After a police officer successfully completes recruit training at the training academy, the officer is assigned to a district police station, where field training officers are assigned to work with the new officer. (Flynn Aff., ¶ 6.)

**RESPONSE**:  **ADMIT.**

12.   During field training, the officer receives on-the-job training regarding Milwaukee Police Department SOPs, policies, and various techniques utilized by officers. (Flynn Aff., ¶ 7.)

**RESPONSE**:  **ADMIT.**

13.   Field training officers ensure that their trainees are familiar with Milwaukee Police Department SOPs, policies and trained techniques. (Flynn Aff., ¶ 8.)

**RESPONSE**:   **DENY**, as Chief Flynn does not have the requisite foundation to testify as to the actions of field training officers or whether or not they "ensure" the trainees familiarity.  Further, the term "familiar" is vague.  (Gende Decl. ¶17, **Ex. O** at Flynn Dep.11:10-12.)   Further, Diaz-Berg, Bungert and Bell all admitted they were unfamiliar with or did not recall receiving training on the policy entitled "Paradigm Shift: Struggling and resistance can indicate an immediate MEDICAL EMERGENCY and not a criminal act." (Id. ¶18, **Ex. P** at Diaz-Berg Dep. 30:10-21; Id. ¶10, **Ex. H** at Bungert Dep. 28:9-15; Id. ¶13, **Ex. K** at Bell Dep. 55:12-23; Katers Decl. ¶13, **Ex. K**.)

26

14. In addition to the training received during both recruit training and field training, officers also receive annual continuing or "in-service" training on various topics, including the provision of medical assistance to prisoners, and other issues related to search and seizure laws. (Flynn Aff., ¶ 9.)

**RESPONSE**: **DENY.** Flynn testified that the MPD officers involved did not have medical training, but first aid training, and in regard to medical emergencies, "I don't know what the exact training was." (Gende Decl. ¶17, **Ex. O** at Flynn Dep. 8:25-9:6, 73:22-25.)

15. Milwaukee Police Department officers are provided with any updates or revisions of MPD policies shortly after they are issued. (Flynn Aff., ¶ 10.)

**RESPONSE**: **DENY.** Diaz-Berg testified that as an assistant jailer, her duties and responsibilities are to check on the prisoners by conducting wellness checks, but she had never seen any written policies and procedures on how to perform those checks. (Gende Decl. ¶18, **Ex. P** at Diaz-Berg Dep. 7:19-25, 8:1-5, 8:18-22.)

16. Also, officers routinely receive additional training regarding various policies and procedures during both roll call announcements and debriefings regarding incidents that may have occurred involving department members. (Flynn Aff., ¶ 11.).

**RESPONSE**: **ADMIT**, but affirmatively allege that Diaz-Berg, Bungert and Bell could not recall receiving training on the paradigm shift that struggling and resistance can indicate an immediate medical emergency and not a criminal act. (Gende Decl. ¶18, **Ex. P** at Diaz-Berg Dep. 30:10-21; Id. ¶10, **Ex. H** at Bungert Dep. 28:9-15; Id. ¶13, **Ex. K** at Bell Dep. 55:12-23.)

17. Representatives of the Milwaukee Police Department routinely evaluate issues, and reevaluate existing policies and SOPs, to determine if any revisions are warranted by existing circumstances or events. (Flynn Aff., ¶ 12.)

**RESPONSE**: **DENY.** The terms "routinely" and "evaluate" are vague, ambiguous and undefined. Thus, Plaintiffs cannot admit.

27

18.   The Milwaukee Police Department has established policies and Standard Operating Procedures (SOPs)(sic) to provide guidance to officers regarding a variety of issues, like providing first responder assistance, which includes first aid and CPR, and conducting investigations regarding in-custody deaths. (Flynn Aff., ¶ 13.)

**RESPONSE**:  **DENY** that MPD has established policies and procedures that provide guidance to officers in regard to conducting investigations.  Lieutenant Warren Allen, assigned to investigate Perry's death while still a detective, testified that he had not received unique training regarding in-custody deaths.  (Gende Decl. ¶32, **Ex. DD** at Allen Dep. 5:24-25, 6:1.)  Detective Dale Bormann, Jr., also assigned to investigate Perry's death, testified that he could not recall if he had received training relatng to in-custody death investigations and that he had never received specific training in regards to investigating other officers.  Detective Bormann was also unaware of any policy or procedure that dictates in-custody death investigations should occur.  (Id. ¶30, **Ex. BB** at Bormann Dep. 5:4-11, 7:22-25.).  Detective Harold Thomas, another detective assigned to investigate Perry's death, testified that there is no policy or procedure in regards to investigating in-custody deaths.  (Id. ¶32, **Ex. DD** at Allen Dep. 14:4-8.)

19.   MPD SOP 090 governs prisoners, and it is part of training received by all MPD personnel. (Flynn Aff. ¶ 16; MacGillis Aff. ¶ 25 and attached Exhibit G, which is a copy of SOP 090-Prisoners that was in effect on September 13, 2010.)

**RESPONSE**:  **ADMIT**, but affirmatively allege that SOP 090 applies to all persons in MPD custody, including arrestees, such as Perry on September 13, 2010.   (Katers Decl. ¶10, **Ex. H**; Gende Decl. ¶14, **Ex. L** at Sandry Dep. 86:22-24, 137: 13-25, 138:1-11.)

20.   Milwaukee Police Department officers are provided with first responder training and CPR training, and that their duties as first responders include 1.) checking the scene; 2.) calling for additional resources; and 3.) provide care for life-threatening conditions until more advanced

28

medical caregivers arrive. (Flynn Aff., ¶¶ 17-20; Lopez Aff., ¶ 5; Salinsky Aff., ¶ 5; Bell Aff., ¶ 5; Diaz-Berg Aff., ¶ 5; Ayala Aff., ¶ 5; Santiago Aff., ¶ 5; Robbins Aff., ¶ 5; Jacks Aff., ¶ 5; Kroes Aff., ¶ 5; Bungert Aff., ¶ 5; Lee Aff., ¶ 5; Ivy Aff., ¶ 4; MacGillis Aff. ¶ 43-50 and Exhibit I.)

**RESPONSE**: **ADMIT.**

21. Milwaukee Police Department officers are trained that some examples of life-threatening conditions or medical emergencies include stroke, seizure, diabetic emergency, poisonings, allergic reaction, and shock. (Flynn Aff. ¶¶ 20-21; Lopez Aff., ¶ 5; Salinsky Aff., ¶ 5; Bell Aff., ¶ 5; Diaz-Berg Aff., ¶ 5; Ayala Aff., ¶ 5; Santiago Aff., ¶ 5; Robbins Aff., ¶ 5; Jacks Aff., ¶ 5; Kroes Aff., ¶ 5; Bungert Aff., ¶ 5; Lee Aff., ¶ 5; Ivy Aff., ¶ 4; MacGillis Aff. ¶ 43-50 and Exhibit I.)

**RESPONSE**: **ADMIT,** but affirmatively allege that Lopez testified that a medical emergency is someone in "obvious distress, or giving us a verbal clue that they're in any kind of medical distress," and Kroes testified that a medical emergency is when someone is "unconscious and not breathing." (Gende Decl. ¶19, **Ex. Q** at Lopez Dep. 5:15-24; Id. ¶6, **Ex. D** at Kroes Dep. 78:12-21.) MPD officers are also supposed to be trained pursuant to MPD policy that struggling and resistance can indicate a medical emergency. (Id. ¶17, **Ex. O** at Flynn Dep. 82:8-10.) Further, the jail healthcare course focuses on how to recognize injury and illness in others and when obtain medical assistance, but Chief Flynn is unsure as to the training regarding medical emergencies. (Id. ¶14, **Ex. L** at Sandry Dep. 153:14-16; Id. ¶17, **Ex. O** at Flynn Dep. 8:25-9:6, 73:22-25.)

22. Milwaukee Police Officers are trained that they cannot give medication to prisoners, and also that they can only render first aid or other first-responder-type-assistance if a subject, including prisoners and citizens alike, is experiencing a life-threatening condition or medical emergency, but that they should do so only until medical providers who have a higher level of training arrive on scene. (Flynn Aff. ¶¶ 21-25; Lopez Aff., ¶ 9; Salinsky Aff., ¶ 9; Bell Aff., ¶ 9; Diaz-Berg Aff., ¶ 9;

29

Ayala Aff. ¶, 9; Santiago Aff., ¶ 9; Robbins Aff., ¶ 9; Jacks Aff., ¶ 9; Kroes Aff., ¶ 9; Bungert Aff., ¶ 9; Lee Aff., ¶ 9; Ivy Aff., ¶ 8; MacGillis Aff. ¶ 50 and Exhibit I.)

**RESPONSE**: **ADMIT**, but affirmatively allege that Lopez testified that a medical emergency is someone in "obvious distress, or giving us a verbal clue that they're in any kind of medical distress," and Kroes testified that a medical emergency is when someone is "unconscious and not breathing." (Gende Decl. ¶19, **Ex. Q** at Lopez Dep. 5:15-24; Id. ¶6, **Ex. D** at Kroes Dep. 78:12-21.)   Further, no MPD officers, including Ivy, Bell, Kroes, Bungert, Ayala and Diaz-Berg, did anything to determine whether Perry's actions and behavior, including struggling and appearing resistive, were voluntary or due to the fact that Perry was suffering from a medical emergency requiring prompt medical attention.   (Gende Decl. ¶17, **Ex. O** at Flynn Dep. 82:11-83:18; Id. ¶6, **Ex. D** at Kroes Dep. 91:10-92:13; Id. ¶18, **Ex. P** at Diaz-Berg Dep. 30:22-31:9; Id. ¶10, **Ex. H** at Bungert Dep. 28:21-25; Id. ¶15, **Ex. M** at Ivy Dep. 19:17-21; Id. ¶13, **Ex. K** at Bell Dep. 55:22-56:7, 58:18-21; Id. ¶11, **Ex. I** at Ayala Dep. 25:3-10; Id. ¶14, **Ex. L** at Sandry Dep.142:6-11.)

23.   All defendant officers successfully completed their MPD recruit training, field training, and in-service training, and throughout their careers, they maintained their certifications to act as a law enforcement officers in the State of Wisconsin. (Lopez Aff., ¶ 4; Salinsky Aff., ¶ 4; Bell Aff., ¶ 4; Diaz-Berg Aff. ¶ 4; Ayala Aff., ¶ 4; Santiago Aff., ¶ 4; Robbins Aff., ¶ 4; Jacks Aff., ¶ 4; Kroes Aff., ¶ 4; Bungert Aff., ¶ 4; Lee Aff., ¶ 4; Ivy Aff., ¶, 3.)

**RESPONSE**:  **DENY,** whatever training these officers received on how to recognize a medical emergency, how to respond to a medical emergency or how to treat an arrestee humanely was clearly inadequate based on their individual and combined response to James Perry on the day he died while in MPD custody.

**MPD Supervision**

24.   It is the policy of Chief Flynn and the Milwaukee Police Department that any suspension or discipline administered to an employee is based on fairness, and is consistent with the mandates of Wisconsin law. (Flynn Aff., ¶ 26.)

**RESPONSE**: **ADMIT.**

25.   Formal discipline may be imposed to punish employee behavior and/or to deter future behavior which violates Milwaukee Police Department SOPs, rules, regulations, or Code of Conduct. (Flynn Aff., ¶ 27.)

**RESPONSE**: **ADMIT.**

26.   The types of discipline which might be issued to a Milwaukee Police Department officer include a district level written reprimand, an official reprimand, suspension without pay, demotion, and termination. (Flynn Aff., ¶ 28.)

**RESPONSE**: **ADMIT.**

27.   Milwaukee Police Department officers and supervisory staff are evaluated and reviewed on a regular basis. (Flynn Aff., ¶ 29.)

**RESPONSE**: **DENY.**   The term "regular" is undefined and vague, and therefore Plaintiffs are unable to admit.

28.   If a supervisor determines that an officer has not complied with policies or procedures, that supervisor evaluates whether the violation warrants discipline and/or retraining, and the officer would be informed of the violation, and may be retrained on the policy or procedure or formally disciplined. (Flynn Aff., ¶ 30.)

**RESPONSE**: **ADMIT.**

29.   Chief Flynn, as Chief of Police for the Milwaukee Police Department, is responsible for the leadership, performance, efficiency, and general good conduct of the Milwaukee Police Department. (Flynn Aff., ¶ 31.)

31

**RESPONSE**: **ADMIT.**

30.  Chief Flynn is not involved in, nor does he have knowledge of, the investigation of all complaints raised against, disciplinary issues involving, or the specific day to day operations or activities, of each and every employee of the Milwaukee Police Department. (Flynn Aff., ¶ 32.)

**RESPONSE**:  **DENY** any implication that Flynn is never made aware of any investigations, disciplinary issues, operations, and/or activities of MPD employees, which is in directly contradicted by Flynn's testimony that he is made aware of critical incidents, which involve investigations, as soon as practical.  (Gende Decl. ¶17, **Ex. O** at Flynn Dep. 11:6-10.)

31.  Currently, there are approximately 2550 people employed by the Milwaukee Police Department, and approximately 1900 of them are sworn officers. (Flynn Aff., ¶ 33.)

**RESPONSE**:  **ADMIT.**

32.  Staffing has been at this level fairly consistently since 2008. (Flynn Aff., ¶ 34.)

**RESPONSE**:  **ADMIT.**

33.  Chief Flynn is not aware of any incident wherein Milwaukee police officers demonstrated that they did not understand either Milwaukee Police Department policies, or Wisconsin law, related to the provision of medical care to prisoners in their custody, including those prisoners held at the PPS, or that additional training was needed by officers regarding related issues. (Flynn Aff., ¶ 42.)

**RESPONSE**:  **DENY.**  Flynn testified that MPD SOP 090 was amended as a direct result of Perry's in-custody death, and additional training was required regarding providing medical care to prisoners in MPD custody.  (Gende Decl. ¶17, **Ex. O** at Flynn Dep. 7:16-22.) Furthermore, in 2012, MPD Internal Affairs determined that Robbins inhumanely spoke to Perry, and Robbins subsequently retired to avoid a disciplinary demotion. (Katers Decl. ¶15, **Ex. M**; Gende Decl. ¶17, **Ex. O** at Flynn Dep. 25:13-25; 26:1-4; Id. ¶4, **Ex. B** at Robbins Dep. 124:7-21; 125:1-3.)

34. MPD policy and training requires that officers provide first responder medical care to any person experiencing a life-threatening condition or medical emergency, and that if a prisoner experiences a life-threatening condition or medical emergency, emergency medical care is to be summoned to provide more advanced medical care for the prisoner and/or transport that prisoner to a medical facility for treatment as soon as practicable. (Flynn Aff., ¶ 43; MacGillis Aff., ¶ 50 and Exhibits G and I.).

**RESPONSE**: **ADMIT**, and affirmatively allege that despite Perry urinating and defecating on himself; Perry telling the MPD officers that "That we were killing him", asking for help and saying he couldn't breathe; observing blood on Perry's spit mask; observing gobs of spit, blood and fecal matter on the cell floor after Perry was removed; dropping Perry on his face twice and having to physically carry Perry by his arms as he was unable to walk on his own, no MPD officers did anything to determine if he was suffering from a medical emergency or offered Perry any medical assistance. (Gende Decl. ¶11, **Ex. I** at Ayala Dep. 22:17-18, 22:24-23:3, 23:25-4, 30:12-31:1, 36:7-9, 39:14-17; Id. ¶6, **Ex. D** at Kroes Dep. 67:13-20; Id. ¶8, **Ex. F** at MacGillis Dep. 193:1-12; Id. ¶19, **Ex. Q** at Lopez Dep. 22:2-5, 23:13-18, 26:17-25, 66:16-24, 67:1-4, 8-10; Id. ¶14, **Ex. L** at Sandry Dep. 154:17-25, 155:2-10; Id. ¶21, **Ex. S** at Salinsky Dep. 20:4-21:13, 39:4-16.)

35. All critical incidents, which includes in custody deaths, are thoroughly investigated by the most experienced and well trained investigators of the Milwaukee Police Department. (Flynn Aff., ¶¶ 35-37, 41; MacGillis Aff. ¶¶ 9-10.)

**RESPONSE**: **DENY.** At the time of the investigation of Perry's in-custody death, the detectives did not look for evidence of wrongdoing, did not attempt to determine if Perry was dropped intentionally or not, and did not attempt to determine the cause of Perry's in-custody death. (Gende Decl. ¶30, **Ex. BB** at Bormann Dep. 14:3-11; Id. ¶20, **Ex. R** at Davis Dep. 28:12-17, 37:19-23; Id. ¶31, **Ex. CC** at Thomas Dep. 75:3-23.) The investigating detectives did not investigate

33

whether Perry was suffering from a medical emergency prior to his death, and did not watch any video or do any independent investigation other than simply interviewing witnesses. (Id. ¶30, **Ex. BB** at Bormann Dep. 20:12-20; Id. ¶32, **Ex. DD** at Allen Dep. 34:21-22; Id. ¶20, **Ex. R** at Davis Dep. 51:20-52:10.) Detective Bormann had only been a detective for approximately 3 years at the time of the Perry death investigation, and could not recall if he had received training relating to in-custody death investigations. (Id. ¶30, **Ex. BB** at Bormann Dep. 4:18-19.) Detective Bormann further testified that he had never received specific training in regards to investigating other officers, and was unaware of any policy or procedure that dictates how in-custody death investigations should occur. (Id. ¶30, **Ex. BB** at Bormann Dep. 5:4-11, 7:22-25-11.)

36. Specifically with regard to in custody deaths, a thorough investigation is conducted, and supervisory staff then meet to discuss the information gathered through the course of the investigation. (Flynn Aff., ¶¶ 38-41; MacGillis Aff. ¶ 11.)

**RESPONSE**: **DENY.** At the time of the investigation of Perry's in-custody death, the detectives did not look for evidence of wrongdoing, did not attempt to determine if Perry was dropped intentionally or not, and did not attempt to determine the cause of Perry's in-custody death. (Gende Decl. ¶30, **Ex. BB** at Bormann Dep. 14:3-11; Id. ¶20, **Ex. R** at Davis Dep. 28:12-17, 37:19-23; Id. ¶31, **Ex. CC** at Thomas Dep. 75:3-23.) The investigating detectives did not investigate whether Perry was suffering from a medical emergency prior to his death, and did not watch any video or do any independent investigation other than simply interviewing witnesses. (Id. ¶30, **Ex. BB** at Bormann Dep. 20:12-20; Id. ¶32, **Ex. DD** at Allen Dep. 34:21-22; Id. ¶20, **Ex. R** at Davis Dep. 51:20-52:10.)

37. During the course of his tenure, Chief Flynn has been advised of critical incidents almost immediately after they occur. (Flynn Aff., ¶¶ 40-41; MacGillis Aff. ¶¶ 11-12.)

**RESPONSE**: **ADMIT.**

34

38.   He is briefed throughout the course of the investigations which stem from critical incidents. (Flynn Aff., ¶¶ 40-41; MacGillis Aff. ¶¶ 11-12.)

**<u>RESPONSE</u>: ADMIT.**

39.   Furthermore, he is briefed regarding the information gathered from the investigations, and also any recommendations made by supervisors who have reviewed the investigations. (Flynn Aff., ¶¶ 40-41; MacGillis Aff. ¶¶ 11-12.)

**<u>RESPONSE</u>: ADMIT.**

40.   Supervisory staff, including the chief, review critical incident investigations to determine if any criminal charges might potentially be issued, or if any disciplinary action should be taken. (Flynn Aff., ¶ 41; MacGillis Aff. ¶¶ 11-12.)

**<u>RESPONSE</u>:   DENY.** Flynn testified that it is the purpose of the Critical Incident Review Board to disaggregate the incident and look for policy and training issues that would be applicable going forward from whatever they learned from that incident.  (Gende Decl. ¶17, **Ex. O** at Flynn Dep. 132:19-23.)

41.   Furthermore, each critical incident is evaluated to determine if the underlying events suggest a need for different or additional training, or for the revision of existing policies or the development of new policies, which would provide guidance to personnel involved in similar situations in the future. (Flynn Aff., ¶ 41; MacGillis Aff. ¶¶ 11-12.)

**<u>RESPONSE</u>: ADMIT.**

42.   There are no state-mandated guidelines, relative to the training of officers who perform various functions and responsibilities at a temporary lockup facility which includes the PPS. (MacGillis Aff. ¶ 56.)

**<u>RESPONSE</u>:   ADMIT,** but affirmatively state that MPD personnel at PPS on the night of Perry's in-custody death, including Jacks, Kroes and Robbins, were required to read, understand and

35

follow Perry's discharge instructions so that they would know how to properly care for him, and were obligated to pass that information on to other officers who would be responsible for Perry's health, welfare, and safety. (Gende Decl. ¶14, **Ex. L** at Sandry Dep. 72:6-8, 116:20-117:3, 120:4-13, 121:13-122:1; Id. ¶17, **Ex. O** at Flynn Dep. 77:7-13.) Failure to do so does not comport with Wisconsin Department of Justice guidelines. (Id. ¶14, **Ex. L** at Sandry Dep.119:20-120:2.)

43. The training of officers who are assigned to the PPS is done through a temporary holding facility class, and by on-the-job training. (MacGillis Aff. ¶ 57 and Exhibit L, which is a copy of the materials used to teach the temporary holding facility class.)

**RESPONSE**: **ADMIT.**

44. PPS personnel, as with any personnel attending to any assignment, are trained relative to first responder, first aid and CPR training. (MacGillis Aff. ¶ 58.)

**RESPONSE**: **ADMIT.**

45. Furthermore, the personnel assigned to the PPS are trained during the Temporary Holding Facility Class regarding SOP 090-Prisoners, and they are given hands-on instruction relative to properly searching prisoners, properly moving prisoners from one location to another within the PPS, properly admitting and releasing inmates from the PPS, and properly monitoring inmates who are located in the PPS. (MacGillis Aff. ¶ 59 and **Exhibit L**.)

**RESPONSE**: **DENY.** Diaz-Berg testified that she had never been trained on different observation levels for inmates, nor was she even aware of different observation levels for inmates. (Gende Decl. ¶18, **Ex. P** at Diaz-Berg Dep. 10:15-20.) Lopez testified that he was not aware of a higher level of monitoring required for a person in physical restraints. (Id. ¶19, **Ex. Q** at Lopez Dep. 18:1-22.)

46. One of the many things that are trained to PPS personnel are how to conduct wellness checks of the cell block areas. (MacGillis Aff. ¶ 60.)

36

**RESPONSE**:  **ADMIT**, but affirmatively allege that Diaz-Berg, assistant jailer on the night of Perry's in-custody death responsible for his "wellness" checks, testified that she had never seen any written polices or procedures on the proper way to perform wellness checks.  (Gende Decl. ¶18, **Ex. P** at Diaz-Berg Dep. 8:1-24, 20:3-9.)  Diaz-Berg testified that she does not recall ever being trained to document her observations when doing wellness checks.  (<u>Id.</u> ¶18, **Ex. P** at Diaz-Berg Dep. 20:10-16.) Clearly, Diaz-Berg was not adequately trained in this regard, because Perry lay in cell A3 in his own urine and feces, bleeding from an unknown source, while moaning in pain and Diaz-Berg did not do anything to determine whether he was suffering from a medical emergency  (<u>Id.</u> ¶18, **Ex. P** at Diaz-Berg Dep. 23:2-6; 37:10-16.)

47.   In short, PPS personnel are trained that they are responsible for conducting wellness checks and that they should check on the status of each and every prisoner at least four times an hour. They are trained that they should stagger the times that they conduct their wellness checks so that prisoners cannot anticipate when PPS personnel will be coming by, and thus they are deterred from engaging in inappropriate activity for fear that they might be caught in the context of a wellness check. (MacGillis Aff. ¶ 61; Bell Aff., ¶¶ 11-12; Ayala Aff., ¶ 12.)

**RESPONSE**:   **ADMIT**, but affirmatively allege that Perry was not continually monitored– "uninterrupted in time, sequence, substance or extent"– for a change in condition while in physical restraints, in violation of MPD SOP 090.10(F).  (Gende Decl. ¶14, **Ex. L** at Sandry Dep. 83:21-84:13, 86:22-24, 137:13-25, 138:1-11.)    Further allege that Diaz-Berg testified that it is common practice at PPS to keep inmates who have suffered from medical emergencies in the bullpen, because there are cameras to monitor them and other inmates act as a warning system to alert MPD officers if an inmate is suffering from a medical emergency, which could not be done for Perry while he was alone in cell A3.  (<u>Id.</u> ¶18, **Ex. P** at Diaz-Berg Dep. 8:1-24, 16:7-16, 20:3-9.)  Incorporate by reference Plaintiffs' response No. 46.

48. PPS personnel initial a card to indicate what times they conduct their wellness checks. Attached to the MacGillis as affidavit as Exhibit C is a copy of the daily cell block check that was prepared from the timeframe of 4:00 a.m. on September 13, 2010 to 10:46 p.m. on September 13, 2010, which indicates that between 7:00 p.m. and 8:43 p.m., Mr. Perry's cell was checked seven times. (MacGillis Aff. ¶ 62.).

**RESPONSE**: **DENY.** Attached as Exhibit C to the MacGillis Affidavit is a copy of Perry's MPD Property Control Property Sheet and does not indicate the times that Perry's cell was checked. Furthermore, Diaz-Berg testified that she was unable to tell by looking at the cellblock check sheet that she observed Perry while he was in cell A3. (Gende Decl. ¶18, **Ex. P** at Diaz-Berg Dep. 37:7-9.)

**The Events of September 13, 2010**

49. On September 13, 2010 at approximately 2:12 a.m., Milwaukee police officers stopped a motor vehicle in which James F. Perry was a passenger. (MacGillis Aff. ¶ , Exh. B, p. MPD 00039.)

**RESPONSE**: **DENY.** Perry was the operator of the motor vehicle that was stopped, not the passenger. There were no other occupants in the vehicle. (Katers Decl. ¶3, **Ex. A** Supplement 0021 at 2.)

50. The motor vehicle matched the description of a vehicle that was stolen in the context of an armed robbery which had happened within hours of the time of the stop. (MacGillis Aff. ¶ , Exh. B, p. MPD 00039.)

**RESPONSE**: **ADMIT.**

51. Subsequently, Mr. Perry was taken into custody regarding the officers' suspicion that he was the perpetrator of the armed robbery. (MacGillis Aff. ¶ , Exh. B, p. MPD 00039.)

**RESPONSE**: **ADMIT.**

38

52. Mr. Perry was booked into the Milwaukee Police Department Prisoner Processing Section (PPS or "City Jail") at approximately 5:36 a.m. (MacGillis Aff. ¶ , Exh. F, p. F-1)

**RESPONSE**: **ADMIT.**

53. While Mr. Perry was being booked into the PPS, a booking officer filled in a medical screening form, pursuant to information he received directly from Mr. Perry, and the form indicated that Mr. Perry told the booking officer that he suffered from seizures, that he takes medication two times a day, and that he had not taken his nightly dosage. (MacGillis Aff. ¶ , Exh. B, p. MPD 00039, Exh. D, p. D-12.)

**RESPONSE**: **ADMIT.**

54. Mr. Perry was placed into the male "bullpen", which is a large cell that holds several male prisoners at the PPS. (MacGillis Aff. ¶ , Exh. B, p. MPD 00039.)

**RESPONSE**: **ADMIT.**

55. Mr. Perry suffered a seizure while in the bullpen, fell and hit his head. (MacGillis Aff. ¶ , Exh. B, p. MPD 00039.)

**RESPONSE**: **ADMIT.**

56. An ambulance was summoned to the PPS, and emergency medical technicians responded to the medical needs of Mr. Perry. (MacGillis Aff. ¶ , Exh. B, pp. MPD 00039-40.)

**RESPONSE**: **ADMIT** and affirmatively allege this is evidence of how easy it was for MPD to get treatment for an individual in their custody who they believed suffered from a medical emergency.

57. At approximately 3:21 p.m. Mr. Perry was then transported by Bell Ambulance to the Aurora Sinai Medical Center (Sinai) for treatment. (MacGillis Aff. ¶ , Exh. F, p. F4; Exh. B, pp. MPD 00039-40.)

**RESPONSE**: **ADMIT.**

58. Officers Crystal Jacks and Corey Kroes accompanied Mr. Perry to the hospital, and Officer Kroes rode in the ambulance with Mr. Perry, while Officer Jacks followed in their squad car. (Jacks Aff., ¶¶ 10-16; Kroes Aff., ¶¶ 10-15.)

**RESPONSE**: **ADMIT.**

59. When Mr. Perry was first being treated at the hospital, he was able to walk on his own, he was alert, and he was responsive to the officers and hospital personnel. (Jacks Aff., ¶¶ 16-24; Kroes Aff., ¶¶ 16-23.)

**RESPONSE**: **ADMIT.**

60. While at the hospital, Mr. Perry experienced at least two additional seizures. (Jacks Aff., ¶¶ 24-34; Kroes Aff., ¶¶ 24-30.)

**RESPONSE**: **ADMIT.**

61. Mr. Perry was medicated with Dilantin, which is a common anti-seizure medication. (Jacks Aff., ¶ 28; Kroes Aff., ¶ 31; see also Perry's hospital discharge records at MacGillis Aff., Exhibit D.)

**RESPONSE**: **ADMIT.**

62. During the course of time that Mr. Perry was being treated at the hospital, the officers perceived that his condition was getting worse, rather than better. (Jacks Aff., ¶¶ 25-44; Kroes Aff., ¶¶ 27-39.)

**RESPONSE**: **DENY.** In the hour before Perry left the hospital Jacks did not observe Perry have any seizures, and did not change at all in the half hour before he left the hospital. (Gende Decl. ¶5, **Ex. C** at Jacks Dep. 31:4-6.) Jacks further testified in regard to Perry's condition at the hospital, "I didn't say he was worse." (Id. ¶5, **Ex. C** at Jacks Dep. 89:6-9.) Upon discharge from the hospital, Perry received a Glasgow score of 15 and was deemed "alert and oriented". (Id. ¶6, **Ex. D** at Kroes Dep. 44-45:11-5; Katers Decl. ¶8, **Ex. F** at 23.)

63. When they first arrived at the hospital, Mr. Perry was conscious, talking, appropriately responsive to their questions, and able to walk by himself. (Jacks Aff., ¶¶ 16-24; Kroes Aff., ¶¶ 16-23.)

**RESPONSE**:  **ADMIT.**

64. By the time he recovered from his second seizure, it appeared to be difficult for Mr. Perry to comprehend and then respond to questions, he appeared drowsy, and he ultimately was unable to walk or dress by himself. (Jacks Aff., ¶¶ 25-44; Kroes Aff., ¶¶ 27-39.)

**RESPONSE**:  **ADMIT.**

65. Officers Jacks and Kroes questioned hospital personnel about Mr. Perry's condition, and they were advised that Mr. Perry's symptoms were a result of the effects of the Dilantin in his body. (Jacks Aff., ¶ 36; Kroes Aff., ¶¶ 33, 35.)

**RESPONSE**:  **DENY.**  Aurora Sinai Nurse Rebecca Potterton testified that she does not recall ever being questioned by either Jacks or Kroes in this regard.  (Gende Decl. ¶7, **Ex. E** at Potterton Dep. 50:3-6, 52:18-22, 57:10-16).  Moreover, Potterton testified that had Jacks or Kroes expressed concerns about Mr. Perry's health, the concerns would be documented in his medical chart.  (Id. ¶7, **Ex. E** at Potterton Dep. 66:15-25, 67:1-25, 68:1-22).

66. The medical personnel advised the officers that they could expect that Mr. Perry would become sleepy, and want to sleep. (Jacks Aff., ¶ 36; Kroes Aff., ¶ 33.)

**RESPONSE**:  **ADMIT.**

67. The practitioners at Sinai medically cleared Mr. Perry for release back into police custody. (See hospital discharge papers at MacGillis Aff., Exh. D; Jacks Aff., ¶ 37; Kroes Aff., ¶ 33.)

**RESPONSE**:  **ADMIT.**

68. Officers Kroes and Jacks assisted Mr. Perry with putting on his clothes and shoes, took him to their squad car in a wheelchair, and assisted him into the squad car. (Jacks Aff., ¶¶ 38-44; Kroes Aff., ¶¶ 34-39.)

**RESPONSE**: **ADMIT.**

69. The officers then drove a few minutes to return to the PPS. (Jacks Aff., ¶ 45; Kroes Aff., ¶ 40.)

**RESPONSE**: **ADMIT.**

70. Mr. Perry's condition did not change from the time he left the hospital room until the time he was in the PAB parking garage. (Jacks Aff., ¶ 46; Kroes Aff., ¶ 41.)

**RESPONSE**: **ADMIT**.

71. The officers waited a few minutes in the basement parking area of the PPS building until Officers Bungert and Santiago came to assist them with Mr. Perry. (Santiago ¶¶ 10-12; Jacks Aff., ¶ 45; Kroes Aff., ¶ 40.)

**RESPONSE**: **DENY,** Santiago reported that he, Bungert, Kroes and Jacks waited in the garage for about ten to fifteen minutes before being advised to bring Perry up to PPS. (Katers Decl. ¶3, **Ex. A** Supplement 0002 at 5.)

72. Officers Kroes, Jacks, Bungert and Santiago had to carry Mr. Perry onto the elevator which brought them up to the floor on which the PPS is located. (Santiago ¶¶ 20-25; Jacks Aff., ¶¶ 44-45; Kroes Aff., ¶¶ 42-43; Bungert ¶¶ 11-12.)

**RESPONSE**: **ADMIT.**

73. The officers then sat Mr. Perry on the floor near a bench located in the hallway area outside of the booking room at the PPS. (Santiago ¶ 29; Jacks Aff., ¶ 49; Kroes Aff., ¶¶ 43- 44.)

**RESPONSE**: **ADMIT.**

74.    While Mr. Perry was seated on the floor outside of the booking room, officers heard him grunting, making noises and making statements, observed that he did not respond to their directions, saw him kicking, felt resistive tension in his arms and legs, and smelled the odor of feces and/or urine. (Santiago ¶¶ 29-34; Jacks Aff., ¶¶ 51, 55; Kroes Aff., ¶¶ 46, 49; Bungert ¶¶ 17-18; Diaz-Berg Aff., ¶ 12; Lee Aff., ¶ 15; Robbins Aff., ¶¶ 17-19; Ayala Aff., ¶¶ 16-19.)

**RESPONSE**:  **ADMIT**, and affirmatively allege that these statements the officers heard Perry yelling included, "I can't breathe," "Help me," and, "you're killing me."  (Gende Decl. ¶11, **Ex. I** at Ayala Dep. 22:17-18, 22:24-23:3; 30:12-16; Id. ¶6, **Ex. D** at Kroes Dep. 74:23-25; Katers Decl. ¶6, **Ex. D**.).

75.    Officers perceived that Mr. Perry was being resistive or combative with regard to their efforts to detain him at the PPS. (Diaz-Berg Aff., ¶¶ 12, 16; Lee Aff., ¶ 15; Santiago ¶ 32; Ivy Aff., ¶ 11; Ayala Aff., ¶ 24.)

**RESPONSE**:  **DENY.** Santiago testified that while carrying Perry into PPS, he never observed Perry being combative or resisting arrest.  (Gende Decl. ¶9, **Ex. G** at Santiago Dep. 85:6-15). Diaz-Berg testified that in her statement to the detectives, she never described Perry as being combative or resistive at the time he was in the hallway of PPS.  (Id. ¶18, **Ex. P** at Diaz-Berg Dep. 52:20-22.) In fact, Perry was never combative, such as physically fighting or using large amounts of force against any officers, during his transport from the Hospital to PPS, while at PPS, during his conveyance to the Jail, or anytime thereafter. (Id. ¶6, **Ex. D** at Kroes Dep. 15:24-16:4; Id. ¶5, **Ex. C** at Jacks Dep. 36:8-12; 47:14-17; Id. ¶11, **Ex. I** at Ayala Dep. 45:21-23; Id. ¶21, **Ex. S** at Salinsky Dep. 23:17-23, 49:25-50:2; Id. ¶28, **Ex. Z** at Schmidt Dep. 55:8-16; Id. ¶26, **Ex. X** at Hale Dep. 96:11-21; Id. ¶25, **Ex. W** at Kieckbusch Dep. 75:2-3; Id. ¶29, **Ex. M** at Jeff Dep. 17:12-14; Id. ¶13, **Ex. K** at Bell Dep. 62:10-11.)   In the event the officers did perceive resistance or combative conduct, they were required under policy and procedure to determine whether such behavior was

43

the result of medical emergency. (Katers Decl. ¶13, **Ex. K**.)  None of these officers followed said training that night.

76.  Also, while Mr. Perry was in a seated position, he began to spit and drool. (Jacks Aff., ¶ 50; Kroes Aff., ¶ 45.)

**RESPONSE**:  **ADMIT**, but affirmatively allege that Mr. Perry was spitting into his own lap and not at officers.  (Katers Decl. ¶3, **Ex. A** Supplement 0002 at 4; Gende Decl. ¶11, **Ex. I** at Ayala Dep.61:18-24, 62:17-22; Id. ¶12, **Ex. J** at Ayala Dep. (pt. 2) 80:3-12.)

77.  In response to the potential biohazard that this action created, an expectorant shield (also often referred to as a "spit mask") was placed over his head. (Jacks Aff., ¶ 52; Kroes Aff., ¶ 47; Ayala Aff., ¶ 21.)

**RESPONSE**:  **ADMIT** that the expectorant shield was placed over Perry's head; **DENY** the reason therefore, as Perry was spitting into his own lap and not at officers.  (Katers Decl. ¶3, **Ex. A** Supplement 0002 at 4; Gende Decl. ¶11, **Ex. I** at Ayala Dep. 61:18-24, 62:17-22; Id. ¶12, **Ex. J** at Ayala Dep. (pt. 2) 80:3-12.)

78.  Police Aide Ivy obtained an expectorant shield from a storage room, and assisted officers in placing it over Mr. Perry's head. (Diaz-Berg Aff., ¶ 15; Ivy Aff. ¶ 13.) (Photographs of the expectorant shield worn by Mr. Perry are attached to the Lappen Affidavit as Exhibit D.)

**RESPONSE**:  **ADMIT.**

79.  The expectorant shield is made out of lightweight and flexible mesh, and there is a paper-towel-like material that is placed over the mouth area. An expectorant shield does not inhibit hearing or vision. Rather, it is a barrier, and simply prevents the subject from being able to expel bodily fluids from his mouth and striking other people with same. (MacGillis Aff., ¶¶ 28-31; Lappen Aff., ¶ 6 and Exhibit D.)

44

**RESPONSE**: **ADMIT** as to the material the expectorant shield is made of, but affirmatively state that the material of the spit mask can become saturated with bodily fluids, which can inhibit breathing and lead to respiratory distress. (Katers Decl. ¶12, **Ex. J** (Doc. 72-2) at 4.)

80. Ultimately, Lieutenant Robbins, the PPS supervisor, along with the officers assigned to the jail, determined that they would place Mr. Perry in a single cell, because by that time, he was perceived as being combative, and they did not want to risk any injury to other prisoners. (Diaz-Berg Aff., ¶¶ 13-18; Robbins Aff. ¶ 25.)

**RESPONSE**: **DENY,** Perry was never combative with any officers, such as physically fighting or using large amounts of force against any officers, during his transport from the Hospital to PPS, while at PPS, during his conveyance to the Jail, or anytime thereafter. (Gende Decl. ¶9, **Ex. G** at Santiago Dep. 85:6-15; Id. ¶6, **Ex. D** at Kroes Dep. 15:24-16:4; Id. ¶5, **Ex. C** at Jacks Dep. 36:8-12; 47:14-17; Id. ¶11, **Ex. I** at Ayala Dep. 45:21-23; Id. ¶18, **Ex. P** at Diaz-Berg Dep. 52: 20-22; Id. ¶21, **Ex. S** at Salinsky Dep. 23:17-23, 49:25-50:2; Id. ¶28, **Ex. Z** at Schmidt Dep. 55:8-16; Id. ¶26, **Ex. X** at Hale Dep. 96:11-21; Id. ¶25, **Ex. W** at Kieckbusch Dep. 75:2-3; Id. ¶29, **Ex. M** at Jeff Dep. 17:12-14; Id. ¶13, **Ex. K** at Bell Dep. 62:10-11.) Robbins testified Perry was placed in A3 for his own safety, and so that the officers could "keep a[n] eye on him." (Id. ¶4, **Ex. B** at Robbins Dep. 51:15-25.)

81. Another reason why Mr. Perry was placed in the cell was because earlier in the day, when he had suffered his seizure in the bullpen, he had fallen off the bench and hit his head on the floor. (Diaz-Berg Aff., ¶¶ 13-18.)

**RESPONSE**: **DENY.** Defendant Robbins testified that cell A3, the cell in which Perry was placed, was not special in any way and was configured like just a regular cell with a metal bench, stool, sink and bed. (Gende Decl. ¶4, **Ex. B** at Robbins Dep. 41:11-25, 42:1-9). Defendant Bell

testified that cell A3 is used for problematic inmates who are combative. (Id. ¶13, **Ex. K** at Bell Dep. 19:24-24, 20:1-14.)

82. Therefore, the jailers chose cell A3 for Mr. Perry's use, because it was a cell that had no bed or bench from which he could fall. (Diaz-Berg Aff., ¶ 18.)

**RESPONSE**: **DENY.** Defendant Robbins testified that cell A3, the cell which Perry was placed into, was not special in any way and was configured like just a regular cell with a metal bench, stool, sink and bed. (Id. ¶4, **Ex. B** at Robbins Dep. 41:11-25, 42:1-9). Moreover, Defendant Bell testified that cell A3 is used for problematic inmates who are combative. (Id. ¶13, **Ex. K** at Bell Dep. 19:24-24, 20:1-14.)

83. Mr. Perry was carried from the bench area outside of the booking room to cell A3 by Officers Kroes, Jacks, Bungert, and Santiago. (Jacks Aff., ¶ 57; Kroes Aff., ¶ 50.)

**RESPONSE**: **ADMIT**.

84. Officer Lee, who happened to be at the PPS when Mr. Perry arrived, also assisted in carrying Mr. Perry into cell A3. (Lee Aff., ¶¶ 10-18.)

**RESPONSE**: **ADMIT.**

85. Officer Ayala was assigned to the PPS that night, he assisted in monitoring Mr. Perry while he was seated on the floor outside the booking room, and he followed other officers as they carried Mr. Perry to cell A3. (Ayala Aff., ¶¶ 10-11, 15-29.)

**RESPONSE**: **DENY,** Ayala was present but hardly monitoring Perry for a medical emergency. He occasionally checked on Perry from outside of the cell, and did not continually monitor Perry in violation of MPD policy and procedure regarding the use of physical restraints. (Gende Decl. ¶14, **Ex. L** at Sandry Dep. 86:22-24, 137: 13-25, 138:1-11; Id. ¶12, **Ex. J** at Ayala Dep. (pt. 2) 81:18-82:1.)

86. From the time the above-noted officers first observed Mr. Perry at the PPS, until the time he was placed in cell A3, they did not observe any change in Mr. Perry's condition which suggested to them that he was experiencing a life-threatening condition or medical emergency. (Jacks Aff., ¶ 60; Kroes Aff., ¶ 53; Diaz-Berg Aff., ¶ 16; Lee Aff., ¶ 20; Santiago Aff., ¶ 36; Bungert Aff., ¶¶ 21-22; Ivy Aff., ¶ 15; Robbins Aff., ¶¶ 18, 23, 33-34.)

**RESPONSE**: **DENY.** After Perry's return from the hospital, MPD Officers observed multiple changes in Perry's condition that clearly suggested to any reasonable person that Perry was suffering from a medical emergency. These observations included: Perry's inability to walk or stand on his own; Perry had defecated and urinated on himself; Perry was struggling to breathe; Perry was spitting up blood-tinged saliva in his lap; Perry was moaning and groaning; there were gobs of blood, spit and feces found on the floor of cell A3 after Perry was removed; and Perry was begging for help and screaming that he couldn't breathe and that the officers were "killing him." (Katers Decl. ¶3, **Ex. A** Supplement 0002 at 3; Supplement 0004 at 2, Supplement 0008 at 2, Supplement 0012 at 3; Gende Decl. ¶6, **Ex. D** at Kroes Dep. 14: 12-22, 87:19-21; Id. ¶11, **Ex. I** at Ayala Dep. 22:17-18; Id. ¶12, **Ex. J** at Ayala Dep. (pt. 2) 79:24-25, 80:3-18; Id. ¶18, **Ex. P** at Diaz-Berg Dep. 56:7-11; Id. ¶4, **Ex. B** at Robbins Dep. 44:1-3, 91:18-25,92:7-14.) None of these conditions were present when Perry arrived at the PAB garage from the hospital, except difficulty ambulating on his own. Perry was not moaning and groaning in pain, was not calling out for help, had not complained of difficulty breathing, had not urinated or defecated on himself, was not bleeding or spitting, and had not complained that the officers were "killing him." (Id. ¶5, **Ex. C** at Jacks Dep. 43-44:8-13, 48:16-17.)

87. Officers Kroes and Jacks attributed Mr. Perry's change in condition while he was still at the hospital to the fact that he had experienced several seizures that day, and he had been given anti-seizure medication. (Jacks Aff., ¶¶ 60-63; Kroes Aff., ¶¶ 53-56.)

47

**RESPONSE**:  **ADMIT**, but affirmatively allege under the totality of facts and circumstances surrounding Perry's in-custody death, such attribution was not objectively reasonable under any standard of review.  Jacks testified that in regard to Perry's condition at the hospital, "I didn't say he was worse."  (Gende Decl. ¶5, **Ex. C** at Jacks Dep. 89:6-9.)

88.  Mr. Perry's handcuffs and leg shackles were removed when he was placed in cell A3. (Krones Aff., ¶ 51.)

**RESPONSE**:  **ADMIT**, but affirmatively allege that Perry's head remained physically restrained by the spit mask when we was placed in cell A3.  (Katers Decl. ¶3, **Ex. A** Supplement 0002 at 2).

89.  Officer Margarita Diaz-Berg was assigned as the assistant jailer at the PPS on the subject date. (Diaz-Berg Aff., ¶ 10 )

**RESPONSE**:  **ADMIT**.

90.  Among Diaz-Berg's job responsibilities was conducting regular wellness checks of each prisoner kept at the PPS. (Diaz-Berg Aff., ¶ 17; Ayala Aff., ¶ 12.)

**RESPONSE**:  **ADMIT**.

91.  Officer Diaz-Berg conducted those regular cell checks of Mr. Perry, and did not observe that he was experiencing any life-threatening condition while he was incarcerated in cell A3 at the PPS, and Officer Bell and Officer Ayala also checked on Mr. Perry, and did not observe any such condition. (Diaz-Berg Aff., ¶ 17.; See also Bell Aff., ¶¶ 17-20; Ayala Aff., ¶¶ 27-39.)

**RESPONSE**:  **DENY**.  Diaz-Berg testified that she was unable to tell by looking at the cellblock check sheet that she observed Perry while he was in cell A3.  (Id. ¶18, **Ex. P** at Diaz-Berg Dep. 37:7-9; see Katers Decl. ¶11, **Ex. I**.)  Diaz-Berg further testified that she did not watch Perry the entire time he was in cell A3, and was unable to verify through the cellblock check sheet whether or not Perry suffered from any medical conditions while in cell A3. (Gende Decl. ¶18, **Ex. P** at Diaz-Berg Dep. 19:2-4, 37:10-16.) Diaz-Berg heard Perry making grunting noises and saw him

48

rolling around in the cell, but did not do anything to determine whether he was suffering from a medical emergency or was in any pain at that time. (Id. ¶18, **Ex. P** at Diaz-Berg Dep. 56:12-16.) In fact, Diaz-Berg testified that it is common practice at PPS to keep inmates who have suffered from medical emergencies in the bullpen, because there are cameras to monitor them and other inmates act as a warning system to alert MPD officers if an inmate is suffering from a medical emergency, which could not be done for Perry while he was alone in cell A3. (Id. ¶18, **Ex. P** at Diaz-Berg Dep. 8:1-24, 16:7-16, 20:3-9.)

92.    Even though Mr. Perry was placed into cell A3 with the spit mask still on his head, he had apparently removed same because when Officer Diaz-Berg made her cell checks, she was able to see his face. (Diaz-Berg Aff., ¶¶ 19-20.)

**RESPONSE**:  **ADMIT** Perry removed the spit mask at some point after being dropped on his face twice and left lying in his own urine, blood and feces in cell A3, but it is unclear how long Perry did not have his spit mask on**.**  (Gende Decl. ¶20, **Ex. R** at Davis Dep. 46:3-9; Id. ¶11, **Ex. I** at Ayala Dep. 47:7-9; Id. ¶21, **Ex. S** at Salinsky Dep. 51:4-13; Id. ¶18, **Ex. P** at Diaz-Berg Dep. 7-10.)

93.    Mr. Perry was kept in cell A3 until approximately 8:34 p.m. on September 13, 2010. (Diaz-Berg Aff., ¶ 22; Salinsky Aff., ¶¶ 11-12; Lopez Aff., ¶¶ 11-12.)

**RESPONSE**:  **ADMIT.**

94.    At that time, he was removed from his cell by Officers Frank Salinsky and Richard Lopez, who then transferred Mr. Perry to the nearby Milwaukee County Criminal Justice Facility (CJF), which was located approximately one block, or a one-minute drive, from the PPS. (Diaz-Berg Aff., ¶ 23; Salinsky Aff., ¶¶ 11-12, 23; Lopez Aff., ¶ 29.)

**RESPONSE**:  **ADMIT.**

49

95. When Mr. Perry was removed from cell A3, officers observed that his spit mask was still secured around his neck, but that he had removed it from his face. (Salinsky Aff., ¶ 18; Lopez Aff., ¶¶ 13.)

**RESPONSE**: **ADMIT**, but affirmatively allege that Defendant Ayala then reapplied that same spit mask to Perry's face, even though it was saturated with blood and spit. (Gende Decl. ¶11, **Ex. I** at Ayala Dep. 47:7-9; Id. ¶19, **Ex. Q** at Lopez Dep. 55:24-25; Katers Decl. ¶12, **Ex. J** (Doc. 72-2) at 5.)

96. As Mr. Perry was moved from cell A3 to the elevator which would take him and the officers to their conveyance vehicle in the parking garage, he was walking on his own, but was escorted with an officer on each side. (Diaz-Berg Aff., ¶¶ 26-27; Ayala Aff., ¶¶ 34-40; Salinsky Aff., ¶ 21; Lopez Aff., ¶¶ 25-27; Lappen Aff. ¶ 8 and Exh. F.)

**RESPONSE**: **DENY.** Lopez told detectives that he and his partner (Salinsky) had to hold Perry up and assist Perry in walking for fear that Perry would fall. (Katers Decl. ¶3, **Ex. A** Supplement 0008 at 2.). Lopez further stated that Perry was walking on "wobbly" legs, as if he was intoxicated. (Id.) Salinsky told detectives that while escorting Perry out of cell A3 and to the conveyance wagon, he took control of Perry's back belt loop, Lopez held Perry's left arm and Ayala held his right harm so that Perry would not fall. (Katers Decl. ¶3, **Ex. A** Supplement 0012 at 3.) Salinsky further told detectives that Perry refused to walk on his own, which forced officers to walk with Perry in order to get him out to the wagon. (Id.) Defendant Ayala testified that Perry was assisted to the elevator from cell A3, which entailed him partially being dragged and partially walking. (Gende Decl. ¶11, **Ex. I** at Ayala Dep. 31:3-16.)

97. While Mr. Perry was at the PPS, he did not appear to officers to have experienced a life-threatening condition or medical emergency. (Diaz-Berg Aff., ¶¶ 29-30; Ayala Aff., ¶ 39; Salinsky Aff., ¶¶ 14-24; Lopez Aff., ¶¶ 39-48.)

50

**RESPONSE**: **DENY.** Perry suffered from life-threatening conditions and/or medical emergencies at PPS both before his trip to the Hospital and after his return from the hospital. Perry obviously suffered from his first medical emergency in PPS at 2:33 p.m., where he experienced a full body seizure that caused him fall and strike his head on the concrete, which necessitated a trip to the Hospital. After Perry's return from the hospital, he clearly suffered from a medical emergency during his time at PPS as evidenced by: Perry's inability to walk or stand on his own; the fact that Perry had defecated and urinated on himself; the fact that Perry was struggling to breath; the fact that Perry was spitting up blood tinged saliva in his lap; the fact that Perry was rolling around on the ground moaning and groaning; the fact that Perry had bled on the floor of cell A3 and left gobs of blood, spit and fecal matter where he lay; and, that Perry was begging for help and screaming that he couldn't breath and that Defendants were killing him. (Katers Decl. ¶3, **Ex. A** Supplement 0002 at 3; Supplement 0004 at 2; Supplement 0008 at 2; Supplement 0012 at 3; Gende Decl. ¶6, **Ex. D** at Kroes Dep. 14: 12-22, 87:19-21; Id. ¶11, **Ex. I** at Ayala Dep. 22:17-18; Id. ¶12, **Ex. J** at Ayala Dep. (pt. 2) 79:24-25, 80:3-18; Id. ¶18, **Ex. P** at Diaz-Berg Dep. 56:7-11; Id. ¶4, **Ex. B** at Robbins Dep. 44:1-3, 91:18-25,92:7-14.) The entire case revolves around the City's Sgt. Schulz defense, "I see nothing, I know nothing" and whether that was objectively reasonable conduct when determining deliberate indifference and reckless disregard of Perry's health, welfare and safety while in MPD's custody as an arrestee who never even received a probable cause hearing.

98. In fact, his overall condition appeared to improve by the time he left for the CJF. (Lappen Aff. ¶ 8 and Exh. F; Ayala Aff., ¶ 39.)

**RESPONSE**: **DENY.** When Perry was discharged from the Hospital at 6:45 p.m. on September 13, 2010, he was "alert and appropriate," according to Perry's hospital chart. (Katers Decl. ¶8, **Ex. F** at 23). When Perry left PPS at 8:34 p.m. for the Jail, Perry was unable to walk on his own, spitting up blood tinged saliva, moaning, groaning, bleeding from his head, had defecated

51

and urinated on himself, was begging for help, and screaming that he could not breathe and that the Defendants were killing him. (Katers Decl. ¶3, **Ex. A** Supplement 0002 at 3; Supplement 0004 at 2; Supplement 0008 at 2; Supplement 0012 at 3; Gende Decl. ¶6, **Ex. D** at Kroes Dep. 14:12-22, 87:19-21; Id. ¶11, **Ex. I** at Ayala Dep. 22:17-18; Id. ¶12, **Ex. J** at Ayala Dep. (pt. 2) 79:24-25, 80:3-18; Id. ¶18, **Ex. P** at Diaz-Berg Dep. 56:7-11; Id. ¶4, **Ex. B** at Robbins Dep. 44:1-3, 91:18-25,92:7-14.)

99.     During the elevator trip down to the parking area, Mr. Perry continued to be ambulatory. (Salinsky Aff., ¶¶ 21-25 ; Lappen Aff. ¶ 8 and Exh. F.)

**RESPONSE**:  **DENY.**  Lopez told detectives that when Perry was being escorted from cell A3 to the conveyance van, he and his partner (Salinsky) had to hold Perry up and assist Perry in walking for fear that Perry would fall.  (Katers Decl. ¶3, **Ex. A** Supplement 0008 at 2.).  Lopez further stated that Perry was walking on "wobbly" legs, as if Perry was intoxicated.  (Id.)  Lopez also informed detectives that Lee and Ayala may have assisted with helping Perry walk to the elevator. (Id.) Moreover, Salinsky told detectives that while escorting Perry out of cell A3 and to the wagon, he took control of Perry's back belt loop, Lopez held Perry's left arm and Ayala held his right harm so that Perry would not fall.  (Katers Decl. ¶3, **Ex. A** Supplement 0012 at 3).  In addition, Defendant Ayala testified that Perry was assisted to the elevator from cell A3, which entailed him partially being dragged and partially walking.  (Gende Decl. ¶11, **Ex. I** at Ayala Dep. 31:3-16).

100.   Upon arrival in the CJF sally port area, Mr. Perry emerged from the conveyance vehicle. (Salinsky Aff., ¶ 26; Lopez Aff., ¶ 35.)

**RESPONSE**:  **ADMIT** that Perry arrived in the sally port, but DENY as vague the term "emerged".  Perry did not "emerge" from the conveyance van under his own power.  Instead, upon arrival at the Jail, Perry was laying on the floor of the conveyance van and required the assistance of

Lopez and Salinsky in exiting the van and ultimately MCSO deputies to assist in dragging him into CJF. (Katers Decl. ¶3, **Ex. A** Supplement 0008 at 3.)

101. At first, Mr. Perry walked under his own power, but just after he passed through the doors into the "pre-book" area of the CJF, Mr. Perry's knees buckled. (Salinsky Aff., ¶ 28 ; Lopez Aff., ¶¶ 35-39; Lappen Aff. ¶ 8 and Exh.F.)

**RESPONSE**: **DENY**, this self-serving summary judgment sham affidavit testimony that was never previously reported to any investigator of Perry's in-custody death, never testified to at deposition and clearly inconsistent with his medical condition leaving PPS and being seen on video when entering CJF. Perry required the assistance of Lopez and Salinsky in exiting the van, as well as Lopez having informed detectives that Perry appeared to be heavier and needed more assistance to walk. (Katers Decl. ¶3, **Ex. A** Supplement 0008 at 3.)

102. Officers, with the assistance of CJF personnel, brought Mr. Perry over to the nurse's desk. (Bell Aff., ¶¶ 28-29; Salinsky Aff., ¶ 29; Lopez Aff., ¶¶ 39-40.)

**RESPONSE**: **ADMIT.**

103. Mr. Perry was then brought to and seated on a bench which was located across from the nurse's desk. (Bell Aff., ¶¶ 28-29; Lopez Aff., ¶ 39.)

**RESPONSE**: **ADMIT.**

104. Up until this point in time, Officers Salinsky and Lopez did not perceive that Mr. Perry was experiencing a life-threatening condition. (Salinsky Aff., ¶ 24; Lopez Aff., ¶¶ 39-48.)

**RESPONSE**: **DENY.** Lopez and Salinsky carried Perry from cell A3 to the elevator by his arms because he was unable to walk on his own and had wobbly legs as if he was "intoxicated", firmly holding onto him for fear that he would fall. (Katers Decl. ¶3, **Ex. A** Supplement 0008 at 2; Gende Decl. ¶19, **Ex. Q** at Lopez Dep. 66:16-24, 67:1-4, 8-10.) Lopez could smell a strong odor of fecal matter emitting from Perry, but did not try to determine whether Perry voluntarily defecated

on himself, despite acknowledging that a Prisoner who urinates of defecates on himself involuntarily could indicate they are suffering from a medical emergency. (Gende Decl. ¶19, **Ex. Q** at Lopez Dep. 26:2-11, 12-16, 58:7-11.) Also, when Lopez and Salinsky dragged Perry out of the van and noticed that Perry appeared to be heavier and needed more assistance to walk. (Katers Decl. ¶3, **Ex. A** Supplement 0008 at 3.) After Perry was removed from the transport wagon, blood was emanating from his head, and there was blood in the rear of the conveyance wagon. (Gende Decl. ¶14, **Ex. L** at Sandry Dep. 51:11-15; Id. ¶19, **Ex. Q** at Lopez Dep. 78:21-25; Katers Decl. ¶3, **Ex. A** Original at 6.) These observations surely demonstrate that Officers Salinsky and Lopez perceived Perry to be experiencing a life-threatening condition, but completely disregarded it.

105. Rather, Officer Lopez believed Mr. Perry was simply being uncooperative, because he had seen this type of behavior exhibited before in prisoners as they were being brought into the CJF. (Lopez Aff., ¶ 39.)

**RESPONSE**: **ADMIT,** but affirmatively allege that Lopez never did anything to determine whether Perry was being uncooperative or suffering from a medical emergency in violation of MPD policies and procedures. (Gende Decl. ¶17, **Ex. O** at Flynn Dep. 82:11-83:18; Katers Decl. ¶13, **Ex. K**.) Furthermore, Lopez testified he believes a person to be suffering from a medical emergency when they are in "obvious distress, or giving us a verbal clue that they're in any kind of medical distress." (Gende Decl. ¶19, **Ex. Q** at Lopez Dep. 5:15-24.) Neither Lopez nor Salinsky informed MCSO nurse Nichole Virgo who performed the pre-screening of Perry at 8:45 p.m. that Perry had complained of an inability to breathe earlier in the evening. (Id. ¶24, **Ex. V** at Virgo Dep. 116:8-11.)

106. Police Officer Stephon Bell was present at that CJF pre-book area because his assignment at that time was to act as the liaison officer between MPD and the CJF booking staff. (Bell Aff., ¶ 10.)

**RESPONSE**: **ADMIT.**

54

107. Officer Bell observed Mr. Perry as he was brought into the pre-book area, and ultimately as he was placed on the bench by the nurse's desk, and at no time did Officer Bell believe that Mr. Perry was experiencing a life-threatening condition. (Bell Aff., ¶¶ 28-35.)

**RESPONSE**:  **ADMIT**, but affirmatively allege that Bell did nothing to determine whether Perry was suffering from a medical emergency despite knowing that Perry had been in the emergency room, had defecated and urinated on himself, and despite observing Perry be unable to walk on his own and slide off the Jail bench onto the floor. (Gende Decl. ¶13, **Ex. K** at Bell Dep. 40:17-25, 70:14-17; 71:9-12, 71:15-16.)

108. Mr. Perry was examined by CJF nursing staff who concluded that they would not admit him into the CJF until he was medically cleared again. (Salinsky Aff., ¶¶ 29-31; Lopez Aff., ¶ 42.)

**RESPONSE**:  **ADMIT.**

109. Therefore, Officer Salinsky called for an ambulance to bring Mr. Perry to a medical facility for medical clearance. (Salinsky Aff., ¶ 32.)

**RESPONSE**:  **DENY.**  Master Control at the Jail called for an ambulance at the request of MCSO Fatrena Hale at 8:48 p.m. on September 13, 2010.  (Gende Decl. ¶26, **Ex. X** at Hale Dep. 43:8-20; Katers Decl. ¶16, **Ex. N**.)

110. While CJF and MPD personnel were waiting for the ambulance to arrive, Mr. Perry became unresponsive and unconscious. (Salinsky Aff., ¶¶ 33-34; Lopez Aff., ¶ 43.)

**RESPONSE**:  **ADMIT.**

111. Mr. Perry died at the scene. (Salinsky Aff., ¶ 37; Lopez Aff., ¶ 46.)

**RESPONSE**:  **ADMIT.**

112. An autopsy was conducted of Mr. Perry on September 14, 2010 by Christopher K. Poulos, M.D., who was an Assistant Medical Examiner at that time, and he found that Mr. Perry died of Coronary Artery Thrombosis (a blood clot in the heart) due to Artherosclerotic Cardiovascular

Disease (hardening of the arteries) and that the manner of death was "natural." (Lappen Aff., Exh. C, Exh. E.)

**RESPONSE**:  **ADMIT**, but affirmatively allege that Dr. Poulos also testified that the clot, which ultimately caused Perry's death, could have been caused by the stress that Perry endured in the hours before his death.  (Gende Decl. ¶33, **Ex. EE** at Poulos Dep. 89:18-90:3.) Furthermore, the MPD Defendants including Kroes, Jacks, Robbins, Ayala, Salinsky, Lopez, Ivy, Bungert, Diaz-Berg, Lee and Bell exacerbated Perry's underlying cardiac condition by failing to distinguish between voluntary behavior and signs and symptoms of myocardial infarction, pulmonary edema, and severe respiratory distress until it was too late and Perry died on the Jail floor. (Katers Decl. ¶12, **Ex. J** (Doc. 72-2) at 4.)

113. Dr. Poulos concluded that Mr. Perry did not have any significant injuries related to his cause of death. (*Id.*, Exh. E, Poulos Depo., pp. 23-24)

**RESPONSE**:  **ADMIT** only if one can consider death as an insignificant injury, inhumane treatment has insignificant injury, bleeding profusely of an unknown origin behind a spit mask, being left to alone die in your own blood, vomit, urine and feces, and/or being dropped twice on your face while leaving behind gobs of blood, split and fecal matter where you lay in cell A3, otherwise deny. As to Dr. Poulos's conclusion, affirmatively allege that Kroes, Jacks, Robbins, Ayala, Salinsky, Lopez, Ivy, Bungert, Diaz-Berg, Lee and Bell exacerbated Perry's underlying cardiac condition by failing to distinguish between voluntary behavior and signs and symptoms of myocardial infarction, pulmonary edema, and severe respiratory distress until it was too late and Perry died on the Jail floor. (Katers Decl. ¶12, **Ex. J** (Doc. 72-2) at 4.) Dr. Poulos also testified that the clot, which ultimately caused Perry's death, could have been caused by the stress that Perry endured in the hours before his death.  (Gende Decl. ¶33, **Ex. EE** at Poulos Dep. 89:18-90:3.)

114.  Dr. Poulos found no evidence of 1.) bruising to Mr. Perry's head, either on the surface or below the scalp; 2.) chipped teeth; or 3.) petechiae in his eyes. (Id., pp. 23-24, 49-51; Exh. C. pp. MPD 00250, 0254.)

**RESPONSE**:  **ADMIT.**

115.  Neither Chief Flynn, DI Galaviz, Captain Beecher, Detective Jones, nor Officer Menzel had any contact whatsoever with Mr. Perry. (Flynn Aff., ¶ ; Jones Aff., ¶¶ 1-7; Menzel Aff., ¶¶ 1-4; Galaviz Aff., ¶¶ 2-5; Beecher Aff., ¶¶2-4.)

**RESPONSE**:  **ADMIT.**

116.  Neither Detective Jones nor Officer Bell engaged in any communication for the purpose of conspiring to deprive anyone, including Mr. Perry, of their constitution rights. (Jones Aff., ¶ 7; Bell Aff., ¶ 36.)

**RESPONSE**:  **ADMIT.**

Dated this 18th day of January, 2016.

<div style="margin-left:40%">

JUDGE, LANG & KATERS, LLC
Attorneys for the Plaintiffs


     /s/ Christopher P. Katers     
Christopher P. Katers
State Bar No. 1067557

</div>

MAILING ADDRESS:
8112 W. Bluemound Rd., Ste 71
Wauwatosa, WI 53213
Telephone:     (414) 777-0778
Facsimile:     (414) 777-0776
ckaters@jlk-law.com

57