# Expert Opinion, Rachel Waldron, MD

## *Timeline for Perry*

James Perry was booked at PPS at 5:36 am and spent the day there until 3:21 pm when he was transported to Mt Sinai ED by Jacks and Kroes after having a seizure. After treatment with intravenous Dilantin and Ativan, he was discharged at 6:45 pm at which time he is recorded by the ED as being "Alert & Appropriate" and "Ambulatory to bathroom". Jacks and Kroes report that Perry was very sleepy after the medication and had to be assisted with putting on his shoes and shirt. Jacks and Kroes, assisted by Bugert and Santiago, carried Perry into the PPS elevator at 6:50 pm. At this point his medical condition was beginning to deteriorate. Perry had a respiratory rate of 40-50 times per minutes, and was yelling "Please help me". Upstairs, Perry was unable to sit on the bench and was placed on the floor. A mask was placed over his face because he was either spitting or drooling. He urinated and defecated on himself and was moaning. The paperwork to move Perry to CJS was not available, so he was carried into a holding cell. Another prisoner, Evans, reports that Perry was dropped on his face twice during the transfer. Surveillance was minimal while he was in the cell. The spit mask was left in place although it seems to have been dislodged during this time. When Perry was taken out of the cell, a custodian, Puechner, noticed "gobs of spit, blood, and fecal matter" on the floor of the cell. The spit mask was reapplied to his face. At approximately 8:20 pm Perry was brought back into the elevator, put in a paddy wagon, and driven over to CJF. Perry was dragged into CJF at 8:40 pm. Mask remained over his face. He was initially put on a bench but then fell to floor and was rolling on the floor and moaning. At 8:45pm, RN Virgo tried to speak to Perry and then walked away. At 8:48 pm, Hale called an ambulance. At this time, on the videotape, Perry stopped moving. RN Wenzel was observing Perry from behind the counter for several minutes and then decided to get a towel, pull off the spit mask, and wipe his face. RN Wenzel pulled off the mask and realized he was in cardiac arrest. Resuscitative efforts began one



minute later, at 8:52 pm. The MFD paramedics and the prison medical team performed CPR. Perry was pronounced at 9:21 pm.

## MPD

The MPD officers involved in Perry's case had an independent obligation to recognize when a person is suffering from a medical emergency. No one did this. Nor did any officer ask Perry if he needed medical assistance. Despite the fact that Perry quickly grew too weak to even walk, the officers assumed that he had to be fine because he had an earlier medical evaluation at Mt Sinai ED. The placement of an expectorant mask prevented the officers from being able to assess his true medical state From the point Perry is in the elevator riding up to PPS, it was clear that he needed help. However, Ivy and the others report that "no one believed that he was in medical distress". Ivy further states that he had never seen a prisoner in such bad shape as Perry. Kroes, who had paramedic training, noted that upon arrival at the jail Perry was unable to walk or even sit on a bench. However, he told Perry that "if you're talking you're breathing". It required six officers to carry Perry, now mumbling and covered in urine and feces, to his jail cell. Jacks reports that she or any officer could have called for an ambulance, but no one did. Robbins, the commanding officer, said that "The only visual interpretation which would suggest a medical emergency is if loss of consciousness or seizure". Robbins also stated that since Perry didn't say "I need medical attention" – at this point Perry could only grunt and moan – therefore there was no need to call an ambulance. Robbins attributed Perry's condition to "Jailitis" and "Playing games" and told him not to "act like an animal". Officers Bell and Diaz-Berg, who was supposed to assess Perry while in the cell, looked through the window but didn't attempt any additional assessment or to ask if he needed medical attention – he was making "grunting noises and rolling around a little bit". Robbins noted spots of blood on the floor when Perry was taken out of the cell, but did not call for EMS or communicate this information to CJS. Robbins could have called for an ambulance at any time but

instead chose to expedite paperwork to "get rid of that person" – i.e. Perry. Officer Santiago found him to be groaning, unable to respond to verbal commands, unable to walk, and incoherent but thought he was faking to avoid being booked. Santiago stated that "once the individual is medically cleared, that at that point in time any additional action for that subject is faking the process." Throughout this time, the MPD officers failed to transfer information as Perry was handed off from one team to the next about Perry's medical condition and recent ED treatment. Salinsky, who along with Lopez brought Perry to CJF in the paddy wagon, noted that Perry was not combative but "noncooperating" – they did not attempt to speak to Perry and could not see his eyes, mouth, or nose due to the spit mask. None of the MPD officers were able to explain how they determined that Perry was voluntarily incontinent and unable to walk or speak, rather than having a legitimate medical emergency.

## CJF

Both Arndt and Kieckbusch, who assisted MPD with bringing Perry into CJF, stated that it was not their job to know if Perry was having a medical emergency – "we usually call a nurse for that". They relied on nurses to decide if he needed help, despite the fact that they observed, along with Hale, that Perry was groaning, rolling on the floor, covered with urine and feces, with blood on the spit mask. They all felt that Perry remained the responsibility of MPD because CJF had not accepted him, and therefore they did not to stand close to him to monitor him. They believed him to be "combative" so they needed to "have our distance" and did not receive any information about the ED visit or about the custodian finding spit and blood in cell. They could not explain why it took the nurse five minutes to come over and assess Perry. Hale reports had she known about Perry's medical problems she would have made the nurses come more quickly. When she goes to assess Perry, RN Virgo reports that "within a minute of just being in his presence, that something isn't right". Virgo wrote in her Prescreening Report (Exhibit 1) that Perry was "bleeding profusely from mouth, unsure of source as has spit mask on". She did not

check any of Perry's vital signs or remove the mask to prevent him from choking. Instead she walked away to call Dr. Grebner and fill out forms. She considers first aid as "That's the process of walking away from him, to call the doctor to let them know what was going on and that he's being refused" rather than rendering any medical care. Virgo did not consider Perry's condition to be a medical emergency until Wenzel said "he's losing consciousness." MFD was not called until three minutes after Virgo walked away from Perry, who had now been in CJF for eight minutes. Based on the video tape, Perry went into cardiac arrest and died at the time of the MFD call – 8:48 pm – because he suddenly stops moving. Wenzel defines a medical emergency by the narrow definition of "someone who is not breathing, someone who has no pulse, someone who has an extreme altered state of consciousness, someone who is hemorrhaging." She reports being aware of Perry's presence and observing him for several minutes from behind a counter, with "blood and possibly vomit on spit mask, blood on shirt, soiled" and saw him slide off the bench, rolling around on the floor and moaning. She did not take vital signs because "he was rejected" and she was "prevented as far as safety issues" – yet did not speak to the MPD or CJF officers to see if Perry was violent. She decided Perry needed medical help when Virgo made the decision to call the doctor, but did not step in for several more minutes. Then Wenzel went to get a towel and take off the mask. She wiped "some vomit and some blood" off Perry's face and found him to be "nonresponsive, no pulse, pupils dilated". Perry had "frothy blood from nose, mouth, and ear". (Exhibit 3). At this point it is clear he had already died without anyone noticing or attempting to help him.

Perry did have underlying cardiac disease, and a combination of extreme stress and barriers to adequate breathing including a spit mask filled with saliva, vomit, and blood, exacerbated his condition and caused him to die. The guards at MPD and CJF failed to recognize signs and symptoms of myocardial infarction, pulmonary edema, and severe respiratory distress until it was too late and he was in a full cardiac arrest. The guards at MPD and CJF assumed that all of Perry's symptoms – inability to speak and walk, and

incontinence, were due to him voluntarily trying to fake a medical condition. Yet no one could explain any reasoning for this or any method used to distinguish between involuntary and voluntary behavior. When the spit mask was dislodged – in the MPD cell – the saliva and blood spilled out onto the cell floor – as seen by Robbins and mopped up by the custodian. Reapplying the spit mask, as was done by the MPD officers, would mean that all the saliva, mucous, blood and vomit on his face, plus all the additional excretions involuntarily produced by Perry, would saturate the mask and be aspirated by Perry as he struggled to breathe.

Both CJF nurses, Virgo and Wenzel, also failed to recognize signs and symptoms of myocardial infarction, pulmonary edema, and severe respiratory distress until it was too late and he was in a full cardiac arrest. In addition they failed to check vital signs or administer any treatment including removal of occluding spit mask and supplying oxygen. Perry suffocated and died in the presence of these two nurses, who failed to provide any treatment whatsoever until it was too late.

The entire time Perry was in the jail and prison system, everyone's goal seemed to be to pass him on to the next set of officers and avoid the responsibility of rendering any aid, from basic needs such as cleaning soiled clothes to recognizing a serious medical emergency and initiating treatment. A medical emergency is not simply recognizing obvious death, as Wenzel did after Perry was in the system for two hours and had already died on the floor. Instead the officers and nurses must be able to recognize signs of distress such as inability to speak, inability to walk, moaning, rolling on the floor, and being incontinent of urine and stool. The MPD and CJF officers assumed these were all being faked by Perry rather than recognizing that they were signs of a dying man. No effort was made between the officers to pass on essential medical information. While with the MPD and then the CJF guards, Perry needed to have his spit mask removed, to be seated in a comfortable position, and a prompt call to MFD for an ambulance and additional emergency management. The CJF nurses had the ability to render additional

medical treatment such as checking vital signs and administering oxygen, but this was not done for a protracted amount of time due to unfounded safety fears. He was passed from MPD to CJF to RN's who then wanted to pass him on to MFD. But it was too late; he was in cardiac arrest at that point and had died on the floor wearing a spit mask occluding his breathing, with no one noticing it. Resuscitation was unsuccessful and Perry was officially pronounced dead 29 minutes later.

Based on my review of the case, the MPD and CJF officers, and the CJF nurses, operated completely outside the standard of care and acted with deliberate and reckless indifference to the health and welfare of James Perry. These actions resulted in clear pain and suffering on Perry's part for the entire two hours after his return from Mt. Sinai ED, and his ultimate death on the floor of CJF. If any one of the people responsible for Perry had recognized what was clearly a medical emergency, they could have changed this outcome. No one called for help or rendered any treatment until he was already dead. In my opinion, the outcome of this case would have been different had even minimal standards of care for ill prisoners been followed.

Submitted November 24, 2014

Rachel Waldron, MD
Emergency Physician
Sea Cliff, NY

