# United States District Court

## Eastern District of Wisconsin

---

## Estate of Perry v. Wenzel

### 12-CV-664



Video Deposition of

## Chief Edward Flynn

Recorded 04/02/2014 in Milwaukee, WI

9:57 am - 1:03 pm, 176 mins. elapsed

---

## Magne-Script

(414) 352-5450



*20421 Condensed transcript with index*

## Page 1

Witness
Chief Edward Flynn

Wednesday 04/02/2014 at 10:15 by: Jeff Joseph

Police Administration Building
950 N. James Lovell St.
Milwaukee, WI

Estate of Perry v. Wenzel
12-CV-664
United States District Court
Eastern District of Wisconsin

## Page 2

### A P P E A R A N C E S

```
 1
 2   James J. Gende
 3   Gende Law Office, S.C.
 4   N28 W23000 Roundy Dr.
 5   Pewaukee, WI  53072
 6   On behalf of the Plaintiffs
 7
 8   Christopher P. Katers
 9   Judge, Lang & Glynn, S.C.
10   8112 W. Bluemound Rd. #71
11   Milwaukee, WI  53213
12   On behalf of the Plaintiffs
13
14   Andrew A. Jones
15   Whyte Hirschboeck Dudek S.C.
16   555 E. Wells St. #1900
17   Milwaukee, WI  53202
18   On behalf of the Milwaukee County Defendants
19
20   Susan E. Lappen
21   Milwaukee City Attorneys Office
22   841 N. Broadway #716
23   Milwaukee, WI  53202
24   On behalf of the City of Milwaukee Defendants
25
```

## Page 3

### I N D E X

| EXAMINATION BY | PAGE NO. |
|---|---|
| Mr. Gende . . . . . . . . . . . . . . . . . . | 3 |
| Mr. Jones . . . . . . . . . . . . . . . . . . | 140 |

| EXHIBIT NO. | PAGE NO. |
|---|---|
| 68 - Notice of Deposition . . . . . . . . . . . | 4 |
| 69 - Transcript of TV interview . . . . . . . . | 59 |
| 70 - 11/21/12 MPD memo . . . . . . . . . . . . . | -- |
| 71 - Interviews regarding in-custody deaths . . . | 86 |
| 72 - MPD investigation supplement . . . . . . . . | 137 |

(The sealed original transcript was sent to Mr. Gende)

### E X A M I N A T I O N

```
     BY MR. GENDE:
13
14
15   Q   Good morning, Chief.  Could you please state your name
16       and spell your last name for the record?
17   A   Edward Flynn, F-l-y-n-n.
18   Q   Chief Flynn, I'm going to ask you a series of
19       questions regarding your knowledge of policies and
20       procedures at the Milwaukee Police Department and the
21       events surrounding Mr. Perry's in-custody death.  If
22       you don't understand my question, please tell me so
23       and I'll attempt to rephrase it in a manner that's
24       more clear.  Is that fair?
25   A   Yep.
```

## Page 4

```
 1   Q   If you answer my question, I will presume that you
 2       understood it.  Is that fair?
 3   A   Yes.
 4   Q   Please allow me to ask my entire question before you
 5       attempt to answer, and I'll afford you the same
 6       courtesy so that we may keep the record clear.  Okay?
 7   A   Okay.
 8           (Exhibit 68 identified)
 9   Q   Sir, I'm going to show you what we've marked as
10       Exhibit No. 68, which is the Notice of Deposition
11       requiring your appearance here today, which was set
12       for 10:15.  We did agree to appear early in an attempt
13       to accommodate your schedule.  Pursuant to this
14       notice, you were required to bring with you any
15       documents that you reviewed in preparation for your
16       deposition.  Did you do that, sir?
17   A   Nope.
18   Q   Did you review any documents in preparation for your
19       deposition?
20   A   As I was preparing for my deposition, I looked at the
21       Critical Incident Review Board Report on the incident.
22   Q   And when was that, sir?
23   A   That was yesterday.
24   Q   Did you meet with your attorney in preparation for
25       your deposition?
```

**Magne-Script Video Court Reporting**

414-352-5450

## Page 5

1  A  Yes, I did.
2  Q  On how many occasions?
3  A  Once.
4  Q  And when did that meeting occur?
5  A  Yesterday, I guess.
6       THE WITNESS:  [Addressing Ms. Lappen]  Day
7    before yesterday?
8  A  Yesterday.
9  BY MR. GENDE:
10  Q  And how long did you meet for, sir?
11  A  Oh, I don't know.  About a half an hour.
12  Q  All right.  Other than reviewing the Critical Incident
13    Report and meeting with your attorney, did you
14    undertake any other steps to prepare for your
15    deposition today?
16  A  No, I did not.
17  Q  Have you spoke with any of the officers that have been
18    previously deposed?
19  A  No.
20  Q  Who is the most responsible at the Milwaukee Police
21    Department for training officers on policies and
22    procedures?
23  A  I need a better sense of what you're getting at.  Do
24    you need to know who is in charge of the Police
25    Academy or who is in charge of the police department

## Page 6

1    or who is in charge of the bureau of which the Police
2    Academy is?  Which do you want to know?
3  Q  Let me ask you this.  Once officers are out of the
4    academy, does their training stop?
5  A  No.
6  Q  If the policies and procedures are changed after an
7    officer is outside of the academy, how are those
8    policies and procedures communicated to officers?
9  A  Two ways.  One is through roll-call training, which
10    takes place at every work site, and another is through
11    the annual in-service training at the Police Academy.
12  Q  For instance, policies and procedures were changed
13    regarding medical emergencies as it relates to inmates
14    who suffer from a medical condition.  Tell me how that
15    policy and procedure was subsequently communicated to
16    officers so they would understand their new
17    responsibilities in that regard.
18  A  It was communicated through -- to all officers who
19    went through in-service training that year, which was
20    everybody, and it was also read at all the roll-calls
21    so that officers were aware that the policy had been
22    amended.
23  Q  Is there a specific officer in your chain of command
24    that is ultimately responsible to make sure that
25    information is disseminated to all officers?

## Page 7

1  A  Well, you know, through me.  I delegate authority to
2    take care of certain aspects of police administration,
3    so when I made the decision that we needed to amend
4    the policy, I delegated the amendment of the policy to
5    the Office of Management and Planning, which reports
6    to one two-star inspector; the Police Academy reports
7    to a separate two-star inspector.
8       It was that inspector's job to reach out to the
9    deputy inspector at the academy and create training
10    around the new protocol, that we'd go through all the
11    various in-service trainings of that year.  And
12    obviously through the Operations commanders, we put
13    out a roll-call training, which simply updated the
14    officers at the work sites that there had been an
15    amendment to the policy.
16  Q  The policy that we're discussing is 090.  Are you
17    familiar with that new policy?
18  A  I'm familiar with the aspect of it that pertains to
19    the lessons learned here, yeah.
20  Q  And when you say "lessons learned here," is that in
21    relation to Mr. Perry's in-custody death?
22  A  That's correct.
23  Q  And tell me what policy was in place prior to Mr.
24    Perry's in-custody death as it relates to medical
25    emergencies for inmates.

## Page 8

1  A  I really can't recite for you what the policy said.  I
2    can tell you what was not in the policy.  And that
3    policy did not anticipate a circumstance in which our
4    officers would disagree with the medical diagnosis of
5    a hospital and attempt to see the prisoner admitted
6    against the hospital's wishes.  We didn't have a
7    policy that anticipated our officers being in that
8    circumstance.
9       And so that's the amendment we made, was to try
10    to put in place a policy which would give supervisory
11    backup to the officers' concerns; and if it couldn't
12    be resolved, get the prisoner to the Central Judicial
13    Facility as soon as possible because they do have
14    medical staff there.  We don't have medical staff at
15    the jail.  And that was the purpose of the change in
16    the policy.
17       So the rest of it, I really couldn't tell you,
18    but I remember why we changed it, and we changed it
19    because we had a circumstance that our policy, I don't
20    know if anybody else's policy, had anticipated.
21  Q  You mentioned the Central Judicial Facility, and maybe
22    I misheard that.  Are you referring to the sheriff's
23    department facility?
24  A  That's correct.  Yeah.
25  Q  How were your officers trained on recognizing a

| Page 9 |
|---|

1   medical emergency prior to September 13th of 2010, if
2   you know?
3 A   I don't know offhand.  I do know our training meets
4   the standards of the Wisconsin law enforcement
5   training people, but I don't -- I don't know what the
6   exact training was.
7 Q   Generally, what's your understanding pursuant to
8   department policies and procedures what constitutes a
9   medical emergency?
10 A   That's a subjective call.  I mean, if somebody is --
11   appears to be in distress, it's our expectation that
12   people will get them medical help, as occurred in this
13   circumstance.
14 Q   Relative to medical emergencies, do you have an
15   understanding or definition for what constitutes a
16   change in condition?
17 A   You'd have to refer to the policy.  I don't know
18   offhand.
19 Q   As the chief of police for Milwaukee, do you have an
20   understanding what a change of condition may be that
21   would suggest a medical emergency is occurring to an
22   inmate?
23 A   It's not a call that I am likely to ever have to make.
24   We develop our policies based on standards set by the
25   state, we train our officers based on standards set by

| Page 10 |
|---|

1   the state, and our policies comply with them.  That's
2   my expectation, that our officers will be trained to
3   comply with the policies we have that meet state
4   standards.
5 Q   And as we sit here today, are you able to describe for
6   me what policies you're referring to that provide
7   training to your officers to recognize a changing
8   condition that may constitute a medical emergency for
9   one of your inmates?
10 A   I have not personally taken the training that
11   accompanies the policies that we have, so I couldn't
12   tell you.
13 Q   You mentioned, as it relates to Mr. Perry's case, that
14   he suffered a medical emergency, appeared in distress.
15   Is that the time period when he was first taken to the
16   emergency room that you are referring to?
17 A   That's correct.
18 Q   And what type of distress did he suffer that suggested
19   he was having a medical emergency requiring an
20   emergency room visit?
21 A   It is my understanding that he had a seizure.
22 Q   How did you come to that understanding?
23 A   Well, I was advised of that subsequent to the incident
24   and the demise of the patient as we did our internal
25   investigation.

| Page 11 |
|---|

1 Q   When did you first become advised that Mr. Perry had
2   passed away while in custody of the Milwaukee Police
3   Department?
4 A   I really can't recall.  This happened in 2010.  I
5   don't remember exactly when I was told.
6 Q   Is it policy and procedure that the chief be advised
7   within 24 hours of a in-custody death for an inmate?
8 A   It's the expectation that I'll be advised as soon as
9   practical.  Obviously it's a critical incident and
10   something I'm going to want to be made aware of.
11 Q   Do you recall initially what information was provided
12   to you about Mr. Perry's in-custody death as soon as
13   practical after he passed away?
14 A   I don't recall.
15 Q   Do you know if you were on duty at the time?
16 A   I do not recall.
17 Q   Do you know if it was via telephone call or an officer
18   coming into your office?
19 A   Don't remember.
20 Q   Do you know how many individuals in the custody of the
21   Milwaukee Police Department have passed away since
22   you've become chief?
23 A   Not exactly.  It's a very, very small number, though.
24 Q   More than ten, less than ten?
25 A   It's less than ten.

| Page 12 |
|---|

1 Q   And in those instances where a individual in the
2   custody of the Milwaukee Police Department has passed
3   away, has there ever been an occasion where a critical
4   incident investigation has not been undertaken?
5 A   Well, we started the Critical Incident Review process
6   I think only a year or so ago, and we've been going
7   backwards to prior critical incidents and evaluating
8   them.
9   So, you know, we did not have the CIRB in
10   existence in 2010, but we have subsequently examined
11   it after we put this in place in order to create a
12   process by which we can learn lessons from the
13   incidents outside of the internal investigation or any
14   criminal investigations; what other lessons might we
15   learn?  And it was in that context, we think it's our
16   obligation.  No policy in any agency can cover every
17   conceivable incident that can occur.  Just can't.
18   Nobody's got them.
19   And so there are times when an unanticipated
20   incident, not anticipated by current policy, occurs,
21   and you need to identify what that is and see if we
22   can learn from it and adjust our policies and
23   trainings to deal with it.  And this circumstance, as
24   I say, I don't know a police department that's got a
25   policy that anticipates that the officers having

## Page 13

1 medical concerns that the hospital is choosing for
2 whatever reason not to recognize.
3     That was our problem. He should have been
4 admitted to the hospital. He wasn't. And he was
5 discharged to us. Our officers took him back to the
6 facility and, you know, continued the process to get
7 him prepared to go to CJF. It's our evaluation of
8 that that we would have been better served by a policy
9 that A) elevated the concerns about the hospital
10 personnel to higher-ranking authority to try to
11 intervene, see if we could get them to change their
12 mind; and if we still failed that, to expedite getting
13 him to CJF simply for the fact that CJF, since it's a
14 permanent jail facility, has medical personnel on
15 call, available there in person. And they're in a
16 better position to say this guy needs medical
17 attention, get him to the hospital. And we could get
18 him to the hospital that way, or CJF could get him to
19 the hospital because they would have medical
20 personnel.
21     So, as I say, this was not something that had
22 occurred to us before. It hadn't happened before.
23 And consequently we amended the policy. But keep in
24 mind, the policy we amended already met the state
25 standards for handling sick prisoners. The state

## Page 14

1 doesn't have a policy that says if the hospital won't
2 admit a person you think needs to be admitted, here's
3 what you do. They didn't anticipate it either.
4 Q  You had mentioned that a new Critical Incident Review
5    policy was put into place after 2010 and that,
6    pursuant to that policy, the police department has
7    gone back and looked at other in-custody deaths --
8 A  Mm-hmm.
9 Q  -- to try and determine what, if anything, could have
10    been done differently to prevent the bad outcome; is
11    that correct?
12 A  That's correct.
13 Q  So is it fair to say that even though the policy was
14    not in place prior to certain in-custody deaths, the
15    police department has undertaken review of those?
16 A  We undertook -- yes, exactly. Well, we looked at the
17    Perry case, and then, as I say, as part of this
18    Critical Incident Review process, changed the policy.
19    You know, the Perry case had to work its way through
20    the system. But we also, once we did the evaluation,
21    which I believe was last year, that's when we made the
22    adjustment to the policy.
23 Q  And when you undertook a review, not only of the Perry
24    case but other in-custody deaths as it relates to the
25    new Critical Incident Review policy, has any officer

## Page 15

1 been disciplined relative to in-custody deaths, based
2 on this review that you have testified to today?
3 A  No. Not to my knowledge.
4 Q  Is it fair to say that when Mr. Perry passed away in
5    September of 2010, the only procedure in place to
6    investigate the incident surrounding his death was an
7    Internal Affairs investigation?
8 A  No, it's not fair to say that. The district
9    attorney's office investigates these as well.
10 Q  Other than the district attorney and Internal Affairs
11    looking at the incidents surrounding an in-custody
12    death, including Mr. Perry's, was there any other
13    policy or procedure in place for the police department
14    to review whether or not officers' conduct or
15    misconduct may have been a cause of the death?
16 A  Well, that's part of the Internal Affairs
17    investigation. I mean, the cause of death was
18    undiagnosed heart disease. That's clear in the
19    autopsy report. The officers did nothing to cause
20    that. The open question is whether or not they could
21    have prevailed on the hospital to admit him if the
22    hospital might have been in position to take
23    lifesaving measures sooner to save his life. But
24    there's not one scintilla of evidence to indicate
25    anybody did anything to Mr. Perry except advocate on

## Page 16

1 his behalf to the hospital personnel.
2 Q  When was it determined that Mr. Perry had passed away
3    from an undiagnosed heart condition?
4 A  That was in the medical examiner's report, said he had
5    atherosclerosis; cause of death, heart attack.
6 Q  Was that known prior to Internal Affairs undertaking
7    an investigation into the events surrounding Mr.
8    Perry's death?
9 A  I don't know if that -- I don't know exactly what the
10    timelines were, but I'm sure that the Internal Affairs
11    investigation was not completed, you know, before the
12    autopsy report came through.
13 Q  Have you seen an opinion or report from Internal
14    Affairs which provides the results of their
15    investigation?
16 A  Not recently, but I have, yeah.
17 Q  Do you understand that as part of the Internal Affairs
18    investigation, statements were taken on the evening in
19    question by detectives assigned from the police
20    department, correct?
21 A  I'm going to assume so.
22 Q  Do you also understand that the medical examiner did
23    not provide cause of death until November of 2010?
24 A  If that's what you say. I don't know.
25 Q  Do you know, as part of the Internal Affairs

## Page 17

1  investigation that started on the evening Mr. Perry
2  died, who was in charge of that investigation?
3  A  I don't recall.
4  Q  Would there be a specific detective in charge, or
5  would a certain group be assigned to it?  Tell me how
6  that process works.
7  A  It depends on the circumstances.  Sometimes the entire
8  investigation is handled by Internal Affairs.
9  Sometimes, if there's a violent death, there is the
10  homicide personnel are brought in.  I don't know who
11  conducted this investigation.
12  Q  After the investigation was completed, was there any
13  responsibility for Internal Affairs to report to you
14  their findings?
15  A  Yes.
16  Q  And tell me how that process works.
17  A  I don't recall in this specific circumstance, but
18  normally they make a report, and they brief me on
19  their findings.
20  Q  Were you advised pursuant to the Internal
21  investigation that Mr. Perry had suffered from any
22  change in condition after he was released from the
23  emergency room and brought back to the police
24  department's prebooking facility?
25  A  My understanding was that after he was administered

## Page 18

1  apparently a very strong sedative at the hospital, he
2  had great difficulty walking.  And our officers were
3  unable to get him to walk from the car to the facility
4  and ultimately had to carry him into the processing
5  unit.  And while there they had to sit him down on the
6  floor because he literally could not stand.  This was
7  allegedly part of the kicking in of the sedative that
8  had been administered to him at the hospital.
9  While there, he began to spit; and the officers,
10  as per the protocols, put a spit mask on him and
11  conveyed him to a cell for observation while the
12  paperwork was finished to convey him to CJF.
13  Q  Do you know if the observation that Mr. Perry was
14  supposed to receive after he was conveyed to the cell
15  was over and above what would normally occur for a
16  prisoner put in a cell as a result of Mr. Perry's
17  prior medical emergent situation where he had gone to
18  the emergency room and then been returned to the
19  police department?
20  A  I don't recall precisely.
21  Q  Should there have been a higher level of observation
22  by Milwaukee police officers as it relates to Mr.
23  Perry, considering he had been released from the
24  emergency room and was unable to walk under his own
25  a result of medications that required him to be

## Page 19

1  carried into the police department and then carried to
2  the cell?
3  A  The expectation is that, understanding the result of
4  the administration of this sedative, that he would be
5  placed in an environment in which he couldn't do harm
6  to himself and that they would keep an eye on him.
7  The understanding was this was a powerful sedative,
8  and it would be expected that he wouldn't be able to
9  walk or otherwise move, so they placed him in what I
10  suspect they perceived to be a secure place and kept
11  an eye on him.  But I don't know what the exact
12  sequence of that consisted of.
13  Q  Well, I'm not inquiring of the exact sequence.  My
14  question to you as the chief of police is whether or
15  not you would have expected your officers to perform a
16  higher level of observation of an inmate who was under
17  a strong sedative, had suffered from seizures earlier
18  requiring an emergency room visit, was unable to walk
19  into the police department upon return from the
20  emergency room, had to be carried in, and then had to
21  be placed in a cell for observation.  Is that a normal
22  observation level, or would you expect some greater
23  observation under those circumstances?
24  A  I would expect him to be observed.  The officers had
25  conveyed him to a hospital, which told him there was

## Page 20

1  nothing wrong with him.  They had discussed with
2  medical personnel they were concerned about his
3  condition and were told by medical personnel that they
4  thought he was faking.  Medical personnel administered
5  a strong sedative, which they said would make him
6  sleep and he would be unable to walk.
7  Everything that Mr. Perry demonstrated in CJF was
8  consistent with what medical personnel told our
9  personnel to expect.  So I would expect them to
10  observe him.  I would not expect them to have him
11  under 24-hour observation or minute-by-minute
12  observation given the set of circumstances that had
13  been presented to them by allegedly competent medical
14  personnel.
15  Q  You mentioned CJF in your answer.  Did you mean the
16  Prisoner Processing Section for MPD?
17  A  No.  I mean when -- to take him to the County, which
18  is where he gets booked into the county system, they
19  as standard practice have medical personnel there.
20  They're a full-service facility that way.  And so
21  that's why when we amended the policy, we said get him
22  directly over there when you have this kind of crossed
23  opinions with hospital personnel.  We're not doctors.
24  So get him someplace where there is medical personnel
25  that theoretically could intervene differently than we

## Page 21

1    can.
2        If they, for example, declined to admit him
3    because he needed medical assistance, then they would
4    be the ones summoning medical assistance. We wouldn't
5    be the ones taking him back again and renewing it. It
6    would be a different level of competence disputing the
7    hospital's refusal.
8    Q   I just want to focus on the observation level you
9    expected of your officers of Mr. Perry after he left
10   the emergency room and was returned to PPS and before
11   he was transported to the Criminal Justice Facility.
12   A   Mm-hmm.
13   Q   Is it your expectation or do you have an understanding
14   under the policies and procedures in place in
15   September of 2010 that Mr. Perry should have received
16   a higher level of observation than what is the normal
17   practice and procedure for prisoners that are put into
18   cells at the PPS?
19   A   What I'm saying is that he should have received a
20   level of observation consistent with our policy and
21   consistent with what the officers knew at the time
22   that had been conveyed to them by medical personnel in
23   terms of what to expect from the administration of his
24   sedative and what the hospital thought his medical
25   condition was. What that exactly consists of, I would

## Page 22

1    have to leave to some level of discretion to the
2    personnel there, but it should be consistent with what
3    they had been advised and what they knew at the time.
4    Q   So in your opinion, would that be a higher level of
5    observation for somebody who had been returned from
6    the emergency room, or would it just be standard
7    operating procedures that any inmate who was put into
8    a cell would receive as far as observation is
9    concerned?
10       MS. LAPPEN: Objection. It's been asked and
11   answered a couple of times now.
12       But go ahead and answer.
13       MR. GENDE: I don't know that it's clear, so
14   I'm asking him for some --
15   A   Well, I mean, I'm not trying to be evasive, but what I
16   am trying to convey is that within the guidelines of
17   policy and what one has been advised by competent
18   medical personnel, the observation should be
19   consistent with those two realities. I don't know
20   precisely how much observation they gave him. I do
21   know that we have a policy that guides how much
22   observation to give, and they had been presented
23   certain information by the hospital that they were
24   aware of. And given what they knew, what the policy
25   said, their observations should be, you know,

## Page 23

1    consistent with those two realities.
2    Q   Do you feel that a thorough investigation was done as
3    it relates to Mr. Perry's death prior to the medical
4    examiner opining that Mr. Perry suffered from a heart
5    condition that caused his death?
6    A   Yes.
7    Q   And did you personally satisfy yourself in that regard
8    that a thorough investigation had been done prior to
9    the medical examiner's report in November of 2010?
10       MS. LAPPEN: Objection as to the form of the
11   question.
12       Go ahead and answer.
13   A   I'm not really sure what you mean, did I personally
14   satisfy myself.
15   BY MR. GENDE:
16   Q   Well, you were advised as soon as practical that Mr.
17   Perry had passed away while in the custody of the
18   Milwaukee Police Department, correct?
19   A   Mm-hmm. Yes. Sorry.
20   Q   And you understood that as part of that critical
21   incident, both the district attorney and your Internal
22   Affairs Division would be asking questions, taking
23   interviews, reviewing video if it was available, and
24   trying to determine whether or not, first of all, if
25   misconduct had occurred, correct?

## Page 24

1    A   Mm-hmm. Yes.
2    Q   And secondly, if there was anything that could have
3    been done differently that might have prevented this
4    tragic outcome, true?
5    A   Well, the investigation by Internal Affairs is about
6    ascertaining whether or not there was culpability on
7    the part of our officers. Having, you know, read the
8    report at the time, I was satisfied that they had
9    gotten to the bottom of what happened in terms of our
10   processes, our procedures, and the conduct of our
11   officers.
12       Subsequent to that, probably about three years
13   later when we constituted the Critical Incident Review
14   Board, maybe it was two years later, we started not
15   only prospectively doing investigations of new cases,
16   but we went back a few years to look at old critical
17   incidents, as I indicated earlier, to identify whether
18   or not there were training or policy issues that arose
19   out of those, and could we amend them. And we
20   subsequently did in this case.
21       So was I satisfied with the competence of the
22   investigation? Yes, I was. I felt like they'd
23   identified the sequence of events in a way that I felt
24   I understood what occurred. And it certainly didn't
25   appear from that that there had been any officer

| Page 25 |
|---|
| 1    misconduct of a willful nature that had anything to do |
| 2    with Mr. Perry's demise. |
| 3  Q  As a result of the follow-up investigation done, based |
| 4    on your new critical incident policy and procedure, do |
| 5    you know if any officers were disciplined regarding |
| 6    their conduct as it relates to Mr. Perry on the |
| 7    evening he died? |
| 8  A  Well, the Critical Incident Review Board doesn't |
| 9    conduct a new investigation. They review all of the |
| 10    paperwork and the relevant policies, and it's through |
| 11    that review that they identify training and policy |
| 12    issues. |
| 13  Q  Do you know if any officers were subsequently |
| 14    disciplined for misconduct as it relates to Mr. Perry? |
| 15  A  My recollection is, as we evaluated the films of this |
| 16    incident, obviously we wanted to look at all available |
| 17    tapes at the Prisoner Processing -- I can't even |
| 18    remember what the last initial is. PP.... |
| 19         MS. LAPPEN: "S," I think. |
| 20         THE WITNESS: "S." Okay. |
| 21  A  Prisoner Processing Section. Okay. We looked at all |
| 22    the tapes there, we did find an instance in which we |
| 23    identified a lieutenant who made a remark that |
| 24    certainly was unprofessional and inconsistent with his |
| 25    responsibilities. I do know we investigated him, and |

| Page 26 |
|---|
| 1    I do know we were putting together charges. And I |
| 2    don't recall precisely the sequence of events, but I |
| 3    believe, faced with what appeared to be some |
| 4    significant discipline, he subsequently retired. |
| 5    BY MR. GENDE: |
| 6  Q  Do you as the police chief condone inhumane treatment |
| 7    of prisoners in the custody of the Milwaukee Police |
| 8    Department? |
| 9  A  Certainly not. |
| 10  Q  And you would agree that inhumane treatment of people |
| 11    in the custody of the Milwaukee Police Department can |
| 12    occur by deed, correct? |
| 13  A  Yes. |
| 14  Q  Or by word, correct? |
| 15  A  Well, you know, if we're going to parse words, I mean, |
| 16    treatment is treatment, words are words. They're not |
| 17    identical. I certainly don't approve of inappropriate |
| 18    words. |
| 19    When we're trying to fix accountability for a |
| 20    critical incident resulting in death, we're going to |
| 21    look at the treatments, we're going to look at the |
| 22    deeds, we're going to look at what people |
| 23    affirmatively did or failed to do. If someone behaves |
| 24    unprofessionally, that's a violation of our values, |
| 25    and they'll be disciplined for it. Whether or not |

| Page 27 |
|---|
| 1    that inappropriate verbiage directly related to the |
| 2    critical incident itself is not an identical issue. |
| 3  Q  You would agree as the police chief or chief of |
| 4    police, whichever is more politically correct, that |
| 5    you lead by example, true? |
| 6  A  I attempt to set the tone for the organization through |
| 7    training, through policy, and through discipline. |
| 8  Q  And you would expect that the command staff that you |
| 9    have appointed underneath you would do the same, true? |
| 10  A  That is the expectation. |
| 11  Q  And you would hope that from the top to the bottom |
| 12    those under your command and control would lead by |
| 13    example and according to the policies and procedures |
| 14    of the Milwaukee Police Department, correct? |
| 15         MS. LAPPEN: Object as to the form of the |
| 16    question. |
| 17    But go ahead and answer. |
| 18  A  I expect them to comport themselves consistent with |
| 19    our policies and procedures, to hold their personnel |
| 20    accountable for adherence to them, and hold themselves |
| 21    accountable for adherence to them. |
| 22    BY MR. GENDE: |
| 23  Q  This is a hypothetical question and not meant as any |
| 24    disrespect to you as the chief of police. If you were |
| 25    to walk into a situation where a prisoner was |

| Page 28 |
|---|
| 1    considered uncooperative and had urinated and |
| 2    defecated on himself, would you ever state to that |
| 3    prisoner in front of subordinate staff that if they |
| 4    were going to act like an animal, they would be |
| 5    treated like they were in prison? |
| 6         MS. LAPPEN: I'm going to object as to the |
| 7    question because of form, and also it does call |
| 8    for speculation. |
| 9    But subject to the objections, go ahead and |
| 10    answer. |
| 11  A  Well, I think as we indicated in this particular case, |
| 12    we would hold somebody accountable for the words they |
| 13    uttered and for their demeanor as a supervisor. And |
| 14    we did. |
| 15    I would keep in mind that, despite the fact that |
| 16    he said this in front of his personnel, and he was |
| 17    clearly wrong and was clearly subject to significant |
| 18    discipline over it, prompting his retirement, that the |
| 19    officers to whom he was speaking had just spent time |
| 20    at the hospital desperately trying to get him admitted |
| 21    against the stone wall of hospital intransigence. So |
| 22    I would say yes, he said bad things for which he was |
| 23    accountable. He was saying them to officers who had |
| 24    just behaved, I think, very humanely in an attempt to |
| 25    advocate for a robbery -- somebody who had been |

## Page 29

1     arrested for robbery, who was in their custody, and
2     they felt needed medical attention. So I don't think
3     his words affected their conduct, but his words
4     certainly indicated his lack of fitness for that
5     position.
6   BY MR. GENDE:
7   Q   I think you anticipate my line of questioning.
8   A   Well, I mean it's --
9   Q   But the --
10   A   But obviously the hypothetical is derived directly
11     from the record.
12   Q   That's true, but I'm seeking an answer to the
13     hypothetical. Would you as the chief of police
14     undertake such a comment to somebody in front of your
15     subordinates?
16   A   No. I --
17        MS. LAPPEN: Same objections.
18        But go ahead and answer.
19   A   Yeah. I wouldn't do it, and I wouldn't expect my
20     subordinates to do it.
21   BY MR. GENDE:
22   Q   And tell me, Chief, why wouldn't you make that type of
23     comment in front of your subordinates to a person in
24     the custody of the police department?
25   A   As I -- I'm sorry.

## Page 30

1        MS. LAPPEN: Same objection.
2        Go ahead and answer.
3   A   It's unprofessional.
4   BY MR. GENDE:
5   Q   And the effect of that unprofessional conduct is what
6     on subordinate staff, if there's any effect
7     whatsoever?
8   A   Well --
9        MS. LAPPEN: Object to that. That calls for
10     speculation.
11        THE WITNESS: Yeah.
12        MS. LAPPEN: But go ahead and answer.
13   A   I mean, it depends on the quality of our subordinate
14     staff. I mean, they are not automatons; they're not
15     lemmings. Just because they have a supervisor who
16     says dumb things doesn't mean they automatically go
17     out and do a dumb thing. And in this situation, the
18     officers didn't do a dumb thing, but the supervisor
19     certainly said a dumb thing and deserved to be
20     disciplined.
21   BY MR. GENDE:
22   Q   Do you know that he was given the option of discipline
23     for making an inhumane comment to a prisoner or
24     retiring? And we're talking about Lieutenant Robbins
25     here.

## Page 31

1   A   I don't recall it was put to him quite that directly,
2     but, you know, it wouldn't surprise me because
3     certainly he was facing significant discipline for
4     that behavior.
5   Q   Earlier you had testified regarding your understanding
6     of Mr. Perry's change in condition after he left the
7     emergency room, and you mentioned that he was unable
8     to walk under his own power. Were there any other
9     characteristics of Mr. Perry that you understand was a
10     change in his condition after he was released from the
11     emergency room and once he arrived at the Prisoner
12     Processing Section?
13   A   I recall two things. One was his inability to walk or
14     otherwise stand erect. The other one was that he was
15     expectorating, and that was the reason they put a
16     expectorant shield on his face.
17   Q   Do you know if the officers that returned Mr. Perry
18     from the emergency room -- strike that question. Do
19     you know how long Mr. Perry had been sitting in his
20     own urination and defecation when he was returned to
21     the Prisoner Processing Section for the Milwaukee
22     Police Department?
23   A   I don't recall what the sequence of events was there,
24     no. I mean, he had just come from the hospital. I
25     don't think he did it at the hospital.

## Page 32

1   Q   So based on the investigation that you reviewed and
2     your understanding of the sequence of events, it's
3     clear that Mr. Perry did not urinate or defecate on
4     himself before he was released from the hospital,
5     correct?
6   A   I can't say that it's clear. I just don't recall the
7     sequence. I don't -- I don't think he would have been
8     released from the hospital in that condition, but I
9     don't know.
10   Q   So assuming for purposes of this line of questioning
11     that Mr. Perry urinated and defecated on himself after
12     he was released from the emergency room --
13   A   Mm-hmm.
14   Q   -- and before he was taken to the Criminal Justice
15     Facility, would you agree that that could constitute a
16     change in condition for an inmate under the custody
17     and control of the Milwaukee Police Department?
18        MS. LAPPEN: Objection to foundation. It
19     calls for speculation.
20        But go ahead and answer.
21   A   Yeah. Yes.
22   BY MR. GENDE:
23   Q   Would you agree that somebody who was bleeding from an
24     unknown source prior to arriving at the Criminal
25     Justice Facility, that could exhibit a change in

## Page 33

```
 1    condition?
 2  A  My understanding was that there was some blood in his
 3     spittle.  I don't recall there being what would be
 4     characterized as an ongoing bleeding wound that was
 5     occurring.  I understand there was some blood in his
 6     spittle.
 7  Q  Do you know how long Mr. Perry had blood in his spit
 8     prior to arriving at the Criminal Justice Facility?
 9  A  No, I don't.
10  Q  Do you even know if your officers made any attempt to
11     determine the source of the blood coming from Mr.
12     Perry after he was released from the emergency room
13     and before he arrived at the Criminal Justice
14     Facility?
15  A  My understanding is what they observed was felt to be
16     consistent with the effects of the sedative that he'd
17     been administered.
18  Q  Including blood from an unknown source?
19  A  Well, again, you know, you know, if the mental picture is, you
20     know, some sort of hemorrhaging, that's certainly
21     different than what's been represented to me, which
22     was that he had some blood in his spittle.
23  Q  Chief, I'm going to show you what we've previously
24     marked as Exhibit No. 1.  And this is a county
25     document, a prescreening, health prescreening document
```

## Page 34

```
 1     done by the nurse that first assessed Mr. Perry upon
 2     his arrival --
 3  A  Mm-hmm.
 4  Q  -- at the Criminal Justice Facility.  Have you ever
 5     seen this document before?
 6  A  No.
 7  Q  According to this nurse, and I'm referring to Exhibit
 8     No. 1, Mr. Perry reported ill or injured.  Do you see
 9     where that checked box that marks --
10  A  Mm-hmm.
11  Q  -- that box is checkmarked "Yes"?
12  A  Yes.
13  Q  She goes on to say as her narrative that "The inmate
14     was bleeding profusely from the mouth.  Unsure of
15     source because he has the spit mask on."
16  A  Mm-hmm.
17  Q  Did I read that correctly into the record?
18  A  And that's what it says he said, yes.
19  Q  No.  This would be her observations of Mr. Perry
20     during the health screening intake.
21  A  Is that what it is?
22  Q  Yes, sir.
23  A  Because it says, "IM."  What does that mean, "inmate"?
24  Q  Inmate, yes.
25  A  Okay.  I thought it meant "I'm."  Sorry.
```

## Page 35

```
 1  Q  No problem.
 2  A  No, I have not seen this before.
 3  Q  So above this narrative, it states, per Exhibit 1,
 4     "Additional clinical information: Fill in only if
 5     being rejected."
 6  A  Mm-hmm.
 7  Q  Do you see that above the narrative?  It's right above
 8     it, Chief.
 9  A  Oh, so they weren't going to accept him, either.
10  Q  Criminal Justice Facility refused to accept Mr. Perry.
11  A  Mm-hmm.
12  Q  Per this exhibit, the nurse filled in the narrative
13     that he was being rejected because he's bleeding
14     profusely from his mouth; she was unsure of the source
15     because he had the spit mask on; and he seemed to have
16     loose bowels, had a history of seizures, and was taken
17     to Sinai earlier in the evening.
18  A  Mm-hmm.
19  Q  Is that correct?
20  A  That's what --
21        MS. LAPPEN:  I'll just object as to the form
22     of the question.
23        But go ahead and answer.
24  A  That's what it says.
25     BY MR. GENDE:
```

## Page 36

```
 1  Q  All right.  As we sit here today, do you have any
 2     evidence which disputes what has been documented in
 3     Exhibit No. 1 as it relates to Mr. Perry bleeding
 4     profusely from his mouth, unsure of the source because
 5     he had the spit mask on, and he seemed to have loose
 6     bowels and had seizures?
 7        MS. LAPPEN:  Object as to the form and the
 8     foundation of the question.
 9        But go ahead and answer.
10        MR. JONES:  Join.
11        THE WITNESS:  [Addressing Ms. Lappen]  What?
12     Yeah.
13  A  No.
14     BY MR. GENDE:
15  Q  In the event that Mr. Perry had been bleeding
16     profusely from his mouth or from some other unknown
17     source on his body while he was still at PPS, you
18     would concede that could constitute a change in
19     condition which would suggest a medical emergency,
20     correct?
21        MS. LAPPEN:  I object as to the form and the
22     foundation.
23        But go ahead and answer.
24  A  I would suspect that the officers would suffer from
25     the same challenge as Mr. Perry, that if he's wearing
```

## Page 37

1    a spit mask, they might not see what he's reporting.
2    I don't know.  That's not -- my recollection is not
3    that they reported to me a profusion of blood from his
4    mouth while he was in the holding facility.
5    BY MR. GENDE:
6    Q    Sir, I'd like to show you what we've marked as Exhibit
7    No. 34.  This is an incident report prepared by your
8    detectives relative to an interview done with another
9    inmate who was present when Mr. Perry was at the
10   Prisoner Processing Section.  Have you ever seen this
11   document before?
12   A    I believe its contents were reported to me by the
13   Internal Affairs people.
14   Q    Did you have any reason to dispute the contents of
15   this report when --
16   A    I'll have to look at it.
17        MR. GENDE:  And for the record, it's the
18        interview of Tyrone Evans done at 12:20 in the
19        morning on September 14th, 2010.
20   A    Okay.
21   Q    In reviewing that report, you see that shortly after
22   Mr. Perry's death, another inmate tells a Milwaukee
23   Police Department detective that he observed Mr. Perry
24   being carried in a hog-tied position and then being
25   dropped on his face before being put in the cell for

## Page 38

1    observation, true?
2        MS. LAPPEN:  Object as to the form and the
3        foundation.
4        But go ahead and answer.
5    A    I know he uses the expression "hog tied."  Certainly,
6    you know, being shackled is not the same as being hog
7    tied, and the only reason I raise that is hog tied is
8    a very dangerous thing to do because it can cut off
9    your breathing.
10        Shackling your hands and shackling your feet
11   separately, which is what did occur and can be seen on
12   the film, is not identical with hog-tying and doesn't
13   create a breathing hazard that hog-tying would.  I do
14   recall now, looking at this, that the investigation
15   did indicate that when they put him into his cell that
16   they did lose control of him and dropped him from a
17   height of about two feet or so onto the floor.
18   BY MR. GENDE:
19   Q    You would agree that somebody who was dropped on their
20   face, who is being carried in the fashion that you've
21   just described, could result in an individual bleeding
22   from his head of an unknown origin, true?
23        MS. LAPPEN:  Objection.  Form and
24        foundation.  Calls for speculation.
25        Go ahead and answer.

## Page 39

1    A    Not knowing precisely what wounds were caused, yes.
2    BY MR. GENDE:
3    Q    Sir, I'm going to show you what we've previously
4    marked as Exhibit No. 36.  This is a continuation of
5    the critical incident or Internal Affairs
6    investigation done after Mr. Perry had passed away.
7    There was an interview done of Andrew J. Puechner, who
8    was a custodial employee for the Milwaukee Police
9    Department.  He was interviewed by detectives.  And
10   I'm at Bates stamp 60 in the lower right-hand corner,
11   Chief.
12   A    Where are we?
13        MS. LAPPEN:  What did you say?
14        MR. GENDE:  I'm at Bates stamp -- MPD Bates
15        stamp 60, lower right-hand corner.
16        MS. LAPPEN:  MPD6....
17        THE WITNESS:  Six-zero or seven-zero?
18        MR. GENDE:  Six-zero.
19        MS. LAPPEN:  We have MPD169, MPD170, MPD171.
20        That's the numbering sequence.
21        MR. GENDE:  May I see the report?  And I'll
22        get you to the page.
23        THE WITNESS:  [Hands document to Mr. Gende]
24   BY MR. GENDE:
25   Q    Have you seen this incident report yet, Chief?

## Page 40

1    A    I can't say.  I don't know.
2    Q    When Custodian Puechner was interviewed by your
3    detectives, he stated that when he went into cell A3,
4    which was the cell Mr. Perry had just been removed
5    from, he saw there were "gobs of spit, blood, and
6    fecal matter in the cell on the floor."
7    A    Mm-hmm.
8    Q    Do you see where I've read that?
9    A    Yes.
10   Q    You would agree that Mr. Perry leaving gobs of spit,
11   blood, and fecal matter on the cell floor where he was
12   being housed could suggest a change in condition as it
13   relates to a potential medical emergency, correct?
14        MS. LAPPEN:  Objection as to the form of the
15        question.  It calls for speculation and
16        foundation as well.
17        But go ahead and answer.
18   A    Yes.
19   BY MR. GENDE:
20   Q    Other than Mr. Perry being dropped on his face prior
21   to being left in the cell for observation, do you have
22   any evidence as we sit here today what would be the
23   cause or origin of the gobs of blood that was present
24   where he had laid before being removed from the cell?
25   A    I don't know.  I don't know if this is -- indicates

## Page 41

1    that it was, the blood was connected to his spit,
2    connected to his fecal matter, or separate, but
3    certainly it was present.
4    Q    Do you have any evidence or reason to dispute as we
5         sit here today that Custodian Puechner did not find
6         gobs of spit, blood, and fecal matter on the cell
7         floor where Mr. Perry had laid after Mr. Perry was
8         removed?
9              MS. LAPPEN:  Objection as to the form of the
10        question.
11             But go ahead and answer.
12   A    Yeah.  I don't think I indicated that I did.
13        BY MR. GENDE:
14   Q    I'm just asking --
15   A    I accept it at its face, yeah.
16   Q    Based on the internal investigation that was
17        completed, do you have any information that the blood
18        found on the floor of Mr. Perry's cell where he lay
19        after he was removed from the cell was the result of
20        any act other than him being dropped on his face?
21             MS. LAPPEN:  Objection as to the form of the
22        question and foundation.
23             Go ahead and answer.
24   A    Yeah.  I don't know.
25        BY MR. GENDE:

## Page 42

1    Q    Based on your review of the internal investigation as
2         it relates to Mr. Perry's death, do you have an
3         opinion as to whether or not Mr. Perry was dropped on
4         his face before being left in his cell?
5              MS. LAPPEN:  Objection as to the form and
6         foundation.
7              But go ahead and answer.
8    A    Yeah.  I mean, I don't have an opinion.  My
9         recollection is that that information was in the
10        Internal Affairs report and that it was not related to
11        the cause of his death but did occur; that it wasn't
12        malicious.  From time to time people lose control of
13        prisoners when they're placing them into a cell, and
14        it had occurred, and it might have caused some injury
15        that would have resulted in some bleeding.  But my
16        recollection is not that it was seen as related to his
17        death.
18        BY MR. GENDE:
19   Q    Let's stay on this page.  You also had a police
20        officer, Diaz-Berg, who was responsible for observing
21        Mr. Perry while he was in the cell --
22   A    Yeah.
23   Q    -- state to the detectives -- and I'm higher on the
24        page, Chief -- that she observed a blood stain on the
25        cell floor of Mr. Perry.

## Page 43

1    A    Mm-hmm.
2    Q    Do you see where I read that?
3    A    Whereabouts on the page are we?
4    Q    We are about a quarter of the way down from the top.
5    A    Okay.  Yeah.  "Diaz-Berg stated she notified the
6         custodian, who was already at PPS cleaning, there was
7         blood and the smell of feces in Perry's cell."
8    Q    So you have --
9    A    Right before that she said, "After Perry was removed
10        from his cell, she observed a blood stain on the cell
11        floor about the size of a half-dollar and a blood
12        stain outside of Perry's cell the size of a dime," and
13        it was then that she called the custodian.
14   Q    So we have a custodian and a police officer observing
15        blood in the cell where Mr. Perry had been left for
16        observation.  We have an inmate saying he witnessed
17        Mr. Perry being dropped on his face before he was put
18        in the cell.  Based on that information, would you
19        expect that your officers should make some inquiry as
20        to whether or not Mr. Perry was suffering from a
21        medical emergency?
22             MS. LAPPEN:  Objection as to the form and
23        the foundation of the question.
24             Go ahead and answer.
25   A    Well, I can't pretend to have memorized this chain of

## Page 44

1    events.  What I see in front of me is that this blood
2    stain on the cell floor about the size of a half-
3    dollar and the blood stain the size of a dime were not
4    observed until he had been removed from the cell.  So
5    I would say just within the four walls of the report,
6    nobody saw it until he was taken out of the cell.
7         Therefore, I don't know that they would say that
8    was a change in his medical condition.  Certainly
9    dropping him on the floor is not an optimum
10   circumstance, but as I recall now from the other
11   report, they continued conversing or talking to him
12   after that had occurred, so they were observing him at
13   that time, but I don't know for how long.
14   BY MR. GENDE:
15   Q    Do you know if Mr. Perry was responsive to any
16        inquiries once he was put in the cell A3 for
17        observation?
18   A    I don't know.  I wouldn't be surprised if he wasn't
19        because he was sedated.
20   Q    Are you aware of anything that prevented the officers
21        who removed Mr. Perry from the cell from observing the
22        gobs of spit, blood, and fecal matter on the cell
23        floor where he lay that was ultimately reported by the
24        custodian, Puechner?
25             MS. LAPPEN:  I object as to the form of the

## Page 45

1     question.
2         But go ahead and answer.
3 A  It would appear from reading of the report that those
4     things weren't visible until he was moved.
5 BY MR. GENDE:
6 Q  In the event that police officers who removed Perry
7     from the cell indicated that it was properly lit and
8     there was nothing that prevented them from observing
9     gobs of blood, spit, and fecal matter where he lay, do
10     you have any information as we sit here today that
11     would suggest those officers were somehow prevented
12     from making this observation?
13         MS. LAPPEN: I'll object as to the form and
14     misstates prior testimony of other witnesses in
15     this case in the context of depositions.
16         But go ahead and answer.
17 A  I really can't say.
18 BY MR. GENDE:
19 Q  Based on all the information available through the
20     Internal Affairs investigation, which you expect to be
21     thorough and complete, is there any other evidence
22     that you're aware of as we sit here today that the
23     profuse bleeding documented by the nurse in Exhibit
24     No. 1, which resulted in Mr. Perry's refusal at the
25     CJF, occurred from some incident other than Mr. Perry

## Page 46

1     being dropped on his face before he was left in cell
2     A3 for observation?
3         MS. LAPPEN: Object --
4         MR. JONES: Object --
5         MS. LAPPEN: Objection as to form and
6     foundation. Calls for speculation.
7         MR. JONES: Objection to form.
8 A  I don't have any information of that sort. I have a
9     report filed, apparently two separate reports, one of
10     which identifies a half-dollar-size blood stain and a
11     dime-size blood stain. I have a report from a nurse
12     describing profuse bleeding. I have a circumstance of
13     the individual is wearing an expectorant shield the
14     whole time that he was being observed by the police.
15     So in that context, I have no information that
16     indicates that anything happened to him that might
17     have caused bleeding, besides either some sort of
18     internal issue or being dropped on the floor.
19 BY MR. GENDE:
20 Q  You mentioned the report from the nurse relative to
21     profuse bleeding when Mr. Perry arrived at CJF and the
22     report from Diaz-Berg about the dollar- and dime-size
23     blood spots, but do you also consider the report from
24     Custodian Puechner when providing your opinion, where
25     Puechner documents he found gobs of spit, blood, and

## Page 47

1     fecal matter in the cell?
2         MS. LAPPEN: Objection as to the form.
3         But go ahead and answer.
4 A  I have no idea if the gobs of blood he observed are
5     the same two blood stains that she observed. I don't
6     know.
7 BY MR. GENDE:
8 Q  Tell me, based on your review of the internal
9     investigation, what your officers did after Mr. Perry
10     was returned to PPS and before he was brought into the
11     Criminal Justice Facility to determine whether or not
12     Mr. Perry was suffering from a change in condition.
13         MS. LAPPEN: Object as to form.
14         Go ahead and answer.
15 A  Yeah. I don't know. I know they were trying to
16     expedite the paperwork because they had been faced
17     with a refusal to admit him to a hospital, and they
18     wanted to get into a facility where there was medical
19     personnel. So they spent some period of time keeping
20     him under some level of observation while they
21     attended to the paperwork to get him ready to go to
22     CJF.
23 BY MR. GENDE:
24 Q  You have mentioned earlier in your testimony training
25     regarding an expected response by Milwaukee police

## Page 48

1     officers to a medical emergency. Are you aware of any
2     policy or procedure in how officers are to respond to
3     a medical emergency?
4 A  Well, we have policies that, you know, consist of
5     their first aid training, and we have policies that
6     indicate when they should call competent medical
7     personnel, which in this case is usually the fire
8     department. If the fire department is not available,
9     then Bell Ambulance. So if they think they're facing
10     an emergency, that's what they do, and that obviously
11     is what happened at the CJF.
12 Q  So your understanding of the policy and procedure of
13     the Milwaukee Police Department as it relates to your
14     subordinates is, if they expect or are concerned an
15     inmate under their custody and control is suffering
16     from a medical emergency, they are either to call for
17     the fire department, an ambulance, take the individual
18     to CJF, or take the individual to the emergency room?
19 A  Well, primarily to get them to an emergency room,
20     which I'm hazy now; I think Bell Ambulance transported
21     him to the emergency room, if I'm not mistaken. I
22     don't precisely recall. But you know, initially, when
23     they first had their concerns, they had him
24     transported, and that was certainly compliant with
25     policy.

| Page 49 |
|---|

1  Q   Are you aware as to whether or not any of your
2       officers on the evening in question on duty at PPS had
3       any concern that Mr. Perry was suffering from a
4       medical emergency once he was returned from Mount
5       Sinai?
6           MS. LAPPEN: Object as to the form.
7           But go ahead and answer.
8  A   Well, as I've indicated numerous times, it appears by
9       all observations that they saw him as behaving in a
10      way consistent with the administering of a powerful
11      sedative.  They had been told by the hospital there
12      was nothing wrong with him, and a powerful sedative
13      had been administered, which put him in a condition
14      that required his carrying.  It was based on that
15      information that they continued to perform their
16      duties.  They didn't make an independent medical
17      diagnosis.  They were responding to what they had been
18      told.
19      BY MR. GENDE:
20  Q   So in answer to my prior question, I need some
21      clarification pursuant to policies and procedures for
22      the Milwaukee Police Department.  In the event one of
23      your subordinate officers is concerned that an inmate
24      may be suffering from a medical emergency, number one,
25      you would expect that officer to call the fire

| Page 50 |
|---|

1       department or an ambulance, correct?
2  A   That's correct.
3  Q   Two, to get that individual to an emergency room for
4       treatment if there is a concern about a medical
5       emergency, correct?
6  A   That's correct.
7  Q   Or three, because there's no medical personnel,
8       nurses, or doctors on staff at the Milwaukee Police
9       Department, that individual should be taken to the
10      Criminal Justice Facility because there's nurses on
11      staff there that are better equipped to determine the
12      status of an inmate's health.
13  A   If you're, you know, if you have -- well, if somebody
14      is, you know -- Initially, when he was having what
15      apparently was a seizure and the first time he fell
16      down, and I believe it was reported that it was
17      believed he hit his head then too, obviously you're
18      not going to try to take him directly to the CJF.
19      Okay?  You want to get him to a hospital.
20          But if he is somebody who has ongoing medical
21      issues that don't elevate to being admitted to the
22      hospital, clearly CJF is a better place for him than
23      PPS because it does have staff.  If I'm not mistaken,
24      if somebody is there on medication, you know, they're
25      in a better place to -- position to deal with all of

| Page 51 |
|---|

1       that.
2           And in this event, when he did present in what
3       was undeniably a medical emergency, i.e., having a
4       seizure, they complied with policy and got him to the
5       hospital.  When he came back, the things that were
6       presenting to them in their subjective, nonmedical
7       opinion were consistent with what they had been told
8       by competent medical authority.  All right?
9           Yes, it was a subjective decision not to seek
10      another ambulance after having just come back from the
11      hospital.  Clearly, his death from a heart attack at
12      CJF indicates there was something wrong with him.  But
13      in their nonmedical, subjective opinion, after just
14      having been at the hospital, they behaved in a way
15      consistent with that awareness and the sense that his
16      symptoms were not inconsistent with his reaction to
17      the sedative.
18  Q   We established earlier in the deposition that you were
19      unaware of any evidence as we sit here today that Mr.
20      Perry had either urinated or defecated on himself
21      prior to being released from the emergency room,
22      correct?
23  A   I said I was -- yeah, I was unaware of when that
24      occurred.  That's correct.
25  Q   Well, we know it didn't occur, or at least you have no

| Page 52 |
|---|

1       evidence that it occurred prior to him being
2       discharged from the emergency room, correct?
3  A   I have no evidence where it occurred period, I think,
4       but it obviously, you know, occurred.
5  Q   Do you have any evidence as we sit here today that the
6       bleeding that we have discussed here at the deposition
7       from Mr. Perry occurred while he was at the emergency
8       room or at some point after?
9  A   I'm getting in the area of recollection now.  You
10      know, my recollection is he had had a seizure and
11      collapsed.  Okay?  Certainly there could have been
12      some bleeding from that.  My recollection is also that
13      blood was reported in the jail cell after he was
14      dropped subsequent to his being moved out of the jail
15      cell, and I am aware now of the report that I just
16      looked at that indicated the nurse observed bleeding.
17      So I know those independent facts.
18  Q   When Mr. Perry had to be carried into the PPS after
19      being released from the emergency room, do you have
20      any information that he was bleeding from anywhere on
21      his body?
22  A   I'm not entirely sure.  I think I have a recollection
23      that there was a wound sustained during his initial
24      seizure, but I can't say that with certainty.  And I'm
25      not trying to say that to deny that, you know, he may

## Page 53

1 well have suffered bleeding as a result of being
2 dropped. I'm just -- It's in there somewhere.
3 Q I'm going to submit to you, and of course your counsel
4 can object if I'm incorrect, that in all the Internal
5 Affairs reports that have been produced, there is not
6 one single officer that says Mr. Perry was bleeding
7 when he was brought into PPS.
8 A Okay.
9 Q And based on all the testimony that I've taken thus
10 far, there has not been one individual who said Mr.
11 Perry was bleeding when he was brought into PPS.
12 Let's accept that as true for purposes of my
13 questioning. Okay?
14 A Okay.
15 Q Are you aware that as part of the instruction your
16 officers received when Mr. Perry was discharged and
17 that the strong sedative he received could result in
18 Mr. Perry urinating and defecating on himself?
19 MS. LAPPEN: I'll object as to the form of
20 the question, foundation.
21 Go ahead and answer.
22 A Yeah. I don't know what they were told precisely.
23 BY MR. GENDE:
24 Q But you've provided certain opinions regarding --
25 A Well, I do know that the administration of the

## Page 54

1 sedative, they were told, was powerful and he was
2 going to go to sleep. And I do know, based on
3 everything that everybody reported to me, that he was
4 almost immediately after being discharged from the
5 hospital, he had been able to walk into the hospital,
6 he was legless coming out of the hospital. I have
7 made the logical leap that there was a direct
8 connection between the sedative and his subsequent
9 physical reaction. And if he's going to sleep, then
10 in going to sleep with a powerful sedative, it's
11 certainly not shocking to me that someone would not
12 have control of their elimination system if they're
13 not capable of, you know, waking or standing or
14 sitting.
15 Q Do you know if your officers were advised that one
16 side effect of the powerful sedative could result in
17 Mr. Perry bleeding from any area of his body?
18 A I don't know that.
19 Q Considering Mr. Perry left the emergency room, based
20 on all the information we have to date in this case,
21 not bleeding from any area of his body and not having
22 urinated and defecated on himself, you would agree
23 that Mr. Perry had a change in condition after his
24 release from the emergency room, not just sleeping?
25 MS. LAPPEN: Objection as to the form of the

## Page 55

1 question and the foundation, and it calls for
2 speculation.
3 Go ahead and answer.
4 A Well, first of all, I'm not trying to convey it was
5 just sleeping. He was under the effect of a powerful
6 sedative. Two, I don't know. I'm not the medical
7 authority here. I just know the sequence of events
8 happened directly after having been administered this
9 drug.
10 BY MR. GENDE:
11 Q You would agree that humane treatment of inmates under
12 your custody and control would include being
13 responsive to calls for help, correct?
14 A Yes.
15 Q Do you know if Mr. Perry called for help, after
16 reviewing the tapes of his experience at PPS?
17 A I don't recall.
18 Q Do you know if Mr. Perry was being combative while he
19 was at PPS after the release from the emergency room?
20 A Well, I do know that some of his behaviors were
21 resistant. All right? Whether or not he was fully
22 aware of what he was doing, I don't know, but I do
23 know that some of his behaviors subsequent to getting
24 the drug were described as combative.
25 Q Did Mr. Perry appear to be asleep as officers were

## Page 56

1 holding him on the floor of the Prisoner Processing
2 Section?
3 A I would have to review the tape again. I don't
4 recall.
5 Q Based on your best recollection as we sit here today,
6 did it appear that Mr. Perry was asleep while your
7 officers surrounded him at PPS before he was put in
8 cell A3?
9 MS. LAPPEN: Objection as to form and
10 foundation.
11 A Yeah. I mean, I'm going to have to, like, create a
12 memory here. I mean, I -- it's been a long time since
13 I saw the tape.
14 BY MR. GENDE:
15 Q Do you recall Mr. Perry calling for help on the tape?
16 MS. LAPPEN: Objection. Asked and answered.
17 But go ahead and answer.
18 A Yeah. I'd have to review it again.
19 BY MR. GENDE:
20 Q In the event that Mr. Perry was calling out for help,
21 would you expect your officers to respond to that?
22 A Well, it depends on --
23 MS. LAPPEN: Objection as to form and
24 foundation.
25 But go ahead and answer.

Case 2:12-cv-00664-JPS   Filed 01/18/16   Page 15 of 61   Document 124-15

Page 57

1  A   It depends on the circumstances. I mean, if they're
2      in a situation -- I mean, again, I don't want to have
3      recovered memory here. If we're in a situation with
4      somebody who is acting in a combative manner, whether
5      it's because they are actually actively being
6      combative or because something is going on inside
7      their head that's making them flail about and the
8      officers don't know what it is, and both things can
9      happen, the officers are going to try to control that
10     individual. Sometimes people in a circumstance of
11     somewhat delirium are calling for help as they're
12     fighting the police. This is not unknown to us. The
13     challenge for us in those circumstances is to gain
14     control of the prisoner and create a circumstance in
15     which they can't injure themselves and they can't
16     injure us.
17         And so it's certainly, you know, not beyond my
18     experience where somebody who is actively fighting the
19     police is also calling for help, because they don't
20     exactly know what's going on. But we have to act in
21     sequence. First is calm the threat down. Nobody is
22     going to get hurt. Then we deal with whatever the
23     circumstance is of that individual, if they have
24     medical problems or mental problems.
25  BY MR. GENDE:

Page 58

1  Q   Let's try and focus on Mr. Perry's situation where we
2      have a known set of circumstances and we have video of
3      it. And I will represent to you that on the video Mr.
4      Perry is calling for help as your police officers
5      surround him. Based on what we know to date as it
6      relates to Mr. Perry, his prior emergency room visit,
7      his strong sedative that had been given, his inability
8      to walk of his own accord, as he calls out for help,
9      would you expect your officers to respond to that in
10     any way, shape, or form?
11  A   I would expect for them first to get the situation
12     under physical control.
13  Q   Did it appear to you in review of the tape that Mr.
14     Perry was not under control?
15  A   Well, that's, as I said, I have not seen the tape in a
16     couple of years, so I don't recall.
17  Q   Do you recall hearing Mr. Perry call out that the
18     officers were killing him as they surrounded him on
19     the floor of the Prisoner Processing Section?
20  A   I don't recollect what he said. I do not recollect
21     seeing a tape that indicated that that was occurring.
22  Q   In the event that Mr. Perry was calling out for help
23     and calling out that the officers were killing him,
24     and in consideration of his release from the emergency
25     room, his inability to walk under his own power, and

Page 59

1      the strong sedatives that he received, did you expect
2      your officers to make a determination whether or not
3      Mr. Perry suffered from a change in condition?
4         MS. LAPPEN: Objection as to the form of the
5      question.
6         But go ahead and answer.
7  A   What I expected them to do is respond in a manner
8      consistent with policy, consistent with their
9      training, and consistent with what they'd been just
10     told by competent medical authority.
11  BY MR. GENDE:
12  Q   Which is what?
13  A   They had just been told by competent medical authority
14     that, A, there was nothing wrong him, and B, he was
15     faking, and C, we've given him a powerful sedative.
16  Q   That was a poor question. What did you expect them to
17     do consistent with the policy and procedure?
18  A   I expected them to create a circumstance in which he
19     couldn't harm himself, that he couldn't be a threat
20     for others, and that we get him processed to CJF as
21     expeditiously as possible.
22         (Exhibit 69 identified)
23  Q   Chief, I'm going to show you what we've marked as
24     Exhibit No. 69. This is a transcript that was
25     prepared based on an interview with a local media

Page 60

1      outlet, and the transcript was prepared by Magne-
2      Script Court Reporting. Do you recall providing a
3      interview as it relates to Mr. Perry on or about
4      October 30th, 2012?
5  A   Yeah. But I don't remember with who.
6         MS. LAPPEN: Just for the record, I'm going
7      to object to any questioning relative to this
8      transcript. I don't believe we were provided a
9      copy of it prior to the deposition.
10         MR. GENDE: I don't know that I have to
11      provide my exhibits prior to deposition. It's a
12      document that we got online, publicly
13      disseminated.
14         MS. LAPPEN: This transcript was publicly
15      disseminated?
16         MR. GENDE: The interview was publicly
17      disseminated.
18         MS. LAPPEN: Oh.
19  BY MR. GENDE:
20  Q   Why don't you take a moment to read through the
21      transcript, and I have some questions that I'm going
22      to ask you.
23         MR. GENDE: Let's go off the record at
24      11:14?
25         THE REPORTER: Okay. Off the record.

Case 2:12-cv-00664-JPS   Filed 01/18/16   Page 16 of 61   Document 124-15

# Video Deposition of Chief Edward Flynn  4/2/2014

## Page 61

1     (Off the record 11:12 - 11:19)
2     THE REPORTER: We're back on the record.
3  BY MR. GENDE:
4  Q  Chief, we've taken an opportunity to have you review
5     what we've marked as Exhibit No. 69, which appears to
6     be an interview that you gave as it relates to Mr.
7     Perry's in-custody death. Do you deny making any of
8     the statements that are contained in this exhibit?
9     MS. LAPPEN: I'm just going to object
10     because this is -- doesn't appear to be a
11     complete transcript of interview as the chief
12     noted in his review. It doesn't reflect the
13     questions that were posed to the chief.
14     But subject to those objections, go ahead
15     and answer.
16  A  I mean, I have no reason not to believe it. Most of
17     these statements look consistent with representations
18     I've made today.
19  BY MR. GENDE:
20  Q  Okay. Looking at page 3, you state that you made an
21     assessment of what you've seen on the tapes and the
22     reports that you reviewed or that the officers
23     followed departmental policy, correct?
24  A  That's correct.
25  Q  So at the time you made that statement, had you

## Page 62

1     actually reviewed the tapes and the reports at issue?
2  A  Well, this is October of 2012, which I guess is about
3     two and a half years after the incident. I believe by
4     that time I had seen the final reports.
5  Q  Considering Lieutenant Robbins, the supervisor at PPS
6     on the evening Mr. Perry passed away, had stated words
7     to the effect in front of his subordinates that if Mr.
8     Perry was going to act like an animal, he'd be treated
9     like a -- like he was in prison, is it your opinion
10     that policies and procedures in that regard were
11     followed?
12     MS. LAPPEN: Object as to the form of the
13     question.
14     But go ahead and answer.
15  A  Listen, that's a self-evident answer. I certainly
16     wasn't responding to Lieutenant Robbins's
17     inappropriate behavior. I was talking of the behavior
18     of the officers who had been charged with moving this
19     prisoner about and processing him.
20  BY MR. GENDE:
21  Q  So when you made this comment about the officers
22     following departmental policy and procedure as it
23     relates to Mr. Perry, that was not in association with
24     the inhumane comment made by your supervisor on the
25     night in question, correct?

## Page 63

1  A  That's correct.
2  Q  And you agree that supervisors can influence their
3     subordinates based on how they lead, correct?
4  A  Theoretically, yes.
5  Q  Well, theoretically and practically, you expect that
6     your supervisors influence their subordinates, true?
7  A  That's true. And when they do so in a way that's
8     unprofessional, they're disciplined, as occurred here.
9  Q  What information do you have as we sit here today that
10     your lieutenant's comment while Mr. Perry was on the
11     floor of the Prisoner Processing Section, surrounded
12     by police officers, and your lieutenant said in front
13     of these subordinates that if you're going to act like
14     an animal, we'll treat you like you're in prison, did
15     not have an effect on these subordinates?
16     MS. LAPPEN: Objection to the form of the
17     question. It does misstate the statement.
18     But go ahead and answer.
19  A  Well, without getting into semantics, if he said,
20     "We're going to treat you like you're in prison," I
21     don't precisely know what you mean by that. I mean,
22     he was treated like he was at the prisoner processing
23     facility. He was appropriately restrained, he was
24     watched. When he needed medical treatment in
25     everybody's view, he received medical treatment. When

## Page 64

1     that medical treatment evaluated him and sent him back
2     to us, paperwork was expedited to get him to CJF.
3     So, you know, I would not expect his statement to
4     induce the officers to do something outside of policy,
5     and we found nothing in our investigation that
6     indicated that his comments had any impact on their
7     compliance with relevant policies.
8  BY MR. GENDE:
9  Q  Is it policy and procedure to drop inmates on their
10     face and not report it?
11  A  It's not policy to accidentally do anything.
12  Q  In the event that an inmate is dropped on his face,
13     either accidentally or intentionally, would you expect
14     your officers to report that?
15  A  Well, in the event, as this transpired, obviously this
16     was reported, but clearly it's -- if we do something
17     that causes an injury, we're expected to make a
18     report.
19  Q  And in the event that your officers failed to report
20     it, is that within policy and procedures? And when I
21     say "it," I'm talking about their conduct that
22     resulted in Mr. Perry being dropped on his face before
23     put on the cell floor of A3.
24     MS. LAPPEN: Objection as to the form of the
25     question.

## Page 65

1    But go ahead --
2  A  Yeah. I think context is important here. When we
3  have a circumstance, and this had been the only thing
4  that happened -- they dropped him on his face and he
5  needed medical attention, and everything else had been
6  fine and he got admitted to the hospital -- and they
7  would obviously, if they hadn't reported it, would
8  have been in jeopardy of discipline.
9    It's hard for me looking back now in the context
10 of what ultimately happened, which is a death in
11 custody and a complete investigation of everything
12 that occurred, I don't know that anybody was thinking
13 of filing a separate report about this incident
14 because everything that occurred to him was part of
15 the investigation in chief. So I really can't
16 disaggregate that right now.
17 BY MR. GENDE:
18 Q  Starting at line 20 of page 3, you made a comment,
19 "The officers at the hospital said they thought
20 something more was wrong with him, and after continued
21 conference, the medical personnel themselves said to
22 the officers, their words, not ours, 'We think he's
23 faking it.'"
24 A  Mm-hmm.
25 Q  Or "We think he's faking." Is that an accurate

## Page 66

1  reflection of the statements you made on the date in
2  question?
3  A  It's an accurate reflection of my understanding at
4  that time, yes.
5  Q  Okay. Has your understanding changed?
6  A  Not significantly, no.
7  Q  In what manner has it changed?
8  A  I, you know, I'm just -- You asked me a question.
9  This is what I was thinking at the time.
10 Q  What, if anything, did your officers do after Mr.
11 Perry was released, and based on their concern that he
12 was still having problems, to distinguish whether or
13 not he continued to suffer from a medical condition or
14 he was faking his symptoms?
15 A  What they did was convey an increasingly incoherent
16 subject back to the hospital as he reacted to the
17 medication that the hospital had given him. So when
18 he was unable to walk, they carried him. When he was
19 unable to get himself to his cell, they ended up, you
20 know, conveying him to the cell in handcuffs and leg
21 cuffs. When he expectorated, they put an expectorant
22 shield on him. They simply responded to the
23 appearances of someone who had -- was under the effect
24 of a sedative and just been released from medical
25 custody.

## Page 67

1  Q  I think you misspoke, and generally I don't attempt to
2  correct misstatements, but you said your officers took
3  him back to the emergency room.
4  A  Yeah, that's not what I meant, yeah.
5  Q  Okay. So just to be clear --
6  A  They took him back to the jail.
7  Q  They took him back to the jail.
8  A  Mm-hmm.
9  Q  Despite the fact that they were concerned, your
10 officers were concerned that he didn't appear right
11 and appeared to be suffering from a medical condition
12 that required more care.
13 A  They'd just been overruled by the doctors.
14 Q  Fair enough. They're overruled by the doctors, and
15 according to your statement, medical personnel said,
16 "He's faking it," right?
17 A  Right.
18 Q  My question is, based on your officers' concern, based
19 on the input they got from the medical staff that
20 allegedly the medical staff said, "He's faking it,"
21 can you describe for me at that point forward and
22 prior to Mr. Perry's death what any officer under your
23 command and control to distinguish whether Mr.
24 Perry was faking his symptoms or was suffering from a
25 change in condition that constituted a medical

## Page 68

1  emergency?
2    MS. LAPPEN: Objection as to form and
3  foundation.
4    But go ahead and answer.
5  A  I think we're in a situation in which officers are
6  forced to confront with just the simple reality that's
7  in front of them. Again, this is all contextual, and
8  given their attempts to get him admitted, given the
9  fact that the hospital, in fact, said there was
10 nothing wrong with him, they were then presented with
11 somebody who was behaving in a certain way.
12   How much of that was the direct result of his
13 sedative? I'm sure a lot of it was. What percentage
14 of it theoretically might be related to somebody
15 "faking," who didn't want to be in jail and would
16 prefer to be in a hospital, we don't know. They
17 simply had this circumstance they had to deal with
18 that the hospital wanted nothing to do with, and we
19 would subsequently find out the jail wanted nothing to
20 do with.
21   So it appears that the entire world of people
22 with medical training wanted to dump this in the lap
23 of the police department. All right? We're between a
24 rock and a hard place here. The cops knew they had a
25 prisoner who was evincing some level of combative

## Page 69

1   behavior for reasons unknown entirely to them, that
2   had been rejected by the hospital, for whom they were
3   responsible to get to CJF, and that was basically the
4   four walls of their concern between the time the
5   hospital refused to admit him and their getting the
6   paperwork completed to get him to the CJF.
7       BY MR. GENDE:
8   Q   That's a fairly involved answer that I believe is
9   nonresponsive to the question. I know you've
10  expressed opinions that the police department did
11  everything they could do under the circumstances, and
12  you've just told me they were placed in a -- between a
13  rock and a hard place.
14      But I'd like you to tell me as distinctly as
15  possible what you understand your officers did, what
16  actions they took after Mr. Perry was released from
17  the emergency room and before he passed away at the
18  Criminal Justice Facility, to distinguish between
19  their concerns that he continued to suffer from a
20  medical emergency, or that he was faking it, as
21  allegedly said by hospital personnel.
22      MS. LAPPEN: Objection to the form. I think
23      the question was asked and answered.
24      But go ahead and answer it.
25  A   Well, I just -- It's difficult to be responsive to

## Page 70

1   that question because I don't expect officers to
2   conduct a controlled medical experiment on a prisoner
3   in their custody. What do they do to distinguish if
4   he's faking or has a medical condition? I don't know
5   that anybody has the answer for that question.
6       BY MR. GENDE:
7   Q   Let me --
8   A   They had -- They've been told something by medical
9   personnel. Okay? They're acting on the belief of
10  what they have been told. They may have their
11  concerns, but they just lost that argument. They're
12  not the doctors.
13  Q   So your officers have concerns. Are your officers
14  able to observe and make decisions based on
15  observations?
16  A   Again, are the observations consistent with somebody
17  under a strong sedative who may or may not be faking,
18  or not? I can't say. I wasn't in their shoes. They
19  were making a subjective judgment based on what they
20  had been told.
21  Q   My question, Chief, is whether or not you expect your
22  officers to be able to observe and make decisions
23  based on their observations?
24  A   I think they did that twice. First time they did it,
25  they did it with a medical seizure and they took the

## Page 71

1   man to the hospital. We all know what didn't happen
2   at the hospital. When he came back, now, based on
3   their first experience with his condition and the
4   medical opinions, yes, they made observations.
5   Challenges to their observations confound what they've
6   been told by the doctors, and I don't think it arose
7   in their opinion to a level where they got to go back
8   to the hospital now with the same individual who had
9   just been rejected.
10  Q   Here's the problem with the position that I've heard
11  thus far. First, you're telling me that your officers
12  are acting in accord with information they received
13  from the emergency room personnel that Mr. Perry is
14  faking it.
15  A   Mm-hmm.
16  Q   Correct?
17  A   And the administration of a strong drug.
18  Q   Secondly, you have testified here today that Mr. Perry
19  was given a strong sedative, and therefore all of the
20  conduct or actions he exhibited were expected by your
21  personnel, right?
22  A   I don't believe I said "expected." I think I said
23  consistent with their understanding of what might
24  happen with this drug.
25  Q   So tell me how your officers reconciled what they,

## Page 72

1   according to your testimony, believe was consistent
2   with a strong sedative of a change in condition as
3   opposed to what may be occurring with Mr. Perry as it
4   relates to a medical emergency.
5       MS. LAPPEN: Objection as to form. It does
6       call for speculation.
7       Go ahead and answer.
8       MR. GENDE: But he's the chief.
9   Q   So, and you reviewed everything.
10  A   Yeah. I'm the chief. I'm not the director of
11  internal medicine of the Milwaukee Police Department.
12  All right? They were operating under observation and
13  belief. They had just tried to get him medical
14  attention for what they thought was something wrong
15  with him.
16      The people that made the informed judgment, who
17  apparently aren't accountable for their judgment,
18  turned him back over to the police department with the
19  administration of a drug and with an observation. The
20  observation of our officers now is somebody who is not
21  necessarily having a seizure or a stroke or a heart
22  attack. He is having a number of responses that
23  reasonable people without medical training but first
24  aid training might not see as inconsistent with what
25  they had just been told.

Case 2:12-cv-00664-JPS   Filed 01/18/16   Page 19 of 61   Document 124-15

Page 73

1      That was the circumstance in which they were
2  placed. And in that circumstance, their goal was to
3  keep him from harming himself, keep him from harming
4  anybody else, and get him to CJF. Now, the benefit of
5  hindsight, we all wish better outcomes had occurred,
6  but in their four walls of what they knew when, they
7  were the ones who had been given somebody by medical
8  authorities who had cleared him.
9  Q   Had cleared him with discharge instructions, correct?
10 A   Well, they had cleared him and administered him a
11 sedative. I don't recall what the instructions were.
12 Q   You understand that when a inmate who is a patient at
13 an emergency room is released, discharge instructions
14 are provided for that inmate, correct? You understand
15 that, sir?
16 A   Well, my understanding is, you know, it depends on the
17 patient and on the diagnosis.
18 Q   Would you ever expect that a individual that your
19 officers take to the emergency room for treatment and
20 care would be discharged without some instructions?
21 A   I don't know.
22 Q   I'm going to show you what we've marked as Exhibit No.
23 28, which are certified medical records from Mount
24 Sinai as it relates to Mr. Perry.
25         MS. LAPPEN:  Are you done with the

Page 74

1  transcript?
2         MR. GENDE:  No. You can leave that open.
3  Q   You understand that Mr. Perry was unable to address
4  his own medical concerns on the evening in question
5  because he was in the custody of the Milwaukee Police
6  Department, true?
7         MS. LAPPEN:  Objection as to the form of the
8  question, and foundation.
9  A   I don't really know what -- what do you mean?
10 BY MR. GENDE:
11 Q   Well, Mr. Perry wasn't free to leave and seek out his
12 own medical assistance, was he?
13 A   No, that's true.
14 Q   Mr. Perry did not have an option as to which emergency
15 room he would be taken to, correct?
16 A   That's correct.
17 Q   He did not have any input on what doctors or nurses
18 would treat him, true?
19 A   True.
20 Q   Those decisions were made by Milwaukee Police
21 Department on the evening in question, right?
22 A   That's correct.
23 Q   At Bates 00025 of this exhibit are patient education
24 instructions for Mr. Perry, and I will represent to
25 you that your transporting officers testified that

Page 75

1  they received these instructions when Mr. Perry was
2  discharged. So --
3  A   Again, my numbers don't comport with yours. My number
4  25 says, "We thank you for allowing us to assist you
5  with your health care needs." Is that where you are?
6  Q   Let me try and find it for you in the exhibit. Yep.
7  That's exactly where I'm at, Chief.
8  A   That's where you're at? Okay.
9  Q   That's where I'm at. It says "Patient Education"
10 towards the top, and it says "Aurora Health Care." It
11 identifies Mr. Perry and the visit date. Do you see
12 that?
13 A   Yes.
14 Q   If we move on to page 27, it says, "Mr. Perry has been
15 given a list of follow-up instructions, medication
16 information, and patient education materials." Do you
17 see where I read that?
18 A   Mm-hmm. Yep.
19 Q   Now, we know Mr. Perry didn't receive it because he
20 wasn't capable of taking care of his own medical care.
21 That information would have been provided to your
22 police officers, true?
23 A   True.
24 Q   And you would expect that once your police officers
25 received that information, they would provide it to

Page 76

1  your supervisor at PPS so he would know how Mr. Perry
2  should be handled in accord with his discharge
3  instructions, true?
4  A   That's correct.
5  Q   Would there be some other individual other than the
6  supervisor, Lieutenant Robbins, that should receive
7  these discharge instructions from the emergency room
8  as it relates to Mr. Perry?
9         MS. LAPPEN:  Objection as to form.
10        But go ahead and answer.
11 A   Yeah. I don't think so.
12 BY MR. GENDE:
13 Q   On page 29 of this exhibit --
14 A   Mm-hmm.
15 Q   -- it talks about home care for Mr. Perry as it
16 relates to potential subsequent seizure activity. We
17 know that Mr. Perry wasn't released to his home,
18 correct?
19 A   That's correct.
20 Q   All right. Do you know if any of your officers
21 advised themselves of the discharge instructions as it
22 relates to potential additional seizure activity for
23 Mr. Perry?
24        MS. LAPPEN:  Objection as to form.
25 A   I have no reason not to.

## Page 77

1 BY MR. GENDE:
2 Q   Let's move on to page 31. "Get prompt medical
3     attention." Do you see where that is at the top of
4     the page? Under "Patient Education"? It's in capital
5     letters in bold?
6 A   Yeah. Okay.
7 Q   You would expect that not only the transporting
8     officers who received these discharge instructions
9     would be advised of the information contained therein,
10    but the supervisor would further advise himself, true?
11 A   I would suspect so.
12 Q   You would expect so, correct?
13 A   Yeah. Mm-hmm.
14 Q   Do you know if your transporting officers or
15    Lieutenant Robbins advised themselves of these
16    specific instructions related to Mr. Perry, that he
17    should get prompt medical attention in the event these
18    conditions occur?
19        MS. LAPPEN: Objection as to the form of the
20        question, and foundation.
21        But go ahead and answer.
22 BY MR. GENDE:
23 Q   The question is, do you know? You can tell me you
24    don't.
25 A   Yeah. I don't know.

## Page 78

1 Q   In the event that Mr. Perry remained confused for more
2     than 30 minutes after a seizure, it was recommended
3     per discharge instructions that he get prompt medical
4     attention, right?
5 A   That's correct.
6 Q   Do you know if Mr. Perry was coherent when he was
7     brought into PPS?
8 A   I don't know that we can disaggregate the impact of
9     the sedative on him from what's being asserted here.
10 Q   And how would your officers do that?
11 A   Well, I mean --
12 Q   In the event that he were --
13 A   -- they'd just been told he had been given a sedative
14    that was going to put him to sleep. He was losing
15    control of his arms and legs in their custody. He was
16    not, from my understanding, exhibiting the seizure
17    behavior they had seen initially, which prompted them
18    to take him to the emergency room in the first place.
19 Q   Does this discharge instruction say, "Only get prompt
20    medical attention in the event another seizure
21    occurs"?
22 A   "If any of the following occurs: seizures occurring
23    more often or becoming longer; seizure lasting over
24    five minutes; no wake-up between seizures; remaining
25    confused for more than 30 minutes after a seizure;

## Page 79

1     injury during a seizure; fever over 100 degrees
2     Fahrenheit." Well, we didn't take his temperature.
3     "Unusual irritability, drowsiness, or confusion," but
4     again, the drowsiness or confusion, he'd just been
5     given a sedative. So everything here seems to refer
6     to them observing seizures.
7 Q   Chief, I don't want to keep you longer than necessary,
8     but I'm asking specific questions.
9 A   That's not a specific answer?
10 Q   Well, I'll have to ask it again, because I don't
11    believe it is specific.
12 A   Okay.
13 Q   I'm asking you under "Get prompt medical attention" --
14 A   Right.
15 Q   -- where it states that medical personnel should be
16    contacted only in the event that there's a subsequent
17    seizure?
18 A   Well, I just read the list. I mean, it doesn't say
19    "only." It simply refers to seizures in almost every
20    entry.
21 Q   Pursuant to the discharge instructions, in the event
22    that Mr. Perry remained confused for more than 30
23    minutes after a seizure, he was to receive prompt
24    medical attention, correct?
25 A   That's correct.

## Page 80

1 Q   Now, I'm asking you as we sit here today -- and if you
2     don't know, you can tell me you don't know -- was Mr.
3     Perry coherent when he was brought back into PPS?
4 A   Implicitly that's a two-pronged question. All right?
5     No, he was not coherent, but there's no testimony or
6     evidence that I am aware of that anybody saw him have
7     a seizure then. He had been administered a drug.
8     That's what we knew.
9 Q   You understood that Mr. Perry was exhibiting signs of
10    being resistant, correct?
11 A   That is true.
12 Q   That could also be considered unusual irritability,
13    right?
14 A   That could be.
15 Q   Mr. Perry was exhibiting signs of drowsiness and
16    confusion as well, true?
17 A   True.
18 Q   And pursuant to these instructions when Mr. Perry
19    should get prompt medical attention, in the event that
20    he exhibited unusual irritability, drowsiness, or
21    confusion, he should get prompt medical attention,
22    right?
23 A   That is one of the things on the list, but I feel
24    obligated to add that in the context of what was
25    occurring that evening, somebody who is being drowsy

## Page 81

1    or confused after having gotten a sedative is not
2    something that automatically would have leapt out as a
3    serious medical condition. And certainly in the
4    context of being in a prisoner processing facility,
5    somebody being irritable is not something unknown to
6    officers in that context.
7    Q   I'd like to show you what we've marked as Exhibit No.
8    53 previously, provided by the Milwaukee Police
9    Department in response to discovery requests. It's a
10   paradigm shift. Are you familiar with this document?
11   A   I'm aware of it; I'm not familiar with it.
12   Q   Do you know when this paradigm shift was created as
13   part of Milwaukee Police Department training?
14   A   No.
15   Q   Okay. On the bottom it's got a copyright of 2005.
16   Would that suggest to you that the paradigm shift
17   occurred in 2005?
18   A   I'm not trying to be argumentative. That's when it
19   was copyrighted. I don't know when the shift in
20   training occurred.
21   Q   The paradigm shift that we're referring to states,
22   "Struggling and resistance can indicate an immediate
23   medical emergency and not a criminal act." Do you see
24   where I read that? It's right at the top of the page,
25   Chief.

## Page 82

1    A   Yes.
2    Q   Do you disagree with that training for the Milwaukee
3    Police Department?
4    A   No.
5    Q   Do you have any information that this paradigm shift
6    was not in effect at the time Mr. Perry passed away?
7    A   No.
8    Q   Did you expect your police officers to be conversant
9    with this paradigm shift, understand it, implement it?
10   A   Yes.
11   Q   So we have discharge instructions that you expect your
12   transporting officers and supervisor to follow; and as
13   part of those discharge instructions, it requires that
14   Mr. Perry get prompt medical attention in the event he
15   shows unusual irritability, drowsiness, or confusion.
16   And then you have a paradigm shift that shows
17   struggling and resistance can indicate an immediate
18   medical emergency. Am I accurate in what I've stated
19   thus far?
20   A   You are.
21   Q   Tell me what your supervisor, Lieutenant Robbins, or
22   your transporting officers did to get prompt medical
23   attention for Mr. Perry, considering he was struggling
24   and resisting, which could be considered unusual
25   irritability, he showed drowsiness and confusion upon

## Page 83

1    his arrival at the Prisoner Processing Section?
2        MS. LAPPEN: Objection to the form of the
3        question and foundation.
4    A   Yes, they did not get him any new medical attention.
5    BY MR. GENDE:
6    Q   And tell me what you understand they did to
7    distinguish whether he was faking what we've
8    previously discussed or that he needed prompt medical
9    attention because he exhibited unusual irritability,
10   drowsiness, or confusion. What did they do to
11   distinguish those?
12       MS. LAPPEN: Objection as to the form and
13       foundation.
14       Go ahead and answer.
15   BY MR. GENDE:
16   Q   If anything, Chief.
17   A   They didn't do anything to distinguish those two
18   things.
19   Q   Do you think that your officers lacked the information
20   and training on the date in question to follow
21   emergency room discharge instructions?
22   A   No, I do not.
23   Q   Do you think your officers lacked training to
24   understand the paradigm shift that struggling and
25   resistance can indicate an immediate medical emergency

## Page 84

1    and not a criminal act on the date Mr. Perry died?
2    A   I don't think they were unaware of that possibility.
3    Q   Do or don't? I'm sorry.
4    A   I said I don't think they were unaware of that
5    possibility.
6    Q   So the opposite of that is you believe they were aware
7    of that paradigm shift on the night Mr. Perry died,
8    correct?
9    A   It was a possibility, yes.
10   Q   Now, after Mr. Perry's return to PPS, and we've gone
11   over a portion of this, we know that there were
12   officers surrounding him while he was on the floor,
13   correct?
14   A   That's correct.
15   Q   We know that the tape heard Mr. Perry calling out
16   certain things, words to the extent, "These officers
17   are killing me," "God help me," things of that nature,
18   correct?
19       MS. LAPPEN: Objection to form and
20       foundation. It misstates the chief's former
21       testimony.
22       Go ahead and answer.
23   A   Yeah. I don't recollect all the things he said, but I
24   do know that he was calling out.
25   BY MR. GENDE:

Case 2:12-cv-00664-JPS   Filed 01/18/16   Page 22 of 61   Document 124-15

## Page 85

1   Q  You also understand that Mr. Perry was complaining of
2      a difficulty breathing to the officers in his
3      presence, correct?
4           MS. LAPPEN: Same objections.
5           Go ahead and answer.
6   A  Yeah. I don't recall.
7   BY MR. GENDE:
8   Q  Was there a unwritten policy or training in the police
9      department that an inmate who is complaining of
10     difficulty breathing is okay if he can talk?
11          MS. LAPPEN: Objection as to the form.
12          Foundation.
13   A  Yeah. There was -- the training is not that anymore.
14     But for many years, particularly in the training of
15     things like the Heimlich maneuver, it was generally
16     asserted to officers that if they were responding to
17     somebody in medical distress, the hierarchy of
18     concerns always was start the breathing, stop the
19     bleeding, treat for shock.
20        So the first question was whether or not the
21     person was breathing. If they were breathing, that
22     would usually indicate if they could talk; treat for
23     shock and stop the bleeding first because obviously
24     they could breathe. Also, in the Heimlich maneuver,
25     the concern was that if you intervene too assertively,

## Page 86

1     you might dislodge whatever it was and block off their
2     airway. So if they were able to communicate, that
3     usually indicated they weren't in the distress that
4     would keep them from, you know, keep them alive.
5        Over the years, that training has evolved. It's
6     not the new instruction, but it's obviously in the
7     minds of a lot of officers given earlier training over
8     many years. I mean, that was the training when I was
9     an officer. It was the training 10 or 20 years later.
10     I don't know -- changed in the last few years, but
11     that was not an uncommon thought that the sequence of
12     treatments were dependent upon whether or not the
13     subject had the capability of breathing.
14          (Exhibit 71 identified)
15   BY MR. GENDE:
16   Q  Chief, I'm going to show you what we've marked as
17     Exhibit No. 71. These were some interviews conducted
18     regarding in-custody deaths. One....
19          MS. LAPPEN: Are you done with Exhibit 28?
20          MR. GENDE: No. You can leave those
21     exhibits in front of the chief. We'll get back
22     to them. Thank you.
23   Q  Do you recall providing interviews to the "Shepherd
24     Express" about Derek Williams' in-custody death?
25   A  I do.

## Page 87

1   Q  Did you know whether or not Mr. Perry's death was of
2     natural consequences or some police misconduct prior
3     to the coroner's report coming out in November of
4     2010?
5          MS. LAPPEN: Objection as to the form of the
6     question.
7          Go ahead and answer.
8   A  I -- We had no indications that there were any police
9     officer conducts that directly caused his death. I
10     don't recall the sequence of findings.
11   BY MR. GENDE:
12   Q  I'd like to look at the second page of your "Shepherd
13     Express" interview. You were asked a question about
14     watching Derek Williams' videos, you provide an
15     answer, and I'm going to focus on a part of it, and
16     you can include whatever additional part you feel is
17     necessary. You state, "And in circumstance where the
18     cause of death was considered natural causes, there is
19     no reason to look at the tape for me." Was that a
20     true statement when you made it?
21   A  At the time when I made it, yeah.
22   Q  And this was as of October 24th, 2012, if you look at
23     the front page of the exhibit?
24   A  Okay.
25   Q  Was there any reason for you to look at the tapes of

## Page 88

1     Mr. Perry while he was at PPS, considering it had died
2     later on in the evening?
3          MS. LAPPEN: Objection as to the form of the
4     question.
5   A  As I say, I don't recollect the sequence of events. I
6     simply recollect having seen the tape. I don't
7     remember if I saw the tape as part of the CIRB or as
8     part of the Internal Affairs investigation briefing.
9     I don't recall.
10   BY MR. GENDE:
11   Q  You as chief are concerned about people that are made
12     prisoners under your custody and control, correct?
13     Citizens that become prisoners become the Milwaukee
14     Police Department chief's concern, true?
15   A  True.
16   Q  And your concern is for the health, safety, and
17     welfare of any individual who is taken into custody
18     and no longer has the freedom to move about of their
19     own accord, correct?
20   A  That's correct.
21   Q  And part of your duty and responsibility as the police
22     chief is to make sure that your officers, your
23     subordinates, express that concern for the individual
24     prisoner or inmate's health, safety, and welfare while
25     under custody and control, yes?

Case 2:12-cv-00664-JPS   Filed 01/18/16   Page 23 of 61   Document 124-15

## Page 89

1 　　　　MS. LAPPEN: Object as to the form.
2 　　Go ahead and answer.
3 A　Yes.
4 BY MR. GENDE:
5 Q　So when an inmate dies on your watch, as the chief,
6 　　you want to know why that happened, right?
7 A　I'd want a thorough investigation.
8 Q　And as part of that thorough investigation, you want
9 　　the results reported to you, correct?
10 A　That's correct.
11 Q　And a thorough investigation means considering all
12 　　sources of information that are available through the
13 　　course of the investigation, correct?
14 A　I expect the investigators to do that, yes.
15 Q　All right. You've told me earlier that there's been
16 　　less than ten in-custody deaths since you've been
17 　　chief. Does that sound right?
18 A　Yep.
19 Q　All right. It doesn't sound like a lot to me. Does
20 　　it sound like a lot to you, less than ten?
21 A　Well, if you're basing it on over a quarter million of
22 　　arrests, it's not a very high number, no.
23 Q　And that was the impression I got from you, is you did
24 　　not believe less than ten in-custody deaths was a
25 　　significant number since you've been police chief. Is

## Page 90

1 　　that fair?
2 A　That's correct.
3 Q　All right. Is there anything that prevented you as a
4 　　chief of police to ensure yourself that everything was
5 　　done correctly as it relates to Mr. Perry on the
6 　　evening in question and before he died?
7 　　　　MS. LAPPEN: Objection as to the form of the
8 　　question.
9 　　But go ahead and answer.
10 A　If you're trying to assert do I conduct my own
11 　　investigation, no, I don't. I delegate that to the
12 　　appropriate personnel. I respond to the results of
13 　　that investigation. I don't reinvestigate it myself.
14 BY MR. GENDE:
15 Q　And I'm not asking if you conduct your own
16 　　investigation, but you've made a statement here as
17 　　part of an interview process regarding another in-
18 　　custody death that you won't review tapes of
19 　　individuals who die in custody if they die of natural
20 　　causes.
21 A　I don't believe I said "won't." I said in the context
22 　　of an interview that I don't need to when the ruling
23 　　is a natural cause death. The challenge for us is to
24 　　determine whether or not the tape shows that police
25 　　activity was directly resulting in the demise of the

## Page 91

1 　　suspect. If there is no indication of that, I don't
2 　　need to see for myself that the police didn't do
3 　　anything to the person.
4 Q　Are you concerned about inhumane treatment of an
5 　　individual who subsequently dies in custody?
6 A　Well, of course I am, and when that is brought to our
7 　　attention, we take appropriate action.
8 Q　Do you know how long the tapes of Mr. Perry at PPS
9 　　last? Are they more than five minutes, less than five
10 　　minutes?
11 A　I don't know. There was a lot of different tapes
12 　　there, so....
13 Q　Do you know how long he was at PPS after his release
14 　　from the emergency room and before he was transported
15 　　to the Criminal Justice Facility?
16 A　I don't recall.
17 Q　If you would have reviewed the tapes of Mr. Perry at
18 　　PPS after his death and before you knew that the
19 　　coroner or the medical examiner had opined it was from
20 　　natural causes, and you heard your lieutenant say on
21 　　the tape words to the effect that "If you are going to
22 　　act like an animal, we'll treat you like you're in
23 　　prison," would you have taken action?
24 A　Well, we did.
25 Q　But I'm asking you personally, if you had looked at

## Page 92

1 　　these tapes shortly after the occurrence and heard
2 　　that comment, would you have taken action?
3 　　　　MS. LAPPEN: Objection as to the form of the
4 　　question.
5 　　But go ahead and answer.
6 A　I took action once I was aware of what he had said.
7 BY MR. GENDE:
8 Q　In the event that you had looked at these tapes and
9 　　heard Mr. Perry complaining of difficulty breathing
10 　　and you heard one his officers say, "If you're
11 　　talking, you're breathing," would you have taken
12 　　action in regards to this?
13 　　　　MS. LAPPEN: Objection. That calls for
14 　　speculation, and form.
15 　　But go ahead and answer.
16 A　I don't take disciplinary action for people that make
17 　　an incorrect decision that's not motivated by malice
18 　　or intent. All right? I had a lieutenant who said
19 　　something that was clearly out of bounds and wrong,
20 　　and he was disciplined. I have a circumstance where
21 　　an officer just coming back from the hospital, where
22 　　he's told that nothing is wrong with the patient, says
23 　　something to calm the patient down who is complaining
24 　　that he can't breathe. He was wrong. It turns out,
25 　　hours later, this individual would suffer a cardiac

## Page 93

1    event. That's not the same as willful misconduct.
2    BY MR. GENDE:
3    Q    Was it hours later? Do you know that?
4    A    Well, I know it was sometime later. I don't remember
5    how much longer.
6    Q    Could it have been within the hour?
7    A    I don't remember exactly the timelines.
8    Q    Could it have been within 30 minutes? I'm asking if
9    you know, and you can tell me you don't know.
10   A    Yeah, I'm telling you I don't know. It's, you
11   know....
12   Q    Let's move on to the next page of your interview. And
13   again, we are looking at the interview with "Shepherd
14   Express." The last comment you make --
15   A    Mm-hmm.
16   Q    -- "It's clear to me watching that tape," and you're
17   referring to the Derek Williams tape, "that they
18   simply don't believe him. If you can talk, you can
19   breathe. That's a common understanding of all the
20   officers dealing with a crisis." Do you recall making
21   that statement?
22   A    Where are we, on the last event?
23   Q    It's the last sentence of your quote.
24   A    Oh. Yeah.
25   Q    Did you make that statement?

## Page 94

1    A    Yes.
2    Q    And you made that statement in October of 2012,
3    correct?
4    A    Yes, I did.
5    Q    I'm sorry? Okay.
6    A    Yep.
7    Q    And when you say, "If you can talk, you can breathe;
8    that's a common understanding of all officers dealing
9    with a crisis," what did you mean by that?
10   A    I meant that that was and has been a common
11   understanding. I'm not asserting that it's correct.
12   I'm not asserting that it's medical training. I am
13   asserting that it is a common understanding. It turns
14   out not to be correct, but it has been an
15   understanding that has -- used to be part of training
16   years ago, isn't, but it's an understanding. If
17   somebody is capable of speaking, they are presumably
18   breathing.
19          Now, that is kind of a take-off on a different
20   kind of training. People with heart attacks are
21   having difficulty breathing, but they can talk.
22   Obviously it doesn't apply to that. What I'm trying
23   to communicate is that it's in an officer's mind
24   sometimes this notion of "If you can breathe, you can
25   talk," meaning, "You're not in a crisis right now

## Page 95

1    because you're communicating with me, calm down,"
2    isn't correct, but it's a not uncommon thought.
3    Q    And that was the training in effect on the day Mr.
4    Perry died, correct?
5    A    I don't know that it was the training in effect then,
6    but it had been the training years ago. When we
7    evolved, I don't recall exactly, but it -- I'm just
8    saying that it's -- notwithstanding that fact, it's a
9    common impression.
10   Q    And in the event that the tapes reveal one of your
11   officers told Mr. Perry words to the effect, when Mr.
12   Perry complained "I can't breathe" or "I'm having
13   trouble breathing," and the officer said, "If you can
14   talk, you can breathe," in your opinion is that a
15   proper or an improper response of your officer as it
16   relates to a potential crisis?
17   A    It's more a question is it a correct or an incorrect
18   response. I mean, it is very common for officers to
19   deal with people in crisis who are hyperventilating.
20   It happens all the time. They're hyperventilating
21   because they just ran from the police. They're
22   hyperventilating because they're in a crisis and
23   concerned and grieving. They're hyperventilating
24   because they're excited. It's not uncommon for us to
25   be faced with people who are not in a medical crisis

## Page 96

1    who are complaining of shortness of breath or
2    inability to breathe. Overwhelmingly, once they
3    settle down, they're fine.
4          There are circumstances, however, in which
5    somebody is giving evidence of having a more
6    significant crisis. I expect us to be able to adjust
7    more quickly to that reality. Sometimes they're going
8    to be wrong. The vast majority of the time, they are
9    right.
10         In this case, in the Perry case, as I say, I
11   don't know what they would have said if he had said
12   that absent having just been charged -- discharged
13   from the hospital. They might have treated it
14   differently. I don't know. What I do know is they
15   weren't trying to be inhumane to him. It sounds to me
16   like they were trying to calm him down.
17   Q    Tell me, as the chief, what prevented, if you know,
18   any of your officers or your supervisor on the evening
19   in question when Mr. Perry was returned from the
20   emergency room to the PPS, what prevented any
21   Milwaukee Police Department employee from requesting
22   additional medical attention for Mr. Perry?
23   A    Nothing.
24   Q    On the fourth page of the exhibit we marked as Exhibit
25   69, you make a comment about your officers: "They

Page 97

1  followed our procedures and protocols."
2          MS. LAPPEN: Just wait until the chief
3      catches up with you.
4          MR. GENDE: Sure.
5  A  Where are we going?
6  Q  Well, let's start on page 3 again so it's in context.
7      We previously read into the record that "The officers
8      at the hospital said they thought something more was
9      wrong with him, and after continued conference, the
10     medical personnel themselves said to the officers,
11     their words, not ours, 'We think he's faking.' Based
12     on that, the officers took him back to the prison
13     facility." Is that a accurate statement thus far --
14 A  Yep.
15 Q  -- of your words?
16 A  Yep.
17 Q  You go on to say, "They followed our procedures and
18     protocols." What procedures and protocols did they
19     follow in bringing Mr. Perry back to the facility
20     after they remained concerned that he was having a
21     medical condition and after they were informed by
22     Mount Sinai that allegedly he was faking?
23 A  As I indicated at the very beginning of this
24     deposition, our evaluation of this circumstance
25     uncovered an issue not anticipated in our procedures,

Page 98

1      which was what happens when, against the wishes or
2      concerns of officers, the emergency room refuses to
3      admit a prisoner. So we did not have a policy or a
4      protocol that said this is what you do when their
5      doctors tell you you're wrong and there's nothing
6      wrong with your prisoner. So based on that, they took
7      him back and they processed him according to our
8      standard procedures for processing a prisoner, and
9      that's what they complied with.
10 Q  Do standard procedures for processing a prisoner
11     released from an emergency room include ignoring
12     discharge instructions?
13 A  I think ignore -- I don't -- I'm not going to
14     categorize it as ignoring them. I think a judgment
15     clearly was made based on the information in front of
16     them, and they made a decision. The discharge
17     instructions, as you can tell, are all written in the
18     first person for somebody who's conscious and
19     advocating for themself.
20         In this situation, as I say, context is
21     everything. Every single one of those emergency
22     precautions directly pertains to another seizure,
23     which did not occur, except for one, and that one that
24     doesn't apply to a seizure is not inconsistent with
25     somebody having a strong sedative. So they may have

Page 99

1      been incorrect, but I wouldn't necessarily say they
2      were ignoring what the discharge papers said, because
3      he did not present another seizure to them while he
4      was back in our custody.
5  Q  I have two follow-up based on that. First of all, you
6      don't assert that Mr. Perry was able to advocate for
7      himself as it relates to the first part of the
8      emergency room instructions.
9  A  No, no, no. No, I'm not trying to say that.
10 Q  And secondly, my inquiry is not asking you to admit
11     that your officers ignored discharge instructions. My
12     question to you is whether or not it is policy and
13     procedure for officers transporting Mr. Perry to
14     ignore discharge instructions from emergency room
15     personnel?
16 A  No.
17 Q  So when you say as part of your statement to the
18     press, reflected in Exhibit No. 69, that your officers
19     followed all their policies and procedures, that would
20     not include ignoring discharge instructions, correct?
21 A  That's correct. That would not include willfully
22     ignoring discharge instructions.
23 Q  Well, are they trained to negligently ignore discharge
24     instructions?
25 A  They're just not trained to ignore them.

Page 100

1  Q  That's not the policy and procedure, whether it's
2      willful or negligent, true?
3  A  That's correct.
4  Q  You go on to say at page 4, quote, and now I'm at the
5      second paragraph, Chief, "We generally never talk
6      about cases that are under litigation. All right?
7      But it's so clear to us in this case that the officers
8      followed their procedures and tried their best to get
9      him medical assistance, but I thought it was worth
10     taking the risk to be a transparent agency in this
11     chain of events." Do you recall making that
12     statement?
13 A  Yes, I do.
14 Q  Was it so clear to you when you made this statement
15     that your officers were following policies and
16     procedures when your lieutenant said words to the
17     effect that "If you're going to act like an animal,
18     we'll treat you like you're in prison"?
19         MS. LAPPEN: Objection as to the form, and
20     this has already been discussed in the
21     deposition, so it's been asked and answered.
22         But go ahead and answer.
23 A  I don't consider his statement relevant to what our
24     officers did on behalf of this prisoner. To me that
25     was the important consideration, that our officers had

## Page 101

1  properly sought medical attention for him, properly
2  advocated for him, and when they were rejected,
3  returned him to the prison jail environment to be
4  processed that way. That was irrelevant to the
5  inappropriate comment of the lieutenant, who
6  subsequently retired under the threat of -- or, while
7  under investigation.
8  BY MR. GENDE:
9  Q  Was it so clear to you that your officers followed
10  policies and procedures as it relates to ignoring Mr.
11  Perry's complaints that he was having difficulty
12  breathing?
13  MS. LAPPEN: Objection. Form and
14  foundation. Asked and answered.
15  Go ahead and answer.
16  A  I think it's clear they did not ignore it. They
17  thought -- they sought to calm him. They clearly did
18  not recognize that there was medical distress.
19  BY MR. GENDE:
20  Q  Were they -- was it so clear to you when you made this
21  statement that your officers were following policies
22  and procedures when they ignored Mr. Perry's calls for
23  help as they surrounded him on the floor of the
24  Prisoner Processing Section?
25  A  Well, they --

## Page 102

1  MS. LAPPEN: Same objections.
2  THE WITNESS: Yeah.
3  MS. LAPPEN: Go ahead and answer.
4  A  They had sought help for him in the past. At this
5  point in time, their concern was that he not injure
6  himself or anybody else.
7  BY MR. GENDE:
8  Q  Were your -- was it so clear to you that your officers
9  were following policies and procedures when they
10  failed to inform anybody at the Criminal Justice
11  Facility that the cell in which Mr. Perry had just
12  been removed had gobs of splut -- bud -- I'm sorry --
13  gobs of blood, spit, and fecal matter on the floor
14  where he lay?
15  MS. LAPPEN: Objection as to the form and
16  the foundation.
17  But go ahead and answer.
18  A  Well, as has been indicated previously during this
19  deposition, from the reports we have nobody observed
20  that until after he was moved from the cell. And it's
21  clear from the nurse's admission document that she was
22  aware immediately upon his presentation that he was
23  bleeding.
24  BY MR. GENDE:
25  Q  In the event that there were gobs of blood, spit, and

## Page 103

1  fecal matter on the floor as documented by your
2  custodial staff, is there a reason why that
3  information would not have been forwarded to the
4  Criminal Justice Facility where Mr. Perry was taken?
5  MS. LAPPEN: Objection to the form. It
6  calls for speculation.
7  Go ahead and answer.
8  A  I don't know.
9  BY MR. GENDE:
10  Q  Is it policy and procedure not to report that an
11  inmate has been laying in his own blood, spit, and
12  fecal matter when he's transported over to CJF?
13  A  No, it's not.
14  Q  Was it so clear to you, pursuant to policies and
15  procedures being followed, that when Mr. Perry was
16  dropped on his head, that was an expectation of how to
17  transport individuals under your custody and control?
18  A  No.
19  Q  You go on to state as part of this interview, quote --
20  and now I'm at the third full paragraph, page 3, "We
21  are the ones that are willing to talk about it,
22  because our piece of it indicates to us that our
23  officers tried to get this man appropriate treatment."
24  Was that a true statement when you made it?
25  A  Yes.

## Page 104

1  Q  What appropriate treatment did your officers attempt
2  to get for Mr. Perry after he returned to PPS and
3  prior to his death at the Criminal Justice Facility?
4  A  They had already gotten him appropriate medical
5  treatment where they were told there was nothing wrong
6  with him. So subsequently, no, they did not get him
7  additional treatment.
8  Q  So after he was returned to PPS, you're not aware of
9  any of your officers' efforts to get Mr. Perry
10  appropriate medical treatment, true?
11  A  They did not seek additional treatment, no.
12  Q  You go on to state, on page 4 and the top of page 5,
13  "Our officers were told by the doctor that he'd given
14  him medication to make him sleep, so the notion that
15  he would, like, lose the ability gradually to walk,
16  that he would be gradually -- that he would gradually
17  grow less coherent and make less sense was consistent
18  to them with what they had been told by the medical
19  authorities, which is, 'We've given him a medication,
20  a sedative to make him sleep,' so they stood by with
21  him while his took effect." Was that a true statement
22  when you made it?
23  A  Yes.
24  Q  In the event that your officers understood and they
25  conveyed to you that Mr. Perry was going to lose the

## Page 105

1  ability to walk, would grow less coherent, and make
2  less sense, being consistent with his medications,
3  tell me how that's consistent with him faking his
4  medical condition.
5  A  You'd have to ask the people that made those
6  representations.
7  Q  Where do you state, in this sentence that I've just
8  read into the record, that in addition to losing the
9  ability to gradually walk, to gradually grow less
10  coherent, and make less sense as a result of the
11  medications, also included the involuntary urination
12  and defecation and bleeding that we know Mr. Perry
13  subsequently suffered after returning to PPS?
14        MS. LAPPEN: Objection as to the form of the
15     question.
16        But go ahead and answer.
17  A  Yeah, I don't know.
18  BY MR. GENDE:
19  Q  Did you take that into consideration, the urination
20     and defecation and bleeding that we've discussed, when
21     you made this statement?
22  A  No, I did not.
23  Q  You go on to state on this page, "At this case, we're
24     presented with an individual who, as you say, is
25     gradually becoming more incoherent, but that to them

## Page 106

1  was consistent with what they've been told, that he'd
2  been given a strong sedative." Did you make that
3  statement?
4  A  Yes, I did, apparently, yep.
5  Q  Tell me who was standing by Mr. Perry after he was
6     placed in the cell for observation to determine
7     whether or not the emergency room discharge
8     instructions were being followed, if you know.
9  A  I don't know.
10  Q  Tell me who was standing by Mr. Perry while he was
11     placed in the holding cell A3 and gradually losing the
12     ability to walk, gradually growing more incoherent and
13     making less sense, bleeding from somewhere, and having
14     urinated and defecated on himself? Who was standing
15     by then, sir?
16  A  I don't know.
17  Q  You further state in your interview, quote -- and
18     we're on the second paragraph of this page, "We took
19     him to the hospital in good faith, based on his self-
20     reported medical condition and his seizure. The
21     hospital released him back to us saying he was okay to
22     go back to jail." Is that a true statement?
23  A  To my understanding, yes.
24  Q  When Mr. Perry self-reported at PPS that he was having
25     difficulty breathing, what action was taken to get him

## Page 107

1  medical attention?
2        MS. LAPPEN: Objection. The question has
3     been asked and answered. Foundation.
4        But go ahead and answer.
5  A  He had just been evaluated medically. No additional
6     effort was made to get him additional medical
7     attention.
8  BY MR. GENDE:
9  Q  When Mr. Perry calls out words to the effect that "I
10     need help," do you believe that's him self-reporting a
11     potential medical emergency?
12  A  That's what it sounds like.
13  Q  And tell me what your officers did to assist him in
14     that regard when he said, "I can't breathe"; he called
15     out for help; he said, "The officers are killing me"?
16        MS. LAPPEN: Objection. Foundation and form
17     and it's been asked and answered at least twice
18     in this deposition already.
19        But go ahead and answer.
20  A  They continued processing him routinely.
21  BY MR. GENDE:
22  Q  If we move on to the next page, Chief, on the third
23     full paragraph down, your statement is, "As I said,
24     they had sought medical attention for him already.
25     The next step in the transportation was to take him to

## Page 108

1  a facility where there are medical personnel on duty
2  24 hours a day. We don't have nurses in our jail
3  facility. The county sheriff's office does, and so
4  the next step in the process was to take him there."
5  Is that a true statement?
6  A  It's true.
7  Q  Do you know why Mr. Perry was delayed in being taken
8     to the Criminal Justice Facility?
9  A  The paperwork had to be processed.
10  Q  Why was the next step in the transportation process to
11     take him to CJF because they had nurses there?
12  A  The next step in the process from our jail is to CJF,
13     but CJF has nurses. So, as I say, we subsequently
14     adjusted that policy if we have a future disagreement
15     with emergency room staff, but at the time of this the
16     policy didn't exist, so they took him back to jail
17     where they finished the paperwork. And the next step
18     after jail is CJF. CJF has medical personnel.
19  Q  I'm trying to understand the context of your statement
20     where you say, quote --
21  A  Well, I don't know. The question isn't here, so I
22     don't know what the context was.
23  Q  Well, we know what your response is.
24  A  Yes.
25  Q  Which I read into the record, and you said it was a

## Page 109

1    true statement. Why was it important to get Mr. Perry
2    to CJF where they had medical -- I'm sorry -- medical
3    personnel on duty 24 hours a day?
4            MS. LAPPEN: Objection. Asked and answered.
5        But go ahead and answer.
6    A   Because once he is processed out of our system, that
7        is a place that he has subsequent medical problems is
8        in a better position to evaluate and do something
9        about it.
10           BY MR. GENDE:
11   Q   Who said he was having medical problems that required
12       a nurse's attention at CJF? Where is that in any of
13       the reports that we've reviewed, Chief?
14   A   What we have is a condition in which a guy is under
15       the influence of a sedative, has had prior seizures,
16       has self-admitted that he has epilepsy, has been
17       discharged from a hospital over the objection of our
18       officers, and continues to obviously respond to the
19       results of his sedative. Clearly he has medical
20       issues. We know that. Right? The hospital just
21       discharged him in the context of his seizures.
22           So we wanted to get him to CJF as expeditiously
23       as possible should he have another seizure. The
24       context of us taking him back from the emergency room
25       was he didn't have subsequent seizures in our

## Page 110

1    presence. He presented as you have previously
2    described.
3    Q   So in answer to my question, are you telling me that
4        it was important to get Mr. Perry to CJF because they
5        had nurses on duty 24 hours a day because he continued
6        to suffer from a medical condition?
7    A   Well, he had a medical condition when he was admitted
8        to us. That was part of the initial intake. We knew
9        he had a medical condition. He had seizures. He
10       didn't have seizures the second time he was in our
11       care, but he was somebody who had self-reported and
12       had already previously in our custody before we took
13       him to the emergency room had a seizure. So we know
14       we have a prisoner who has seizures. Get him to CJF
15       as soon as we can because they should know. They've
16       got medical personnel, we've got somebody who has
17       seizures and will presumably need a re-application of
18       seizure medicine.
19   Q   It sounds to me like you're answering my question,
20       "Yes," and then providing an explanation. Is your
21       answer yes or no, considering your explanation that
22       Mr. Perry had to be taken to CJF because they had
23       nurses on staff 24 hours a day that could evaluate his
24       ongoing medical condition? I already understand your
25       explanation. Now I just need to know if it's an

## Page 111

1    affirmative or negative response.
2            MS. LAPPEN: Objection. It's been asked and
3        answered. Form.
4        But go ahead and answer.
5    A   As far as I understand your question, yes.
6            BY MR. GENDE:
7    Q   Thank you. Chief, if we can go on to page 7, as a
8        further part of your statement, and I'm looking at the
9        first full paragraph where you describe Mr. Perry's
10       death as being a bad outcome. Do you see where I'm
11       at?
12   A   I think at the, yeah, first full paragraph?
13   Q   Yes, sir.
14   A   Yeah.
15   Q   You go on to state, "All I'm in a position to
16       professionally evaluate is did the officers respond in
17       a way consistent with their training and policy." Do
18       you see where I read that?
19   A   Yes.
20   Q   You agree that was part of your duties and
21       responsibilities was to make a professional evaluation
22       regarding your officers' conduct on the night in
23       question, right?
24   A   That's correct.
25   Q   Now, we've gone over several issues with the officers'

## Page 112

1    conduct on the night in question, true?
2    A   Yes.
3    Q   You would agree not all of your officers, based on
4        what we know today, responded in a way that was
5        consistent with their training and policies, true?
6            MS. LAPPEN: Objection as to the form of the
7        question, and it's vague.
8        Go ahead and answer.
9    A   As I say, I don't know what the question was that was
10       posed when I said that. It's clear to me in this
11       statement I am referring to the officers that had
12       escorted him to the hospital and escorted him back.
13       They were the ones that I felt particularly, in my
14       mind as I was talking here, had tried to do the right
15       thing for him.
16           BY MR. GENDE:
17   Q   I don't want to --
18   A   I'm not, you know, I'm not trying sum up the conduct
19       of Lieutenant Robbins in this statement. I'm
20       referring to the officers who had him im their direct
21       custody.
22   Q   Let's disregard this statement for a moment, and based
23       on the information and evidence that we've gone
24       through here today, is it your position that all the
25       officers who had contact with Mr. Perry on the night

## Page 113

1  in question and before his death responded consistent
2  with MPD's policies, trainings -- training, and
3  procedures?
4  A  All right. I'm going to have to engage in some
5  semantics here. All right? I have a lieutenant
6  there, I have police officers there. Do you want me
7  to lump the lieutenant together with the officers so I
8  say, no, they didn't, or do you want me to
9  disaggregate the fact that the lieutenant clearly was
10  wrong and the officers, I thought, were still
11  complying with our policies?
12  Q  Chief, whatever you feel comfortable with is how you
13  should answer the question, and if I have additional
14  follow-up, I'll ask it.
15  A  Okay. Well, my feeling is that the officers that were
16  involved behaved in a manner consistent with our
17  policy.
18  Q  Which is going to require me to ask some additional
19  questions that we've already gone over.
20  A  All right.
21  Q  Was it consistent with your policies and procedures to
22  ignore discharge instructions? I'm not saying that it
23  happened on the night in question. I'm asking you
24  generally.
25  A  Okay. If we're talking generally, should we ignore

## Page 114

1  discharge instructions? No.
2  Q  Generally speaking, is it consistent with your
3  policies and procedures to respond to an inmate who
4  complains of difficulty breathing, "If you're talking,
5  you're breathing"?
6  A  It's not consistent.
7  Q  Is it consistent with policies and procedures to
8  ignore potential changes in condition, which may
9  suggest a medical emergency is occurring?
10  A  And as I have said previously, even in the context of
11  our policies and procedures, we expect people to
12  exercise judgment based on what is known to them. I
13  believe in this circumstance, they did. That's
14  consistent with policy.
15     A policy has -- I mean, no policy is a step-by-
16  step rigid prescription for precisely what to do. All
17  right? They are general orders. They offer strong
18  guidance as to what is required, but judgment clearly
19  is a part of the application of policy to a
20  circumstance.
21  Q  Was it policy and procedure -- strike that. Is it
22  consistent with policies and procedures to ignore the
23  paradigm shift that struggling and resistance can
24  indicate an immediate medical emergency and not a
25  criminal act? Would that be consistent?

## Page 115

1     MS. LAPPEN: Objection as to form. It's
2  been asked and answered.
3     But go ahead.
4  A  This is a hypothetical?
5  BY MR. GENDE:
6  Q  It is, sir.
7  A  Okay. No, it wouldn't be.
8  Q  Chief, I want to continue on page 7. You state, "Did
9  they spend several hours waiting for that medical
10  assistance? They did. When the doctors ruled that he
11  was fit to come back to the jail but could be expected
12  to present himself in a groggy, less coherent way as
13  the medication took effect, they took the doctor's
14  word and brought him back." Was that a true statement
15  when you made it?
16  A  That's correct, yep.
17  Q  When you made that statement, tell me where you took
18  into account a doctor advising your transporting
19  personnel that if Mr. Perry had blood coming from an
20  unknown origin or urinated and defecated on himself,
21  that was something that would be an effect of the
22  medication.
23  A  I don't have any information to that effect.
24  Q  Chief, when you had an opportunity to review Exhibit
25  No. 69, which we're referring to, did you find any

## Page 116

1  statements in there to be inconsistent or ones that
2  you would change at this point in time?
3  A  You know, I said what I said. I'm, you know....
4  Q  Okay. It is 12:30. I think I'm nearing the end of my
5  examination. It may take another 45 minutes. It may
6  take an hour. It's up to the witness whether he'd
7  like to press on, which I'm happy to do, or we can
8  take a short break for lunch.
9  A  I've got a day ahead of me. Let's go. Let's move
10  ahead.
11  Q  Yes, sir. What is your -- strike that. What was the
12  department's policy at the time Mr. Perry passed away
13  in providing medical care or lifesaving procedures to
14  individuals in your custody?
15  A  I think you probably have a copy of it. I don't
16  recall what it says exactly.
17  Q  Generally, what is your understanding in that regard?
18  A  We should get medical care for people who need it.
19  Q  Are you aware of any written policy that was in effect
20  at the time Mr. Perry passed away as to how police
21  personnel are to recognize or evaluate an individual
22  in their custody or care suffering from a medical
23  emergency?
24  A  I don't know.
25  Q  Are you aware of any written policy as it relates to

Page 117

1   your police officers performing wellness checks on
2   individuals kept in a cell for observation?
3   A   I do know there are policies governing it.
4   Q   And are you aware whether those policies governing how
5   wellness checks are to be conducted include different
6   observation levels?
7   A   I would assume that they do.
8   Q   And why would you assume that, Chief?
9   A   Well, there are times when we're going to have people
10  in our custody that are exhibiting behaviors that
11  might indicate a risk to themselves or a suicide risk
12  or some such thing, and folks under that context are
13  required to be observed more frequently.
14  Q   How about folks that have suffered from seizures and
15  required emergency room contact?
16  A   Well, you know, I think medical conditions are one of
17  the variables.
18  Q   Are you aware -- strike that. Do you have any
19  information as we sit here today that Mr. Perry did
20  not suffer from a seizure as he lay in cell A3 in his
21  blood, spit, and feces?
22  A   Is that the question?
23  Q   Do you have any information?
24  A   I have no....
25       MS. LAPPEN: I'll object to the form of the

Page 118

1   question.
2       THE WITNESS: Right. Right.
3       MS. LAPPEN: But go ahead and answer.
4   A   I don't have any information that was brought to my
5   attention that indicated that he did. I don't know
6   how to get information that proves that he didn't.
7   BY MR. GENDE:
8   Q   Well, one way to get that information would be to
9   determine his observation level and whether that was
10  followed, true?
11  A   That's true.
12  Q   Did you see in any report or were you provided any
13  information from any of your detectives or deputies
14  that Mr. Perry was under a specific observation level
15  and that was followed in accord with policies and
16  procedures?
17  A   I don't recall.
18  Q   And I just want to be clear because I know there's no
19  written policy. Was it the department's policy at the
20  time Mr. Perry passed away, whether written or
21  unwritten, that when an individual complains of not
22  being able to breathe, that the officers' response
23  should be "If you're talking, you're breathing"?
24  A   No, it wasn't a department policy.
25  Q   Was that a policy that you expected your officers to

Page 119

1   follow at the time Mr. Perry died?
2       MS. LAPPEN: Objection as to the form of the
3   question. It's argumentative.
4       Go ahead and answer.
5   A   Yeah. No, it wasn't. As indicated earlier, it was
6   more of a holdover from earlier years of training but
7   not a current state of training or an expectation.
8   BY MR. GENDE:
9   Q   In the event that your officers determine that there
10  is a medical emergency that requires additional
11  assistance, what are they trained to do for that
12  individual before an ambulance or the fire department
13  or a nurse or a doctor presents themselves?
14  A   It depends on the circumstances. If it's a
15  circumstance in which conventional first aid can be
16  applied, they're expected to start the breathing, stop
17  the bleeding, and treat for shock, and wait for
18  medical assistance. If it's somebody who has got a
19  medical condition, they're just expected to see to it
20  that the person is reasonably comfortable and await
21  medical transport.
22  Q   And when you say "make sure they're reasonably
23  comfortable," what does that mean, Chief?
24  A   The general rule, it means they're placed in a
25  circumstance in which they're not going to injure

Page 120

1   themselves or others.
2   Q   Do you know if, when Mr. Perry, after he was dropped
3   on his head and placed in the cell in A3 to be
4   observed, was made more comfortable?
5   A   Well, I do know he was placed in a circumstance where
6   he couldn't injure himself or others, and that was a
7   concern at the time.
8   Q   My question is, do you know if he was made more
9   comfortable?
10  A   Well, I just....
11  Q   Do you know?
12  A   That's the condition. I mean, no, he was not
13  necessarily made more comfortable, but he -- part of
14  being -- their concern for him was that he might
15  inadvertently do harm to himself.
16  Q   Do you know if officers were trained before or at the
17  time of Mr. Perry's death that once an individual who
18  had been released from a hospital for a medical
19  emergency cannot suffer another medical emergency
20  going forward?
21  A   I'm sorry. Repeat the question?
22  Q   Let me try and be more clear. Do you know if your
23  officers are trained, either prior to Mr. Perry's
24  death or at the time of Mr. Perry's death, that in the
25  event a prisoner is discharged from an emergency room

## Page 121

1    for a medical condition, that that prisoner cannot
2    suffer a medical condition or emergency from that
3    point forward?
4  A   No, they're not trained that way.
5  Q   Do you know if the officers are trained to pay any
6    closer attention to an individual who is released from
7    an emergency room and remains in their custody and
8    control going forward?
9  A   The policy in the Prisoner Processing Section does, I
10   believe, make allowances for people to be under more
11   observation, depending on their physical or mental
12   condition.
13 Q   And that was a change made after Mr. Perry's death,
14   correct?
15 A   I'm not sure what the sequence was.
16 Q   You would agree that your officers should always be on
17   the lookout for an individual who may be suffering
18   from a medical emergency, correct?
19       MS. LAPPEN: Objection as to the form of the
20   question.
21       But go ahead and answer.
22 A   Certainly.
23 BY MR. GENDE:
24 Q   Is the review conducted after a in-custody death of an
25   inmate different depending on whether the death is

## Page 122

1    determined to be natural or the result of either
2    willful or negligent conduct?
3  A   The review takes place subsequent to the death and
4    generally is taking place even prior to a ruling from
5    the ME's office as we try to examine and understand
6    the circumstances that preceded the death. And that's
7    fairly standard, and the results of the Medical
8    Examiner's Office are additional important
9    information, ultimately, but the investigation doesn't
10   wait for that to be done.
11 Q   Are you aware of any officers under your command and
12   control that have ever received additional training as
13   it relates to an in-custody death?
14 A   Do you mean officers that were involved in an incident
15   in which there was an in-custody death were retrained?
16 Q   Let's start with that --
17 A   Yeah.
18 Q   -- proposition.
19 A   I don't know. Offhand, I don't know.
20 Q   After Mr. Perry's death, the entire police department
21   was retrained on how to respond to medical
22   emergencies, correct?
23 A   Well, we made some adjustments, as I have indicated
24   earlier, yes.
25 Q   Is an in-custody death investigated by your Internal

## Page 123

1    Affairs Division as a potential criminal matter?
2  A   It can be. You know, we sometimes do a single
3    investigation, and we sometimes do a dual
4    investigation in which there's one investigation of
5    disciplinary violations and a parallel investigation
6    on a criminal side. It depends on the circumstances.
7  Q   And do you know if there was any inquiry into a
8    potential criminal investigation as it relates to Mr.
9    Perry's in-custody death?
10 A   I don't recall.
11 Q   Do you personally review the entire investigation of
12   in-custody deaths after they're completed?
13 A   No.
14 Q   Any reason why not?
15 A   As I say, I delegate the responsibility for conducting
16   the investigation to the appropriate authority. I
17   review the conclusions.
18 Q   Is there a specific individual at the police
19   department -- strike that. Is it a police officer's
20   responsibility or a supervisor's responsibility to
21   make a decision whether an inmate is to receive
22   medical attention?
23 A   I think it depends on the circumstances. I mean, I
24   don't know who made the decision initially to get him
25   medical treatment, so I would suspect that either can,

## Page 124

1    but....
2  Q   Was there some delineation per policy and procedure
3    that prevents a police officer, as opposed to a
4    supervisor, in requesting medical attention?
5  A   No.
6  Q   For an inmate who has an emergency?
7  A   No.
8  Q   Is there any medical care -- strike that. Other than
9    CPR, is there any other medical care that's expected
10   or should be provided to an inmate in the custody and
11   control of the Milwaukee Police Department while
12   they're at a city facility, such as the Prisoner
13   Processing Section?
14 A   Well, as I say, I would expect common first aid to be
15   applied if necessary.
16       MR. GENDE: I'm going to take a moment and
17   go off the record. We'll review my notes and let
18   you know if we have any other questions. Thank
19   you, Chief.
20       THE WITNESS: Okay.
21       THE REPORTER: Off the record.
22       (Off the record 12:39 - 12:43)
23       THE REPORTER: We're back on the record.
24 BY MR. GENDE:
25 Q   Chief, was there a general understanding that

## Page 125

1  prisoners in the custody of the Milwaukee Police
2  Department who needed further medical care and could
3  not be taken back to an emergency room should be
4  transported to the Criminal Justice Facility?
5  　　　MS. LAPPEN: Objection as to form. It calls
6  　　for speculation.
7  　　　MR. JONES: Objection.
8  　　　MS. LAPPEN: But go ahead.
9  　　　MR. JONES: Objection to form.
10 A  Yeah. I wouldn't say there was a general expectation.
11  What I would say is that in this circumstance and in
12  our subsequent evaluation of policy, we saw that as a
13  way to overcome a circumstance we'd not encountered
14  before. I know we've talked about it before, and that
15  is hospital disagrees who would take the prisoner.
16  We're not a medical facility.
17  　　　And so subsequently our thought has been, if we
18  can't resolve it at a supervisory level, we will
19  transport directly to CJF because they've got medical
20  personnel there, and they can call for medical
21  attention we've already [gesturing quotes] lost, if
22  you will.
23  　　　At the time, there wasn't a general expectation
24  along those lines because we hadn't had that
25  circumstance before. But in the context of the time,

## Page 126

1  an effort was made, from my understanding, to move the
2  paperwork along faster because we were not somebody
3  equipped to hold somebody who had had seizures, had
4  been prescribed seizure message -- medicine, and was
5  under the influence of a sedative. So they wanted to
6  get him out of there over to CJF, and that's -- that
7  became the priority. Get the paperwork done.
8  BY MR. GENDE:
9  Q  Was there any policy and procedure in place that
10  prevented Mr. Perry, after he returned to PPS, from
11  being taken back to an emergency room, whether it was
12  Mount Sinai or somewhere else?
13 A  Well, this is an interesting issue, and it's an
14  important issue, which I didn't even know at the time
15  because that was my question. Nothing would have
16  prevented us taking him back to the place that had
17  just rejected him, but what I did find is there's
18  rules against us "emergency room shopping." It's some
19  kind of federal law that prevents us basically from
20  taking a prisoner from place A that won't accept him
21  to Froedtert's emergency room or somebody else's
22  emergency room. I forget what the name of it is. You
23  guys can look it up, but there is a proscription
24  against it.
25  　　　And so we couldn't shop around for a different

## Page 127

1  emergency room with the same patient. That is one of
2  the reasons why, from what I can discern, it made
3  sense getting it to a different jurisdiction where
4  them presenting it, if necessary, might have a
5  different outcome.
6  Q  Sir, over the series of questions in this deposition,
7  you've referred on numerous occasions of the emergency
8  room rejecting Mr. Perry. Mr. Perry was accepted for
9  admission into the emergency room, was he not?
10 A  Okay. Let me correct myself, then. Yes, he was in
11  the emergency room. What he wasn't was admitted to
12  the hospital.
13  Q  So he was treated at the emergency room and released
14  with instructions, correct?
15 A  He was given a sedative, I know, and he was released
16  with instructions, yes.
17  Q  So during the course of this deposition when you've
18  said Mr. Perry was rejected at the emergency room,
19  that would not be an accurate statement, true?
20 A  No. He was not admitted to the hospital. He was
21  treated at the emergency room.
22  Q  At what point in time were your officers relieved from
23  their duty to monitor Mr. Perry's health, safety, and
24  welfare?
25 A  They weren't.

## Page 128

1  　　　MS. LAPPEN: I'll just object to the form.
2  　　　THE WITNESS: Yeah.
3  　　　MS. LAPPEN: Vague as to which officers.
4  　　But go ahead and answer.
5  A  No one was relieved from their responsibility to
6  monitor his condition.
7  BY MR. GENDE:
8  Q  For instance, the two officers that transported Mr.
9  Perry from PPS to the Criminal Justice Facility --
10 A  Mm-hmm.
11  Q  -- had a duty and obligation to continue and monitor
12  Mr. Perry until he was discharged from their custody,
13  correct?
14 A  That's correct.
15  Q  And at what point in time was he discharged from their
16  custody prior to his death?
17 A  Well, I don't exactly know. I know from what I read
18  that apparently he was being rejected, but I did not
19  know that to be the truth at the time.
20  Q  Do you have an opinion as we sit here today whether or
21  not Mr. Perry continued to be in the custody of
22  Milwaukee Police Department at the time of his death?
23 A  That's a good question. It was my understanding that
24  we were handing him off to CJF. We stayed by him. We
25  didn't leave him there. But my understanding was he

| Page 129 | Page 131 |
|---|---|

**Page 129**

1  was in the process of being admitted when he had his
2  cardiac event.
3  Q  So just so we're clear for the record, because this is
4  an issue in the case --
5  A  Mm-hmm.
6  Q  -- is it the chief of police for the Milwaukee Police
7  Department's opinion that Mr. Perry did or did not
8  remain in the custody of MPD at the point he passed
9  away?
10 A  You may be -- forgive me. All right? I'm not trying
11 to engage in semantics.
12       What my understanding all along has been, we were
13 in the process of transferring custody from us to the
14 sheriff's office. Our people stayed there, the
15 sheriff's people were there, everybody was there. At
16 what legal moment he was theirs, not ours, I can't
17 answer. I do know that we were taking him where we
18 believeD that he should be. It was my understanding
19 he was in the process of being admitted, not rejected,
20 when he had his event. I mean, I know it's a long
21 answer to a short question, but that's the best I can
22 do.
23 Q  Have you seen the tape of Mr. Perry at CJF?
24 A  I've seen part of it, yeah.
25 Q  And in the parts that you saw, did you see Milwaukee

**Page 130**

1  Sheriff's Department personnel in the vicinity of Mr.
2  Perry?
3  A  Well, I may be having recovered memory here. My
4  recollection is they were on the scene.
5  Q  They were on the scene, and do you recall officers
6  assist -- I'm sorry -- do you recall sheriff's
7  deputies assisting Mr. Perry into the facility at CJF?
8  A  I don't really recall who did what.
9  Q  Let me ask you -- I'm sorry. How much experience have
10 you had in police departments over the course of your
11 career, sir?
12 A  A lot.
13 Q  How many years?
14 A  Over 40.
15 Q  And of those 40 years, how many have been designated
16 as chief of police for different municipalities?
17 A  About 25.
18 Q  And how long have you been the chief for the Milwaukee
19 Police Department?
20 A  Six years.
21 Q  All right. Based on your vast amount of experience,
22 not only as a police officer over the last 40 years
23 but as a chief of police for different municipalities
24 for the last 25, and for the last six at the Milwaukee
25 Police Department, are you able to say with any degree

**Page 131**

1  of probability whether custody of Mr. Perry changed
2  from the Milwaukee Police Department to the Milwaukee
3  County Sheriff's Department at any point prior to his
4  death?
5  A  The best I can say is it was in process. We were in
6  the process of handing him off. If he was still
7  technically ours, that may well have been so, but my
8  understanding was it virtually happened in the middle
9  of a transfer of custody.
10 Q  Have you ever had any discussions with Sheriff Clarke
11 about Mr. Perry's incident?
12 A  No.
13 Q  Have you ever had any discussions with anybody at the
14 sheriff's department about Mr. Perry's treatment after
15 he arrived at the Criminal Justice Facility?
16 A  No.
17 Q  What is -- You've mentioned the CRIB? Am I --
18 A  Critical Incident Review Board, CIRB, yeah.
19 Q  Okay. Was there a Critical Incident Review Board
20 instituted for Mr. Perry's death?
21 A  Yeah.
22 Q  Are there documents related to that?
23 A  Well, this again would have been about two years
24 later, because it didn't exist at the time of his
25 death. And there was a PowerPoint created that made

**Page 132**

1  the recommendation, as I've indicated earlier, that
2  our policy needed to specifically address
3  circumstances in which patients -- patient prisoners
4  that we thought needed to be admitted to a hospital
5  were rejected for admission. We needed to account for
6  that when there was a difference of opinion. We did
7  not have anything covering that. And so the
8  evaluation made the recommendation and we subsequently
9  adjusted our policy.
10 Q  Is the Criminal Incident Review Board made up of
11 police officers?
12 A  That's correct.
13       MS. LAPPEN: For clarification, it's
14 "Critical," not "Criminal."
15       MR. GENDE: Thank you.
16       MS. LAPPEN: Critical Incident Review Board.
17       THE WITNESS: Yeah. It's -- yeah.
18       MR. GENDE: Thank you for the clarification.
19 A  Yeah. It's an important clarification. Its purpose
20 is not to reinvestigate the incident. Its purpose is
21 to disaggregate the incident and look for policy and
22 training issues that would be applicable going forward
23 from whatever we learned from that.
24 Q  And -- I'm sorry. Go ahead.
25 A  So it was in that context that adjustments would be

| Page 133 | Page 135 |
|---|---|
| 1    made to the policy. | 1   A   No. |
| 2   Q   And the CIRB, is that made up of supervisory staff? | 2   Q   Do you have any information or evidence as we sit here |
| 3   A   That's correct. | 3    today as to how long blood was seeping from Mr. |
| 4   Q   Lieutenant and above? | 4    Perry's spit mask before he arrived at CJF? |
| 5   A   Yeah. | 5   A   No. |
| 6   Q   And how are those individuals appointed or elected to | 6   Q   Do you have any explanation or information or evidence |
| 7    that position? | 7    as we sit here today that would suggest that your |
| 8   A   Well, they're appointed. They're from a variety of | 8    Officer Salinsky or Lopez were unable to view blood |
| 9    disciplines that usually involve people from the | 9    seeping from Mr. Perry's spit mask while they were |
| 10    Inspections Bureau and the Police Academy, because the | 10    transporting him or escorting him into the facility? |
| 11    Police Academy covers training. Inspections is -- and | 11   A   No. |
| 12    we have individuals from, you know, a variety of | 12   Q   Have you ever inquired as to how long blood was |
| 13    disciplines on it. | 13    seeping from Mr. Perry's spit mask before he arrived |
| 14   Q   And this Critical Incident Review Board, is it tasked | 14    at CJF? |
| 15    with reviewing incidents that only involve potential | 15   A   Well, this is the first time I've seen this report, so |
| 16    willful misconduct? | 16    I don't know. |
| 17   A   No, no. It's tasked with reviewing Critical Incidents | 17   Q   Does that concern you, for the first time seeing this |
| 18    that occurred, period. I mean, there may be | 18    report, that your officers transported an individual |
| 19    absolutely no allegations of misconduct at all, but | 19    who had blood seeping from his spit mask and carried |
| 20    there could be a pursuit that occurs which is entirely | 20    him into a facility without calling for medical |
| 21    within policy but, you know, there's a fatal car crash | 21    attention themselves? |
| 22    at the end. | 22        MS. LAPPEN: Objection as to the question. |
| 23     Okay. What might we have done, even though we | 23        It misstates prior deposition testimony. It's |
| 24    clearly were within our standard policy, that might | 24        vague and multiple. |
| 25    have, you know, prevented that? There might be a use | 25        But go ahead and answer. |

| Page 134 | Page 136 |
|---|---|
| 1    of force incident that's fully within the current | 1   A   Well, I mean, they're getting him to where we wanted |
| 2    policies and the law. Was there any way that policy | 2    him to be, which was a prison facility with a medical |
| 3    or training might have come up with a better outcome? | 3    capability, and a registered nurse saw him within five |
| 4     So, no, we don't start from the standpoint of | 4    minutes of our arriving there. So this is what I |
| 5    we're suspicious of what occurred. We start from the | 5    would hope would have occurred. |
| 6    standpoint of this is a critical incident usually | 6    BY MR. GENDE: |
| 7    resulting in a death. Let's examine it from the | 7   Q   You would agree that a prisoner who has blood seeping |
| 8    standpoints of our training and our policies to see if | 8    from his spit mask could be exhibiting a medical |
| 9    any issues need to be addressed. | 9    emergency, true? |
| 10   Q   Sir, I'd like to show you what we've marked | 10        MR. JONES: Objection to form. |
| 11    as Exhibit No. 2. This is a county document relative | 11        MS. LAPPEN: Join. |
| 12    to their major incident report, and their supervisor, | 12   A   Yes, they could be. |
| 13    Sergeant Hale, prepared an outline as it relates to | 13    BY MR. GENDE: |
| 14    Mr. Perry's sequence of events once he arrived at CJF. | 14   Q   You would agree that a prisoner who has blood seeping |
| 15    Under the entry "2040 hours" Sergeant Hale documented, | 15    from his spit mask -- strike that. You would agree |
| 16    "MPD Officers Frank Salinsky and Richard Lopez | 16    that the condition documented by Sergeant Hale, which |
| 17    escorted Prisoner Franklin into prebook in leg | 17    reflects Mr. Perry arrived at the CJF with blood |
| 18    restraints, handcuffed behind back, and wearing a spit | 18    seeping from his spit mask -- |
| 19    mask." Do you have any evidence as we sit here today | 19   A   Mm-hmm. |
| 20    that did not in fact occur as she documented? | 20   Q   -- would be a change in condition from how Mr. Perry |
| 21   A   No. | 21    was discharged from the emergency room earlier in the |
| 22   Q   She further documents, "Blood was seeping from the | 22    evening, correct? |
| 23    spit mask." Do you have any evidence or information | 23   A   Yes. |
| 24    as we sit here today that her notation in this regard | 24        MS. LAPPEN: Objection as to foundation. |
| 25    is inaccurate or untrue? | 25        But go ahead and answer. |

| Page 137 | Page 139 |
|---|---|

**Page 137**

1 A  Yep.
2 BY MR. GENDE:
3 Q  Would you expect as a law enforcement official and
4 supervisor and chief for 25 years that in the event a
5 prisoner has blood seeping from his spit mask that he
6 would not receive any medical attention for five
7 minutes at the Criminal Justice Facility?
8         MS. LAPPEN: Objection. Calls for
9 speculation, and foundation.
10        But go ahead and answer.
11        MR. JONES: Objection to form.
12 A  I think five minutes is reasonable.
13        (Exhibit 72 identified)
14 BY MR. GENDE:
15 Q  I'm going to show you what we've marked as Exhibit No.
16 72, which is a further supplement to the Milwaukee
17 Police Department's investigation in the events
18 surrounding Mr. Perry's death, taken by your
19 detectives, and they spoke to one of the paramedics.
20 I'm on the second page of this exhibit.
21        Let me know when you're ready, Chief, and I'll
22 ask a question.
23 A  Sure. Go ahead.
24 Q  On the second page, your detectives documented, "The
25 nurses told Kimber that they knew Perry was in trouble

**Page 138**

1 when he arrived. He could not walk or stand." Do you
2 have any reason to dispute this information --
3        MS. LAPPEN: Objection --
4 BY MR. GENDE:
5 Q  -- generated by your detective?
6        MS. LAPPEN: Objection as to form and
7 foundation.
8        Go ahead and answer.
9 A  It is consistent with what occurred shortly after he
10 was administered his tranquilizer.
11 BY MR. GENDE:
12 Q  The detective goes on to document, "They removed the
13 spit mask. Perry was bleeding from his nose and left
14 ear." Do you have any information as we sit here
15 today or evidence to suggest that is untrue or
16 incorrect?
17 A  No.
18 Q  Your detective -- and now I'm on the first page of the
19 incident report, Chief. At the bottom of the page, he
20 documents, "On the second run, they," meaning fire
21 department, "were sent to an uncontrolled bleeding at
22 CJF." Do you see where I read that?
23 A  Yes.
24 Q  Do you know how long, based on your review of all the
25 evidence to date and the reports and the videos, that

**Page 139**

1 Mr. Perry was suffering from an uncontrolled bleed
2 before he arrived at CJF?
3 A  No.
4 Q  Does it concern you as the chief of police that Mr.
5 Perry may have been suffering from an uncontrolled
6 bleed while he remained at the Prisoner Processing
7 Section?
8         MS. LAPPEN: Objection as to form and
9 foundation.
10        But go ahead and answer.
11 A  If that was true, yes.
12 BY MR. GENDE:
13 Q  And you would agree that there is evidence suggesting
14 Mr. Perry suffered from an uncontrolled bleed at the
15 Prisoner Processing Section based on your custodial
16 employee Puechner's report to a detective that he was
17 cleaning up gobs of blood, spit, and feces in the area
18 where Mr. Perry was laying, true?
19        MS. LAPPEN: Objection as to form and
20 foundation.
21 A  I don't know that that presented as uncontrolled
22 bleeding. I will say that, yes, blood was found in
23 the location where he had been laying down.
24        MR. GENDE: I have nothing further. I
25 appreciate your time, Chief.

**Page 140**

1         THE WITNESS: Thank you.
2         THE REPORTER: Off the record briefly.
3         (Off the record 1:01 - 1:01)
4         THE REPORTER: We're back on the record.
5 Mr. Jones.
6         E X A M I N A T I O N
7 BY MR. JONES:
8 Q  Chief, do you have any personal knowledge one way or
9 the other what did or did not happen with respect to
10 Mr. Perry once he arrived at the CJF on the night in
11 question?
12 A  No.
13 Q  Do you have any personal knowledge as to whether
14 sheriff's office personnel were in the process of
15 accepting Mr. Perry or rejecting him, that is, into
16 the custody of the sheriff's office during the events
17 that occurred at the CJF that night?
18 A  No.
19 Q  And if I understand your prior testimony on the
20 subject and given that you don't have any personal
21 knowledge on the subject, do I understand that you are
22 not offering an opinion one way or the other whether
23 Mr. Perry -- or, rather, whose custody Mr. Perry was
24 in at the time of his death?
25 A  No.

Case 2:12-cv-00664-JPS   Filed 01/18/16   Page 36 of 61   Document 124-15

Page 141

1   Q   So that is a correct statement: you are not offering

2       any opinion?

3   A   No.  I'm not trying to assign who it was.  I, quite

4       honestly, the handoff was occurring.  I don't know.

5       That's for the attorneys to sort out.  As far as my

6       understanding was, the handoff was in the process of

7       taking place.

8   Q   And, but you don't have any personal knowledge on the

9       subject, correct?

10  A   No.

11  Q   That is correct, you don't have personal knowledge?

12  A   That's correct, yeah.

13          MR. JONES:  Okay.  Thank you, Chief.  That's

14      it.

15          THE REPORTER:  Okay.  There being no further

16      questions, the deposition is concluded at 1:03

17      p.m.  Off the record.

Magne-Script Video Court Reporting                    414-352-5450

**A**

**ability** 104:15
105:1,9 106:12
**able** 10:5 19:8
54:5 70:14,22
86:2 96:6 99:6
118:22 130:25
**absent** 96:12
**absolutely** 133:19
**academy** 5:25 6:2
6:4,7,11 7:6,9
133:10,11
**accept** 35:9,10
41:15 53:12
126:20
**accepted** 127:8
**accepting** 140:15
**accidentally**
64:11,13
**accommodate**
4:13
**accompanies**
10:11
**accord** 58:8 71:12
76:2 88:19
118:15
**account** 115:18
132:5
**accountability**
26:19
**accountable**
27:20,21 28:12
28:23 72:17
**accurate** 65:25
66:3 82:18
97:13 127:19
**act** 28:4 41:20
57:20 62:8
63:13 81:23
84:1 91:22
100:17 114:25
**acting** 57:4 70:9
71:12
**action** 91:7,23
92:2,6,12,16
106:25

**actions** 69:16
71:20
**actively** 57:5,18
**activity** 76:16,22
90:25
**add** 80:24
**addition** 105:8
**additional** 35:4
76:22 87:16
96:22 104:7,11
107:5,6 113:13
113:18 119:10
122:8,12
**address** 74:3
132:2
**addressed** 134:9
**Addressing** 5:6
36:11
**adherence** 27:20
27:21
**adjust** 12:22 96:6
**adjusted** 108:14
132:9
**adjustment** 14:22
**adjustments**
122:23 132:25
**administered**
17:25 18:8 20:4
33:17 49:13
55:8 73:10 80:7
138:10
**administering**
49:10
**administration**
1:6 7:2 19:4
21:23 53:25
71:17 72:19
**admission** 102:21
127:9 132:5
**admit** 14:2 15:21
21:2 47:17 69:5
98:3 99:10
**admitted** 8:5 13:4
14:2 28:20
50:21 65:6 68:8
110:7 127:11,20

129:1,19 132:4
**advise** 77:10
**advised** 10:23
11:1,6,8 17:20
22:3,17 23:16
54:15 76:21
77:9,15
**advising** 115:18
**advocate** 15:25
28:25 99:6
**advocated** 101:2
**advocating** 98:19
**Affairs** 15:7,10,16
16:6,10,14,17,25
17:8,13 23:22
24:5 37:13 39:5
42:10 45:20
53:5 88:8 123:1
**affirmative** 111:1
**affirmatively**
26:23
**afford** 4:5
**agency** 12:16
100:10
**ago** 12:6 94:16
95:6
**agree** 4:12 26:10
27:3 32:15,23
38:19 40:10
54:22 55:11
63:2 111:20
112:3 121:16
136:7,14,15
139:13
**ahead** 22:12 23:12
27:17 28:9
29:18 30:2,12
32:20 35:23
36:9,23 38:4,25
40:17 41:11,23
42:7 43:24 45:2
45:16 47:3,14
49:7 53:21 55:3
56:17,25 59:6
61:14 62:14
63:18 65:1 68:4

69:24 72:7
76:10 77:21
83:14 84:22
85:5 87:7 89:2
90:9 92:5,15
100:22 101:15
102:3,17 103:7
105:16 107:4,19
109:5 111:4
112:8 115:3
116:9,10 118:3
119:4 121:21
125:8 128:4
132:24 135:25
136:25 137:10
137:23 138:8
139:10
**aid** 48:5 72:24
119:15 124:14
**airway** 86:2
**alive** 86:4
**allegations** 133:19
**allegedly** 18:7
20:13 67:20
69:21 97:22
**allow** 4:4
**allowances**
121:10
**allowing** 75:4
**ambulance** 48:9
48:17,20 50:1
51:10 119:12
**amend** 7:3 24:19
**amended** 6:22
13:23,24 20:21
**amendment** 7:4
7:15 8:9
**amount** 130:21
**Andrew** 2:14 39:7
**animal** 28:4 62:8
63:14 91:22
100:17
**annual** 6:11
**answer** 4:1,5
20:15 22:12
23:12 27:17

28:10 29:12,18
30:2,12 32:20
35:23 36:9,23
38:4,25 40:17
41:11,23 42:7
43:24 45:2,16
47:3,14 49:7,20
53:21 55:3
56:17,25 59:6
61:15 62:14,15
63:18 68:4 69:8
69:24 70:5 72:7
76:10 77:21
79:9 83:14
84:22 85:5 87:7
87:15 89:2 90:9
92:5,15 100:22
101:15 102:3,17
103:7 105:16
107:4,19 109:5
110:3,21 111:4
112:8 113:13
118:3 119:4
121:21 128:4
129:17,21
135:25 136:25
137:10 138:8
139:10
**answered** 22:11
56:16 69:23
100:21 101:14
107:3,17 109:4
111:3 115:2
**answering** 110:19
**anticipate** 8:3
14:3 29:7
**anticipated** 8:7,20
12:20 97:25
**anticipates** 12:25
**anybody** 8:20
15:25 65:12
70:5 73:4 80:6
102:6,10 131:13
**anymore** 85:13
**apparently** 18:1
46:9 50:15

72:17 106:4
128:18
**appear** 4:12 24:25
45:3 55:25 56:6
58:13 61:10
67:10
**appearance** 4:11
**appearances**
66:23
**appeared** 10:14
26:3 67:11
**appears** 9:11 49:8
61:5 68:21
**applicable** 132:22
**application**
114:19
**applied** 119:16
124:15
**apply** 94:22 98:24
**appointed** 27:9
133:6,8
**appreciate** 139:25
**appropriate**
90:12 91:7
103:23 104:1,4
104:10 123:16
**appropriately**
63:23
**approve** 26:17
**area** 52:9 54:17
54:21 139:17
**argument** 70:11
**argumentative**
81:18 119:3
**arms** 78:15
**arose** 24:18 71:6
**arrested** 29:1
**arrests** 89:22
**arrival** 34:2 83:1
**arrived** 31:11
33:13 46:21
131:15 134:14
135:4,13 136:17
138:1 139:2
140:10
**arriving** 32:24

33:8 136:4
**ascertaining** 24:6
**asked** 22:10 56:16
66:8 69:23
87:13 100:21
101:14 107:3,17
109:4 111:2
115:2
**asking** 22:14
23:22 41:14
79:8,13 80:1
90:15 91:25
93:8 99:10
113:23
**asleep** 55:25 56:6
**aspect** 7:18
**aspects** 7:2
**assert** 90:10 99:6
**asserted** 78:9
85:16
**asserting** 94:11
94:12,13
**assertively** 85:25
**assessed** 34:1
**assessment** 61:21
**assign** 141:3
**assigned** 16:19
17:5
**assist** 75:4 107:13
130:6
**assistance** 21:3,4
74:12 100:9
115:10 119:11
119:18
**assisting** 130:7
**association** 62:23
**assume** 16:21
117:7,8
**assuming** 32:10
**atherosclerosis**
16:5
**attack** 16:5 51:11
72:22
**attacks** 94:20
**attempt** 3:23 4:5
4:12 8:5 27:6

28:24 33:10
67:1 104:1
**attempts** 68:8
**attended** 47:21
**attention** 13:17
29:2 65:5 72:14
77:3,17 78:4,20
79:13,24 80:19
80:21 82:14,23
83:4,9 91:7
96:22 101:1
107:1,7,24
109:12 118:5
121:6 123:22
124:4 125:21
135:21 137:6
**attorney** 4:24
5:13 15:10
23:21
**attorneys** 2:21
141:5
**attorney's** 15:9
**Aurora** 75:10
**authorities** 73:8
104:19
**authority** 7:1
13:10 51:8 55:7
59:10,13 123:16
**automatically**
30:16 81:2
**automatons** 30:14
**autopsy** 15:19
16:12
**available** 13:15
23:23 25:16
45:19 48:8
89:12
**await** 119:20
**aware** 6:21 11:10
22:24 44:20
45:22 48:1 49:1
52:15 53:15
55:22 80:6
81:11 84:6 92:6
102:22 104:8
116:19,25 117:4

117:18 122:11
**awareness** 51:15
**A3** 40:3 44:16
46:2 56:8 64:23
106:11 117:20
120:3

**B**

**B** 59:14
**back** 13:5 14:7
17:23 21:5
24:16 51:5,10
61:2 64:1 65:9
66:16 67:3,6,7
71:2,7 72:18
80:3 86:21
92:21 97:12,19
98:7 99:4
106:21,22
108:16 109:24
112:12 115:11
115:14 124:23
125:3 126:11,16
134:18 140:4
**backup** 8:11
**backwards** 12:7
**bad** 14:10 28:22
111:10
**based** 9:24,25
15:1 25:3 32:1
41:16 42:1
43:18 45:19
47:8 49:14 53:9
54:2,19 56:5
58:5 59:25 63:3
66:11 67:18,18
70:14,19,23
71:2 97:11 98:6
98:15 99:5
106:19 112:3,22
114:12 130:21
138:24 139:15
**basically** 69:3
126:19
**basing** 89:21
**Bates** 39:10,14,14

74:23
**becoming** 78:23
105:25
**began** 18:9
**beginning** 97:23
**behalf** 2:6,12,18
2:24 16:1
100:24
**behaved** 28:24
51:14 113:16
**behaves** 26:23
**behaving** 49:9
68:11
**behavior** 31:4
62:17,17 69:1
78:17
**behaviors** 55:20
55:23 117:10
**belief** 70:9 72:13
**believe** 14:21 26:3
37:12 50:16
60:8 61:16 62:3
69:8 71:22 72:1
79:11 84:6
89:24 90:21
93:18 107:10
114:13 121:10
**believed** 50:17
129:18
**Bell** 48:9,20
**benefit** 73:4
**best** 56:5 100:8
129:21 131:5
**better** 5:23 13:8
13:16 50:11,22
50:25 73:5
109:8 134:3
**beyond** 57:17
**bleed** 139:1,6,14
**bleeding** 32:23
33:4 34:14
35:13 36:3,15
38:21 42:15
45:23 46:12,17
46:21 52:6,12
52:16,20 53:1,6

53:11 54:17,21
85:19,23 102:23
105:12,20
106:13 119:17
138:13,21
139:22
**block** 86:1
**blood** 33:2,5,7,11
33:18,22 37:3
40:5,11,23 41:1
41:6,17 42:24
43:7,10,11,15
44:1,3,22 45:9
46:10,11,23,25
47:4,5 52:13
102:13,25
103:11 115:19
117:21 134:22
135:3,8,12,19
136:7,14,17
137:5 139:17,22
**Bluemound** 2:10
**Board** 4:21 24:14
25:8 131:18,19
132:10,16
133:14
**body** 36:17 52:21
54:17,21
**bold** 77:5
**booked** 20:18
**bottom** 24:9
27:11 81:15
138:19
**bounds** 92:19
**bowels** 35:16 36:6
**box** 34:9,11
**break** 116:8
**breath** 96:1
**breathe** 85:24
92:24 93:19
94:7,24 95:12
95:14 96:2
107:14 118:22
**breathing** 38:9,13
85:2,10,18,21,21
86:13 92:9,11

94:18,21 95:13
101:12 106:25
114:4,5 118:23
119:16
**brief** 17:18
**briefing** 88:8
**briefly** 140:2
**bring** 4:14
**bringing** 97:19
**Broadway** 2:22
**brought** 17:10,23
47:10 53:7,11
78:7 80:3 91:6
115:14 118:4
**bud** 102:12
**Building** 1:6
**bureau** 6:1 133:10

---
**C**
---

**C** 2:1 59:15
**call** 9:10,23 11:17
13:15 28:7 48:6
48:16 49:25
58:17 72:6
125:20
**called** 43:13 55:15
107:14
**calling** 56:15,20
57:11,19 58:4
58:22,23 84:15
84:24 135:20
**calls** 30:9 32:19
38:24 40:15
46:6 55:1,13
58:8 92:13
101:22 103:6
107:9 125:5
137:8
**calm** 57:21 92:23
95:1 96:16
101:17
**capability** 86:13
136:3
**capable** 54:13
75:20 94:17
**capital** 77:4

**car** 18:3 133:21
**cardiac** 92:25
129:2
**care** 7:2 67:12
73:20 75:5,10
75:20,20 76:15
110:11 116:13
116:18,22 124:8
124:9 125:2
**career** 130:11
**carried** 19:1,1,20
37:24 38:20
52:18 66:18
135:19
**carry** 18:4
**carrying** 49:14
**case** 10:13 14:17
14:19,24 24:20
28:11 45:15
48:7 54:20
96:10,10 100:7
105:23 129:4
**cases** 24:15 100:6
**catches** 97:3
**categorize** 98:14
**cause** 15:15,17,19
16:5,23 40:23
42:11 87:18
90:23
**caused** 23:5 39:1
42:14 46:17
87:9
**causes** 64:17
87:18 90:20
91:20
**cell** 18:11,14,16
19:2,21 22:8
37:25 38:15
40:3,4,6,11,21
40:24 41:6,18
41:19 42:4,13
42:21,25 43:7
43:10,10,12,15
43:18 44:2,4,6
44:16,21,22
45:7 46:1 47:1

52:13,15 56:8
64:23 66:19,20
102:11,20 106:6
106:11 117:2,20
120:3
**cells** 21:18
**Central** 8:12,21
**certain** 7:2 14:14
17:5 22:23
53:24 68:11
84:16
**certainly** 24:24
25:24 26:9,17
29:4 30:19 31:3
33:20 38:5 41:3
44:8 48:24
52:11 54:11
57:17 62:15
81:3 121:22
**certainty** 52:24
**certified** 73:23
**chain** 6:23 43:25
100:11
**challenge** 36:25
57:13 90:23
**Challenges** 71:5
**change** 8:15 9:16
9:20 13:11
17:22 31:6,10
32:16,25 36:18
40:12 44:8
47:12 54:23
59:3 67:25 72:2
116:2 121:13
136:20
**changed** 6:6,12
8:18,18 14:18
66:5,7 86:10
131:1
**changes** 114:8
**changing** 10:7
**characteristics**
31:9
**characterized**
33:4
**charge** 5:24,25

6:1 17:2,4
**charged** 62:18
96:12
**charges** 26:1
**checked** 34:9
**checkmarked**
34:11
**checks** 117:1,5
**chief** 1:2 3:15,18
9:19 11:6,22
19:14 26:6 27:3
27:3,24 29:13
29:22 33:23
35:8 39:11,25
42:24 59:23
61:4,11,13
65:15 70:21
72:8,10 75:7
79:7 81:25
83:16 86:16,21
88:11,22 89:5
89:17,25 90:4
96:17 97:2
100:5 107:22
109:13 111:7
113:12 115:8,24
117:8 119:23
124:19,25 129:6
130:16,18,23
137:4,21 138:19
139:4,25 140:8
141:13
**chief's** 84:20
88:14
**choosing** 13:1
**Christopher** 2:8
**CIRB** 12:9 88:7
131:18 133:2
**circumstance** 8:3
8:8,19 9:13
12:23 17:17
44:10 46:12
57:10,14,23
59:18 65:3
68:17 73:1,2
87:17 92:20

Case 2:12-cv-00664-JPS   Filed 01/18/16   Page 40 of 61   Document 124-15

97:24 114:13,20
119:15,25 120:5
125:11,13,25
**circumstances**
17:7 19:23
20:12 57:1,13
58:2 69:11 96:4
119:14 122:6
123:6,23 132:3
**Citizens** 88:13
**city** 2:21,24
124:12
**CJF** 13:7,13,13,18
18:12 20:7,15
45:25 46:21
47:22 48:11,18
50:18,22 51:12
59:20 64:2 69:3
69:6 73:4
103:12 108:11
108:12,13,18,18
109:2,12,22
110:4,14,22
125:19 126:6
128:24 129:23
130:7 134:14
135:4,14 136:17
138:22 139:2
140:10,17
**clarification**
49:21 132:13,18
132:19
**Clarke** 131:10
**cleaning** 43:6
139:17
**clear** 3:24 4:6
15:18 22:13
32:3,6 67:5
93:16 100:7,14
101:9,16,20
102:8,21 103:14
112:10 118:18
120:22 129:3
**cleared** 73:8,9,10
**clearly** 28:17,17
50:22 51:11

64:16 92:19
98:15 101:17
109:19 113:9
114:18 133:24
**clinical** 35:4
**closer** 121:6
**coherent** 78:6
80:3,5 104:17
105:1,10 115:12
**collapsed** 52:11
**combative** 55:18
55:24 57:4,6
68:25
**come** 10:22 31:24
51:10 115:11
134:3
**comfortable**
113:12 119:20
119:23 120:4,9
120:13
**coming** 11:18
33:11 54:6 87:3
92:21 115:19
**command** 6:23
27:8,12 67:23
122:11
**commanders** 7:12
**comment** 29:14
29:23 30:23
62:21,24 63:10
65:18 92:2
93:14 96:25
101:5
**comments** 64:6
**common** 93:19
94:8,10,13 95:9
95:18 124:14
**communicate**
86:2 94:23
**communicated**
6:8,15,18
**communicating**
95:1
**competence** 21:6
24:21
**competent** 20:13

22:17 48:6 51:8
59:10,13
**complained** 95:12
**complaining** 85:1
85:9 92:9,23
96:1
**complains** 114:4
118:21
**complaints**
101:11
**complete** 45:21
61:11 65:11
**completed** 16:11
17:12 41:17
69:6 123:12
**compliance** 64:7
**compliant** 48:24
**complied** 51:4
98:9
**comply** 10:1,3
**complying** 113:11
**comport** 27:18
75:3
**concede** 36:18
**conceivable** 12:17
**concern** 49:3 50:4
66:11 67:18
69:4 85:25
88:14,16,23
102:5 120:7,14
135:17 139:4
**concerned** 20:2
22:9 48:14
49:23 67:9,10
88:11 91:4
95:23 97:20
**concerns** 8:11
13:1,9 48:23
69:19 70:11,13
74:4 85:18 98:2
**concluded** 141:16
**conclusions**
123:17
**condition** 6:14
9:16,20 10:8
16:3 17:22 20:3

21:25 23:5 31:6
31:10 32:8,16
33:1 36:19
40:12 44:8
47:12 49:13
54:23 59:3
66:13 67:11,25
70:4 71:3 72:2
81:3 97:21
105:4 106:20
109:14 110:6,7
110:9,24 114:8
119:19 120:12
121:1,2,12
128:6 136:16,20
**conditions** 77:18
117:16
**condone** 26:6
**conduct** 15:14
24:10 25:6,9
29:3 30:5 64:21
70:2 71:20
90:10,15 111:22
112:1,18 122:2
**conducted** 17:11
86:17 117:5
121:24
**conducting**
123:15
**conducts** 87:9
**conference** 65:21
97:9
**confound** 71:5
**confront** 68:6
**confused** 78:1,25
79:22 81:1
**confusion** 79:3,4
80:16,21 82:15
82:25 83:10
**connected** 41:1,2
**connection** 54:8
**conscious** 98:18
**consequences**
87:2
**consequently**
13:23

**consider** 46:23
100:23
**consideration**
58:24 100:25
105:19
**considered** 28:1
80:12 82:24
87:18
**considering** 18:23
54:19 62:5
82:23 88:1
89:11 110:21
**consist** 48:4
**consisted** 19:12
**consistent** 20:8
21:20,21 22:2
22:19 23:1
27:18 33:16
49:10 51:7,15
59:8,8,9,17
61:17 70:16
71:23 72:1
104:17 105:2,3
106:1 111:17
112:5 113:1,16
113:21 114:2,6
114:7,14,22,25
138:9
**consists** 21:25
**constitute** 10:8
32:15 36:18
**constituted** 24:13
67:25
**constitutes** 9:8,15
**contact** 112:25
117:15
**contacted** 79:16
**contained** 61:8
77:9
**contents** 37:12,14
**context** 12:15
45:15 46:15
65:2,9 80:24
81:4,6 90:21
97:6 98:20
108:19,22

109:21,24
114:10 117:12
125:25 132:25
**contextual** 68:7
**continuation** 39:4
**continue** 115:8
128:11
**continued** 13:6
44:11 49:15
65:20 66:13
69:19 97:9
107:20 110:5
128:21
**continues** 109:18
**control** 27:12
32:17 38:16
42:12 48:15
54:12 55:12
57:9,14 58:12
58:14 67:23
78:15 88:12,25
103:17 121:8
122:12 124:11
**controlled** 70:2
**conventional**
119:15
**conversant** 82:8
**conversing** 44:11
**convey** 18:12
22:16 55:4
66:15
**conveyed** 18:11
18:14 19:25
21:22 104:25
**conveying** 66:20
**cops** 68:24
**copy** 60:9 116:15
**copyright** 81:15
**copyrighted**
81:19
**corner** 39:10,15
**coroner** 91:19
**coroner's** 87:3
**correct** 7:22 8:24
10:17 14:11,12
16:20 23:18,25

26:12,14 27:4
27:14 32:5
35:19 36:20
40:13 50:1,2,5,6
51:22,24 52:2
55:13 61:23,24
62:25 63:1,3
67:2 71:16 73:9
73:14 74:15,16
74:22 76:4,18
76:19 77:12
78:5 79:24,25
80:10 84:8,13
84:14,18 85:3
88:12,19,20
89:9,10,13 90:2
94:3,11,14 95:2
95:4,17 99:20
99:21 100:3
111:24 115:16
121:14,18
122:22 127:10
127:14 128:13
128:14 132:12
133:3 136:22
141:1,9,11,12
**correctly** 34:17
90:5
**counsel** 53:3
**county** 2:18 20:17
20:18 33:24
108:3 131:3
134:11
**couple** 22:11
58:16
**course** 53:3 89:13
91:6 127:17
130:10
**Court** 1:12 60:2
**courtesy** 4:6
**cover** 12:16
**covering** 132:7
**covers** 133:11
**CPR** 124:9
**crash** 133:21
**create** 7:9 12:11

38:13 56:11
57:14 59:18
**created** 81:12
131:25
**CRIB** 131:17
**criminal** 12:14
21:11 32:14,24
33:8,13 34:4
35:10 47:11
50:10 69:18
81:23 84:1
91:15 102:10
103:4 104:3
108:8 114:25
123:1,6,8 125:4
128:9 131:15
132:10,14 137:7
**crisis** 93:20 94:9
94:25 95:16,19
95:22,25 96:6
**critical** 4:21 5:12
11:9 12:3,5,7
14:4,18,25
23:20 24:13,16
25:4,8 26:20
27:2 39:5
131:18,19
132:14,16
133:14,17 134:6
**crossed** 20:22
**cuffs** 66:21
**culpability** 24:6
**current** 12:20
119:7 134:1
**custodial** 39:8
103:2 139:15
**custodian** 40:2
41:5 43:6,13,14
44:24 46:24
**custody** 11:2,20
12:2 23:17 26:7
26:11 29:1,24
32:16 48:15
55:12 65:11
66:25 70:3 74:5
78:15 88:12,17

88:25 90:18,19
91:5 99:4
103:17 110:12
112:21 116:14
116:22 117:10
121:7 124:10
125:1 128:12,16
128:21 129:8,13
131:1,9 140:16
140:23
**cut** 38:8

_____

**D**

**D** 3:1
**dangerous** 38:8
**date** 54:20 58:5
66:1 75:11
83:20 84:1
138:25
**day** 5:6 95:3
108:2 109:3
110:5,23 116:9
**deal** 12:23 50:25
57:22 68:17
95:19
**dealing** 93:20
94:8
**death** 3:21 7:21
7:24 11:7,13
15:6,12,15,17
16:5,8,23 17:9
23:3,5 26:20
37:22 42:2,11
42:17 51:11
61:7 65:10
67:22 86:24
87:1,9,18 90:18
90:23 91:18
104:3 111:10
113:1 120:17,24
120:24 121:13
121:24,25 122:3
122:6,13,15,20
122:25 123:9
128:16,22 131:4
131:20,25 134:7

137:18 140:24
**deaths** 3:9 14:7,14
14:24 15:1
86:18 89:16,24
123:12
**decision** 7:3 51:9
92:17 98:16
123:21,24
**decisions** 70:14
70:22 74:20
**declined** 21:2
**deed** 26:12
**deeds** 26:22
**defecate** 32:3
**defeated** 28:2
32:11 51:20
54:22 106:14
115:20
**defecating** 53:18
**defecation** 31:20
105:12,20
**Defendants** 2:18
2:24
**definition** 9:15
**degree** 130:25
**degrees** 79:1
**delayed** 108:7
**delegate** 7:1 90:11
123:15
**delegated** 7:4
**delineation** 124:2
**delirium** 57:11
**demeanor** 28:13
**demise** 10:24 25:2
90:25
**demonstrated**
20:7
**deny** 52:25 61:7
**department** 3:20
5:21,25 8:23 9:8
11:3,21 12:2,24
14:6,15 15:13
16:20 18:19
19:1,19 23:18
26:8,11 27:14
29:24 31:22

32:17 37:23 39:9 48:8,8,13 48:17 49:22 50:1,9 68:23 69:10 72:11,18 74:6,21 81:9,13 82:3 85:9 88:14 96:21 118:24 119:12 122:20 123:19 124:11 125:2 128:22 130:1,19,25 131:2,3,14 138:21

**departmental** 61:23 62:22

**departments** 130:10

**department's** 17:24 116:12 118:19 129:7 137:17

**dependent** 86:12

**depending** 121:11 121:25

**depends** 17:7 30:13 56:22 57:1 73:16 119:14 123:6,23

**deposed** 5:18

**deposition** 3:6 4:10,16,19,20,25 5:15 51:18 52:6 60:9,11 97:24 100:21 102:19 107:18 127:6,17 135:23 141:16

**depositions** 45:15

**deputies** 118:13 130:7

**deputy** 7:9

**Derek** 86:24 87:14 93:17

**derived** 29:10

**describe** 10:5 67:21 111:9

**described** 38:21 55:24 110:2

**describing** 46:12

**deserved** 30:19

**designated** 130:15

**desperately** 28:20

**despite** 28:15 67:9

**detective** 17:4 37:23 138:5,12 138:18 139:16

**detectives** 16:19 37:8 39:9 40:3 42:23 118:13 137:19,24

**determination** 59:2

**determine** 14:9 23:24 33:11 47:11 50:11 90:24 106:6 118:9 119:9

**determined** 16:2 122:1

**develop** 9:24

**diagnosis** 8:4 49:17 73:17

**Diaz-Berg** 42:20 43:5 46:22

**die** 90:19,19

**died** 17:2 25:7 84:1,7 88:1 90:6 95:4 119:1

**dies** 89:5 91:5

**difference** 132:6

**different** 21:6 33:21 91:11 94:19 117:5 121:25 126:25 127:3,5 130:16 130:23

**differently** 14:10 20:25 24:3 96:14

**difficult** 69:25

**difficulty** 18:2 85:2,10 92:9

94:21 101:11 106:25 114:4

**dime** 43:12 44:3

**dime-size** 46:11 46:22

**direct** 54:7 68:12 112:20

**directly** 20:22 27:1 29:10 31:1 50:18 55:8 87:9 90:25 98:22 125:19

**director** 72:10

**disaggregate** 65:16 78:8 113:9 132:21

**disagree** 8:4 82:2

**disagreement** 108:14

**disagrees** 125:15

**discern** 127:2

**discharge** 73:9,13 76:2,7,21 77:8 78:3,19 79:21 82:11,13 83:21 98:12,16 99:2 99:11,14,20,22 99:23 106:7 113:22 114:1

**discharged** 13:5 52:2 53:16 54:4 73:20 75:2 96:12 109:17,21 120:25 128:12 128:15 136:21

**disciplinary** 92:16 123:5

**discipline** 26:4 27:7 28:18 30:22 31:3 65:8

**disciplined** 15:1 25:5,14 26:25 30:20 63:8 92:20

**disciplines** 133:9 133:13

**discovery** 81:9

**discretion** 22:1

**discussed** 20:1 52:6 83:8 100:20 105:20

**discussing** 7:16

**discussions** 131:10,13

**disease** 15:18

**dislodge** 86:1

**dispute** 37:14 41:4 138:2

**disputes** 36:2

**disputing** 21:6

**disregard** 112:22

**disrespect** 27:24

**disseminated** 6:25 60:13,15,17

**distinctly** 69:14

**distinguish** 66:12 67:23 69:18 70:3 83:7,11,17

**distress** 9:11 10:14,18 85:17 86:3 101:18

**district** 1:12,13 15:8,10 23:21

**Division** 23:22 123:1

**doctor** 104:13 115:18 119:13

**doctors** 20:23 50:8 67:13,14 70:12 71:6 74:17 98:5 115:10

**doctor's** 115:13

**document** 33:25 33:25 34:5 37:11 39:23 60:12 81:10 102:21 134:11 138:12

**documented** 36:2 45:23 103:1 134:15,20

136:16 137:24

**documents** 4:15 4:18 46:25 131:22 134:22 138:20

**doing** 24:15 55:22

**dollar** 44:3 46:22

**Dr** 2:4

**drop** 64:9

**dropped** 37:25 38:16,19 40:20 41:20 42:3 43:17 46:1,18 52:14 53:2 64:12,22 65:4 103:16 120:2

**dropping** 44:9

**drowsiness** 79:3,4 80:15,20 82:15 82:25 83:10

**drowsy** 80:25

**drug** 55:9,24 71:17,24 72:19 80:7

**dual** 123:3

**Dudek** 2:15

**dumb** 30:16,17,18 30:19

**dump** 68:22

**duties** 49:16 111:20

**duty** 11:15 49:2 88:21 108:1 109:3 110:5 127:23 128:11

---
**E**

**E** 2:1,1,16,20 3:1 3:13 140:6

**ear** 138:14

**earlier** 19:17 24:17 31:5 35:17 47:24 51:18 86:7 89:15 119:5,6 122:24 132:1

136:21
early 4:12
Eastern 1:13
education 74:23
  75:9,16 77:4
Edward 1:2 3:17
effect 30:5,6
  54:16 55:5 62:7
  63:15 66:23
  82:6 91:21 95:3
  95:5,11 100:17
  104:21 107:9
  115:13,21,23
  116:19
effects 33:16
effort 107:6 126:1
efforts 104:9
either 14:3 35:9
  46:17 48:16
  51:20 64:13
  120:23 122:1
  123:25
elected 133:6
elevate 50:21
elevated 13:9
elimination 54:12
else's 8:20 126:21
emergencies 6:13
  7:25 9:14
  122:22
emergency 9:1,9
  9:21 10:8,14,16
  10:19,20 17:23
  18:18,24 19:18
  19:20 21:10
  22:6 31:7,11,18
  32:12 33:12
  36:19 40:13
  43:21 48:1,3,10
  48:16,18,19,21
  49:4,24 50:3,5
  51:3,21 52:2,7
  52:19 54:19,24
  55:19 58:6,24
  67:3 68:1 69:17
  69:20 71:13

72:4 73:13,19
  74:14 76:7
  78:18 81:23
  82:18 83:21,25
  91:14 96:20
  98:2,11,21 99:8
  99:14 106:7
  107:11 108:15
  109:24 110:13
  114:9,24 116:23
  117:15 119:10
  120:19,19,25
  121:2,7,18
  124:6 125:3
  126:11,18,21,22
  127:1,7,9,11,13
  127:18,21 136:9
  136:21
emergent 18:17
employee 39:8
  96:21 139:16
encountered
  125:13
ended 66:19
enforcement 9:4
  137:3
engage 113:4
  129:11
ensure 90:4
entire 4:4 17:7
  68:21 122:20
  123:11
entirely 52:22
  69:1 133:20
entry 79:20
  134:15
environment 19:5
  101:3
epilepsy 109:16
equipped 50:11
  126:3
erect 31:14
escorted 112:12
  112:12 134:17
escorting 135:10
established 51:18

Estate 1:10
evaluate 109:8
  110:23 111:16
  116:21
evaluated 25:15
  64:1 107:5
evaluating 12:7
evaluation 13:7
  14:20 97:24
  111:21 125:12
  132:8
Evans 37:18
evasive 22:15
evening 16:18
  17:1 25:7 35:17
  49:2 62:6 74:4
  74:21 80:25
  88:2 90:6 96:18
  136:22
event 36:15 45:6
  49:22 51:2
  56:20 58:22
  64:12,15,19
  77:17 78:1,12
  78:20 79:16,21
  80:19 82:14
  92:8 93:1,22
  95:10 102:25
  104:24 119:9
  120:25 129:2,20
  137:4
events 3:21 16:7
  24:23 26:2
  31:23 32:2 44:1
  55:7 88:5
  100:11 134:14
  137:17 140:16
everybody 6:20
  54:3 129:15
everybody's
  63:25
evidence 15:24
  36:2 40:22 41:4
  45:21 51:19
  52:1,3,5 80:6
  96:5 112:23

134:19,23 135:2
  135:6 138:15,25
  139:13
evincing 68:25
evolved 86:5 95:7
exact 9:6 19:11,13
exactly 11:5,23
  14:16 16:9
  21:25 57:20
  75:7 93:7 95:7
  116:16 128:17
examination 3:2
  116:5
examine 122:5
  134:7
examined 12:10
examiner 16:22
  23:4 91:19
examiner's 16:4
  23:9 122:8
example 21:2
  27:5,13
excited 95:24
exercise 114:12
exhibit 3:5 4:8,10
  32:25 33:24
  34:7 35:3,12
  36:3 37:6 39:4
  45:23 59:22,24
  61:5,8 73:22
  74:23 75:6
  76:13 81:7
  86:14,17,19
  87:23 96:24,24
  99:18 115:24
  134:11 137:13
  137:15,20
exhibited 71:20
  80:20 83:9
exhibiting 78:16
  80:9,15 117:10
  136:8
exhibits 60:11
  86:21
exist 108:16
  131:24

existence 12:10
expect 19:22,24
  20:9,9,10 21:23
  27:8,18 29:19
  43:19 45:20
  48:14 49:25
  56:21 58:9,11
  59:1,16 63:5
  64:3,13 70:1,21
  73:18 75:24
  77:7,12 82:8,11
  89:14 96:6
  114:11 124:14
  137:3
expectation 9:11
  10:2 11:8 19:3
  21:13 27:10
  103:16 119:7
  125:10,23
expected 19:8,15
  21:9 47:25 59:7
  59:18 64:17
  71:20,22 115:11
  118:25 119:16
  119:19 124:9
expectorant 31:16
  46:13 66:21
expectorated
  66:21
expectorating
  31:15
expedite 13:12
  47:16
expedited 64:2
expeditiously
  59:21 109:22
experience 55:16
  57:18 71:3
  130:9,21
experiment 70:2
explanation
  110:20,21,25
  135:6
express 86:24
  87:13 88:23
  93:14

expressed 69:10
expression 38:5
extent 84:16
eye 19:6,11

**F**
face 31:16 37:25
  38:20 40:20
  41:15,20 42:4
  43:17 46:1
  64:10,12,22
  65:4
faced 26:3 47:16
  95:25
facility 8:13,21,23
  13:6,14 17:24
  18:3 20:20
  21:11 32:15,25
  33:8,14 34:4
  35:10 37:4
  47:11,18 50:10
  63:23 69:18
  81:4 91:15
  97:13,19 102:11
  103:4 104:3
  108:1,3,8
  124:12 125:4,16
  128:9 130:7
  131:15 135:10
  135:20 136:2
  137:7
facing 31:3 48:9
fact 13:13 28:15
  67:9 68:9,9 95:8
  113:9 134:20
facts 52:17
Fahrenheit 79:2
failed 13:12 26:23
  64:19 102:10
fair 3:24 4:2
  14:13 15:4,8
  67:14 90:1
fairly 69:8 122:7
faith 106:19
faking 20:4 59:15
  65:23,25 66:14

67:16,20,24
68:15 69:20
70:4,17 71:14
83:7 97:11,22
105:3
familiar 7:17,18
81:10,11
far 22:8 53:10
71:11 82:19
97:13 111:5
141:5
fashion 38:20
faster 126:2
fatal 133:21
fecal 40:6,11 41:2
41:6 44:22 45:9
47:1 102:13
103:1,12
feces 43:7 117:21
139:17
federal 126:19
feel 23:2 80:23
87:16 113:12
feeling 113:15
feet 38:10,17
fell 50:15
felt 24:22,23 29:2
33:15 112:13
fever 79:1
fighting 57:12,18
filed 46:9
filing 65:13
Fill 35:4
filled 35:12
film 38:12
films 25:15
final 62:4
find 25:22 41:5
68:19 75:6
115:25 126:17
findings 17:14,19
87:10
fine 65:6 96:3
finished 18:12
108:17
fire 48:7,8,17

49:25 119:12
138:20
first 10:15 11:1
23:24 34:1 48:5
48:23 50:15
55:4 57:21
58:11 70:24
71:3,11 72:23
78:18 85:20,23
98:18 99:5,7
111:9,12 119:15
124:14 135:15
135:17 138:18
fit 115:11
fitness 29:4
five 78:24 91:9,9
136:3 137:6,12
fix 26:19
flail 57:7
floor 18:6 38:17
40:6,11 41:7,18
42:25 43:11
44:2,9,23 46:18
56:1 58:19
63:11 64:23
84:12 101:23
102:13 103:1
Flynn 1:2 3:17,18
focus 21:8 58:1
87:15
folks 117:12,14
follow 82:12
83:20 97:19
119:1
followed 61:23
62:11 97:1,17
99:19 100:8
101:9 103:15
106:8 118:10,15
following 62:22
78:22 100:15
101:21 102:9
follow-up 25:3
75:15 99:5
113:14
force 134:1

forced 68:6
forget 126:22
forgive 129:10
form 23:10 27:15
28:7 35:21 36:7
36:21 38:2,23
40:14 41:9,21
42:5 43:22
44:25 45:13
46:5,7 47:2,13
49:6 53:19
54:25 56:9,23
58:10 59:4
62:12 63:16
64:24 68:2
69:22 72:5 74:7
76:9,24 77:19
83:2,12 84:19
85:11 87:5 88:3
89:1 90:7 92:3
92:14 100:19
101:13 102:15
103:5 105:14
107:16 111:3
112:6 115:1
117:25 119:2
121:19 125:5,9
128:1 136:10
137:11 138:6
139:8,19
former 84:20
forward 67:21
120:20 121:3,8
132:22
forwarded 103:3
found 41:18 46:25
64:5 139:22
foundation 32:18
36:8,22 38:3,24
40:16 41:22
42:6 43:23 46:6
53:20 55:1
56:10,24 68:3
74:8 77:20 83:3
83:13 84:20
85:12 101:14

102:16 107:3,16
136:24 137:9
138:7 139:9,20
four 44:5 69:4
73:6
fourth 96:24
Frank 134:16
Franklin 134:17
free 74:11
freedom 88:18
frequently 117:13
Froedtert's
126:21
front 28:3,16
29:14,23 44:1
62:7 63:12 68:7
86:21 87:23
98:15
full 103:20 107:23
111:9,12
fully 55:21 134:1
full-service 20:20
further 77:10
106:17 111:8
125:2 134:22
137:16 139:24
141:15
future 108:14
F-l-y-n-n 3:17

**G**
gain 57:13
Gende 2:2,3 3:3
3:11,14 5:9
22:13 23:15
26:5 27:22 29:6
29:21 30:4,21
32:22 35:25
36:14 37:5,17
38:18 39:2,4
39:18,21,23,24
40:19 41:13,25
42:18 44:14
45:5,18 46:19
47:7,23 49:19
53:23 55:10

56:14,19 57:25
59:11 60:10,16
60:19,23 61:3
61:19 62:20
64:8 65:17 69:7
70:6 72:8 74:2
74:10 76:12
77:1,22 83:5,15
84:25 85:7
86:15,20 87:11
88:10 89:4
90:14 92:7 93:2
97:4 101:8,19
102:7,24 103:9
105:18 107:8,21
109:10 111:6
112:16 115:5
118:7 119:8
121:23 124:16
124:24 126:8
128:7 132:15,18
136:6,13 137:2
137:14 138:4,11
139:12,24
**general** 114:17
119:24 124:25
125:10,23
**generally** 9:7 67:1
85:15 100:5
113:24,25 114:2
116:17 122:4
**generated** 138:5
**gesturing** 125:21
**getting** 5:23 13:12
52:9 55:23
63:19 69:5
127:3 136:1
**give** 8:10 22:22
**given** 20:12 22:24
30:22 58:7
59:15 66:17
68:8,8 71:19
73:7 75:15
78:13 79:5 86:7
104:13,19 106:2
127:15 140:20

**giving** 96:5
**Glynn** 2:9
**go** 7:10 13:7 22:12
23:12 27:17
28:9 29:18 30:2
30:12,16 32:20
35:23 36:9,23
38:4,25 40:17
41:11,23 42:7
43:24 45:2,16
47:3,14,21 49:7
53:21 54:2 55:3
56:17,25 59:6
60:23 61:14
62:14 63:18
65:1 68:4 69:24
71:7 72:7 76:10
77:21 83:14
84:22 85:5 87:7
89:2 90:9 92:5
92:15 97:17
100:4,22 101:15
102:3,17 103:7
103:19 104:12
105:16,23
106:22 107:4,19
109:5 111:4,7
111:15 112:8
115:3 116:9
118:3 119:4
121:21 124:17
125:8 128:4
132:24 135:25
136:25 137:10
137:23 138:8
139:10
**goal** 73:2
**gobs** 40:5,10,23
41:6 44:22 45:9
46:25 47:4
102:12,13,25
139:17
**God** 84:17
**goes** 34:13 138:12
**going** 3:18 4:9
11:10 12:6

16:21 26:15,20
26:21,22 28:4,6
33:23 35:9 39:3
50:18 53:3 54:2
54:9,10 56:11
57:6,9,20,22
59:23 60:6,21
61:9 62:8 63:13
63:20 73:22
78:14 86:16
87:15 91:21
96:7 97:5 98:13
100:17 104:25
113:4,18 117:9
119:25 120:20
121:8 124:16
132:22 137:15
**good** 3:15 106:19
128:23
**gotten** 24:9 81:1
104:4
**governing** 117:3,4
**gradually** 104:15
104:16,16 105:9
105:9,25 106:11
106:12
**great** 18:2
**greater** 19:22
**grieving** 95:23
**groggy** 115:12
**group** 17:5
**grow** 104:17
105:1,9
**growing** 106:12
**guess** 5:5 62:2
**guidance** 114:18
**guidelines** 22:16
**guides** 22:21
**guy** 13:16 109:14
**guys** 126:23

_____
**H**
**Hale** 134:13,15
136:16
**half** 5:11 44:2
62:3

**half-dollar** 43:11
**half-dollar-size**
46:10
**handcuffed**
134:18
**handcuffs** 66:20
**handing** 128:24
131:6
**handled** 17:8 76:2
**handling** 13:25
**handoff** 141:4,6
**hands** 38:10 39:23
**happen** 57:9 71:1
71:24 140:9
**happened** 11:4
13:22 24:9
46:16 48:11
55:8 65:4,10
89:6 113:23
131:8
**happens** 95:20
98:1
**happy** 116:7
**hard** 65:9 68:24
69:13
**harm** 19:5 59:19
120:15
**harming** 73:3,3
**hazard** 38:13
**hazy** 48:20
**head** 38:22 50:17
57:7 103:16
120:3
**health** 33:25
34:20 50:12
75:5,10 88:16
88:24 127:23
**heard** 71:10 84:15
91:20 92:1,9,10
**hearing** 58:17
**heart** 15:18 16:3,5
23:4 51:11
72:21 94:20
**height** 38:17
**Heimlich** 85:15
85:24

**help** 9:12 55:13
55:15 56:15,20
57:11,19 58:4,8
58:22 84:17
101:23 102:4
107:10,15
**hemorrhaging**
33:20
**hierarchy** 85:17
**high** 89:22
**higher** 18:21
19:16 21:16
22:4 42:23
**higher-ranking**
13:10
**hindsight** 73:5
**Hirschboeck** 2:15
**history** 35:16
**hit** 50:17
**hog** 38:5,6,7
**hog-tied** 37:24
**hog-tying** 38:12
38:13
**hold** 27:19,20
28:12 126:3
**holding** 37:4 56:1
106:11
**holdover** 119:6
**home** 76:15,17
**homicide** 17:10
**honestly** 141:4
**hope** 27:11 136:5
**hospital** 8:5 13:1
13:4,9,17,18,19
14:1 15:21,22
16:1 18:1,8
19:25 20:23
21:24 22:23
28:20,21 31:24
31:25 32:4,8
47:17 49:11
50:19,22 51:5
51:11,14 54:5,5
54:6 65:6,19
66:16,17 68:9
68:16,18 69:2,5

69:21 71:1,2,8
92:21 96:13
97:8 106:19,21
109:17,20
112:12 120:18
125:15 127:12
127:20 132:4
**hospital's** 8:6
21:7
**hour** 5:11 93:6
116:6
**hours** 11:7 92:25
93:3 108:2
109:3 110:5,23
115:9 134:15
**housed** 40:12
**humane** 55:11
**humanely** 28:24
**hurt** 57:22
**hyperventilating**
95:19,20,22,23
**hypothetical**
27:23 29:10,13
115:4

---

**I**

**idea** 47:4
**identical** 26:17
27:2 38:12
**identified** 4:8
24:23 25:23
59:22 86:14
137:13
**identifies** 46:10
75:11
**identify** 12:21
24:17 25:11
**ignore** 98:13
99:14,23,25
101:16 113:22
113:25 114:8,22
**ignored** 99:11
101:22
**ignoring** 98:11,14
99:2,20,22
101:10

**ill** 34:8
**im** 34:23 112:20
**immediate** 81:22
82:17 83:25
114:24
**immediately** 54:4
102:22
**impact** 64:6 78:8
**implement** 82:9
**Implicitly** 80:4
**important** 65:2
100:25 109:1
110:4 122:8
126:14 132:19
**impression** 89:23
95:9
**improper** 95:15
**inability** 31:13
58:7,25 96:2
**inaccurate** 134:25
**inadvertently**
120:15
**inappropriate**
26:17 27:1
62:17 101:5
**incident** 4:21,21
5:12 10:23 11:9
12:4,5,17,20
14:4,18,25 15:6
23:21 24:13
25:4,8,16 26:20
27:2 37:7 39:5
39:25 45:25
62:3 65:13
122:14 131:11
131:18,19
132:10,16,20,21
133:14 134:1,6
134:12 138:19
**incidents** 12:7,13
15:11 24:17
133:15,17
**include** 55:12
87:16 98:11
99:20,21 117:5
**included** 105:11

**including** 15:12
33:18
**incoherent** 66:15
105:25 106:12
**inconsistent** 25:24
51:16 72:24
98:24 116:1
**incorrect** 53:4
92:17 95:17
99:1 138:16
**increasingly**
66:15
**independent**
49:16 52:17
**indicate** 15:24
38:15 48:6
81:22 82:17
83:25 85:22
114:24 117:11
**indicated** 24:17
28:11 29:4
41:12 45:7 49:8
52:16 58:21
64:6 86:3 97:23
102:18 118:5
119:5 122:23
132:1
**indicates** 40:25
46:16 51:12
103:22
**indication** 91:1
**indications** 87:8
**individual** 12:1
38:21 46:13
48:17,18 50:3,9
53:10 57:10,23
71:8 73:18 76:5
88:17,23 91:5
92:25 105:24
116:21 118:21
119:12 120:17
121:6,17 123:18
135:18
**individuals** 11:20
90:19 103:17
116:14 117:2

133:6,12
**induce** 64:4
**influence** 63:2,6
109:15 126:5
**inform** 102:10
**information** 6:25
11:11 22:23
35:4 41:17 42:9
43:18 45:10,19
46:8,15 49:15
52:20 54:20
63:9 71:12
75:16,21,25
77:9 82:5 83:19
89:12 98:15
103:3 112:23
115:23 117:19
117:23 118:4,6
118:8,13 122:9
134:23 135:2,6
138:2,14
**informed** 72:16
97:21
**inhumane** 26:6,10
30:23 62:24
91:4 96:15
**initial** 25:18 52:23
110:8
**initially** 11:11
48:22 50:14
78:17 123:24
**injure** 57:15,16
102:5 119:25
120:6
**injured** 34:8
**injury** 42:14
64:17 79:1
**inmate** 9:22 11:7
19:16 22:7
32:16 34:13,23
34:24 37:9,22
43:16 48:15
49:23 64:12
73:12,14 85:9
89:5 103:11
114:3 121:25

123:21 124:6,10
**inmates** 6:13 7:25
10:9 55:11 64:9
**inmate's** 50:12
88:24
**input** 67:19 74:17
**inquired** 135:12
**inquiries** 44:16
**inquiring** 19:13
**inquiry** 43:19
99:10 123:7
**inside** 57:6
**Inspections**
133:10,11
**inspector** 7:6,7,9
**inspector's** 7:8
**instance** 6:12
25:22 128:8
**instances** 12:1
**instituted** 131:20
**instruction** 53:15
78:19 86:6
**instructions** 73:9
73:11,13,20
74:24 75:1,15
76:3,7,21 77:8
77:16 78:3
79:21 80:18
82:11,13 83:21
98:12,17 99:8
99:11,14,20,22
99:24 106:8
113:22 114:1
127:14,16
**intake** 34:20
110:8
**intent** 92:18
**intentionally**
64:13
**interesting** 126:13
**internal** 10:24
12:13 15:7,10
15:16 16:6,10
16:13,17,25
17:8,13,20
23:21 24:5

37:13 39:5
41:16 42:1,10
45:20 46:18
47:8 53:4 72:11
88:8 122:25
**intervene** 13:11
20:25 85:25
**interview** 3:7 37:8
37:18 39:7
59:25 60:3,16
61:6,11 87:13
90:17,22 93:12
93:13 103:19
106:17
**interviewed** 39:9
40:2
**interviews** 3:9
23:23 86:17,23
**intransigence**
28:21
**investigate** 15:6
**investigated**
25:25 122:25
**investigates** 15:9
**investigation** 3:10
10:25 12:4,13
15:7,17 16:7,11
16:15,18 17:1,2
17:8,11,12,21
23:2,8 24:5,22
25:3,9 32:1
38:14 39:6
41:16 42:1
45:20 47:9 64:5
65:11,15 88:8
89:7,8,11,13
90:11,13,16
101:7 122:9
123:3,4,4,5,8,11
123:16 137:17
**investigations**
12:14 24:15
**investigators**
89:14
**involuntary**
105:11

**involve** 133:9,15
**involved** 69:8
113:16 122:14
**in-custody** 3:9,21
7:21,24 11:7,12
14:7,14,24 15:1
15:11 61:7
86:18,24 89:16
89:24 121:24
122:13,15,25
123:9,12
**in-service** 6:11,19
7:11
**irrelevant** 101:4
**irritability** 79:3
80:12,20 82:15
82:25 83:9
**irritable** 81:5
**issue** 27:2 46:18
62:1 97:25
126:13,14 129:4
**issues** 24:18 25:12
50:21 109:20
111:25 132:22
134:9
**i.e** 51:3

___ **J** ___
**J** 2:2 39:7
**jail** 8:15 13:14
52:13,14 67:6,7
68:15,19 101:3
106:22 108:2,12
108:16,18
115:11
**James** 1:7 2:2
**Jeff** 1:4
**jeopardy** 65:8
**job** 7:8
**Join** 36:10 136:11
**Jones** 2:14 3:4
36:10 46:4,7
125:7,9 136:10
137:11 140:5,7
141:13
**Joseph** 1:4

**Judge** 2:9
**judgment** 70:19
72:16,17 98:14
114:12,18
**Judicial** 8:12,21
**jurisdiction** 127:3
**Justice** 21:11
32:14,25 33:8
33:13 34:4
35:10 47:11
50:10 69:18
91:15 102:10
103:4 104:3
108:8 125:4
128:9 131:15
137:7

___ **K** ___
**Katers** 2:8
**keep** 4:6 13:23
19:6 28:15 73:3
73:3 79:7 86:4,4
**keeping** 47:19
**kept** 19:10 117:2
**kicking** 18:7
**killing** 58:18,23
84:17 107:15
**Kimber** 137:25
**kind** 20:22 94:19
94:20 126:19
**knew** 21:21 22:3
22:24 68:24
73:6 80:8 91:18
110:8 137:25
**know** 5:11,24 6:2
7:1 8:20 9:2,3,3
9:5,17 11:15,17
11:20 12:9,24
13:6 14:19 16:9
16:9,11,24,25
17:10 18:13
19:11 22:13,19
22:21,25 24:7
25:5,13,25 26:1
26:15 30:22
31:2,17,19 32:9

33:7,10,19,20
37:2 38:5,6 40:1
40:25,25 41:24
44:7,13,15,18
47:6,15,15 48:4
48:22 50:13,14
50:24 51:25
52:4,10,17,25
53:22,25 54:2
54:13,15,18
55:6,7,15,18,20
55:22,23 57:8
57:17,20 58:5
60:10 63:21
64:3 65:12 66:8
66:20 68:16
69:9 70:4 71:1
73:16,21 74:9
75:19 76:1,17
76:20 77:14,23
77:25 78:6,8
80:2,2 81:12,19
84:11,15,24
86:4,10 87:1
89:6 91:8,11,13
93:3,4,9,9,10,11
95:5 96:11,14
96:14,17 103:8
105:12,17 106:8
106:9,16 108:7
108:21,22,23
109:20 110:13
110:15,25 112:4
112:9,18 116:3
116:3,24 117:3
117:16 118:5,18
120:2,5,8,11,16
120:22 121:5
122:19,19 123:2
123:7,24 124:18
125:14 126:14
127:15 128:17
128:17,19
129:17,20
133:12,21,25
135:16 137:21

138:24 139:21
141:4
**knowing** 39:1
**knowledge** 3:19
15:3 140:8,13
140:21 141:8,11
**known** 16:6 58:2
114:12

___ **L** ___
**lack** 29:4
**lacked** 83:19,23
**laid** 40:24 41:7
**Lang** 2:9
**lap** 68:22
**Lappen** 2:20 5:6
22:10 23:10
25:19 27:15
28:6 29:17 30:1
30:9,12 32:18
35:21 36:7,11
36:21 38:2,23
39:13,16,19
40:14 41:9,21
42:5 43:22
44:25 45:13
46:3,5 47:2,13
49:6 53:19
54:25 56:9,16
56:23 59:4 60:6
60:14,18 61:9
62:12 63:16
64:24 68:2
69:22 72:5
73:25 74:7 76:9
76:24 77:19
83:2,12 84:19
85:4,11 86:19
87:5 88:3 89:1
90:7 92:3,13
97:2 100:19
101:13 102:1,3
102:15 103:5
105:14 107:2,16
109:4 111:2
112:6 115:1

117:25 118:3
119:2 121:19
125:5,8 128:1,3
132:13,16
135:22 136:11
136:24 137:8
138:3,6 139:8
139:19
**lasting** 78:23
**law** 2:3 9:4 126:19
134:2 137:3
**lay** 41:18 44:23
45:9 102:14
117:20
**laying** 103:11
139:18,23
**lead** 27:5,12 63:3
**leap** 54:7
**leapt** 81:2
**learn** 12:12,15,22
**learned** 7:19,20
132:23
**leave** 22:1 74:2,11
86:20 128:25
**leaving** 40:10
**left** 21:9 31:6
40:21 42:4
43:15 46:1
54:19 138:13
**leg** 66:20 134:17
**legal** 129:16
**legless** 54:6
**legs** 78:15
**lemmings** 30:15
**lessons** 7:19,20
12:12,14
**letters** 77:5
**let's** 42:19 53:12
58:1 60:23 77:2
93:12 97:6
112:22 116:9,9
122:16 134:7
**level** 18:21 19:16
19:22 21:6,8,16
21:20 22:1,4
47:20 68:25

71:7 118:9,14
125:18
**levels** 117:6
**lieutenant** 25:23
30:24 62:5,16
63:12 76:6
77:15 82:21
91:20 92:18
100:16 101:5
112:19 113:5,7
113:9 133:4
**lieutenant's** 63:10
**life** 15:23
**lifesaving** 15:23
116:13
**line** 29:7 32:10
65:18
**lines** 125:24
**list** 75:15 79:18
80:23
**Listen** 62:15
**lit** 45:7
**literally** 18:6
**litigation** 100:6
**local** 59:25
**location** 139:23
**logical** 54:7
**long** 5:10 31:19
33:7 44:13
56:12 91:8,13
129:20 130:18
135:3,12 138:24
**longer** 78:23 79:7
88:18 93:5
**look** 24:16 25:16
26:21,21,22
37:16 61:17
87:12,19,22,25
126:23 132:21
**looked** 4:20 14:7
14:16 25:21
52:16 91:25
92:8
**looking** 15:11
38:14 61:20
65:9 93:13

111:8
**lookout** 121:17
**loose** 35:16 36:5
**Lopez** 134:16
135:8
**lose** 38:16 42:12
104:15,25
**losing** 78:14 105:8
106:11
**lost** 70:11 125:21
**lot** 68:13 86:7
89:19,20 91:11
130:12
**Lovell** 1:7
**lower** 39:10,15
**lump** 113:7
**lunch** 116:8

_____ **M** _____

**M** 3:13 140:6
**Magne** 60:1
**major** 134:12
**majority** 96:8
**making** 30:23
45:12 57:7 61:7
70:19 93:20
100:11 106:13
**malice** 92:17
**malicious** 42:12
**man** 71:1 103:23
**Management** 7:5
**maneuver** 85:15
85:24
**manner** 3:23 57:4
59:7 66:7
113:16
**marked** 4:9 33:24
37:6 39:4 59:23
61:5 73:22 81:7
86:16 96:24
134:10 137:15
**marks** 34:9
**mask** 18:10 34:15
35:15 36:5 37:1
134:19,23 135:4
135:9,13,19

136:8,15,18
137:5 138:13
**materials** 75:16
**matter** 40:6,11
41:2,6 44:22
45:9 47:1
102:13 103:1,12
123:1
**mean** 9:10 15:17
20:15,17 22:15
23:13 26:15
29:8 30:13,14
30:16 31:24
34:23 42:8
56:11,12 57:1,2
61:16 63:21,21
74:9 78:11
79:18 86:8 94:9
95:18 114:15
119:23 120:12
122:14 123:23
129:20 133:18
136:1
**meaning** 94:25
138:20
**means** 89:11
119:24
**meant** 27:23
34:25 67:4
94:10
**measures** 15:23
**media** 59:25
**medical** 6:13,14
7:24 8:4,14,14
9:1,9,12,14,21
10:8,14,19 13:1
13:14,16,19
16:4,22 18:17
20:2,3,4,8,13,19
20:24 21:3,4,22
21:24 22:18
23:3,9 29:2
36:19 40:13
43:21 44:8
47:18 48:1,3,6
48:16 49:4,16

49:24 50:4,7,20
51:3,8 55:6
57:24 59:10,13
63:24,25 64:1
65:5,21 66:13
66:24 67:11,15
67:19,20,25
68:22 69:20
70:2,4,8,25 71:4
72:4,13,23 73:7
73:23 74:4,12
75:20 77:2,17
78:3,20 79:13
79:15,24 80:19
80:21 81:3,23
82:14,18,22
83:4,8,25 85:17
91:19 94:12
95:25 96:22
97:10,21 100:9
101:1,18 104:4
104:10,18 105:4
106:20 107:1,6
107:11,24 108:1
108:18 109:2,2
109:7,11,19
110:6,7,9,16,24
114:9,24 115:9
116:13,18,22
117:16 119:10
119:18,19,21
120:18,19 121:1
121:2,18 122:7
122:21 123:22
123:25 124:4,8
124:9 125:2,16
125:19,20
135:20 136:2,8
137:6
**medically** 107:5
**medication** 50:24
66:17 75:15
104:14,19
115:13,22
**medications**
18:25 105:2,11

medicine 72:11
110:18 126:4
meet 4:24 5:10
10:3
meeting 5:4,13
meets 9:3
memo 3:8
memorized 43:25
memory 56:12
57:3 130:3
mental 33:19
57:24 121:11
mentioned 8:21
10:13 14:4
20:15 31:7
46:20 47:24
131:17
message 126:4
met 13:24
ME's 122:5
middle 131:8
million 89:21
Milwaukee 1:8
2:11,17,18,21,23
2:24 3:20 5:20
9:19 11:2,21
12:2 18:22
23:18 26:7,11
27:14 31:21
32:17 37:22
39:8 47:25
48:13 49:22
50:8 72:11 74:5
74:20 81:8,13
82:2 88:13
96:21 124:11
125:1 128:22
129:6,25 130:18
130:24 131:2,2
137:16
mind 13:12,24
28:15 94:23
112:14
minds 86:7
minutes 78:2,24
78:25 79:23

91:9,10 93:8
116:5 136:4
137:7,12
minute-by-min...
20:11
misconduct 15:15
23:25 25:1,14
87:2 93:1
133:16,19
misheard 8:22
misspoke 67:1
misstate 63:17
misstatements
67:2
misstates 45:14
84:20 135:23
mistaken 48:21
50:23
Mm-hmm 14:8
21:12 23:19
24:1 32:13 34:3
34:10,16 35:6
35:11,18 40:7
43:1 65:24 67:8
71:15 75:18
76:14 77:13
93:15 128:10
129:5 136:19
moment 60:20
112:22 124:16
129:16
monitor 127:23
128:6,11
morning 3:15
37:19
motivated 92:17
Mount 49:4 73:23
97:22 126:12
mouth 34:14
35:14 36:4,16
37:4
move 19:9 75:14
77:2 88:18
93:12 107:22
116:9 126:1
moved 45:4 52:14

102:20
moving 62:18
MPD 3:8,10 20:16
39:14 129:8
134:16
MPD's 113:2
MPD169 39:19
MPD170 39:19
MPD171 39:19
MPD6 39:16
multiple 135:24
municipalities
130:16,23

## N

N 1:7 2:1,22 3:1
3:13,13 140:6,6
name 3:15,16
126:22
narrative 34:13
35:3,7,12
natural 87:2,18
90:19,23 91:20
122:1
nature 25:1 84:17
nearing 116:4
necessarily 72:21
99:1 120:13
necessary 79:7
87:17 124:15
127:4
need 5:23,24
12:21 49:20
90:22 91:2
107:10 110:17
110:25 116:18
134:9
needed 7:3 21:3
29:2 63:24 65:5
83:8 125:2
132:2,4,5
needs 13:16 14:2
75:5
negative 111:1
negligent 100:2
122:2

negligently 99:23
never 100:5
new 6:16 7:10,17
14:4,25 24:15
25:4,9 83:4 86:6
night 62:25 84:7
111:22 112:1,25
113:23 140:10
140:17
Nobody's 12:18
nonmedical 51:6
51:13
nonresponsive
69:9
Nope 4:17
normal 19:21
21:16
normally 17:18
18:15
nose 138:13
notation 134:24
noted 61:12
notes 124:17
notice 3:6 4:10,14
notified 43:5
notion 94:24
104:14
notwithstanding
95:8
November 16:23
23:9 87:3
number 11:23
49:24 72:22
75:3 89:22,25
numbering 39:20
numbers 75:3
numerous 49:8
127:7
nurse 34:1,7
35:12 45:23
46:11,20 52:16
119:13 136:3
nurses 50:8,10
74:17 108:2,11
108:13 110:5,23
137:25

nurse's 102:21
109:12
N28 2:4

## O

O 3:13 140:6
object 27:15 28:6
30:9 35:21 36:7
36:21 38:2
44:25 45:13
46:3,4 47:13
49:6 53:4,19
60:7 61:9 62:12
89:1 117:25
128:1
objection 22:10
23:10 30:1
32:18 38:23
40:14 41:9,21
42:5 43:22 46:5
46:7 47:2 54:25
56:9,16,23 59:4
63:16 64:24
68:2 69:22 72:5
74:7 76:9,24
77:19 83:2,12
84:19 85:11
87:5 88:3 90:7
92:3,13 100:19
101:13 102:15
103:5 105:14
107:2,16 109:4
109:17 111:2
112:6 115:1
119:2 121:19
125:5,7,9
135:22 136:10
136:24 137:8,11
138:3,6 139:8
139:19
objections 28:9
29:17 61:14
85:4 102:1
obligated 80:24
obligation 12:16
128:11

Case 2:12-cv-00664-JPS   Filed 01/18/16   Page 50 of 61   Document 124-15

**observation** 18:11
18:13,21 19:16
19:21,22,23
20:11,12 21:8
21:16,20 22:5,8
22:18,20,22
38:1 40:21
43:16 44:17
45:12 46:2
47:20 72:12,19
72:20 106:6
117:2,6 118:9
118:14 121:11
**observations**
22:25 34:19
49:9 70:15,16
70:23 71:4,5
**observe** 20:10
70:14,22
**observed** 19:24
33:15 37:23
42:24 43:10
44:4 46:14 47:4
47:5 52:16
102:19 117:13
120:4
**observing** 42:20
43:14 44:12,21
45:8 79:6
**obviously** 7:12
11:9 25:16
29:10 48:10
50:17 52:4
64:15 65:7
85:23 86:6
94:22 109:18
**occasion** 12:3
**occasions** 5:2
127:7
**occur** 5:4 12:17
18:15 26:12
38:11 42:11
51:25 77:18
98:23 134:20
**occurred** 9:12
13:22 23:25

24:24 42:14
44:12 45:25
51:24 52:1,3,4,7
63:8 65:12,14
73:5 81:17,20
133:18 134:5
136:5 138:9
140:17
**occurrence** 92:1
**occurring** 9:21
33:5 58:21 72:3
78:22 80:25
114:9 141:4
**occurs** 12:20
78:21,22 133:20
**October** 60:4 62:2
87:22 94:2
**offer** 114:17
**offering** 140:22
141:1
**offhand** 9:3,18
122:19
**office** 2:3,21 7:5
11:18 15:9
108:3 122:5,8
129:14 140:14
140:16
**officer** 6:7,23
11:17 14:25
24:25 42:20
43:14 49:25
53:6 67:22 86:9
87:9 92:21
95:13,15 124:3
130:22 135:8
**officers** 5:17,21
6:3,8,16,18,21
6:25 7:14 8:4,7
8:11,25 9:25
10:2,7 12:25
13:5 15:14,19
18:2,9,22 19:15
19:24 21:9,21
24:7,11 25:5,13
28:19,23 30:18
31:17 33:10

36:24 43:19
44:20 45:6,11
47:9 48:1,2 49:2
49:23 53:16
54:15 55:25
56:7,21 57:8,9
58:4,9,18,23
59:2 61:22
62:18,21 63:12
64:4,14,19
65:19,22 66:10
67:2,10,18 68:5
69:15 70:1,13
70:13,22 71:11
71:25 72:20
73:19 74:25
75:22,24 76:20
77:8,14 78:10
81:6 82:8,12,22
83:19,23 84:12
84:16 85:2,16
86:7 88:22
92:10 93:20
94:8 95:11,18
96:18,25 97:7
97:10,12 98:2
99:11,13,18
100:7,15,24,25
101:9,21 102:8
103:23 104:1,9
104:13,24
107:13,15
109:18 111:16
111:22,25 112:3
112:11,20,25
113:6,7,10,15
117:1 118:22,25
119:9 120:16,23
121:5,16 122:11
122:14 127:22
128:3,8 130:5
132:11 134:16
135:18
**officer's** 94:23
123:19
**official** 137:3

**Oh** 5:11 35:9
60:18 93:24
**okay** 4:6,7 25:20
25:21 34:25
37:20 43:5
50:19 52:11
53:8,13,14
60:25 61:20
66:5 67:5 70:9
75:8 77:6 79:12
81:15 85:10
87:24 94:5
106:21 113:15
113:25 115:7
116:4 124:20
127:10 131:19
133:23 141:13
141:15
**old** 24:16
**once** 5:3 6:3 14:20
31:11 44:16
49:4 75:24 92:6
96:2 109:6
120:17 134:14
140:10
**ones** 21:4,5 73:7
103:21 112:13
116:1
**ongoing** 33:4
50:20 110:24
**online** 60:12
**open** 15:20 74:2
**operating** 22:7
72:12
**Operations** 7:12
**opined** 91:19
**opining** 23:4
**opinion** 16:13
22:4 42:3,8
46:24 51:7,13
62:9 71:7 95:14
128:20 129:7
132:6 140:22
141:2
**opinions** 20:23
53:24 69:10

71:4
**opportunity** 61:4
115:24
**opposed** 72:3
124:3
**opposite** 84:6
**optimum** 44:9
**option** 30:22
74:14
**order** 12:11
**orders** 114:17
**organization** 27:6
**origin** 38:22
40:23 115:20
**original** 3:11
**outcome** 14:10
24:4 111:10
127:5 134:3
**outcomes** 73:5
**outlet** 60:1
**outline** 134:13
**outside** 6:7 12:13
43:12 64:4
**overcome** 125:13
**overruled** 67:13
67:14
**Overwhelmingly**
96:2

---

**P**

**P** 2:1,1,8
**page** 3:2,5 39:22
42:19,24 43:3
61:20 65:18
75:14 76:13
77:2,4 81:24
87:12,23 93:12
96:24 97:6
100:4 103:20
104:12,12
105:23 106:18
107:22 111:7
115:8 137:20,24
138:18,19
**papers** 99:2
**paperwork** 18:12

25:10 47:16,21
64:2 69:6 108:9
108:17 126:2,7
**paradigm** 81:10
81:12,16,21
82:5,9,16 83:24
84:7 114:23
**paragraph** 100:5
103:20 106:18
107:23 111:9,12
**parallel** 123:5
**paramedics**
137:19
**parse** 26:15
**part** 14:17 15:16
16:17,25 18:7
23:20 24:7
53:15 65:14
81:13 82:13
87:15,16 88:7,8
88:21 89:8
90:17 94:15
99:7,17 103:19
110:8 111:8,20
114:19 120:13
129:24
**particular** 28:11
**particularly**
85:14 112:13
**parts** 129:25
**passed** 11:2,13,21
12:2 15:4 16:2
23:17 39:6 62:6
69:17 82:6
116:12,20
118:20 129:8
**patient** 10:24
73:12,17 74:23
75:9,16 77:4
92:22,23 127:1
132:3
**patients** 132:3
**pay** 121:5
**people** 9:5,12
26:10,22 37:13
42:12 57:10

68:21 72:16,23
88:11 92:16
94:20 95:19,25
105:5 114:11
116:18 117:9
121:10 129:14
129:15 133:9
**perceived** 19:10
**percentage** 68:13
**perform** 19:15
49:15
**performing** 117:1
**period** 10:15
47:19 52:3
133:18
**permanent** 13:14
**Perry** 1:10 11:1
14:17,19,23
15:4,25 16:2
17:1,21 18:13
18:23 20:7 21:9
21:15 23:4,17
25:6,14 31:9,17
31:19 32:3,11
33:7,12 34:1,8
34:19 35:10
36:3,15,25 37:9
37:23 39:6 40:4
40:10,20 41:7,7
42:3,21,25 43:9
43:15,17,20
44:15,21 45:6
45:25 46:21
47:9,12 49:3
51:20 52:7,18
53:6,11,16,18
54:17,19,23
55:15,18,25
56:6,15,20 58:4
58:6,14,17,22
59:3 60:3 62:6,8
62:23 63:10
64:22 66:11
67:24 69:16
71:13,18 72:3
73:24 74:3,11

74:14,24 75:1
75:11,14,19
76:1,8,15,17,23
77:16 78:1,6
79:22 80:3,9,15
80:18 82:6,14
82:23 84:1,7,15
85:1 88:1 90:5
91:8,17 92:9
95:4,11,12
96:10,19,22
97:19 99:6,13
102:11 103:4,15
104:2,9,25
105:12 106:5,10
106:24 107:9
108:7 109:1
110:4,22 112:25
115:19 116:12
116:20 117:19
118:14,20 119:1
120:2 126:10
127:8,8,18
128:9,12,21
129:7,23 130:2
130:7 131:1
136:17,20
137:25 138:13
139:1,5,14,18
140:10,15,23,23
**Perry's** 3:21 7:21
7:24 10:13
11:12 15:12
16:8 18:16 23:3
25:2 31:6 37:22
41:18 42:2 43:7
43:12 45:24
58:1 61:7 67:22
84:10 87:1
101:11,22 111:9
120:17,23,24
121:13 122:20
123:9 127:23
131:11,14,20
134:14 135:4,9
135:13 137:18

**person** 13:15 14:2
29:23 85:21
91:3 98:18
119:20
**personal** 140:8,13
140:20 141:8,11
**personally** 10:10
23:7,13 91:25
123:11
**personnel** 13:10
13:14,20 16:1
17:10 20:2,3,4,8
20:9,14,19,23,24
21:22 22:2,18
27:19 28:16
47:19 48:7 50:7
65:21 67:15
69:21 70:9
71:13,21 79:15
90:12 97:10
99:15 108:1,18
109:3 110:16
115:19 116:21
125:20 130:1
140:14
**pertains** 7:18
98:22
**Pewaukee** 2:5
**physical** 54:9
58:12 121:11
**picture** 33:19
**piece** 103:22
**place** 6:10 7:23
8:10 12:11 14:5
14:14 15:5,13
19:10 21:14
50:22,25 68:24
69:13 78:18
109:7 122:3,4
126:9,16,20
141:7
**placed** 19:5,9,21
69:12 73:2
106:6,11 119:24
120:3,5
**placing** 42:13

**Plaintiffs** 2:6,12
**Planning** 7:5
**please** 3:15,22 4:4
**point** 52:8 67:21
102:5 116:2
121:3 127:22
128:15 129:8
131:3
**police** 1:6 3:20
5:20,24,25 6:1
6:11 7:2,6 9:19
11:2,21 12:2,24
14:6,15 15:13
16:19 17:23
18:19,22 19:1
19:14,19 23:18
26:6,7,11 27:3,4
27:14,24 29:13
29:24 31:22
32:17 37:23
39:8 42:19
43:14 45:6
46:14 47:25
48:13 49:22
50:8 57:12,19
58:4 63:12
68:23 69:10
72:11,18 74:5
74:20 75:22,24
81:8,13 82:3,8
85:8 87:2,8
88:14,21 89:25
90:4,24 91:2
95:21 96:21
113:6 116:20
117:1 122:20
123:18,19 124:3
124:11 125:1
128:22 129:6,6
130:10,16,19,22
130:23,25 131:2
132:11 133:10
133:11 137:17
139:4
**policies** 3:19 5:21
6:6,8,12 9:8,24

10:1,3,6,11
12:22 21:14
25:10 27:13,19
48:4,5 49:21
62:10 64:7
99:19 100:15
101:10,21 102:9
103:14 112:5
113:2,11,21
114:3,7,11,22
117:3,4 118:15
134:2,8
policy 6:15,21 7:4
7:4,15,16,17,23
8:1,2,3,7,10,16
8:19,20 9:17
11:6 12:16,20
12:25 13:8,23
13:24 14:1,5,6
14:13,18,22,25
15:13 20:21
21:20 22:17,21
22:24 24:18
25:4,11 27:7
48:2,12,25 51:4
59:8,17 61:23
62:22 64:4,9,11
64:20 85:8 98:3
99:12 100:1
103:10 108:14
108:16 111:17
113:17 114:14
114:15,15,19,21
116:12,19,25
118:19,19,24,25
121:9 124:2
125:12 126:9
132:2,9,21
133:1,21,24
134:2
politically 27:4
poor 59:16
portion 84:11
posed 61:13
112:10
position 13:16

15:22 29:5
37:24 50:25
71:10 109:8
111:15 112:24
133:7
possibility 84:2,5
84:9
possible 8:13
59:21 69:15
109:23
potential 40:13
76:16,22 95:16
107:11 114:8
123:1,8 133:15
power 31:8 58:25
powerful 19:7
49:10,12 54:1
54:10,16 55:5
59:15
PowerPoint
131:25
PP 25:18
PPS 21:10,18
36:17 43:6
47:10 49:2
50:23 52:18
53:7,11 55:16
55:19 56:7 62:5
76:1 78:7 80:3
84:10 88:1 91:8
91:13,18 96:20
104:2,8 105:13
106:24 126:10
128:9
practical 11:9,13
23:16
practically 63:5
practice 20:19
21:17
prebook 134:17
prebooking 17:24
precautions 98:22
preceded 122:6
precisely 18:20
22:20 26:2 39:1
48:22 53:22

63:21 114:16
prefer 68:16
preparation 4:15
4:18,24
prepare 5:14
prepared 13:7
37:7 59:25 60:1
134:13
preparing 4:20
prescreening
33:25,25
prescribed 126:4
prescription
114:16
presence 85:3
110:1
present 37:9
40:23 41:3 51:2
99:3 115:12
presentation
102:22
presented 20:13
22:22 68:10
105:24 110:1
139:21
presenting 51:6
127:4
presents 119:13
press 99:18 116:7
presumably 94:17
110:17
presume 4:1
pretend 43:25
prevailed 15:21
prevent 14:10
prevented 24:3
44:20 45:8,11
90:3 96:17,20
126:10,16
133:25
prevents 124:3
126:19
previously 5:18
33:23 39:3 81:8
83:8 97:7
102:18 110:1,12

114:10 134:10
primarily 48:19
prior 7:23 9:1
12:7 14:14 16:6
18:17 23:3,8
32:24 33:8
40:20 45:14
49:20 51:21
52:1 58:6 60:9
60:11 67:22
87:2 104:3
109:15 120:23
122:4 128:16
131:3 135:23
140:19
priority 126:7
prison 28:5 62:9
63:14,20 91:23
97:12 100:18
101:3 136:2
prisoner 8:5,12
18:16 20:16
25:17,21 27:25
28:3 30:23
31:11,21 37:10
56:1 57:14
58:19 62:19
63:11,22 68:25
70:2 81:4 83:1
88:24 98:3,6,8
98:10 100:24
101:24 110:14
120:25 121:1,9
124:12 125:15
126:20 134:17
136:7,14 137:5
139:6,15
prisoners 13:25
21:17 26:7
42:13 88:12,13
125:1 132:3
probability 131:1
probably 24:12
116:15
problem 13:3
35:1 71:10

problems 57:24
57:24 66:12
109:7,11
procedure 6:15
11:6 15:5,13
21:17 25:4 48:2
48:12 59:17
62:22 64:9
99:13 100:1
103:10 114:21
124:2 126:9
procedures 3:20
5:22 6:6,8,12
9:8 21:14 22:7
24:10 27:13,19
49:21 62:10
64:20 97:1,17
97:18,25 98:8
98:10 99:19
100:8,16 101:10
101:22 102:9
103:15 113:3,21
114:3,7,11,22
116:13 118:16
process 12:5,12
13:6 14:18 17:6
17:16 90:17
108:4,10,12
129:1,13,19
131:5,6 140:14
141:6
processed 59:20
98:7 101:4
108:9 109:6
processes 24:10
processing 18:4
20:16 25:17,21
31:12,21 37:10
56:1 58:19
62:19 63:11,22
81:4 83:1 98:8
98:10 101:24
107:20 121:9
124:13 139:6,15
produced 53:5
professional

111:21
**professionally**
111:16
**profuse** 45:23
46:12,21
**profusely** 34:14
35:14 36:4,16
**profusion** 37:3
**prompt** 77:2,17
78:3,19 79:13
79:23 80:19,21
82:14,22 83:8
**prompted** 78:17
**prompting** 28:18
**proper** 95:15
**properly** 45:7
101:1,1
**proposition**
122:18
**proscription**
126:23
**prospectively**
24:15
**protocol** 7:10
98:4
**protocols** 18:10
97:1,18,18
**proves** 118:6
**provide** 10:6
16:23 60:11
75:25 87:14
**provided** 11:11
53:24 60:8
73:14 75:21
81:8 118:12
124:10
**provides** 16:14
**providing** 46:24
60:2 86:23
110:20 116:13
**publicly** 60:12,14
60:16
**Puechner** 39:7
40:2 41:5 44:24
46:24,25
**Puechner's**

139:16
**purpose** 8:15
132:19,20
**purposes** 32:10
53:12
**pursuant** 4:13 9:7
14:6 17:20
49:21 79:21
80:18 103:14
**pursuit** 133:20
**put** 7:12 8:10
12:11 14:5
18:10,16 21:17
22:7 31:1,15
37:25 38:15
43:17 44:16
49:13 56:7
64:23 66:21
78:14
**putting** 26:1
**p.m** 141:17

## Q

**quality** 30:13
**quarter** 43:4
89:21
**question** 3:22 4:1
4:4 15:20 16:19
19:14 23:11
27:16,23 28:7
31:18 35:22
36:8 40:15
41:10,22 43:23
45:1 49:2,20
53:20 55:1 59:5
59:16 62:13,25
63:17 64:25
66:2,8 67:18
69:9,23 70:1,5
70:21 74:4,8,21
77:20,23 80:4
83:3,20 85:20
87:6,13 88:4
90:6,8 92:4
95:17 96:19
99:12 105:15

107:2 108:21
110:3,19 111:5
111:23 112:1,7
112:9 113:1,13
113:23 117:22
118:1 119:3
120:8,21 121:20
126:15 128:23
129:21 135:22
137:22 140:11
**questioning** 29:7
32:10 53:13
60:7
**questions** 3:19
23:22 60:21
61:13 79:8
113:19 124:18
127:6 141:16
**quickly** 96:7
**quite** 31:1 141:3
**quote** 93:23 100:4
103:19 106:17
108:20
**quotes** 125:21

## R

**R** 2:1
**raise** 38:7
**ran** 95:21
**Rd** 2:10
**reach** 7:8
**reacted** 66:16
**reaction** 51:16
54:9
**read** 6:20 24:7
34:17 40:8 43:2
60:20 75:17
79:18 81:24
97:7 105:8
108:25 111:18
128:17 138:22
**reading** 45:3
**ready** 47:21
137:21
**realities** 22:19
23:1

**reality** 68:6 96:7
**really** 8:1,17 11:4
23:13 45:17
65:15 74:9
130:8
**reason** 13:2 31:15
37:14 38:7 41:4
61:16 76:25
87:19,25 103:2
123:14 138:2
**reasonable** 72:23
137:12
**reasonably**
119:20,22
**reasons** 69:1
127:2
**recall** 11:4,11,14
11:16 17:3,17
18:20 26:2 31:1
31:13,23 32:6
33:3 38:14
44:10 48:22
55:17 56:4,15
58:16,17 60:2
73:11 85:6
86:23 87:10
88:9 91:16
93:20 95:7
100:11 116:16
118:17 123:10
130:5,6,8
**receive** 18:14 22:8
75:19 76:6
79:23 123:21
137:6
**received** 21:15,19
53:16,17 59:1
63:25 71:12
75:1,25 77:8
122:12
**recite** 8:1
**recognize** 10:7
13:2 101:18
116:21
**recognizing** 8:25
**recollect** 58:20,20

84:23 88:5,6
**recollection** 25:15
37:2 42:9,16
52:9,10,12,22
56:5 130:4
**recommendation**
132:1,8
**recommended**
78:2
**reconciled** 71:25
**record** 3:16 4:6
29:11 34:17
37:17 60:6,23
60:25 61:1,2
97:7 105:8
108:25 124:17
124:21,22,23
129:3 140:2,3,4
141:17
**records** 73:23
**recovered** 57:3
130:3
**refer** 9:17 79:5
**referred** 127:7
**referring** 8:22
10:6,16 34:7
81:21 93:17
112:11,20
115:25
**refers** 79:19
**reflect** 61:12
**reflected** 99:18
**reflection** 66:1,3
**reflects** 136:17
**refusal** 21:7 45:24
47:17
**refused** 35:10
69:5
**refuses** 98:2
**regard** 6:17 23:7
62:10 107:14
116:17 134:24
**regarding** 3:9,19
6:13 25:5 31:5
47:25 53:24
86:18 90:17

**regards** 92:12
**registered** 136:3
**reinvestigate**
   90:13 132:20
**rejected** 35:5,13
   69:2 71:9 101:2
   126:17 127:18
   128:18 129:19
   132:5
**rejecting** 127:8
   140:15
**related** 27:1 42:10
   42:16 68:14
   77:16 131:22
**relates** 6:13 7:24
   10:13 14:24
   18:22 23:3 25:6
   25:14 36:3
   40:13 42:2
   48:13 58:6 60:3
   61:6 62:23 72:4
   73:24 76:8,16
   76:22 90:5
   95:16 99:7
   101:10 116:25
   122:13 123:8
   134:13
**relation** 7:21
**relative** 9:14 15:1
   37:8 46:20 60:7
   134:11
**release** 54:24
   55:19 58:24
   91:13
**released** 17:22
   18:23 31:10
   32:4,8,12 33:12
   51:21 52:19
   66:11,24 69:16
   73:13 76:17
   98:11 106:21
   120:18 121:6
   127:13,15
**relevant** 25:10
   64:7 100:23
**relieved** 127:22

128:5
**remain** 129:8
**remained** 78:1
   79:22 97:20
   139:6
**remaining** 78:24
**remains** 121:7
**remark** 25:23
**remember** 8:18
   11:5,19 25:18
   60:5 88:7 93:4,7
**removed** 40:4,24
   41:8,19 43:9
   44:4,21 45:6
   102:12 138:12
**renewing** 21:5
**Repeat** 120:21
**rephrase** 3:23
**report** 4:21 5:13
   15:19 16:4,12
   16:13 17:13,18
   23:9 24:8 37:7
   37:15,21 39:21
   39:25 42:10
   44:5,11 45:3
   46:9,11,20,22,23
   52:15 64:10,14
   64:18,19 65:13
   87:3 103:10
   118:12 134:12
   135:15,18
   138:19 139:16
**reported** 34:8
   37:3,12 44:23
   50:16 52:13
   54:3 64:16 65:7
   89:9 106:20
**REPORTER**
   60:25 61:2
   124:21,23 140:2
   140:4 141:15
**reporting** 37:1
   60:2
**reports** 7:5,6 46:9
   53:5 61:22 62:1
   62:4 102:19

109:13 138:25
**represent** 58:3
   74:24
**representations**
   61:17 105:6
**represented** 33:21
**requesting** 96:21
   124:4
**requests** 81:9
**require** 113:18
**required** 4:14
   18:25 49:14
   67:12 109:11
   114:18 117:13
   117:15
**requires** 82:13
   119:10
**requiring** 4:11
   10:19 19:18
**resistance** 81:22
   82:17 83:25
   114:23
**resistant** 55:21
   80:10
**resisting** 82:24
**resolve** 125:18
**resolved** 8:12
**respect** 140:9
**respond** 48:2
   56:21 58:9 59:7
   90:12 109:18
   111:16 114:3
   122:21
**responded** 66:22
   112:4 113:1
**responding** 49:17
   62:16 85:16
**response** 47:25
   81:9 95:15,18
   108:23 111:1
   118:22
**responses** 72:22
**responsibilities**
   6:17 25:25
   111:21
**responsibility**

17:13 88:21
   123:15,20,20
   128:5
**responsible** 5:20
   6:24 42:20 69:3
**responsive** 44:15
   55:13 69:25
**rest** 8:17
**restrained** 63:23
**restraints** 134:18
**result** 18:16,25
   19:3 25:3 38:21
   41:19 53:1,17
   54:16 68:12
   105:10 122:1
**resulted** 42:15
   45:24 64:22
**resulting** 26:20
   90:25 134:7
**results** 16:14 89:9
   90:12 109:19
   122:7
**retired** 26:4 101:6
**retirement** 28:18
**retiring** 30:24
**retrained** 122:15
   122:21
**return** 19:19
   84:10
**returned** 18:18
   21:10 22:5
   31:17,20 47:10
   49:4 96:19
   101:3 104:2,8
   126:10
**returning** 105:13
**reveal** 95:10
**review** 4:18,21
   12:5 14:4,15,18
   14:23,25 15:2
   15:14 24:13
   25:8,9,11 42:1
   47:8 56:3,18
   58:13 61:4,12
   90:18 115:24
   121:24 122:3

123:11,17
   124:17 131:18
   131:19 132:10
   132:16 133:14
   138:24
**reviewed** 4:15
   32:1 61:22 62:1
   72:9 91:17
   109:13
**reviewing** 5:12
   22:23 37:21
   55:16 133:15,17
**re-application**
   110:17
**Richard** 134:16
**right** 5:12 35:7
   36:1 43:9 51:8
   55:21 65:16
   67:10,16,17
   68:23 71:21
   72:12 74:21
   76:20 78:4
   79:14 80:4,13
   80:22 81:24
   89:6,15,17,19
   90:3 92:18
   94:25 96:9
   100:6 109:20
   111:23 112:14
   113:4,5,20
   114:17 118:2,2
   129:10 130:21
**right-hand** 39:10
   39:15
**rigid** 114:16
**risk** 100:10
   117:11,11
**robbery** 28:25
   29:1
**Robbins** 30:24
   62:5 76:6 77:15
   82:21 112:19
**Robbins's** 62:16
**rock** 68:24 69:13
**roll-call** 6:9 7:13
**roll-calls** 6:20

**room** 10:16,20
17:23 18:18,24
19:18,20 21:10
22:6 31:7,11,18
32:12 33:12
48:18,19,21
50:3 51:21 52:2
52:8,19 54:19
54:24 55:19
58:6,25 67:3
69:17 71:13
73:13,19 74:15
76:7 78:18
83:21 91:14
96:20 98:2,11
99:8,14 106:7
108:15 109:24
110:13 117:15
120:25 121:7
125:3 126:11,18
126:21,22 127:1
127:8,9,11,13,18
127:21 136:21
**Roundy** 2:4
**routinely** 107:20
**rule** 119:24
**ruled** 115:10
**rules** 126:18
**ruling** 90:22
122:4
**run** 138:20

_____
**S**
**S** 2:1 25:19,20
**safety** 88:16,24
127:23
**Salinsky** 134:16
135:8
**satisfied** 24:8,21
**satisfy** 23:7,14
**save** 15:23
**saw** 40:5 44:6
49:9 56:13 80:6
88:7 125:12
129:25 136:3
**saying** 21:19

28:23 43:16
95:8 106:21
113:22
**says** 14:1 30:16
34:18,23 35:24
53:6 75:4,9,10
75:14 92:22
116:16
**scene** 130:4,5
**schedule** 4:13
**scintilla** 15:24
**screening** 34:20
**Script** 60:2
**sealed** 3:11
**second** 87:12
100:5 106:18
110:10 137:20
137:24 138:20
**secondly** 24:2
71:18 99:10
**Section** 20:16
25:21 31:12,21
37:10 56:2
58:19 63:11
83:1 101:24
121:9 124:13
139:7,15
**secure** 19:10
**sedated** 44:19
**sedative** 18:1,7
19:4,7,17 20:5
21:24 33:16
49:11,12 51:17
53:17 54:1,8,10
54:16 55:6 58:7
59:15 66:24
68:13 70:17
71:19 72:2
73:11 78:9,13
79:5 81:1 98:25
104:20 106:2
109:15,19 126:5
127:15
**sedatives** 59:1
**see** 8:5 12:21
13:11 34:8 35:7

37:1,21 39:21
40:8 43:2 44:1
72:24 75:11,17
77:3 81:23 91:2
111:10,18
118:12 119:19
129:25 134:8
138:22
**seeing** 58:21
135:17
**seek** 51:9 74:11
104:11
**seeking** 29:12
**seen** 16:13 34:5
35:2 37:10
38:11 39:25
42:16 58:15
61:21 62:4
78:17 88:6
129:23,24
135:15
**seeping** 134:22
135:3,9,13,19
136:7,14,18
137:5
**seizure** 10:21
50:15 51:4
52:10,24 70:25
72:21 76:16,22
78:2,16,20,23,25
79:1,17,23 80:7
98:22,24 99:3
106:20 109:23
110:13,18
117:20 126:4
**seizures** 19:17
35:16 36:6
78:22,24 79:6
79:19 109:15,21
109:25 110:9,10
110:14,17
117:14 126:3
**self** 106:19
**self-admitted**
109:16
**self-evident** 62:15

**self-reported**
106:24 110:11
**self-reporting**
107:10
**semantics** 63:19
113:5 129:11
**sense** 5:23 51:15
104:17 105:2,10
106:13 127:3
**sent** 3:11 64:1
138:21
**sentence** 93:23
105:7
**separate** 7:7 41:2
46:9 65:13
**separately** 38:11
**September** 9:1
15:5 21:15
37:19
**sequence** 19:12,13
24:23 26:2
31:23 32:2,7
39:20 55:7
57:21 86:11
87:10 88:5
121:15 134:14
**Sergeant** 134:13
134:15 136:16
**series** 3:18 127:6
**serious** 81:3
**served** 13:8
**set** 4:11 9:24,25
20:12 27:6 58:2
**settle** 96:3
**seven-zero** 39:17
**shackled** 38:6
**shackling** 38:10
38:10
**shape** 58:10
**Shepherd** 86:23
87:12 93:13
**Sheriff** 131:10
**sheriff's** 8:22
108:3 129:14,15
130:1,6 131:3
131:14 140:14

140:16
**shield** 31:16 46:13
66:22
**shift** 81:10,12,16
81:19,21 82:5,9
82:16 83:24
84:7 114:23
**shock** 85:19,23
119:17
**shocking** 54:11
**shoes** 70:18
**shop** 126:25
**shopping** 126:18
**short** 116:8
129:21
**shortly** 37:21 92:1
138:9
**shortness** 96:1
**show** 4:9 33:23
37:6 39:3 59:23
73:22 81:7
86:16 134:10
137:15
**showed** 82:25
**shows** 82:15,16
90:24
**sick** 13:25
**side** 54:16 123:6
**significant** 26:4
28:17 31:3
89:25 96:6
**significantly** 66:6
**signs** 80:9,15
**simple** 68:6
**simply** 7:13 13:13
66:22 68:17
79:19 88:6
93:18
**Sinai** 35:17 49:5
73:24 97:22
126:12
**single** 53:6 98:21
123:2
**sir** 4:9,16,22 5:10
34:22 37:6 39:3
73:15 106:15

111:13 115:6
116:11 127:6
130:11 134:10
sit 10:5 18:5 36:1
    40:22 41:5
    45:10,22 51:19
    52:5 56:5 63:9
    80:1 117:19
    128:20 134:19
    134:24 135:2,7
    138:14
site 6:10
sites 7:14
sitting 31:19
    54:14
situation 18:17
    27:25 30:17
    57:2,3 58:1,11
    68:5 98:20
six 130:20,24
Six-zero 39:17,18
size 43:11,12 44:2
    44:3
sleep 20:6 54:2,9
    54:10 78:14
    104:14,20
sleeping 54:24
    55:5
small 11:23
smell 43:7
somebody 9:10
    22:5 28:12,25
    29:14 32:23
    38:19 50:13,20
    50:24 57:4,18
    68:11,14 70:16
    72:20 73:7
    80:25 81:5
    85:17 94:17
    96:5 98:18,25
    110:11,16
    119:18 126:2,3
    126:21
someplace 20:24
somewhat 57:11
soon 8:13 11:8,12

23:16 110:15
sooner 15:23
sorry 23:19 29:25
    34:25 84:3 94:5
    102:12 109:2
    120:21 130:6,9
    132:24
sort 33:20 46:8,17
    141:5
sought 101:1,17
    102:4 107:24
sound 89:17,19,20
sounds 96:15
    107:12 110:19
source 32:24
    33:11,18 34:15
    35:14 36:4,17
sources 89:12
speaking 28:19
    94:17 114:2
specific 6:23 17:4
    17:17 77:16
    79:8,9,11
    118:14 123:18
specifically 132:2
speculation 28:8
    30:10 32:19
    38:24 40:15
    46:6 55:2 72:6
    92:14 103:6
    125:6 137:9
spell 3:16
spend 115:9
spent 28:19 47:19
spit 18:9,10 33:7
    34:15 35:15
    36:5 37:1 40:5
    40:10 41:1,6
    44:22 45:9
    46:25 102:13,25
    103:11 117:21
    134:18,23 135:4
    135:9,13,19
    136:8,15,18
    137:5 138:13
    139:17

spittle 33:3,6,22
splut 102:12
spoke 5:17 137:19
spots 46:23
St 1:7 2:16
staff 8:14,14 27:8
    28:3 30:6,14
    50:8,11,23
    67:19,20 103:2
    108:15 110:23
    133:2
stain 42:24 43:10
    43:12 44:2,3
    46:10,11
stains 47:5
stamp 39:10,14
    39:15
stand 18:6 31:14
    138:1
standard 20:19
    22:6 98:8,10
    122:7 133:24
standards 9:4,24
    9:25 10:4 13:25
standing 54:13
    106:5,10,14
standpoint 134:4
    134:6
standpoints 134:8
start 85:18 97:6
    119:16 122:16
    134:4,5
started 12:5 17:1
    24:14
Starting 65:18
state 3:15 9:25
    10:1,3 13:24,25
    28:2 42:23
    61:20 87:17
    103:19 104:12
    105:7,23 106:17
    111:15 115:8
    119:7
stated 40:3 43:5
    62:6 82:18
statement 61:25

63:17 64:3
67:15 87:20
90:16 93:21,25
94:2 97:13
99:17 100:12,14
100:23 101:21
103:24 104:21
105:21 106:3,22
107:23 108:5,19
109:1 111:8
112:11,19,22
115:14,17
127:19 141:1
statements 16:18
    61:8,17 66:1
    116:1
states 1:12 35:3
    79:15 81:21
status 50:12
stay 42:19
stayed 128:24
    129:14
step 107:25 108:4
    108:10,12,17
    114:16
steps 5:14
step-by 114:15
stone 28:21
stood 104:20
stop 6:4 85:18,23
    119:16
strike 31:18
    114:21 116:11
    117:18 123:19
    124:8 136:15
stroke 72:21
strong 18:1 19:17
    20:5 53:17 58:7
    59:1 70:17
    71:17,19 72:2
    98:25 106:2
    114:17
struggling 81:22
    82:17,23 83:24
    114:23
subject 28:9,17

61:14 66:16
86:13 140:20,21
141:9
subjective 9:10
    51:6,9,13 70:19
submit 53:3
subordinate 28:3
    30:6,13 49:23
subordinates
    29:15,20,23
    48:14 62:7 63:3
    63:6,13,15
    88:23
subsequent 10:23
    24:12 52:14
    54:8 55:23
    76:16 79:16
    109:7,25 122:3
    125:12
subsequently 6:15
    12:10 24:20
    25:13 26:4
    68:19 91:5
    101:6 104:6
    105:13 108:13
    125:17 132:8
suffer 6:14 10:18
    36:24 66:13
    69:19 92:25
    110:6 117:20
    120:19 121:2
suffered 10:14
    17:21 19:17
    23:4 53:1 59:3
    105:13 117:14
    139:14
suffering 43:20
    47:12 48:15
    49:3,24 67:11
    67:24 116:22
    121:17 139:1,5
suggest 9:21
    36:19 40:12
    45:11 81:16
    114:9 135:7
    138:15

| | | | |
|---|---|---|---|
| suggested 10:18 | **T** | technically 131:7 | 25:19 28:11,24 |
| suggesting 139:13 | | telephone 11:17 | 29:2,7 31:25 |
| suicide 117:11 | **T** 3:13 140:6 | tell 3:22 6:14 7:23 | 32:7 41:12 48:9 |
| sum 112:18 | take 7:2 15:22 | 8:2,17 10:12 | 48:20 52:3,22 |
| summoning 21:4 | 20:17 48:17,18 | 17:5,16 29:22 | 65:2,22,25 67:1 |
| supervisor 28:13 | 50:18 60:20 | 47:8 69:14 | 68:5 69:22 |
| 30:15,18 62:5 | 73:19 78:18 | 71:25 77:23 | 70:24 71:6,22 |
| 62:24 76:1,6 | 79:2 91:7 92:16 | 80:2 82:21 83:6 | 76:11 83:19,23 |
| 77:10 82:12,21 | 105:19 107:25 | 93:9 96:17 98:5 | 84:2,4 97:11 |
| 96:18 124:4 | 108:4,11 116:5 | 98:17 105:3 | 98:13,14 101:16 |
| 134:12 137:4 | 116:6,8 124:16 | 106:5,10 107:13 | 111:12 116:4,15 |
| supervisors 63:2 | 125:15 | 115:17 | 117:16 123:23 |
| 63:6 | taken 10:10,15 | telling 71:11 | 137:12 |
| supervisory 8:10 | 16:18 32:14 | 93:10 110:3 | thinking 65:12 |
| 125:18 133:2 | 35:16 44:6 50:9 | tells 37:22 | 66:9 |
| supervisor's | 53:9 61:4 74:15 | temperature 79:2 | third 103:20 |
| 123:20 | 88:17 91:23 | ten 11:24,24,25 | 107:22 |
| supplement 3:10 | 92:2,11 103:4 | 89:16,20,24 | thorough 23:2,8 |
| 137:16 | 106:25 108:7 | terms 21:23 24:9 | 45:21 89:7,8,11 |
| supposed 18:14 | 110:22 125:3 | testified 15:2 31:5 | thought 20:4 |
| sure 6:24 16:10 | 126:11 137:18 | 71:18 74:25 | 21:24 34:25 |
| 23:13 52:22 | takes 6:10 122:3 | testimony 45:14 | 65:19 72:14 |
| 68:13 88:22 | take-off 94:19 | 47:24 53:9 72:1 | 86:11 95:2 97:8 |
| 97:4 119:22 | talk 85:10,22 | 80:5 84:21 | 100:9 101:17 |
| 121:15 137:23 | 93:18 94:7,21 | 135:23 140:19 | 113:10 125:17 |
| surprise 31:2 | 94:25 95:14 | thank 75:4 86:22 | 132:4 |
| surprised 44:18 | 100:5 103:21 | 111:7 124:18 | threat 57:21 |
| surround 58:5 | talked 125:14 | 132:15,18 140:1 | 59:19 101:6 |
| surrounded 56:7 | talking 30:24 | 141:13 | three 24:12 50:7 |
| 58:18 63:11 | 44:11 62:17 | theirs 129:16 | tied 38:5,7,7 |
| 101:23 | 64:21 92:11 | themself 98:19 | time 10:15 11:15 |
| surrounding 3:21 | 112:14 113:25 | theoretically | 21:21 22:3 24:8 |
| 15:6,11 16:7 | 114:4 118:23 | 20:25 63:4,5 | 28:19 42:12,12 |
| 84:12 137:18 | talks 76:15 | 68:14 | 44:13 46:14 |
| Susan 2:20 | tape 56:3,13,15 | they'd 24:22 59:9 | 47:19 50:15 |
| suspect 19:10 | 58:13,15,21 | 67:13 78:13 | 56:12 61:25 |
| 36:24 77:11 | 84:15 87:19 | thing 30:17,18,19 | 62:4 66:4,9 69:4 |
| 91:1 123:25 | 88:6,7 90:24 | 38:8 65:3 | 70:24 82:6 |
| suspicious 134:5 | 91:21 93:16,17 | 112:15 117:12 | 87:21 95:20 |
| sustained 52:23 | 129:23 | things 28:22 | 96:8 102:5 |
| symptoms 51:16 | tapes 25:17,22 | 30:16 31:13 | 108:15 110:10 |
| 66:14 67:24 | 55:16 61:21 | 45:4 51:5 57:8 | 116:2,12,20 |
| system 14:20 | 62:1 87:25 | 80:23 83:18 | 118:20 119:1 |
| 20:18 54:12 | 90:18 91:8,11 | 84:16,17,23 | 120:7,17,24 |
| 109:6 | 91:17 92:1,8 | 85:15 | 125:23,25 |
| S.C 2:3,9,15 | 95:10 | think 12:6,15 14:2 | 126:14 127:22 |
| | tasked 133:14,17 | | |

| | |
|---|---|
| 128:15,19,22 | tone 27:6 |
| 131:24 135:15 | top 27:11 43:4 |
| 135:17 139:25 | 75:10 77:3 |
| 140:24 | 81:24 104:12 |
| timelines 16:10 | tragic 24:4 |
| 93:7 | train 9:25 |
| times 12:19 22:11 | trained 8:25 10:2 |
| 49:8 117:9 | 99:23,25 119:11 |
| today 4:11 5:15 | 120:16,23 121:4 |
| 10:5 15:2 36:1 | 121:5 |
| 40:22 41:5 | training 5:21 6:4 |
| 45:10,22 51:19 | 6:9,11,19 7:9,13 |
| 52:5 56:5 61:18 | 9:3,5,6 10:7,10 |
| 63:9 71:18 80:1 | 24:18 25:11 |
| 112:4,24 117:19 | 27:7 47:24 48:5 |
| 128:20 134:19 | 59:9 68:22 |
| 134:24 135:3,7 | 72:23,24 81:13 |
| 138:15 | 81:20 82:2 |
| told 11:5 19:25 | |
| 20:3,8 49:11,18 | |
| 51:7 53:22 54:1 | |
| 59:10,13 69:12 | |
| 70:8,10,20 71:6 | |
| 72:25 78:13 | |
| 89:15 92:22 | |
| 95:11 104:5,13 | |
| 104:18 106:1 | |
| 137:25 | |

83:20,23 85:8
85:13,14 86:5,7
86:8,9 94:12,15
94:20 95:3,5,6
111:17 112:5
113:2 119:6,7
122:12 132:22
133:11 134:3,8
**trainings** 7:11
12:23 113:2
**tranquilizer**
138:10
**transcript** 3:7,11
59:24 60:1,8,14
60:21 61:11
74:1
**transfer** 131:9
**transferring**
129:13
**transparent**
100:10
**transpired** 64:15
**transport** 103:17
119:21 125:19
**transportation**
107:25 108:10
**transported** 21:11
48:20,24 91:14
103:12 125:4
128:8 135:18
**transporting**
74:25 77:7,14
82:12,22 99:13
115:18 135:10
**treat** 63:14,20
74:18 85:19,22
91:22 100:18
119:17
**treated** 28:5 62:8
63:22 96:13
127:13,21
**treatment** 26:6,10
26:16,16 50:4
55:11 63:24,25
64:1 73:19 91:4
103:23 104:1,5

104:7,10,11
123:25 131:14
**treatments** 26:21
86:12
**tried** 72:13 100:8
103:23 112:14
**trouble** 95:13
137:25
**true** 24:4 27:5,9
29:12 38:1,22
53:12 63:6,7
74:6,13,18,19
75:22,23 76:3
77:10 80:11,16
80:17 87:20
88:14,15 100:2
103:24 104:10
104:21 106:22
108:5,6 109:1
112:1,5 115:14
118:10,11
127:19 136:9
139:11,18
**truth** 128:19
**try** 8:9 13:10 14:9
50:18 57:9 58:1
75:6 120:22
122:5
**trying** 22:15,16
23:24 26:19
28:20 47:15
52:25 55:4
81:18 90:10
94:22 96:15,16
99:9 108:19
112:18 129:10
141:3
**turned** 72:18
**turns** 92:24 94:13
**TV** 3:7
**twice** 70:24
107:17
**two** 6:9 22:19
23:1 24:14
31:13 38:17
46:9 47:5 50:3

55:6 62:3 83:17
99:5 128:8
131:23
**two-pronged** 80:4
**two-star** 7:6,7
**type** 10:18 29:22
**Tyrone** 37:18

___
## U
**ultimately** 6:24
18:4 44:23
65:10 122:9
**unable** 18:3,24
19:18 20:6 31:7
66:18,19 74:3
135:8
**unanticipated**
12:19
**unaware** 51:19,23
84:2,4
**uncommon** 86:11
95:2,24
**uncontrolled**
138:21 139:1,5
139:14,21
**uncooperative**
28:1
**uncovered** 97:25
**undeniably** 51:3
**underneath** 27:9
**understand** 3:22
6:16 16:17,22
31:9 33:5 69:15
73:12,14 74:3
82:9 83:6,24
85:1 108:19
110:24 111:5
122:5 140:19,21
**understanding**
9:7,15,20 10:21
10:22 17:25
19:3,7 21:13
31:5 32:2 33:2
33:15 48:12
66:3,5 71:23
73:16 78:16

93:19 94:8,11
94:13,15,16
106:23 116:17
124:25 126:1
128:23,25
129:12,18 131:8
141:6
**understood** 4:2
23:20 24:24
80:9 104:24
**undertake** 5:14
29:14
**undertaken** 12:4
14:15
**undertaking** 16:6
**undertook** 14:16
14:23
**undiagnosed**
15:18 16:3
**unit** 18:5
**United** 1:12
**unknown** 32:24
33:18 36:16
38:22 57:12
69:1 81:5
115:20
**unprofessional**
25:24 30:3,5
63:8
**unprofessionally**
26:24
**unsure** 34:14
35:14 36:4
**untrue** 134:25
138:15
**unusual** 79:3
80:12,20 82:15
82:24 83:9
**unwritten** 85:8
118:21
**updated** 7:13
**urinate** 32:3
**urinated** 28:1
32:11 51:20
54:22 106:14
115:20

**urinating** 53:18
**urination** 31:20
105:11,19
**use** 133:25
**uses** 38:5
**usually** 48:7
85:22 86:3
133:9 134:6
**uttered** 28:13

___
## V
**v** 1:10
**vague** 112:7 128:3
135:24
**values** 26:24
**variables** 117:17
**variety** 133:8,12
**various** 7:11
**vast** 96:8 130:21
**verbiage** 27:1
**vicinity** 130:1
**video** 23:23 58:2,3
**videos** 87:14
138:25
**view** 63:25 135:8
**violation** 26:24
**violations** 123:5
**violent** 17:9
**virtually** 131:8
**visible** 45:4
**visit** 10:20 19:18
58:6 75:11

___
## W
**W** 2:10
**wait** 97:2 119:17
122:10
**waiting** 115:9
**wake-up** 78:24
**waking** 54:13
**walk** 18:3,24 19:9
19:18 20:6
27:25 31:8,13
54:5 58:8,25
66:18 104:15
105:1,9 106:12
138:1

| | | | | |
|---|---|---|---|---|
| **walking** 18:2 | 86:3 96:15 | 25:20 30:11 | 30:11 32:21 | **1:01** 140:3,3 |
| **wall** 28:21 | 127:25 | 36:11 39:17,23 | 36:12 41:12,15 | **1:03** 141:16 |
| **walls** 44:5 69:4 | **we'll** 63:14 86:21 | 102:2 116:6 | 41:24 42:8,22 | **10** 86:9 |
| 73:6 | 91:22 100:18 | 118:2 124:20 | 43:5 47:15 | **10:15** 1:4 4:12 |
| **want** 6:2 11:10 | 124:17 | 128:2 132:17 | 51:23 53:22 | **100** 79:1 |
| 21:8 50:19 57:2 | **we're** 7:16 20:23 | 140:1 | 56:11,18 60:5 | **11/21/12** 3:8 |
| 68:15 79:7 89:6 | 26:15,19,20,21 | **witnessed** 43:16 | 65:2 67:4,4 | **11:12** 61:1 |
| 89:7,8 112:17 | 26:22 30:24 | **witnesses** 45:14 | 72:10 76:11 | **11:14** 60:24 |
| 113:6,8 115:8 | 57:3 61:2 63:20 | **word** 26:14 | 77:6,13,25 | **11:19** 61:1 |
| 118:18 | 64:17 68:5,23 | 115:14 | 84:23 85:6,13 | **12-CV-664** 1:11 |
| **wanted** 25:16 | 81:21 105:23 | **words** 26:15,16 | 87:21 93:10,24 | **12:20** 37:18 |
| 47:18 68:18,19 | 106:18 113:25 | 26:16,18 28:12 | 102:2 105:17 | **12:30** 116:4 |
| 68:22 109:22 | 115:25 117:9 | 29:3,3 62:6 | 111:12,14 119:5 | **12:39** 124:22 |
| 126:5 136:1 | 124:23 125:16 | 65:22 84:16 | 122:17 125:10 | **12:43** 124:22 |
| **wasn't** 13:4 42:11 | 129:3 134:5 | 91:21 95:11 | 128:2 129:24 | **13th** 9:1 |
| 44:18 62:16 | 140:4 | 97:11,15 100:16 | 131:18,21 | **137** 3:10 |
| 70:18 74:11 | **we've** 4:9 12:6 | 107:9 | 132:17,17,19 | **14th** 37:19 |
| 75:20 76:17 | 33:23 37:6 39:3 | **work** 6:10 7:14 | 133:5 141:12 | **140** 3:4 |
| 118:24 119:5 | 59:15,23 61:4,5 | 14:19 | **year** 6:19 7:11 | |
| 125:23 127:11 | 73:22 81:7 83:7 | **works** 17:6,16 | 12:6 14:21 | **2** |
| **watch** 89:5 | 84:10 86:16 | **world** 68:21 | **years** 24:12,14,16 | **2** 134:11 |
| **watched** 63:24 | 104:19 105:20 | **worth** 100:9 | 58:16 62:3 | **20** 65:18 86:9 |
| **watching** 87:14 | 109:13 110:16 | **wouldn't** 19:8 | 85:14 86:5,8,9 | **2005** 81:15,17 |
| 93:16 | 111:25 112:23 | 21:4 29:19,19 | 86:10 94:16 | **2010** 9:1 11:4 |
| **way** 13:18 14:19 | 113:19 125:14 | 29:22 31:2 | 95:6 119:6 | 12:10 14:5 15:5 |
| 20:20 24:23 | 125:21 134:10 | 44:18 99:1 | 130:13,15,20,22 | 16:23 21:15 |
| 43:4 49:10 | 137:15 | 115:7 125:10 | 131:23 137:4 | 23:9 37:19 87:4 |
| 51:14 58:10 | **whatsoever** 30:7 | **wound** 33:4 52:23 | **yep** 3:25 75:6,18 | **2012** 60:4 62:2 |
| 63:7 68:11 | **Whereabouts** | **wounds** 39:1 | 89:18 94:6 | 87:22 94:2 |
| 101:4 111:17 | 43:3 | **written** 98:17 | 97:14,16 106:4 | **2040** 134:15 |
| 112:4 115:12 | **whichever** 27:4 | 116:19,25 | 115:16 137:1 | **24** 11:7 108:2 |
| 118:8 121:4 | **Whyte** 2:15 | 118:19,20 | **yesterday** 4:23 | 109:3 110:5,23 |
| 125:13 134:2 | **WI** 1:8 2:5,11,17 | **wrong** 20:1 28:17 | 5:5,7,8 | **24th** 87:22 |
| 140:8,22 | 2:23 | 49:12 51:12 | | **24-hour** 20:11 |
| **ways** 6:9 | **willful** 25:1 93:1 | 59:14 65:20 | **#** | **25** 75:4 130:17,24 |
| **wearing** 36:25 | 100:2 122:2 | 68:10 72:14 | **#1900** 2:16 | 137:4 |
| 46:13 134:18 | 133:16 | 92:19,22,24 | **#71** 2:10 | **27** 75:14 |
| **Wednesday** 1:4 | **willfully** 99:21 | 96:8 97:9 98:5,6 | **#716** 2:22 | **28** 73:23 86:19 |
| **welfare** 88:17,24 | **Williams** 86:24 | 104:5 113:10 | | **29** 76:13 |
| 127:24 | 87:14 93:17 | **W23000** 2:4 | **0** | |
| **wellness** 117:1,5 | **willing** 103:21 | | **00025** 74:23 | **3** |
| **Wells** 2:16 | **Wisconsin** 1:13 | **X** | **04/02/2014** 1:4 | **3** 3:3 61:20 65:18 |
| **went** 6:19 24:16 | 9:4 | **X** 3:1,13 140:6 | **090** 7:16 | 97:6 103:20 |
| 40:3 | **wish** 73:5 | | | **30** 78:2,25 79:22 |
| **Wenzel** 1:10 | **wishes** 8:6 98:1 | **Y** | **1** | 93:8 |
| **weren't** 35:9 45:4 | **witness** 1:1 5:6 | **yeah** 7:19 8:24 | **1** 33:24 34:8 35:3 | **30th** 60:4 |
| | | 16:16 29:19 | 36:3 45:24 | **31** 77:2 |

Case 2:12-cv-00664-JPS   Filed 01/18/16   Page 60 of 61   Document 124-15

**34** 37:7
**36** 39:4

---

**4**

**4** 3:6 100:4 104:12
**40** 130:14,15,22
**45** 116:5

---

**5**

**5** 104:12
**53** 81:8
**53072** 2:5
**53202** 2:17,23
**53213** 2:11
**555** 2:16
**59** 3:7

---

**6**

**60** 39:10,15
**68** 3:6 4:8,10
**69** 3:7 59:22,24
   61:5 96:25
   99:18 115:25

---

**7**

**7** 111:7 115:8
**70** 3:8
**71** 3:9 86:14,17
**72** 3:10 137:13,16

---

**8**

**8112** 2:10
**841** 2:22
**86** 3:9

---

**9**

**950** 1:7