# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**ESTATE OF JAMES FRANKLIN PERRY, et al.,**

          Plaintiffs,

        **-vs-**                       **Case No. 12-C-664**

**CHERYL WENZEL, et al.,**

          Defendants.

---

## DECISION AND ORDER

---

This civil rights lawsuit arises from the death of James Franklin Perry. On September 13, 2010, Perry was arrested by Milwaukee police officers, suffered multiple seizures, and eventually died at the county jail. Perry's son and the administrator of Perry's estate sued Milwaukee County, the City of Milwaukee, and various police officers, medical personnel, and other individuals employed by the County and City. Both groups of defendants – the County Defendants and the City Defendants – move for summary judgment, and the County Defendants move for sanctions. These motions are granted.

## I. Background.

The City Defendants are police officers Richard Lopez, Frank Salinsky, Stephon Bell, Margarita Diaz-Berg, Alexander C. Ayala, Froilan

Santiago, Crystal Jacks, Corey Kroes, Rick Bungert, Luke Lee, Jacob Ivy, and Richard Menzel, Chief of Police Edward Flynn, Deputy Inspector Ramon Galaviz, Captain Victor Beecher, Lieutenant Karl Robbins, Detective Shannon Jones, and the City of Milwaukee.

The County Defendants are registered nurses Cheryl Wenzel, Nicole Virgo, and Tina Watts, Sergeant Fatrena Hale, Correctional Officers Kelly Kieckbusch, Abie Douglas, Anthony Arndt, Sheila Jeff, and Darius Holmes, Inspector Richard R. Schmidt, Sheriff David A. Clarke, Jr., Milwaukee County, and the Wisconsin County Mutual Insurance Corporation, a domestic insurance corporation that issued an insurance policy to Milwaukee County for the time periods at issue.

### A. MPD policies and training.

The Milwaukee Police Department training academy staff trains officers using its own Standard Operating Procedures (SOPs) and Code of Conduct, state statutes, and pertinent case law, along with state-board-mandated training guides, which are published by the Wisconsin Department of Justice. Officers are presented with MPD policies regarding many subject matter areas, including the provision of medical assistance to prisoners, and conducting investigations regarding deaths of arrestees which occur while they are in MPD custody.

- 2 -

First responder duties include checking the scene, calling for additional resources, and providing care for life-threatening conditions until more advanced medical caregivers arrive. Officers are trained that some examples of life-threatening conditions or medical emergencies include stroke, seizure, diabetic emergency, poisonings, allergic reaction, and shock. Officers are also trained that they cannot give medication to prisoners. Officers may render first aid or other first-responder-type-assistance if a subject, prisoner and citizen alike, is experiencing a life-threatening condition or medical emergency, but only until medical providers who have a higher level of training arrive on the scene.

MPD policy and procedure requires that once arrested, the arresting officer is responsible for monitoring the arrestee's physical condition; that throughout the arrest, conveyance, and transport of prisoners, there's an overriding concern to monitor arrestee health; that any medical emergency should be immediately reported to dispatch and transported to the appropriate medical facility; and that once transferred to another officer for conveyance, the conveying officer is responsible for monitoring the arrestee/prisoner's physical condition. If an individual in MPD custody is medically cleared, that does not alleviate an officer's duty to continue to observe and protect the individual's health, safety, and welfare.

- 3 -

**B.    September 13, 2010.**

On September 13, 2010, at approximately 2:12 a.m., Milwaukee police officers stopped a motor vehicle in which the plaintiff, James Franklin Perry, was a passenger. The vehicle matched the description of a vehicle that was stolen during an armed robbery within the previous few hours. Perry was taken into custody and booked into the MPD Prisoner Processing Section/City Jail at approximately 5:36 a.m.. The booking form indicates that Perry told the booking officer that he suffers from seizures, takes medication two times a day, and had yet to take his nightly dosage.

Perry was placed into the male "bullpen," a large cell that holds several male prisoners at the PPS. While in the bullpen, Perry suffered a seizure, fell, and hit his head. MPD personnel contacted the Milwaukee Fire Department to request an ambulance. A first responder noted that "Upon arrival found 41 year old male patient lying supine on floor of holding cell with cushion under his head. Per police, patient had suffered approximately one minute long full body seizure, fell of [sic] bench and hit head on floor." Lieutenant Robbins, the PPS supervisor, spoke with Perry, who answered his questions and advised him that he suffered from seizures requiring medication twice a day, but had not taken his medication for some time. Perry was conscious, coherent, not resistant or

- 4 -

combative and responsive to verbal inquiries. At 3:21 p.m., Perry was transported by ambulance to Aurora Sinai Medical Center for treatment, accompanied by MPD Officers Kroes and Jacks.

At the hospital, Perry was initially alert, responsive, and able to walk on his own. However, Perry suffered at least two additional seizures at the hospital. Perry was medicated with Dilantin, a common anti-seizure drug, and Ativan. Kroes and Jacks perceived that Perry was getting worse, not better. After his second seizure, Perry had a difficult time answering questions, appeared drowsy, and was unable to walk or dress by himself. Hospital personnel told the officers that Perry's symptoms were the side effects of medication. Perry was discharged into police custody at approximately 6:45 p.m.. Once again, Perry was not resistive or combative at this time. He received a Glasgow score of 15[1] and was "alert and oriented" upon discharge.

Prior to their departure from the hospital, Jacks called Robbins for instructions on whether they should bring Perry back to PPS or take him

---

[1] The Glasgow Coma Scale is a neurological scale which "aims to give a reliable and objective way of recording the conscious state of a person for initial as well as subsequent assessment. A patient is assessed against the criteria of the scale, and the resulting points give a patient score between 3 (indicating deep unconsciousness) and either 14 (original scale) or 15 (the more widely used modified or revised scale)." *See* https://en.wikipedia.org/wiki/Glasgow_Coma_Scale.

directly to the Milwaukee County Criminal Justice Facility (CJF, or the County Jail). Robbins ordered Perry's return to PPS as certain paperwork had not been completed.

Kroes and Jacks helped Perry put on his clothes and shoes, took him to their squad car in a wheelchair, and assisted him into the squad car. Officers Bungert and Santiago met Kroes and Jacks in the basement parking area at PPS. All four had to carry Perry onto the elevator which brought them up to the jail. The officers then sat Perry on the floor near a bench located in the hallway area outside of the booking room because Perry was unable to control his body or sit on the bench. At that point, one of the four identified officers said to Perry "you're faking it."

Perry urinated and defecated on himself. The odor caused Jacks to become ill and vomit. The officers heard Perry grunting, observed that he did not respond to their directions, saw him kicking, felt resistive tension in his arms and legs, and smelled the odor of feces and/or urine. They perceived that Perry was being resistive or combative. When Robbins first came upon Perry in the hallway, he laughed, turned and walked away.[2]

Officer Ayala joined the other four officers in attending to Perry.

---

[2] Robbins testified that he was having a conversation with an officer seated at the process desk and was laughing at something she said, but nothing directed at Mr. Perry.

Case 2:12-cv-00664-JPS   Filed 05/06/16   Page 6 of 31   Document 143

Ayala took control of Perry's shoulders to prevent him from getting up. Perry cried out that he couldn't breathe. Officer Bungert placed a compression hold on Perry and Ayala continued to hold Perry down, pushing forward on Perry's shoulder and pressing his chest toward his knees. Perry said that Ayala and the other officers were "killing him," and he began to grunt and moan.

Perry also began to spit and drool. Due to the potential biohazard, Officer Ivy obtained an expectorant shield/spit mask and assisted officers in placing it over Perry's head. The shield is made out of lightweight and flexible mesh, and there is a paper-towel-like material that is placed over the mouth area. An expectorant shield does not inhibit hearing or vision. Rather, it is a barrier that prevents the subject from being able to expel bodily fluids from the mouth.

Perry complained that he couldn't breathe with the spit mask on his face. Officer Kroes responded, "If you're talking, you're breathing." Robbins told Perry that "if he was going to act like an animal, he would be treated like he was in prison ..." Robbins, along with the officers assigned to the jail, decided to place Perry in a single cell because they did not want to risk injury to other prisoners. The jailers chose cell A3 because it was a cell that had no bed or bench from which he could fall. Perry was carried into the

- 7 -

cell by Officers Kroes, Jacks, Bungert, and Lee. Perry's handcuffs and leg shackles were removed when he was placed in cell A3.

From the time that Perry re-arrived at PPS until he was placed in cell A3, the above-noted officers did not observe any change in Perry's condition which suggested to them that he was experiencing a life-threatening condition or medical emergency. Officers Kroes and Jacks attributed Perry's change in condition to the anti-seizure medication.

Officer Diaz-Berg was the assistant jailer at the PPS. Part of her job was to conduct regular wellness checks of each prisoner kept at the PPS. At some point, Perry had removed the spit mask because Diaz-Berg could see his face. Diaz-Berg heard Perry grunting and saw him rolling around on the cell floor, but did not observe or perceive that Perry was experiencing a life-threatening condition. Perry's cell was checked seven times.

At 8:08 p.m., Officers Salinsky and Lopez were dispatched to convey Perry to the County Jail. Robbins, Lopez, Salinsky, Lee, Ayala, Diaz-Berg, and Ivey all went to cell A3, where shackles were placed on Perry's arms and legs and a spit mask was re-applied. Upon entering the cell, Salinsky observed that Perry had defecated on himself. Lopez noticed blood on the discarded spit mask. After his removal, Diaz-Berg and Robbins both noticed blood on the floor. Diaz-Berg summoned custodial worker Andrew

- 8 -

Puechner to clean cell A3. Puechner noticed "gobs of spit, blood, and fecal matter."

Perry walked under his own power to the elevator, escorted by an officer on each side. Perry's condition appeared to have improved when he was being transported to the County Jail.

## C. CJF/County Jail.

The pre-booking area at the CJF is where arrestees and prisoners are first brought into the jail before being booked into the facility. It is a rectangular room, approximately 54 feet by 14 feet in size. At one end of the pre-booking room, closest to the door into the pre-booking room from the jail's sally port, and behind a wall that includes a glass partition, is the pre-booking control tower. The officer assigned to the pre-booking control tower is responsible for monitoring the secure door between the pre-booking room and the sally port. At the same end of the pre-booking room as the pre-booking control tower, and adjacent to the door into the pre-booking room from the sally port, is a desk staffed by an MPD officer. The MPD officer assigned to this desk is responsible for assisting with individuals being booked in the jail from the custody of the MPD. At the opposite end of the pre-booking room is a nurse's station, which is staffed by one or more nurses employed by the Milwaukee County Sheriff's Office

- 9 -

(MCSO). Nurses assigned to the pre-booking room conduct initial health screenings of arrestees and prisoners brought to the jail to assess whether they are healthy enough to be booked into the jail. No arrestee or prisoner can be booked into the custody of the jail unless he or she is medically cleared through such an initial health screening.

Immediately across from the nurse's station is a bench along the wall where arrestees and prisoners are seated while they are waiting for an initial health screening by a nurse. The bench is approximately seven feet away from the nurse's station. There are two video cameras in the pre-booking room, each located at opposite ends of the pre-booking room. The events that occurred while Perry was in the pre-booking room on September 13, 2010 were recorded by these cameras.

Prior to Perry's arrival at the CJF, an MPD officer called to inform the jail that Perry was a "combative" prisoner. The jail was not informed at that time that Perry had been taken to and released from the hospital while in MPD custody.

Officer Holmes was assigned to the pre-booking control tower at the jail. Holmes was responsible for monitoring the door between the pre-booking room and the sally port. Holmes was not permitted to leave his post in the tower.

- 10 -

At approximately 8:42 p.m. that evening, County Officers Kieckbusch and Arndt helped MPD Officers Salinsky and Lopez bring Perry from an MPD transport vehicle parked in the jail's sally port into the pre-booking room. Perry arrived in the pre-booking room in leg restraints, his hands cuffed behind his back, and wearing a spit mask, all of which had been applied by MPD officers prior to Perry's arrival at the jail. Perry was unable to walk under his own power. Arndt and Kieckbusch braced Perry as his legs were dragging behind him on the floor.

As Perry was brought into the pre-booking room, Officer Jeff walked into the room and exited shortly thereafter, given the number of MCSO and MPD officers already in the room with Perry. Sergeant Hale was responsible for the pre-booking and booking areas that night. Hale entered the pre-booking room less than one minute after Perry's arrival for booking.

Kieckbusch, Arndt, Salinsky, and Lopez placed Perry on a bench adjacent to the nurse's station. Shortly after being placed on the bench, Perry slid onto the floor in front of the bench. Kieckbusch, Arndt, and Hale, along with several MPD officers, were present with Perry and watching him. At 8:43 p.m., Kieckbusch, Arndt, and the MPD officers moved Perry over to the bench opposite the nurse's station. At this point, Officers

- 11 -

Salinsky and Lopez believed that Perry was being uncooperative, because they had seen prisoner exhibit this type of behavior as they were being brought into the CJF.

MPD Officer Bell was present at the CJF pre-book area because his assignment at the time was to act as the liaison officer between MPD and the CJF booking staff. Officer Bell observed Perry as he was brought into the pre-book area. At no time did he perceive that Perry was experiencing a life-threatening condition.

Kieckbusch left to ask a nurse to come to pre-booking to assess Perry. Hale and other jail staff watched Perry until the nurses arrived in the pre-booking room. Before a nurse arrived in the pre-booking room, Hale attempted to assess the situation by establishing a dialogue with Perry while standing near him, but his responses to her were mumbles that she did not understand. While he was on the floor, Perry was rolling back and forth and kicking. Hale was uncertain why he was behaving that way. Hale was still under the impression that Perry was a combative prisoner based on the call from the MPD before his arrival.

At 8:44 p.m., Nurse Virgo arrived at the nurse's station after being called to the pre-booking room. Virgo was joined at the nurse's station by Nurse Wenzel roughly one minute later. Once the nurses were present in

- 12 -

the pre-booking room, jail staff members who were present relied on the nurses to asses Perry's condition and determine the proper medical response, if any.

Sheriff's office employees are trained that if they believe a medical emergency is occurring, they have an obligation and a duty to request assistance. Nurses, in particular, must provide medical assistance to a person in the midst of a medical emergency. Pursuant to County policy, a registered nurse and at least one other member of the health staff are required to respond immediately with the appropriate equipment, with the nurse assessing the situation and providing emergency care. Personnel are instructed to stay close to an ill or injured inmate, closely monitor the situation, and try to keep the inmate calm. The purpose of the County's policy and procedure regarding initial health assessment is to ensure that all inmates entering the facility with significant health problems have their needs identified and treated on a timely basis.

At 8:45 p.m., Virgo walked from behind the nurse's station over to the bench where Perry was sitting to assess his condition. Virgo's assessment lasted approximately one minute, as Kieckbusch and Arndt stood next to Perry, with Hale and Wenzel remaining at the nurse's station. At the time of her assessment, Virgo knew that Perry had been

- 13 -

evaluated at Aurora Sinai for seizure activity and that he had been released from the hospital back into MPD custody.

Virgo asked Perry if his name was James Perry; Perry nodded yes. Virgo also asked Perry if he had a history of seizures; Perry nodded yes. Virgo asked Perry to state his name, but he did not respond. Virgo observed that Perry had defecated in his pants and there was blood on his spit mask. Virgo also observed that Perry was not having labored breathing, was not using his neck or abdominal muscles to breathe, did not have an increased respiratory rate, and was otherwise breathing normally. Virgo did not believe that the spit mask was obstructing Perry's ability to breathe. Perry did not complain to Virgo of any chest pain, and she did not perceive him to be having any chest pain. Virgo did not believe the spit mask was obstructing Perry's ability to breathe. Virgo did not observe Perry to be sweating or that his mucous membranes were an unusual color.

Based on her assessment, Virgo did not allow Perry to be booked into the jail. Virgo reached this decision based on Perry's failure to verbalize his name, the blood on his spit mask, the fact that he had soiled himself, and his recent history of seizures. Virgo thus determined that Perry was not stable enough to be admitted to the Jail. Instead, Virgo determined that Perry needed to be taken to a hospital. Virgo did not

- 14 -

believe that the blood she observed was a significant enough problem to cause her to deviate from her decision to have Perry transported to a hospital for further evaluation.

At 8:46 p.m., Virgo walked back to the nurse's station, leaving Kieckbusch and Arndt next to Perry. Virgo informed Hale of her decision to refuse Perry's admission and requested that an ambulance be called to transfer Perry to a hospital. At that point, Virgo was "trying to get [Perry] to a medical facility, calling the doctor to let him know what was going on, letting them know to call, whether a fire department or ambulance, to get him to a medical facility."

At 8:47 p.m., Perry slipped off the bench opposite the nurse's station onto the floor immediately in front of the nurse's station. Kieckbusch and Arndt, who were next to Perry, allowed him to slide from the bench to the floor because he was swaying back and forth on the bench and appeared to want to go to the floor. Less than 30 seconds later, Kieckbusch and Hale walked away from Perry and out of the pre-booking room. Arndt remained next to Perry watching him, and Virgo remained behind the nurse's station. Hale left the pre-booking room to return to her desk to call for an ambulance.

Shortly after Perry went to the floor, Virgo walked from the nurse's

- 15 -

station over to Perry to again assess his condition. Virgo's second assessment lasted approximately 40 seconds. At 8:48 p.m., Hale called Master Control to request an ambulance.

After assessing Perry the second time, Virgo called and spoke with the jail's medical director to inform him of her decision to refuse Perry's admission. At 8:49 p.m., Hale returned to the pre-booking room. Approximately 30 seconds later, Arndt walked away from Perry, who remained on the floor in front of the nurse's station, while Virgo, Wenzel, and Hale remained at the nurse's station watching Perry. Up to that point, Arndt had been with Perry the entire time he was in the pre-booking room. Perry never said anything to Arndt. Milwaukee Fire Department unit E2 was dispatched to the jail at approximately 8:50 p.m..

Wenzel left the nurse's station to retrieve a towel so she could wipe Perry's face. Wenzel wanted to be sure that Perry was okay and to see if there was something more they could do to help him while they were waiting for the ambulance. At 8:51 p.m., Wenzel asked officers to sit Perry up and remove his spit mask. After the mask was removed, Wenzel observed blood and vomit on Perry's face. In Wenzel's experience, many patients who have seizures bite their tongue, their lip, or the inside of their mouth and, as a result, will have bloody sputum, a mix of blood and saliva.

- 16 -

Once the mask was removed, Wenzel wiped Perry's face with a towel. Perry's face fell backwards and Wenzel saw his eyes roll back into his head. Wenzel observed that Perry was no longer breathing. Wenzel checked Perry's carotid pulse and felt none. At 8:52 p.m., a call was made for emergency response in the jail. Until Perry became unresponsive, neither Virgo nor Wenzel believed Perry's condition presented a medical emergency.

Corrections Officer Abie Douglas, a security officer assigned to the booking room that evening, delivered the jail's orange resuscitation bag, and Officer Jeff brought an AED. Jail staff immediately started to perform CPR on Perry. At 8:54 p.m., Master Control notified the fire department that Perry was no longer breathing. As a result, the fire Department dispatched an additional unit, MU 6, to the jail. Also at 8:54 p.m., Nurse Watts arrived and began to assist with the resuscitation efforts.

At 8:55 p.m., unit E2 arrived in the pre-booking room and took over the efforts to resuscitate Perry. Unit MU 6 arrived at 9:00 p.m. and began assisting with the ongoing resuscitation efforts. Perry was pronounced dead at 9:21 p.m.. An autopsy performed by Assistant Milwaukee County Coroner Christopher Polous, M.D., revealed that Perry died of coronary artery thrombosis, secondary to a clot in a blood vessel in the heart, leading

- 17 -

to deprivation of oxygen to that part of the heart that was clotting.

## II. Summary judgment.

Summary judgment should be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "material fact" is one identified by the substantive law as affecting the outcome of the suit. *Bunn v. Khoury Enters., Inc.*, 753 F.3d 676, 681 (7th Cir. 2014) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A "genuine issue" exists with respect to any such material fact when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 681-82. Thus, Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

### A. Count one.

The plaintiffs' primary claim is that the City and County Defendants were deliberately indifferent to Perry's medical needs in violation of the Eighth and Fourteenth Amendments. At the time of his

death, Perry was an arrestee, not a prisoner or pretrial detainee. Accordingly, Perry's Section 1983 claims are governed by the Fourth Amendment, not the Eighth Amendment. *See Lopez v. City of Chi.*, 464 F.3d 711, 719 (7th Cir. 2006) ("the protections of the Fourth Amendment apply at arrest and through the *Gerstein* probable cause hearing, due process principles govern a pretrial detainee's conditions of confinement after the judicial determination of probable cause, and the Eighth Amendment applies following conviction"); *Currie v. Chhabra*, 728 F.3d 626, 629-30 (7th Cir. 2013) (Fourth Amendment's "objectively unreasonable" standard applies to "conditions of confinement" and "medical care" claims brought by arrestees who have not yet had their *Gerstein* hearing).

Under this line of cases, the Court must consider four factors to determine whether the defendants' responses to Perry's medical needs were objectively reasonable: (1) whether the officer had notice of the detainee's medical needs; (2) the seriousness of the medical need; (3) the scope of the requested treatment; and (4) police interests, including administrative, penological, or investigatory concerns. *Ortiz v. City of Chi.*, 656 F.3d 523, 530 (7th Cir. 2011).

Far from ignoring Perry's medical issues, MPD officers took Perry to

- 19 -

the hospital for treatment after he suffered a seizure. Perry was discharged, so it was reasonable for the officers to presume that Perry was fine for the time-being. It was also reasonable for the officers to attribute Perry's behavioral issues to any of the following: the side effects of medication, the after-effects of multiple seizures, or the possibility that Perry was simply a combative prisoner resisting arrest. Moreover, plaintiffs do not dispute that their claims against the following City Defendants must be dismissed for lack of personal involvement: Chief Flynn, Deputy Inspector Galaviz, Captain Beecher, Detective Jones, and Officer Menzel. ECF No. 121 at 37 n.2. *See Chavez v. Ill. State Police*, 251 F.3d 612, 651 (7th Cir. 2001) (Section 1983 plaintiff must show that the defendant was "personally responsible for the deprivation of a constitutional right").

The actions of the County Defendants were also objectively reasonable. Nurses Virgo and Wenzel, for example, did everything in their power to help Perry upon his arrival at the County Jail. Nurse Virgo assessed Perry's condition and refused Perry's admission to the Jail, triggering the call for an ambulance to take Perry back to the hospital. Nurse Wenzel removed Perry's spit mask and called for an emergency response. Officers Kieckbusch and Arndt were not aware of Perry's health

- 20 -

issues that evening, but they directed Perry to a nurse upon bringing him into the pre-booking area. Sergeant Hale acted reasonably by monitoring Perry, deferring to the nurses, and calling for an ambulance. Officer Jeff delivered an AED to the nurses. Finally, plaintiffs' claims against Sheriff Clarke and Officer Holmes fail for lack of personal involvement. Sheriff Clarke was not at the jail that night, and Officer Holmes was not allowed to leave his post in the pre-booking room. Plaintiffs do not oppose summary judgment as to Nurse Watts, Officer Douglas, or Inspector Schmidt. ECF No. 118 at 29 n.2.

The City and County Defendants are also entitled to qualified immunity. "Public officials are immune from suit under 42 U.S.C. § 1983 unless they have 'violated a statutory or constitutional right that was clearly established at the time of the challenged conduct.'" *City & Cnty. of S.F. v. Sheehan*, --- U.S. ---, 135 S. Ct. 1765, 1774 (2015) (quoting *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2023 (2014)). An officer "cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in [his] shoes would have understood that he was violating it," meaning that "existing precedent … placed the statutory or constitutional question beyond debate." *Id.* (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). This "exacting standard"

- 21 -

gives "governmental officials breathing room to make reasonable but mistaken judgments" by "protect[ing] all but the plainly incompetent or those who knowingly violate the law." *Id.*

The theme of plaintiffs' case is that the defendants should have done more to help Perry, especially after his discharge from the hospital. However, none of Perry's symptoms were or should have been particularly alarming to the City Defendants. Instead, and as explained by hospital personnel, it was reasonable for the City Defendants to perceive that Perry's symptoms were simply the side effects of medication. At minimum, reasonable officers would disagree as to whether the actions of the City Defendants, both before and after discharge, were objectively unreasonable. "To be clearly established, a right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right. … We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Taylor v. Barkes*, --- U.S. ----, 135 S. Ct. 2042, 2044 (2015); *Mullenix v. Luna*, --- U.S. ----, 136 S. Ct. 305, 308 (2015) ("The dispositive question is 'whether the violative nature of *particular* conduct is clearly established.' This inquiry 'must be undertaken in light of the specific context of the case, not as a broad general proposition'") (quoting

- 22 -

*al-Kidd*, 563 U.S. at 742) (emphasis added).

As for the County Defendants, they are entitled to qualified immunity for similar reasons, but also due to the fact that Perry was never actually in their custody. Perry was arrested by MPD officers and brought to the County Jail, but he was never booked into custody by the County. At minimum, reasonable officials would disagree as to whether Perry was in the County's custody, and thus whether County officials owed Perry a duty under the Fourth Amendment in the first instance. This actually understates a fundamental defect in plaintiffs' pursuit of relief against the County Defendants, one which justifies the imposition of sanctions, as discussed below.

**B.     Count two – Article I, Section 6, Wisconsin Constitution.**

Plaintiffs do not oppose summary judgment on this claim.

**C.     Count three – *Monell* liability.**

Under *Monell v. Dep't of Social Servs. of N.Y.*, 436 U.S. 658 (1978), municipalities and other local governments are liable for their employees' conduct only if the employee injured the plaintiff in the execution of an official policy, custom, or widespread practice. The imposition of *Monell* liability usually requires "a finding that [an] individual officer is liable on the underlying substantive claim." *Treece v. Hostetler*, 213 F.3d 360, 364

- 23 -

(7th Cir. 2000) (citing *City of L.A. v. Heller*, 475 U.S. 796 (1986)). Even so, a municipality "can be held liable under *Monell*, even when its officers are not, unless such a finding would create an *inconsistent* verdict." *Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 305 (7th Cir. 2009) (emphasis in original). To determine whether a municipality's liability is "dependent on its officers," courts "look to the nature of the constitutional violation, the theory of municipality liability, and the defenses set forth." *Id.*

Plaintiffs assert that the City promoted and even encouraged the mistreatment of arrestees by failing to conduct internal reviews of in-custody deaths, failing to discipline officers who provided inadequate medical care, and instituting a policy of ignoring the complaints of arrestees who were having difficulty breathing. These allegations are only relevant if the alleged policies or practices caused a constitutional violation. *Thomas*, 604 F.3d at 306 ("*Monell* recognized that the premise behind a § 1983 action against a governmental body is 'the allegation that official policy is *responsible* for the deprivation of rights'") (quoting *Monell*, 436 U.S. at 690) (emphasis in original). The City Defendants are entitled to qualified immunity, but the Court also held that there was no constitutional violation in the first instance. *See id.* at 304 (if "the officer had pled an affirmative defense …, then the jury might have found that the

- 24 -

plaintiff's constitutional rights were indeed violated, but that the officer could not be held liable") (discussing *Heller*, *supra*). In this context, the City's liability turns on the liability of the individual police officers.

Plaintiffs do not oppose summary judgment on their *Monell* claim against the County. ECF No. 118 at 29 n.2.

### D. Counts four and five, negligence and wrongful death.

None of the defendants breached their duty to treat Perry with ordinary care. *Hocking v. City of Dodgeville*, 768 N.W.2d 552, 556 (Wis. 2009). Even if the defendants were negligent, they are entitled to discretionary immunity under Wisconsin law.

Section 893.80(4), Wis. Stats., provides that a political subdivision and its employees are immune from any suit for "acts done in the exercise of legislative, quasi-legislative, judicial, or quasi-judicial functions." *Brown v. Acuity*, 833 N.W.2d 96, 106 (Wis. 2013). Such activities involve the exercise of discretion. *Scott v. Savers Prop. & Cas. Ins. Co.*, 663 N.W.2d 715, 721 (Wis. 2003). A duty is ministerial rather than discretionary "only when it is absolute, certain and imperative," involves the "performance of a specific task" that the law imposes, and defines the "time, mode and occasion for its performance with such certainty that nothing remains for judgment or discretion." *Lister v. Bd. of Regents of the Univ. of Wis. Sys.*,

- 25 -

240 N.W.2d 610, 622 (Wis. 1976).

The manner in which medical care is administered to an inmate/arrestee is discretionary, not ministerial. *See Swatek v. Cnty. of Dane*, 531 N.W.2d 45, 50 (Wis. 1995) ("the sheriff has discretion in deciding how best to attend to the needs of those inmates within their custody"). More generally, the nature of law enforcement involves the use of discretion in response to evolving circumstances. "For these reasons, it is clear that law enforcement officials must retain the discretion to determine, at all times, how best to carry out their responsibilities." *Barillari v. City of Milwaukee*, 533 N.W.2d 759, 764 (Wis. 1995). The defendants exercised that discretion in deciding how to deal with Perry and his medical issues as they developed after his arrest.

### E. Count six, medical negligence.

This claim against Aurora Sinai Medical Center, Paul Coogan, and Becky Potterton was dismissed by stipulation. ECF No. 68.

### F. Count seven, conspiracy against Officers Bell and Jones.

Plaintiffs do not oppose summary judgment on this claim.

## III. Sanctions.

The County Defendants move for sanctions under 28 U.S.C. § 1927,

- 26 -

which provides that "[a]ny attorney or other person admitted to conduct cases in any court of the United States or any territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." To impose § 1927 sanctions, the Court must conclude that the lawyer acted with subjective or objective bad faith. *Dal Pozzo v. Basic Machinery Co., Inc.*, 463 F.3d 609, 614 (7th Cir. 2006). "Subjective bad faith must be shown only if the conduct under consideration had an objectively colorable basis. The standard for objective bad faith does not require a finding of malice or ill will; reckless indifference to the law will qualify." *Id.* "If a lawyer pursues a path that a reasonably careful attorney would have known, after appropriate inquiry, to be unsound, the conduct is objectively unreasonable and vexations." *Riddle & Assocs. P.C. v. Kelly*, 414 F.3d 832, 835 (7th Cir. 2005).

As discussed above, Perry was never taken into custody by Milwaukee County. Plaintiffs argue that Perry was in custody at the County Jail because he was not free to leave. This is true, but county officials did not seize Perry, and custody never transferred from MPD to the County. *See Carlson v. Bukovic*, 621 F.3d 610, 618 (7th Cir. 2010) ("Any

- 27 -

Fourth Amendment inquiry necessarily begins with a determination of whether a search or seizure actually occurred"). Nor is there any other source from which a constitutional duty would flow in this context. *See Monfils v. Taylor*, 165 F.3d 511, 516 (7th Cir. 1998) (no affirmative duty to protect citizens from harm except where the state has established a "special relationship" with an individual and where the state "affirmatively places a particular individual in a position of danger the individual would not have otherwise faced") (discussing *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189 (1989)). The absence of a *constitutional* duty owed to Perry by the County Defendants was known at the outset of discovery in this case, at the latest. *See, e.g.,* ECF No. 86-21, March 26, 2013 Deposition of Richard Schmidt, at 11 ("I asked if – I know I asked if the inmate was in our custody at that time, *and the answer given was no. The individual was in the custody of the Milwaukee Police Department*") (emphasis added); ECF No. 86-10, Deposition of Nicole Virgo, at 8 ("So I said, 'Okay. Well, he needs to go back out. We're refusing him because he needs attention that we don't – we can't give him'"). Even so, plaintiffs' counsel persisted in years of litigation against the County Defendants with no hope of success.

In addition, many of the County Defendants saw Perry in passing or

- 28 -

not at all. Officer Douglas, for example, did what she could to *help* Perry by bringing an orange resuscitation bag. Same for Officer Jeff, who brought an AED. Video surveillance, obtained by plaintiffs' counsel long before filing suit, shows that Douglas was in the pre-booking room for only 23 seconds, and Jeff was there for only 16 seconds. ECF No. 87-2. The quixotic pursuit of claims against basically every government official who saw Perry the night he died, and some who didn't, was objectively unreasonable.

Finally, the need for sanctions is underscored by the repetitive, abusive, and argumentative conduct of plaintiff's counsel, James Gende, during deposition discovery. The County Defendants documented numerous incidents in their brief at pages 12-29, ECF No. 117. This is just one example, from the deposition of Nurse Wenzel:

> Q    What is first aid to you as a nurse?
>
> A    If someone is hemorrhaging, I would have put my hand on to stop a hemorrhage, a bleed that I could see.
>
> Q    Is that the extent of your definition of first aid as a nurse?
>
> A    No, but I don't –
>
> Q    The only time you render first aid is when you see somebody hemorrhaging and you put your hand on the hemorrhage?
>
> MR. JONES (defense counsel): Which question do you want

- 29 -

her to answer, Counsel? One at a time.

MR GENDE: Well, she looks confused, so I'm further defining for her.

MR. JONES: Well, you know why she looks confused? Because you're sitting across the table from her laughing at her, visually laughing at her.

MR. GENDE: No, I'm not laughing. I am aghast at her attempts to evade questioning. So if I express surprise by her lack of knowledge regarding nursing, or what she apparently is showing as lack of knowledge, I am extremely surprised. And I am further surprised by your attempts to limit my cross examination by giving your witness direction as opposed to just making legal objections, which is what your duties are under the federal rules. So if I'm surprised –

MR. JONES: Well, actually –

MR. GENDE: -- by her testimony, I would wonder what a jury may be, based on what she's describing as first aid for me. So let's go back to the beginning.

MR. JONES: That was an interesting speech, but it really doesn't accurately reflect what's going on here. But if you do want to ask her questions, that's what we're here for, so go ahead and ask another question.

MR. GENDE: I think it accurately reflects what's going on.

***

This entire lawsuit has had the tenor of seeking to blame *someone* (or some entity) for Mr. Perry's unfortunate death. Mr. Gende's conduct reflects that underlying motivation, a motivation at odds with the absence

- 30 -

of an actionable or even arguable claim for relief.

***

NOW, THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT:

1.  Plaintiffs' motion to file a sur-reply brief [ECF No. 141] is **GRANTED**;

2.  The City Defendants' motion to file an oversized reply brief [ECF No. 133] is **GRANTED**;

3.  The motions for summary judgment [ECF Nos. 84 and 89] are **GRANTED**;

4.  The County Defendants' motion for sanctions [ECF No. 115] is **GRANTED**; and

5.  The Clerk of Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 6th day of May, 2016.

SO ORDERED:

_Rudolph T. Randa_
**HON. RUDOLPH T. RANDA**
**U.S. District Judge**

- 31 -