UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

THE ESTATE OF JAMES FRANKLIN PERRY,
by BETTIE A. RODGERS, Special Administrator,
and JAMES FRANKLIN PERRY JR. (A Minor)
      Plaintiffs,
    v.
CHERYL WENZEL, R.N., et al,
      Defendants.

Case No. 12-CV-0664

## PLAINTIFFS' OPPOSITION TO MILWAUKEE COUNTY DEFENDANTS' PETITION FOR ATTORNEYS' FEES AND COSTS

NOW COMES, the Plaintiffs' attorneys, by and through their counsel, and respectfully object to the Milwaukee County Defendants' (the County) Petition for Attorneys' fees and costs as set forth below:

### I. REQUEST FOR HEARING.

Plaintiff's attorneys seek a hearing to satisfy their due process rights and be heard regarding the appropriateness of the nature and extent, if any, for § 1927 sanctions to be awarded. "[T]he requirements of due process of law are applicable to a proceeding to impose sanction, entitling a party or attorney to notice and an opportunity to respond[.]" *Kapco Mfg. Co., v. C & O Enterprises, Inc.*, 886 F.2d 1485, 1494 (7th Cir. 1989). Sanctions should not be assessed "without fair notice and an opportunity for a hearing on the record." *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 767 (1980). Due to the County's request that this Court award virtually all of its attorney's fees and costs, an evidentiary hearing on the record in this matter is appropriate.

### II. INTRODUCTION.

This Court found, "At minimum, reasonable officials would disagree as to whether Perry was in the County's custody, and thus whether County officials owed Perry a duty under the Fourth

1

Amendment . . ." (D.143:23). Bringing a claim "when reasonable officials would disagree" as to whether the County Defendants owed Perry Constitutional duties is not vexatious conduct as defined by any case in the United States. Although the analysis at issue focused on whether Perry was in the custody of the County, the appropriate standard on review is whether Perry had been "seized" by the County Defendants and therefore entitled to Constitutional protections under the 4th Amendment.

This Court recognized that Perry was not free to leave the County Jail, one of the most significant factors when considering whether a seizure occurred. The traditional approach to determine if a seizure has occurred is whether a person believed he was "free to leave." *Carlson v. Bukovic*, 621 F.3d 610, 618 (7th Cir. 2010). The standard is an objective one and is determined on the basis of the totality of the circumstances surrounding the encounter. *Id.* (internal citations omitted). Here, plaintiffs asserted that Perry was seized by the County, which was supported with a factual basis and this Court agreed he was not free to leave. Such a decision would generally entitle Perry to a jury trial on the nature and extent of what Constitutional protection Perry was owed at that time. The fluidity of this issue throughout the case, evidence by the factual record and differing expert opinions, is simply not the type of claim upon which §1927 monetary sanctions have ever been awarded.

The County argued that it was "[E]qually clear that the Milwaukee County Defendants did not 'seize' Perry, as at no time was Perry in the custody of any of the County defendants." (D.88:14). Yet, custody and seizure are not one in the same. A person is "seized" when "by means of physical force or show of authority, [an individual's] freedom of movement is restrained." *United States v. Mendenhall*, 446 U.S. 544, 553, (1980). In stark contrast, the issue of custody requires "'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125 (1983). Establishing custody is a much higher bar requiring

2

greater restraint than seizure. Regardless, Plaintiffs' counsel advanced a plausible legal basis that Perry had been seized by the County Defendants when he was locked in their Jail. His freedom of movement was restrained – there is no dispute Perry was not free to leave the County Jail unless the County allowed him to leave. Under these circumstances no monetary sanctions are appropriate. As a result of the differing definitions of custody and restraint, as well as the incredible amount of fees at issue, it is only fair to allow plaintiffs' counsel the benefit of all procedural due process protections to defend their position on the record at hearing and decipher whether the huge amount of fees sought are appropriate considering the complete lack of precedent in §1983 in-custody death cases for the type of result contemplated by the County.

### III. FACTS NEGATING IMPOSITION OF SANCTIONS.

James Perry (Plaintiff) died on the floor of the County Criminal Justice Facility (CJF) on September 13, 2010. The County moved for summary judgment. (D.84) The County argued sanctions should be imposed because three of its employees opined Perry was never in its custody, therefore no constitutional duty was owed to Perry. (D.88:14) (D.117:5-8) The County relied on the Declaration of Edward H. Bailey, Inspector at the Sheriff's Office, who stated "No arrestee or prisoner can be booked into the custody of the Jail unless they are medically cleared through…an initial health screening." (D.87:3). The County also relied on two defendants, Deputy Kieckbusch and Sergeant Hale, who both testified that Perry was in the City of Milwaukee's (City) custody. (D.86-7:11) (D.86-12:14, 19-20) The County provided little in the way to support its position that Perry had not been seized, as that term is legally defined, by the County Defendants. Instead maintaining "[I]t is equally clear that the Milwaukee County Defendants did not 'seize' Perry, as at no time was Perry in the custody of any of the County defendants." (D.88:14) Unfortunately, the County's circular argument is not supported by the case law.

3

Plaintiffs opposed the motions and set forth an objectively reasonable basis for prosecuting this s.1983 in-custody death action. Plaintiff identified material issues of fact regarding an extensive record that indicated the City and County had joint custody over Perry when he died and that the County had a constitutional duty to intervene regardless of custody. (D.118:20-22) (D.125:3-4, 15) Plaintiffs' opposition relied upon multiple expert opinions, including those of the City's Chief of Police, the City's expert, and Plaintiffs' expert. (D.119:15). Additionally, Plaintiff relied on the fact that the 4th Amendment jurisprudence required Perry be "seized", as opposed to in "custody", for the protection afforded to citizens by the 4th Amendment.

Even if "custody" was the determinative issue on the imposition of sanctions, and the plaintiffs respectfully decline to accept that proposition, the City's expert, Lieutenant MacGillis, testified that Perry was in the 'physical custody' of the County at varying times and was in the custody of the County prior to his death:

> A: [Perry] was in the administrative custody of the police department and at varying times was in the physical custody of both the MPD officers and the Milwaukee County Sheriff's Department.
> Q: So when the Milwaukee County Sheriff's Department was in the immediate vicinity of Mr. Perry, they were in his physical custody?
> A: He was in [the County's] physical custody.
> …
> Q: If a Milwaukee County Sheriff's Department officer walks away from a person who is at the CJF, does that inmate remain in the physical custody of the sheriff's department?
> A: At that point in time, yes.
> …
> Q: So it was joint physical custody of Mr. Perry?
> A: At certain points, yes. And then the MPD officers walk away to do some administrative function, hand over paperwork through the chute to intake deputy.
> Q: Whose custody was Mr. Perry in at 8:48?
> A: He was in the care and custody of one of the nurses at the nursing station, I'm assuming.
> Q: So when you say "care and custody," he was in the custody of the Milwaukee Sheriff's Department?
> A: Yes.
> …
> Q: Whose custody was Mr. Perry in when he died?
> A: MPD's, the sheriff's department. Both.
> Q: Who was responsible for Mr. Perry's health, safety, and welfare once he arrived at CJF?
> A: MPD and MCSO officers and nursing staff.

4

Q: So it was a joint responsibility, correct?
A: It is in my opinion, yes.

(D.120-12:50-51, 54) If an expert on the issue of "custody" testified that the County had custody of Perry at the time of his death, certainly a private attorney general taking the same position cannot be guilty of vexatious or imminently unreasonable conduct on that exact issue.

Plaintiff's expert, Robert Prevot (Prevot), M.A., is a highly-accredited criminal forensics consultant with thirty-four years of experience as an officer, detective, training officer, supervisor and jail manager. (D.120-14:2) Prevot opined that the County was responsible for the care, safety and welfare of Perry regardless of whether he had been accepted as an inmate:

> 7.3…Inspector Schmidt repeatedly stated that Mr. Perry was not [MCSO's] prisoner and that his staff was not responsible for what occurred. Inspector Schmidt failed to acknowledge that Mr. Perry was in a county facility and that the jail staff was responsible for Mr. Perry's care, whether or not he had been accepted as an inmate. The jail policies and procedures apply to inmates in their facility, whether they are in a housing unit or are being processed in the intake unit.
>
> 7.4 …Officers from the Milwaukee Police Department brought Mr. Perry into the county jail facility. It then becomes the responsibility of the Milwaukee County Sheriff's Department Jail staff to determine if he is medically suitable for booking. The County jail staff cannot say, 'We are not medically screening people today.' It was the responsibility of members of both agencies present to provide medical care, safety, and comfort to Mr. Perry. The supervisor assigned to the booking area during the incident, Sgt. Hale, was responsible for directing the activities of all of the personnel who were present.

(D.120-14:45) Now two experts support an argument against the County on the issue of its custody of Perry at the of his death.

The City's Chief of Police, Edward Flynn, testified that Perry's death occurred during the transfer of custody from the City to the County:

> Q: Just so we're clear for the record, because this is an issue in the case--
> A: Mm-hmm.
> Q: --is it the chief of police for the Milwaukee Police Department's opinion that Mr. Perry did or did not remain in the custody of MPD at the point he passed away?
> A: You may be – forgive me. All right? I'm not trying to engage in semantics. What my understanding all along has been, we were in the process of transferring custody from us to the sheriff's office. Our people stayed there, the sheriff's people were there, everybody was there. At what legal moment he was theirs, not ours, I can't answer. I do know that we

5

> were taking him where we believed that he should be. It was my understanding he was in the process of being admitted, not rejected, when he had his event. I mean, I know it's a long answer to a short question, but that's the best I can do.
> …
> Q: All right. Based on your vast amount of experience, not only as a police officer over the last 40 years but as a chief of police for different municipalities for the last 25, and for the last six at Milwaukee Police Department, are you able to say with any degree of probability whether custody of Mr. Perry changed from the Milwaukee Police Department to the Milwaukee County Sheriff's Department at any point prior to his death?
> A: The best I can say is [transfer of custody from MPD to MCSO] was in process. We were in the process of handing him off. If he was still technically ours, that may well have been so, but my understanding was it virtually happened in the middle of a transfer of custody.

(Doc. 120-13:34) Three experts have opined either joint custody or in the process of transfer so it would be question of fact for a jury to determine under the totality of circumstances test. Hardly frivolous or vexatious.

County defendant and supervisor on duty at CJF at the time of Perry's in-custody death, Sgt. Hale, admitted that the County was primarily responsible for Perry's care once he was screened at CJF:

> Q: So once Mr. Perry was screened by the nurse at the sheriff's department, the nurse was primarily responsible for his care and treatment going forward?
> A: Yes, to a certain degree. Yes.

(D.86-12:19) County defendant, Deputy Inspector Schmidt, confirmed Perry was at the mercy of his keepers to receive timely care:

> Q: Based on your experience in the correctional setting and your observation of the last minutes of his life while he was at the county facility, tell me what ability you observed Mr. Perry had to take care of his own health care needs while he remained bound at his arms and legs and had a spit mask on where he was bleeding profusely from his mouth.
> A: None.
> Q: You would agree that such inmates must depend on their keepers to respond to their needs, ranging from obtaining aspirin for a headache to responding to an emergency medical situation, true?
> A: True.

(Doc. 86-21:50) County defendant, Nurse Virgo, who performed Perry's initial screening agreed:

> Q: You would agree that when Mr. Perry presented to you, bound by his arms and legs and gagged with a spit mask, that he was not in a position to take care of his own needs at that point in time?

6

A: Correct.

(Doc. 86-10:24) Virgo's supervisor, Nurse Watts, also agreed that Perry was reliant on those individuals in charge of him at CJF to timely and properly respond to his medical needs. (D.86-17:34) The County's Director of Nursing at CJF, Pope-Wright, stated the County nurses had an obligation to determine if Perry suffered from a medical emergency and respond appropriately:

> Q: You would agree that Mr. Perry had to depend on the people who had him in custody to respond to any health care needs that he may have, correct?
> A: Correct.
> Q: Including responding appropriately to a medical emergency, right?
> A: Yes.
> Q: You agree that your nurses not only had an obligation to identify whether Mr. Perry was suffering from a medical emergency, but they also had an obligation to respond appropriately, true?
> A: Yes.

(Doc. 120-1:19) All of these facts support plaintiffs' position that the County owed constitutional duties to Perry after it was established he was not free to leave the County's jail.

There was no dispute that the CJF pre-booking room was a secure area and Perry could not leave unless allowed by CJF employees. (D.119:16, 24-25) The County's Deputy Inspector Schmidt testified that the pre-booking room was secure:

> Q: It was a secure area. [Perry] could have walked out if he so chose?
> A: No.
> …
> Q: And no one could get out that isn't allowed by one of your [MCSO] officers, correct?
> A: Correct.

(D.86-21:6, 18). County defendant Nurse Wenzel observed blood and vomit on Perry's spit mask, blood on his shirt, and that he had "soiled" underpants down by his ankles. (D.86-13:15) Even though she took no action to assist him, (D.86-13:15-18, 26, 28, 30, 53-54), Wenzel agreed that Perry could not leave CJF:

> Q: Was Mr. Perry free to leave at any point in time while he was at the prebooking facility?
> A: No. Not to my knowledge.

7

(Doc. 86-13:4) MCSO Correctional Officer Darius Holmes was assigned to the control tower and had sole authority over ingress and egress to the CJF pre-booking area:

> Q: When you were at that post, did you have permission to leave it at any point in time as the booking and control officer?
> A: You don't leave that post for any—for anything.
> Q: Tell me why.
> A: Because you are the person who are (sic) in control of letting people in and out of the jail. So under no circumstances do you leave that unless you are relieved by a supervisor, which I wasn't.
> …
> A: When – whenever an agency pulls up at the facility, they come to what's called the sally port, and there's a big garage door that's controlled by master control. Once they accept them, we make sure that they remove any duty weapon or any weapon of any sort, whether Taser or pepper spray, whatever the case may be."

(D.86-8:4-5). The facts clearly indicated that regardless custody Perry was seized by the Milwaukee County Defendants.

Even if seizure was an undisputed issue, certain County defendants – the nurses – were required to assist a prisoner in need. Despite admitting that Perry was reliant on the County to provide for his medical needs, Nurse Virgo did not screen Perry until five minutes after he was dragged into the CJF with blood seeping from his spit mask. (D.120-2:2) (D.120-5) (D.120-6:3) The County's Director of Nursing at CJF, Pope-Wright, testified that if the County Nurses were aware that Perry had blood seeping from his spit mask it would be unacceptable to wait five minutes before performing the initial health screening because, "It's a medical emergency. They need to respond." (D.120-1:13).

IV. ARGUMENT.

    A. PLAINTIFFS' CLAIM AGAINST THE COUNTY DEFENDANTS WAS SUPPORTED BY A LEGAL AND FACTUAL BASIS.

Section 1927 clearly is punitive and thus must be construed strictly. *Badillo v. Central Steel & Wire Co.*, 717 F.2d 1160, 1166 (7th Cir. 1983). A court may impose section 1927 fees only to sanction needless delay by counsel. *Reid v. United States*, 715 F.2d 1148, 1154 (7th Cir. 1983). The

8

purpose of section 1927 is to penalize attorneys who engage in dilatory conduct. House Conf. Rep. No. 1234, 96th Cong., 2d Sess. 8, *reprinted in* 1980 U.S. Code Cong. & Ad. News 2781, 2782 ("Conference Report"). To be liable under section 1927, counsel must have engaged in "serious and studied disregard for the orderly process of justice." *Overnite Transportation Co. v. Chicago Industrial Tire Co.*, 697 F.2d 789, 795 (7th Cir. 1983) (quoting *Kiefel v. Las Vegas Hacienda, Inc.*, 404 F.2d 1163, 1167 (7th Cir.), *cert. denied*, 395 U.S. 908, 89 S. Ct. 1750, 23 L. Ed. 2d 221 (1968)).

In *Knorr*, where counsel's alleged misconduct was the filing and arguing of a claim, the Seventh Circuit held it was not sufficient that the claim be found meritless; the claim must be without a plausible legal or factual basis and lacking in justification. *Knorr Brake Corp. v. Harbil, Inc.*, 738 F.2d 223, 226-27 (7th Cir. 1984). Here, plaintiffs' counsel had plausible legal and factual bases to pursue claims against the County defendants based on multiple expert opinions that Perry was in the County's physical custody, joint custody and/or Perry was seized by the County Defendants. The fact that Perry was not able to leave the CJF by itself provides a plausible legal and factual basis to pursue the County Defendants for the violation of Perry's rights under the 4th Amendment. Further, the testimony of the City Defendants who stated Perry was in joint physical custody and the testimony of the County Defendants who stated they were responsible for Perry's care, when considered in conjunction, created a plausible legal and factual basis for pursuing claims. Therefore, minimal if any monetary sanction is appropriate.

The Seventh Circuit established that a rule permitting the imposition of attorneys' fees only where the attorney intentionally acts without a plausible basis is proper. Such a rule protects three important interests. First is the societal interest in encouraging free access to the courts. Second is the interest of the client in obtaining legal counsel who otherwise might be chilled from taking a close case. Third is the lawyer's ethical obligation to represent his or her client zealously within the bounds of the law. Congress, in allowing attorneys' fees to be assessed under section 1927, was

9

concerned "that the provision…in no way dampen the legitimate zeal of an attorney in representing his client." *Knorr*, 738 F.2d at 227. Here, substantial attorney's fees would clearly dampen the legitimate zeal of private attorney generals prosecuting §1983 cases and fighting for the advancement and protection of civil rights delineated by the U.S. Constitution. Advancing the position that an individual, like Perry, who was locked in the CJF, was "seized" – unable to leave and at the mercy of the County employees – created duties for all those government actors responsible for his care simply does not equate to vexatious conduct that is necessary before hundreds of thousands of dollars are assessed in monetary sanctions. The County impeded Perry's freedom of movement and to argue he was seized by the County as a result is reasonable and appropriate – especially considering the severity of the ultimate outcome, Perry's in-custody death. The plaintiffs' attorneys engaged nothing more than zealous advocacy on behalf of their clients.

Plaintiffs brought suit against the County Defendants pursuant to §1983 which holds, "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress…" 42 U.S.C. §1983. The U.S. Supreme Court first recognized the "private attorney general" doctrine in *Newman v. Piggie Park Enterprises, Inc.*, one of the earliest cases construing the Civil Rights Act of 1964. *Newman v. Piggie Park Enterprises, Inc.*, 390 U.S. 400, 401-402 (1968). The Court noted that when the civil rights legislation was passed it was evident that enforcement would prove difficult and that the Nation "would have to rely in part upon private litigation as a means of securing broad compliance with the law." *Id.* at 401. The Court created new doctrine by finding that private attorneys who prosecute civil rights actions act as a "private attorney general" and are entitled to recover attorney fees even if

10

they prevail on non-monetary suits. *Id.* at 402. Congress subsequently codified the "private attorney general" doctrine into law with the enactment of the Civil Rights Attorney's Fees Award Act of 1976, 42 U.S.C. §1988. *Grooms v. Snyder*, 474 F. Supp 380 (N.D. Ind. 1979); see also, *Black's Law Dictionary* 1213 (7th ed. 1999) ("Private attorney general doctrine. The equitable principle that allows the recovery of attorney's fees to a party who brings a lawsuit that benefits a significant number of people, requires private enforcement, and is important to society as a whole.")

"The purpose of §1988 is to ensure 'effective access to the judicial process' for persons with civil rights grievances." *Blanchard v. Bergeron*, 489 U.S. 87, 95 (1989); quoting *Hensley v. Eckerhart*, 461 U.S. 424, 429 (1983). "The intention of Congress was to encourage successful civil rights litigation…Congress has elected to encourage meritorious civil rights claims because of the benefits of such litigation for the named plaintiff and for society at large, irrespective of whether the action seeks monetary damages." *Id.* at 95-96 (1989); see also, *Flaherty v. Marchand*, 284 F. Supp. 2d 1056, 1065 (N.D. Ill 2003) (discussing policy imperative of §1988 encouraging attorneys to take risky civil rights cases); see also, *Riverside v. Rivera*, 477 U.S. 561, 578-80 (1986) (In enacting §1988, "Congress recognized that private-sector fee arrangements were inadequate to ensure sufficiently vigorous enforcement of civil rights.")

The only way to successfully pursue civil rights litigation, especially when an egregious in-custody death is at issue, is to zealously pursue all avenues of inquiry seeking to hold those culpable individuals responsible for their actions. §§1983 and 1988 are designed to encourage attorneys to take risky cases and encourage meritorious civil rights litigation to ensure that those rights are vigorously enforced in areas where the State has proven unwilling or unable to secure compliance with our civil rights laws. Awarding anything, or even nominal monetary sanctions in this matter, would severely chill the zealous prosecution of the § 1983 actions in this district.

## B. THE COUNTY FAILED TO MITGIATE ITS DAMAGES BY RESOLVING THE ISSUE QUICKLY OR EFFICIENTLY AND THEREFORE HAVE NO BASIS FOR ATTORNEYS FEES.

Here, the County seeks essentially all of their fees from the inception of this litigation, but fails to explain why they took no action to mitigate the alleged damages. A party defending a claim that believes has no basis or prosecuted in a frivolous fashion has a duty to mitigate its legal fees and expenses by resolving the issue quickly and efficiently. Though discussing Rule 11 sanctions, *Dubinsky v. Owens*, 849 F.2d 1034 (7th Cir. 1988) is instructive on this matter.

> A party defending against a frivolous paper has a duty under Rule 11 to mitigate its legal fees and expenses by resolving frivolous issues quickly and efficiently. *Brown*, 830 F.2d at 1439; Schwarzer, *Sanctions Under The New Federal Rule 11-A Closer Look*, 104 F.R.D. 181, 202 (1985) ("obligation to mitigate is implicit" in the rule). Counsel "must mitigate damages by correlating his response, in terms of hours and funds expended, to the merit of the claims." *INVST Financial Group, Inc. v. Chem-Nuclear Systems, Inc.*, 815 F.2d 391, 404 (6th Cir. 1987), *cert. denied*, 484 U.S. 927, 108 S. Ct. 291, 98 L. Ed. 2d 251 (1987) (footnote omitted). Further, the court must consider to what extent a defending party's injury could have been avoided or was self-inflicted. *Thomas v. Capital Security Services, Inc.*, 836 F.2d 866, 879 (5th Cir. 1988) (en banc). This entails an examination of the promptness and method of bringing the frivolous conduct to the attention of both the court and the opposing party. *See* Fed. R. Civ. P. 11 advisory notes ("[a] party seeking sanctions should give notice to the court and the offending party promptly upon discovering a basis for doing so"). "If a baseless claim could have been readily disposed of by summary procedures, there is little justification for a claim for attorney's fees and expenses engendered in lengthy and elaborate proceedings in opposition." *Thomas*, 836 F.2d at 879 n.19 (*quoting* Schwarzer, 104 F.R.D. at 200-201).

*Dubisky v. Owens*, 849 F.2d 1034, 1037 (7th Cir. 1988). The County has done nothing to satisfy the elements required under *Dubisky*.

Here, the County argued very early that Perry was not in its "custody" and therefore not seized, "Perry died while still in the custody of the Milwaukee Police Department in the pre-booking area of the Jail." (D.16:4) Yet, the County failed to press its position even though the Court could have addressed custody and seizure by summary proceedings years ago – without the County's private attorneys billing hundreds of thousands of dollars in fees. Therefore, as in *Dubisky*, "there is little justification for a claim for attorney's fees and expenses engendered in lengthy and elaborate proceedings." *Dubisky v. Owens*, 849 F.2d 1034, 1037 (7th Cir. 1988).

12

The County confirms that its position on custody/seizure has been consistent from the start:

[I]t was abundantly clear that Perry was not even in the custody of the Milwaukee County Defendants . . . Accordingly this Court should award the Milwaukee County Defendants all their reasonable fees and costs in defending against this frivolous suit after April 17, 2013.

(D.155:2). Yet the County makes no attempt to explain why it failed to seek summary disposition in the earliest stages of litigation or how its ongoing defense of meritless claims for hundreds of thousands of dollars is justified under these circumstances. If it was so clear, hundreds of thousands in attorney fees were unnecessarily expended on such a simple matter. Putting aside (a) the fact that Fourth Amendment seizure is the appropriate analysis not custody, and (b) the Plaintiffs' good faith legal position that Perry was "seized" by the County when he was not free to leave the CJF and his freedom of movement was restricted by the County's employees, the County's private attorneys did anything but mitigate their fees. Instead, they billed for hundreds and hundreds of hours and got paid hundreds of thousands of dollars in the process of defending what they believed from the beginning to be a meritless claim. The County's attorneys make no attempt to set forth any action on their part to mitigate the damages they now seek to recover on behalf of their client. On this record, there is no justification to award the County's attorneys anything for the fees and costs that were unnecessarily incurred in the event they had advanced the position plaintiff's claims were meritless from the beginning. Based on *Dubinsky*, no award is justified.

### C. THE MILWAUKEE COUNTY DEFENDANTS MISCONTRUE THE APPRROPRIATTE MEASURE OF ATTORNEYS FEES PURSUANT TO §1927.

The County cites a series of cases claiming they are entitled to attorneys' fees determined by the Lodestar method. (D.155:2-3) This position is simply wrong. Not one of the cases cited by the County even mentions § 1927 sanctions, or sanctions in general.

Trial courts have wide latitude in deciding whether conduct is sanctionable. *Samuels v. Wilder*, 906 F.2d 272, 276 (7th Cir. 1990). This discretion "extends as well to the selection of the sanction."

13

*Id.* "[H]owever…Rule 11 and §1927 are *sanctions* rules, not compensation devices. Persons required to pay sanctions have no entitlement to a perfect match between the award and the defendants' legal fees, and the discretion the district judge possesses in deciding whether the conduct is sanctionable extends as well to the selection of the sanction." *Id.* at 276 (emphasis in original).

Here, this Court has the discretion and authority to select the appropriate sanction. Based on the above facts and the Plaintiffs' good faith pursuit of claims designed to protect not only the rights of Perry, but the rights of all those protected under the United States Constitution, no monetary sanction is appropriate.

Dated this 15th day of June, 2016.

**MAHANY LAW**
Attorneys for the Plaintiffs' Counsel

   /s/ Brian H. Mahany
Brian H. Mahany
State Bar No. 1065623

**MAILING ADDRESS:**
P.O. Box 511328
Milwaukee, WI 53202
Telephone: (414) 258-2375
Facsimile: (414) 258-2521
brian@mahanylaw.com