In the

# United States Court of Appeals

## For the Seventh Circuit

———————————

Nos. 16-2353 and 16-3130

ESTATE OF JAMES FRANKLIN PERRY,
*et al.*,

*Plaintiffs-Appellants*,

*v.*

CHERYL WENZEL, *et al.*,

*Defendants-Appellees.*

———————————

Appeals from the United States District Court for the
Eastern District of Wisconsin.
No. 2:12-cv-00664 — **Rudolph T. Randa**, *Judge.*

———————————

ARGUED JANUARY 5, 2017 — DECIDED SEPTEMBER 18, 2017

———————————

Before POSNER,[*] MANION, and WILLIAMS, *Circuit Judges*.

WILLIAMS, *Circuit Judge*. James Franklin Perry died on the
floor of the Milwaukee County Criminal Justice Facility less
than 24 hours after Milwaukee City police officers arrested
him. Shortly after he was arrested, Perry suffered a seizure.

———————————

[*] Circuit Judge Posner retired on September 2, 2017, and did not par-
ticipate in the decision of this case, which is being resolved by a quorum
of the panel under 28 U.S.C. § 46(d).

The City transported him to the hospital where he received treatment. But, after he returned to the City jail, the City failed to provide Perry with medical care even though he displayed signs of deteriorating health. Instead, they shackled him and placed a spit mask over his face. The City officers ignored his cries for help, his complaints that he could not breathe, and transferred him to the County's Criminal Justice Facility.

After arriving at the County's Criminal Justice Facility, the County nurses decided that Perry was medically unfit to be booked into the jail. Yet, they provided him with no medical care and failed to remove the spit mask, which was seeping blood. When a nurse finally removed the spit mask, it was clear that Perry was no longer breathing. Although emergency efforts were taken, they were unsuccessful and Perry died on the County facility's floor. Perry's estate and his minor son (to whom we will collectively refer to as "Perry") brought suit against a number of police and corrections officers and the County's nurses pursuant to 42 U.S.C. § 1983, alleging that the failure to provide Perry with any medical care while he was in their custody violated his constitutional rights. Perry also brought a *Monell* claim against the City, alleging that it had a *de facto* policy of failing to investigate in custody deaths and ignoring medical complaints made by its detainees. Lastly, Perry brought state law claims against the individual defendants. The defendants filed for summary judgment, which the district court granted on all claims.

On appeal, Perry contends that the district court improperly weighed the evidence and ignored factual disputes on his § 1983 claim. We agree. On this record, which includes surveillance footage from both the City and County facilities, a

jury could conclude that Perry is entitled to relief on his § 1983 claims.

The defendants contend that even if the district court erred by improperly weighing the evidence regarding Perry's § 1983 claims, it properly concluded that they were entitled to qualified immunity. We disagree, because in 2010, it was clearly established that a detainee such as Perry was entitled to objectively reasonable medical care and failing to provide any medical care in light of a serious medical need was objectively unreasonable. As a result, qualified immunity is not a bar to Perry's suit. But, we agree with the district court that Perry's *Monell* claim is not viable because he has failed to adequately support these claims with admissible evidence.

Finally, Perry argues that the district court improperly concluded that the defendants were entitled to governmental immunity on his state-law claims of negligence and wrongful death. We agree, in part. The district court erred when it determined that the defendant nurses were entitled to immunity, because under Wisconsin law, the medical discretion exception to governmental immunity applies to their actions. But, we find that the officer defendants were entitled to immunity, because the medical discretion exception is narrow and does not extend to police or correctional officers.

## I.  BACKGROUND

Because Perry appeals from a grant of summary judgment against him, we construe the evidence and take all reasonable

inferences in his favor. *See e.g.*, *Ortiz v. City of Chi.*, 656 F.3d 523, 527 (7th Cir. 2011).

### A. Perry's Arrest

Shortly after 2:00 a.m. on September 13, 2010, Perry was arrested by Milwaukee police officers after a traffic stop and he was transported to the City's Prisoner Processing Section ("PPS"), where he was processed. As part of this processing, at approximately 5:45 a.m., an initial medical intake screening interview was conducted. The Medical Receiving Screening Form from that interview indicates that Perry told the officer conducting the interview that he suffered from seizures as a result of a previous head injury and that his seizures were treated twice a day with medication. Perry also stated that he had not taken his medication the afternoon before. Even though he had not taken his medication, the City did not give or get him any medication.

After being screened and disclosing his medical condition to the officers, Perry was placed in a large holding cell. This cell—known as "the bullpen"—was capable of holding up to 150 detainees at a time. In the bullpen, approximately 12 hours after he was arrested, Perry had a seizure. During the seizure, Perry struck his head on the concrete floor. Afterwards, Perry was able to communicate and was cooperative with officers. The Milwaukee Fire Department was summoned, and emergency medical technicians attended to Perry's medical needs in the PPS.

### B. Perry Is Treated at Hospital

Perry was then transported by private ambulance to the Aurora Sinai Medical Center with Officer Corey Kroes while his partner, Officer Crystal Jacks, followed behind in a police

car. In the ambulance, Perry was awake, but appeared tired and did not talk very much. After arriving at the hospital, Perry was cooperative with medical professionals and was able to answer their questions.

The two officers remained with Perry while he was treated in the emergency room. Shortly after arriving, Perry informed the officers and hospital personnel that he had to use the bathroom to have a bowel movement. He was able to slowly walk to the bathroom on his own. He was neither wobbly nor unsteady. He also walked back to his bed on his own. But, after returning from the bathroom, he had at least two more seizures. According to Officer Kroes, after each seizure, Perry became more tired, weak, and less responsive. To treat his seizures, Perry was given Dilantin, a drug used to prevent seizures, and Ativan, a sedative also used to treat seizures. Perry began to mumble, occasionally screamed out, and began to drool.

Both Officers Kroes and Jacks were concerned about Perry's condition and why he did not seem to be improving. Officer Jacks expressed her concern to the hospital medical staff, who told her that his condition had changed because of the medication he had been given. But a doctor said that Perry could stay in the emergency room a short time longer so that he could rest. So, the officers stayed in the hospital for another 30 minutes. The officers also insist that the message from the medical staff was clear: Perry's drowsy condition was because of the medication and that he was going to be released. In fact, according to Officer Kroes, one of the nurses told him that Perry was simply faking his condition.

Officer Jacks was concerned that Perry was going to be released, so she called the PPS supervisor, Lieutenant Karl Robbins. She told him that although Perry attempted to dress himself to leave the hospital, he was unable to do so on his own. She also told him that Perry was unable to walk. Officer Jacks asked whether they should return Perry to the PPS, or take him to the County's Criminal Justice Facility ("CJF"), where nurses were available. Lieutenant Robbins instructed the officers to return to the PPS with Perry and that he could not be transferred to the CJF since his paperwork was not complete. According to Officer Kroes, Lieutenant Robbins told them that they somehow had to get Perry back to the PPS, even if it meant calling for extra officers to come help carry him. However, Lieutenant Robbins contends that he never received a report that Perry's condition had deteriorated. Instead, he asserts that he was told that Perry was not cooperating at the hospital.

Nonetheless, at approximately 6:45 p.m., Perry was discharged. Although his medical record states that he was "alert and appropriate upon [discharge]," according to the officers, Perry was unable to walk on his own and was unsteady on his feet. As a result, he was unable to get into a wheelchair on his own, and the officers had to assist him in doing so. The officers placed Perry, handcuffed, in the back seat of their police vehicle. Officer Jacks placed him in his seat belt. Perry was not combative or otherwise uncooperative. The two officers then drove Perry back to the PPS, which was only minutes away from the hospital.

The hospital provided the officers with Perry's discharge paperwork. This paperwork noted that Perry had suffered from a seizure and indicated that the most common cause of

a recurrent seizure was a missed dose of seizure medication. Additionally, the paperwork identified side effects from the Dilantin he had received. These side effects included, "[w]obbly gait, poor balance or coordination, slurred speech, jerky eye movement, drowsiness." Lastly, the paperwork instructed Perry to "GET PROMPT MEDICAL ATTENTION" if he, among other things, experienced unusual irritability, drowsiness or confusion or remained confused for more than 30 minutes after a seizure. Officer Jacks understood this to mean that if Perry's condition changed, they should return him to the hospital. The officers brought this paperwork back to the PPS with them, where, at some point, they gave it to Lieutenant Robbins, their commanding officer.

### C. Perry Returned to PPS

After returning to the PPS, Officers Kroes and Jacks were met in the garage by two additional police officers, Officers Froilan Santiago and Rick Bungert, who assisted in removing Perry from the police car, as he was unable to get out on his own. Surveillance video from the PPS shows the officers dragging Perry into the elevator, where they placed him on the floor with his feet out in front of him.

When the elevator reached the fifth floor, the surveillance video showed that the four officers, two holding his arms and two holding his feet, carried Perry down the hallway. The officers placed Perry on the floor, as they waited for a cell to be assigned. While he was on the floor, Officer Bungert placed him in a compression hold, as Perry moaned and complained that he was in pain. He also yelled out, at various times, "Jesus, just kill me."

One of the officers said that Perry was starting to resist their hold, by pushing against them. The officers repeatedly told Perry to "behave himself," as he continually moaned. Another officer, exactly whom is unclear from the video, stated that Perry was simply "faking it." Eventually, while still on the floor of the PPS hallway, Perry defecated and urinated in his pants. No one inquired as to whether Perry had done that intentionally, or whether this was an unintentional action that might suggest that he needed further medical treatment. Nor did Perry ever receive a new pair of pants.

Lieutenant Robbins was present in the hallway while Officer Bungert applied the compression hold to Perry. He spoke briefly to Perry and both the officers who were restraining Perry, while he waited for another officer to retrieve a beverage for him from an area outside of the camera's view. As Lieutenant Robbins walked away, he laughed. He never inquired as to Perry's medical condition or whether he needed medical assistance. And, even though it was obvious that Perry had defecated and urinated, like his subordinates, Lieutenant Robbins did not inquire as to whether this was a voluntary act. The smell was so strong, however, that Officer Jacks eventually became physically ill and vomited.

Approximately 10 minutes after Perry was returned to the PPS, and after he noticed that Perry was spitting and drooling, Officer Alexander Ayala requested a spit mask.[1] While Perry's face is not visible on the video, as the officers applied the spit mask, one stated, "he's spitting!" But, it is unclear whether

---

[1] A spit mask, also referred to as an expectorant shield, is a hood-like piece of material that is placed over a detainee's face to prevent the detainee from being able to spit on officers or other individuals.

Perry was spitting or drooling, and taking the facts in the light most favorable to Perry, we must assume as he contends, that this was not an aggressive act. Police Aide, Jacob Ivy, retrieved the mask and helped the officers place it over Perry's face.

After the spit mask was applied, the officers could no longer see Perry's face. Perry screamed, "help me" and that he could not see. He continued to yell, "you're killing me," and that he was unable to breathe. Officer Kroes responded to Perry's complaint that he could not breathe by stating, "if you're talking, you're breathing." Perry, still moaning, was then carried by five officers to cell A3.[2] As he was carried towards the cell, Lieutenant Robbins stated, "now, we're going to treat you like we used to treat prisoners … like animals." There is no dispute that Lieutenant Robbins, who was later investigated for this incident, made this statement, which is also captured on the surveillance footage.[3]

Before Perry was placed in the cell, the officers removed his handcuffs and shackles. However, they left his spit mask

---

[2] Perry asserts that another prisoner witnessed the officers drop him on his face as they were carrying him to cell A3. These allegations are contained in a police investigation report. We cannot consider these statements because they are hearsay, for which there is no exception that renders them admissible. *See Cairel v. Alderden*, 821 F.3d 823, 830 (7th Cir. 2016) (noting that the court must find that each layer of hearsay contained in a police report is admissible before it can consider the entirety of the report); *see also* FED. R. EVID. R. 805 ("Hearsay within hearsay is not excluded by the rule against hearsay if each part of the combined statements conforms with an exception to the rule.").

[3] At the conclusion of the investigation, he was given two options: resign or accept a demotion. He chose to resign and is no longer a member of the Milwaukee Police Department.

on. Officer Margarita Diaz-Berg, the Assistant Jailer on duty that evening, conducted a wellness check of Perry every 15 minutes. While she noticed that he had removed his spit mask, she also heard him grunting and saw him rolling on the floor. But, she took no action to determine whether he was experiencing a medical emergency.

Perry could not be transferred to the CJF until his paperwork was completed and because Perry was exhibiting "inappropriate behavior" Lieutenant Robbins expedited it. Around 8:30 p.m., Officer Diaz-Berg opened the door to cell A3 so that Officers Frank Salinsky and Richard Lopez could remove Perry. Perry was compliant as they placed him in handcuffs and shackles once more. The spit mask was also secured over his face. Officer Ayala assisted the officers in escorting Perry, who walked with assistance to the elevator. When the elevator arrived in the garage, Perry had to be dragged out to the police car.

After he was removed from cell A3, Officer Diaz-Berg and Lieutenant Robbins observed spots of blood on the floor where Perry had been. Additionally, Andy Puechner, a janitor at PPS, observed blood, saliva, urine, and feces on the cell's floor. No one, however, relayed this information to the County. Nor did anyone inquire as to whether these bodily excretions were caused by a medical condition.

### D. Perry Transferred to CJF

Before transferring Perry to the CJF, a County facility, the City called the facility to inform County officials that they were transporting a "combative prisoner." At 8:41 p.m., Perry arrived at the CJF. Two cameras in the pre-booking facility captured the following events.

Two City Officers, Officers Salinsky and Lopez, dragged Perry into CJF. They were assisted by two County Correctional Officers, Anthony Arndt and Kelly Kieckbusch. Another City Officer, Stephon Bell, was stationed at a desk by the door into the CJF's pre-booking area, where he served as a liaison between the City and the County as prisoners were transferred between the two entities. Perry remained in his soiled clothing from earlier in the day, was fully shackled, and was wearing the spit mask. Corrections Officer Kieckbusch noticed that the mask had blood on it. And, while Corrections Officer Kieckbusch had been told that Perry was a combative prisoner, she did not observe that he was combative when he arrived to the CJF. While Corrections Officer Kieckbusch testified that Perry "didn't appear to want to walk," she could not say whether Perry was able to walk. Again, taking the facts in the light most favorable to Perry, we assume that he was unable to walk when he arrived at the County facility and was not behaving in a combative manner, which, to the extent relevant, is for a jury to determine.

The four officers placed Perry on the floor. While surrounded by the officers, Perry continued to slowly squirm. Approximately a minute and a half later, the officers moved Perry to the bench across from the nurses' station. As he was moved, his pants fell down around his ankles, exposing his clearly soiled undergarments. After he was placed on the bench, Perry continued to writhe and shake. Because the video does not have sound, it is unclear how much noise he made.

According to the County's policy, each inmate received a medical screening "to identify inmates who perhaps ought

not be accepted into jail custody until they have been medically evaluated and cleared for admission." While Corrections Officer Kieckbusch sought a nurse to attend to Perry, Sergeant Fatrena Hale, attempted to communicate with Perry. But, Perry's responses were unintelligible. In her report, Sergeant Hale noted that "[b]lood was seeping" from Perry's spit mask.

According to Nurse Nicole Virgo, a registered nurse who worked four shifts a month at the CJF as a "pool nurse," an unidentified correctional officer approached her and asked her to evaluate Perry. That correctional officer told Nurse Virgo that Perry had recently been to the hospital. So, Virgo looked at his medical records, which indicated that Perry had suffered from a seizure and had been given seizure medication at the hospital earlier that day. The discharge notes did not indicate that Perry had a heart condition or had suffered from chest pain or difficulty breathing.

At 8:45 p.m., Nurse Virgo approached Perry and spoke to him from a distance. Although she contends that she knew something was wrong with Perry the minute she saw him, the video clearly shows that she never touched Perry, never took his vitals, and did not remove his spit mask. While Nurse Virgo observed that Perry was not labored in his breathing, she also observed "profuse blood" on his spit mask and that he had soiled himself—two conditions that she believed were signs of distress. During this interaction, Corrections Officers Kieckbusch and Arndt physically restrained Perry on the bench. After 32 seconds, Nurse Virgo walked away to call the attending physician to get an official order allowing her to refuse to book Perry into the CJF.

Almost a minute after Nurse Virgo walked away, Corrections Officers Kieckbusch and Arndt allowed Perry to slide to

the floor, as Officers Salinsky and Lopez walked back towards the entrance to the CJF. Once Perry was on the floor, Corrections Officer Kieckbusch walked away, leaving Corrections Officer Arndt standing by Perry's side. Perry continued to roll around on the floor, in shackles and the spit mask, with his pants around his ankles. Nurse Virgo returned to Perry, appearing to ask him additional questions. But, she neither touched Perry nor removed his blood-stained spit mask. Again, Nurse Virgo left Perry's side.

While Perry was laying on the floor, Nurse Cheryl Wenzel stood behind the nurses' station observing him. As Perry continued to roll around on the floor in front of Corrections Officer Arndt, she too did nothing. At 8:48 p.m., Sergeant Hale called for an ambulance to come to the facility. Yet, no medical attention was provided to Perry. At 8:49 p.m., Corrections Officer Arndt walked away, and Perry was left alone on the floor of the CJF. Over a two-minute period, Perry continued to writhe around, his movements slowing over time.

At 8:51 p.m., Nurse Wenzel instructed Officers Salinsky and Lopez to lift Perry's body up. While they did so, she stood at a distance from Perry. She then asked the officers to remove his spit mask so that she could wipe his face off with a towel. But, when she did, Perry's head fell backwards, his eyes rolled back into his head, and it became clear that he was no longer breathing. It was also clear that the amount of blood around Perry's mouth was much more significant than it had appeared with the spit mask over his face. For the first time since Perry returned from the hospital, at 8:52 p.m., his vital signs were taken by Nurse Wenzel, who discovered that Perry no longer had a pulse.

A medical emergency was called at 8:52 p.m. and emergency efforts were taken to revive Perry. Officer Abie Douglas delivered the CJF's resuscitation bag to the nurses and returned to his post in the booking room. Officer Sheila Jeff delivered an Automated External Defibrillator ("AED") to the area, and then, like Officer Douglas, returned to her post in the booking room.

Although the Milwaukee Fire Department was dispatched to the CJF and life-saving measures were employed, efforts to revive Perry were unsuccessful. He was pronounced dead at approximately 9:21 p.m., less than 24 hours after he was first arrested. An autopsy revealed that Perry died from a coronary artery thrombosis, or as the medical examiner explained, he had a clot in one of the heart's blood vessels that deprived Perry's heart of blood and oxygen.

### E.  Procedural History

On June 8, 2012, Perry's Estate and his minor son (to whom we will refer to collectively as "Perry") filed a complaint in Wisconsin state court. On June 29, 2012, the defendants petitioned to remove the case to the United States District Court for the Eastern District of Wisconsin pursuant to 28 USC § 1441(a) and (c). Perry filed an Amended Complaint, the operative complaint in this action, on March 25, 2013, which contained claims pursuant to 42 U.S.C. § 1983 and state-law claims including negligence and wrongful death. It named as defendants Milwaukee County and a group of its employees: Cheryl Wenzel, Deputy Kickbush, Nicole Virgo, Tina Watts, Fatrena Hale, Sheriff David A. Clarke, Kelly Kieckbusch, Abie Douglas, Anthony Arndt, Sheila Jeff, Darius Holmes, and Richard E. Schmidt, the City of Milwaukee and a group of its

employees: Richard Lopez, Frank Salinsky, Stephon Bell, Margarita Diaz-Berg, Alexander Ayala, Froilan Santiago, Karl Robbins, Crystal Jacks, Corey Kroes, Rick Bungert, Luke Lee, Jacob Ivy, Shannon Jones, Richard Menzel, Police Chief Edward Flynn, Roman Galaviz, and Victor Beecher, and the Wisconsin County Mutual Insurance Corporation.[4]

### 1. District Court Granted Summary Judgment

After the close of discovery, the defendants filed a motion for summary judgment.[5] Although Perry presented his § 1983 claims in his Amended Complaint as Eighth Amendment deliberate indifference claims, the district court held that because Perry was a pre-trial detainee who had yet to receive his probable cause hearing, his claims were governed by the objectively unreasonable standard of the Fourth Amendment. But, even under this more lenient standard, the district court determined that Perry's claims failed, as it was reasonable for the City officers to attribute Perry's change in behavior to the medications he received while in the hospital. Likewise, the

---

[4] Also named as defendants were the Aurora Sinai Medical Center, Dr. Paul Coogan, and Nurse Rebecca Potterton. These claims were later dismissed with prejudice on March 3, 2014 pursuant to a stipulation between the parties.

[5] Perry did not oppose summary judgment on his state constitutional claim and his individual liability § 1983 claims against defendants Jones, Menzel, Galaviz, Beecher, Watts, Douglas, and Schmidt.

district court concluded that the claims against the County defendants also failed because, among other things, Perry was never in its custody, as Nurse Virgo had rejected his booking.

Further, the district court concluded that even if Perry had established his Fourth Amendment claims, qualified immunity barred his suit, as reasonable officers would disagree as to whether the officers' actions before and after Perry was discharged from the hospital were objectively unreasonable. Perry also failed to establish that the City was liable pursuant to *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978), because, according to the district court, such liability was dependent upon the individual officers' liability.[6] And, because the individual officers were not liable, the district court found that *Monell* liability did not attach.

With regard to the state law claims, the district court found the defendants had not breached their duty to treat Perry with ordinary care. Even if they had, the district court reasoned that they were entitled to discretionary immunity under Wisconsin law, and therefore Perry's claims were barred.[7] Therefore, the district court granted the motions for summary judgment in their entirety and dismissed Perry's suit.

## 2. District Court Awarded Sanctions and Costs

The County defendants also filed a motion for sanctions pursuant to 28 U.S.C. § 1927. The district court concluded that

---

[6] Perry did not oppose summary judgment on his *Monell* claim against the County.

[7] Perry also did not oppose summary judgment with regard to his state-law conspiracy claim against Officers Bell and Jones.

Perry's attorneys should have known that their claims were baseless after reviewing the surveillance footage from the CJF and taking the depositions of two County employees who testified that Perry was never booked into the County's custody. The court also noted that counsel engaged in "repetitive, abusive and argumentative conduct" during depositions. Therefore, the district court concluded that sanctions were appropriate and granted the County's motion. It did not, however, allow Perry's counsel the opportunity to be heard before imposing such sanctions. Instead, the district court entered an order awarding the County defendants $288,999.38 in sanctions, attorney's fees, and costs. This appeal followed.

## II. ANALYSIS

On appeal, we review a district court's grant of summary judgment *de novo. Suarez v. W.M. Barr & Co., Inc.*, 842 F.3d 513, 517 (7th Cir. 2016). We must construe all facts in the light most favorable to Perry as the non-moving party. *Westfield Ins. Co. v. Nat'l Decorating Serv., Inc.*, 863 F.3d 690, 695 (7th Cir. 2017), *reh'g and suggestion for reh'g en banc denied* (Aug. 14, 2017). Summary judgment is only appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. R. 56(a).

Here, Perry brings individual liability and *Monell* claims pursuant to § 1983 and state law claims of negligence and wrongful death. We address each claim in turn.

### A. Perry's § 1983 Claims

To establish his § 1983 claim, Perry must demonstrate that the individual defendants: (1) acted under the color of state law; and (2) deprived him of a constitutional right. *Colbert v. City of Chi.*, 851 F.3d 649, 656 (7th Cir. 2017). Here, there is no

dispute that all of the named defendants were acting in their official capacities as state actors during the events on the night of September 13, 2010.

Perry's Amended Complaint contends that he is entitled to relief because the defendants violated his Eighth Amendment rights when they acted with deliberate indifference to his medical needs. But, Perry, who had been in custody for less than 24 hours when he died, never received a probable cause hearing. Therefore, the district court properly concluded that it is the Fourth Amendment, and not the Eighth, that governs Perry's claims. *See Williams v. Rodriguez*, 509 F.3d 392, 403 (7th Cir. 2007) (noting that claims challenging the conditions of confinement brought by "pretrial detainees … who have not yet had a judicial determination of probable cause (a *Gerstein* hearing), are instead governed by the Fourth Amendment") (citing *Lopez v. City of Chi.*, 464 F.3d 711, 719 (7th Cir. 2006)); *see also Sides v. City of Champaign*, 496 F.3d 820, 828 (7th Cir. 2007) (noting that the governing standard for a claim of inadequate medical care prior to a probable cause determination is the Fourth Amendment's reasonableness standard). So, to succeed on his claim, Perry must demonstrate that the officers' actions were "objectively unreasonable under the circumstances," a less demanding standard than the Eighth Amendment's deliberate indifference standard. *Williams*, 509 F.3d at 403 (citing *Lopez*, 464 F.3d at 720).

The City defendants contend that Perry is precluded from asserting his claims under the Fourth Amendment because his Amended Complaint failed to do so. This argument is without merit because, as we have noted before, "there is no duty to plead legal theories." *Currie v. Chhabra*, 728 F.3d 626, 629 (7th Cir. 2013). Therefore, as long as Perry's Amended

Complaint provided adequate notice to the defendants of his claims, it is immaterial whether it mentioned the Fourth or the Eighth Amendment. *Id*.

It is clear from the Amended Complaint that Perry's claims were based on his belief that he received constitutionally inadequate medical care while in the defendants' custody. And, it cannot be said that the defendants were prejudiced by the Amended Complaint's failure to invoke the proper Amendment. Rather, because the defendants were clearly aware that Perry had yet to receive a judicial probable cause determination at the time of his death, the Amended Complaint sufficiently placed the defendants on notice of the nature of Perry's § 1983 claims, and that they arose under the Fourth Amendment. Therefore, the district court did not err in reaching the merits of Perry's § 1983 claims.

### 1. Summary Judgment on Perry's § 1983 Claims Was Improperly Granted

"[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 199–200 (1989). When considering whether the medical care provided comported with the objectively reasonable requirement of the Fourth Amendment, we are guided by four factors: "(1) whether the officer has notice of the detainee's medical needs; (2) the seriousness of the medical need; (3) the scope of the requested treatment; and (4) police interests, including administrative, penological, or investigatory concerns." *Ortiz*, 656 F.3d at 530 (citing *Williams*, 509 F.3d at 403).

Here, the defendants do not (and cannot) argue that the scope of the requested treatment—returning Perry to a hospital or simply checking his vital signs to see if further treatment was necessary—was too onerous or unreasonable. Nor do the defendants contend that the fourth prong, the interest of police, weighed against doing so. Rather, on appeal, the defendants argue that Perry cannot establish the first two prongs—notice and a serious medical need. Our ultimate inquiry, however, is "whether the conduct of each defendant was objectively reasonable under the circumstances." *Id*. at 531.

### a. City Defendants

The district court concluded that it was reasonable for the City's police officers named as defendants to presume that after Perry was discharged from the hospital, "he was fine for the time-being." R. 143 at 20.[8] It also determined that the officers were reasonable in attributing Perry's "behavioral issues" to either the medication he had received and seizures he had suffered or Perry's desire not to comply with the police. But, in coming to these conclusions, the district court improperly credited the officers' testimony that they never *perceived* that Perry was in distress while he was in their custody and prior to collapsing on the floor of the CJF. This was an error, as it ignores the district court's obligation at summary judgment to consider the evidence in the light most favorable to Perry and to refrain from making credibility determinations. *See Deets v. Massman Const. Co.*, 811 F.3d 978, 982 (7th Cir. 2016) (noting that "credibility determination[s] may not

---

[8] All record citations are to the record in the United States District Court for the Eastern District of Wisconsin

be resolved at summary judgment."); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge … .").

Additionally, the district court placed too much emphasis on the fact that the City sought medical care for the seizure Perry suffered in the bullpen. To be clear, this treatment *is* relevant to our analysis. But, simply because Perry received treatment at some point during his detention does not completely absolve the officers from liability as a matter of law. Rather, his hospitalization must be considered among the other facts when determining whether or not the officers were reasonable in the way that they treated Perry *after* his return from the hospital. After review of the record, we find that factual disputes abound that require the case to be submitted to a jury.

Officers can be placed on notice of a serious medical condition either by word or through observation of the detainee's physical symptoms, *Williams*, 509 F.3d at 403, both of which were present here. Officers Kroes and Jacks were with Perry at the hospital. They observed him have multiple seizures and saw him receive treatment and medication. Both admit that they had concerns about Perry returning to the PPS and whether that was a proper course of action. Because of their concerns, Officer Jacks called Lieutenant Robbins to discuss how to proceed. Taking the facts in the light most favorable to Perry, Lieutenant Robbins' response was that the officers were to do whatever it took to bring Perry back to the PPS despite their concerns.

When Perry was discharged to Officers Kroes and Jacks, they were provided with his discharge instructions. The instructions put these officers on notice that if Perry were to experience certain changes in his physical or mental state, he should be returned to the hospital. The instructions directed Perry to "GET PROMPT MEDICAL ATTENTION" if he experienced, among other things, "unusual irritability, drowsiness or confusion," if he remained "confused for more than 30 minutes after a seizure" or if he had a fever over 100.4 degrees. When they returned with Perry to the police station, Perry was unable to walk. So they, along with Officers Froilan Santiago and Rick Bungert, dragged Perry, a known seizure victim returning from the hospital, into the facility. Sometime after their arrival at the PPS, Officers Kroes and Jacks provided the discharge instructions to their commanding officer, Lieutenant Robbins, placing him on notice of the hospital's guidance.

While he was on the floor and surrounded by Officers Kroes, Jacks, Santiago, Bungert, Ayala, Lee, and Police Aide Ivy, Perry began to moan. He also defecated and urinated. A jury could view Perry's actions on the video and find that this constituted a change in Perry's condition that put the officers on notice of a serious medical need. The jury could also conclude that it was unreasonable for these officers not to seek medical care on Perry's behalf.

The jury could also consider Perry's own words and conclude that there was a change in his condition that put the officers on notice of a serious medical need. On the surveillance video, Perry can be heard crying out, "help me," "you are killing me," and that he was in pain. The officers placed this man, who had just returned from the hospital after having multiple

seizures, in a compression hold. We cannot, as a matter of law, say that the officers were reasonable in ignoring Perry's cries for help and in their actions, *especially* in light of his physical condition at the time and the medical issues that were known to the officers restraining him.

After Perry, who again was known to have just suffered from a series of seizures only hours before, had already defecated and urinated, he began to spit or drool into his lap. But, the officers still did not obtain medical care for him. Nor did they check his vitals or take any other actions to determine whether Perry was having a medical event. Rather, the officers contend that they perceived this behavior as that of a combative or uncooperative prisoner. So, they placed a spit mask over Perry's face. Officer Ayala noticed a "slight tint of red in some of his saliva, and a spot of red-tinted saliva on his chin," while doing so. Yet, he did not inquire into the source of the blood or whether it was indicative of a medical issue. And, even when Perry began to complain that he could not breathe, additional statements from which a jury could conclude placed the officers on notice of a serious medical need, the officers did nothing. Instead, Officer Kroes responded to Perry's complaint by stating, "If you're talking, you're breathing."

While the officers contend that their response was objectively reasonable because Perry's actions were consistent with those of a combative or uncooperative prisoner, this is again, a factual dispute that must be determined by a jury. The same is true of their assertion that they believed that Perry was simply exhibiting the side effects of the medication he had received while in the hospital. While his inability to walk might be considered a side effect spelled out in his discharge instructions, nowhere in those instructions is the inability to control

one's bowels or saliva listed as side effects. Therefore, it was improper for the district court to conclude that there was no factual dispute regarding whether the officers were on notice of a serious medical issue after Perry was discharged from the hospital. That is for a jury to decide.

Likewise, the district court erred in concluding that Lieutenant Robbins responded in an objectively reasonable manner. Lieutenant Robbins can be seen on the video interacting with Perry, who was restrained on the ground, having soiled himself, moaning, and complaining that he was in pain. Instead of directing his subordinates to take Perry back to the hospital, Lieutenant Robbins is seen on the video laughing as he walked away from Perry. And, when Perry was later carried to cell A3, Lieutenant Robbins is clearly heard telling him that "now, we're going to treat you like we used to treat prisoners … like animals."

Lieutenant Robbins contends that his actions were reasonable and that he even expedited Perry's paperwork so that he could be transferred more quickly to the CJF, as Perry was exhibiting "inappropriate behavior." Further, he attempts to offer benign explanations for both his laughing and his comment to Perry. But, the jury could conclude that Lieutenant Robbins was on notice of Perry's serious medical need from his observations of Perry and his discharge instructions. The jury could also take his barbaric comment and laughing as an objectively unreasonable response to that serious need. Further, a jury could consider his decision and actions to expedite Perry's transfer as evidence that he knew that Perry had a serious medical need, but did not want to manage that need in

his facility, passing the buck to another facility to do so instead. Summary judgment was improperly granted as to Lieutenant Robbins.

Officer Diaz-Berg helped carry Perry to cell A3 and was responsible for conducting wellness checks on Perry while he was in the cell. She knew that he had been to the hospital earlier that day because of the seizure he experienced in the bullpen. While Perry was in cell A3, she observed him every 15 minutes and heard him making grunting noises and rolling around. Yet, she did nothing to inquire about his condition. Later, she opened the cell so that the officers could remove Perry and transport him to the CJF. After the officers removed Perry, she entered the cell and noticed that there was blood on the floor where Perry had been. Although she notified Lieutenant Robbins about the blood, she did not make any efforts to contact the County or to ensure that Perry had received medical treatment. And, Officer Diaz-Berg does not assert that reporting her observations to Lieutenant Robbins should absolve her from liability. Rather, her argument rests on her belief that she did not observe Perry experiencing a medical emergency while in cell A3. For the reasons we discuss above, this is not sufficient to establish that summary judgment is appropriate. A jury could infer from these facts that she was on notice that Perry had a serious medical need and her failure to take action while he was in the cell, or after she discovered the blood, was objectively unreasonable.

Officers Lopez and Salinsky's actions could also be considered objectively unreasonable. Although, Officer Diaz-Berg contends that Perry walked to the elevator after he was removed from cell A3, the surveillance video shows that Officers Lopez and Salinsky had to drag Perry out of the elevator

to their police car. Additionally, while there is evidence that these officers provided Perry's discharge papers to the County, they did not verbally indicate anything about his medical condition at the PPS or his earlier hospitalization. The jury could infer from Perry's physical condition that when he arrived at the CJF, the officers were on notice of his serious medical condition and their failure to take him to the hospital was objectively unreasonable. Officers Lopez and Salinsky do not assert that they did not have the authority to take Perry to the hospital. Rather, their arguments, like those of Officer Diaz-Berg, are based on their assertion that Perry was not experiencing a medical emergency in their custody. Alternatively, a jury could decide that these officers acted reasonably in that they transported Perry to a facility, the CJF, where they knew that medical staff would attend to his needs. Yet, this is not a decision that we can make.

Chief Flynn asserts that there is no basis for a § 1983 personal liability claim against him because he was not personally involved in the events that occurred on September 10, 2013. We need not address this argument, however, as the Amended Complaint does not plead an individual liability § 1983 claim against Flynn.

### b. County Defendants

Perry's claims against the County defendants did not begin until after the City defendants dragged and essentially deposited Perry on the floor of the County facility with soiled pants, an awful stench, and in an alarming medical state. We acknowledge that the County defendants encountered Perry under very different circumstances than the City defendants found him. Still, we evaluate Perry's claims as they are made

against the County defendants, and defer any factual questions about the relative culpability of City defendants versus County defendants as questions for trial.

The district court concluded that Perry's § 1983 claims against the County defendants failed as a matter of law because Perry was never in the County's custody and therefore, none of the County defendants owed him a constitutional duty. However, the district court's conclusion that Perry was not in the County's custody was based upon Nurse Virgo's decision not to accept Perry as an inmate because of the condition in which he arrived. We disagree with the district court's analysis, as it improperly substituted the County's booking policy for the proper constitutional analysis.

It is the Fourth Amendment and not a County's policy that governs Perry's claim. The district court erred when it permitted the County, via its own policy, to determine whether or not the United States Constitution applied to its actions. Such a rule would allow municipalities to easily isolate themselves from liability by enacting policies that have the effect of dictating when their constitutional duties begin. We reject this rule.

Instead, the district court should have applied the constitutional analysis for determining whether a seizure has occurred, as the Fourth Amendment protects "against unreasonable searches and seizures." U.S. CONST. amend. IV. When determining whether there has been a seizure, "the traditional approach is whether the person believed he was 'free to leave.'" *Carlson v. Bukovic*, 621 F.3d 610, 618 (7th Cir. 2010). This is an objective standard, which focuses on how a reasonable person in the suspect's position would have understood the situation. *Qian v. Kautz*, 168 F.3d 949, 954 (7th Cir. 1999)

(citing *Sprosty*, 79 F.3d at 642; *California v. Beheler*, 463 U.S. 1121, 1125 (1983)).

Here, no reasonable jury could conclude that Perry was not in the County's custody. County officers assisted in dragging Perry into the facility and placed him inside the facility, behind a door that could only be opened by a County officer. Further, while Nurse Virgo examined Perry, two County officers (not City officers) physically restrained him on the bench. A reasonable person in Perry's position would not have believed that he was free to leave the County facility. Further, a reasonable person would have believed that it was the County that was restricting his movement, based upon the fact that the County controlled the entrance and that County Correctional Officers were physically restraining him. Therefore, we hold that Perry was in the County's custody when he died even though the formal booking process was not completed.

Despite concluding that Perry was not in the County's custody at any point on the night of September 13, 2010, the district court also concluded that Perry failed to establish that the County defendants' actions were objectively unreasonable under the circumstances. In coming to this conclusion the court noted that Nurses Virgo and Wenzel "did everything in their power to help Perry upon his arrival at the County Jail." R. 143 at 20. But, after viewing the surveillance footage from that night, we are unable to come to the same conclusion.

Admittedly, Perry was only in the County's custody for a short period of time. Yet, the jury could view the video from that night and disagree with the district court's characterization of the nurses' actions. Nurse Virgo, the first medical professional to come into contact with Perry after he was released

from the hospital, interacted with Perry for just over 30 seconds after he first arrived. There is evidence that his spit mask was "seeping blood," yet, Nurse Virgo did not remove the mask to determine why Perry was bleeding or the blood's origin. She did not take his vitals or even touch him. It was only after Nurse Wenzel removed Perry's mask almost seven minutes later that Nurse Virgo first touched Perry when rendering emergency aid. And, while Nurse Virgo contends that she knew that Perry was medically unfit to be booked from her first interaction with him, she did not immediately call for help. Rather, three minutes passed before an ambulance was called. Further, it is not clear, based upon this record, whether the ambulance was told it was urgent to come at that time or if that message was only relayed to emergency dispatchers at 8:52 p.m., when a medical emergency was finally declared. The district court improperly concluded that there was no factual dispute as to whether Nurse Virgo's actions were objectively reasonable.

The same is true of the district court's conclusion regarding Nurse Wenzel's actions. Although she was not initially summoned to attend to Perry, she was present in the CJF and chose to stand at the nurses' station to observe Perry rather than render any treatment. Ultimately, she decided to remove Perry's mask, which revealed his dire condition. The County misses the point when it argues that it was only then that the nurses knew that Perry was experiencing a medical emergency. Rather, a jury could determine that it was this delay in removing the mask, which the County seems to assert concealed the emergent nature of Perry's condition, that was objectively unreasonable. On this record, summary judgment was inappropriate with regard to the two nurses.

### c. Summary Judgment Appropriate for Defendants Arndt, Kieckbusch, Hale, Bell, Clarke, Holmes, and Jeff

While we take issue with the district court's decision to grant summary judgment to Nurses Virgo and Wenzel, we agree that the officers present in the County facility were entitled to summary judgment. These officers were not medical professionals. Therefore, they were entitled to rely upon the nurses' professional judgment without subjecting themselves to § 1983 liability. *See Greeno v. Daley*, 414 F.3d 645, 656 (7th Cir. 2005) ("If a prisoner is under the care of medical experts ... a non-medical prison official will generally be justified in believing that the prisoner is in capable hands.") (quoting *Spruill v. Gillis*, 372 F.3d 218, 236 (3d Cir. 2004) (internal quotation marks omitted)); *see also Arnett v. Webster*, 658 F.3d 742, 755 (7th Cir. 2011) ("Non-medical defendants … can rely on the expertise of medical personnel."). Therefore, summary judgment was appropriately granted with regard to Corrections Officers Arndt and Kieckbusch, and Sergeant Hale. Summary judgment was also appropriate with regard to Officer Bell, a City Officer who was stationed at the CJF, as he too was entitled to rely upon the nurses' medical judgment. Although Officers Salinsky and Lopez were also present in the CJF, a jury could determine that their actions prior to arriving at the CJF were objectively unreasonable such that liability should attach. Therefore, we reiterate that summary judgment was inappropriately granted with regard to these two officers.

We also find that summary judgment was appropriate with regard to Sheriff Clarke and Corrections Officers Jeff and Holmes. Individual liability pursuant to § 1983 "requires personal involvement in the alleged constitutional deprivation."

*Colbert*, 851 F.3d at 657 (quoting *Minix v. Canarecci*, 597 F.3d 824, 833 (7th Cir. 2010) (internal quotation marks omitted)). After discovery, Perry has not been able to demonstrate that these three defendants were personally involved in the denial of medical care. There is no allegation that Sheriff Clarke was even present in the facility that night. Corrections Officer Jeff's involvement was limited to retrieving the AED device that was used to render emergency care to Perry. She then returned to her post in the booking room. There is no allegation that her actions were objectively unreasonable, and therefore, this minimal involvement is not sufficient to invoke liability. Lastly, Corrections Officer Holmes was assigned to the control tower that night. Perry has not offered any evidence to contradict the County's assertion that Corrections Officer Holmes was not permitted to leave that post, as he controlled entry into the CJF. Therefore, summary judgment was appropriately granted with regard to these three defendants.

### d. Causation Sufficiently Established

The City defendants assert that summary judgment was also appropriate because Perry failed to establish causation. In support of this argument, the City notes that Perry died of a heart condition, not a seizure, and that this heart condition was unknown to the officers in his presence that night.

The City is correct that to prevail on his § 1983 claims, Perry must demonstrate that the unconstitutional actions alleged caused him harm. *See Ortiz*, 656 F.3d at 530. In *Ortiz*, we discussed this requirement and noted:

> Where an obviously ill detainee
> dies in custody and the defend-
> ants' failure to provide medical

> care is challenged, the causation
> inquiry is quite broad: "the consti-
> tutional violation in question here
> is the failure to provide adequate
> medical care [ ] in response to a se-
> rious medical condition, not
> 'causing her death.'"

*Ortiz*, 656 F.3d at 535 (quoting *Gayton v. McCoy*, 593 F.3d 610, 619 (7th Cir. 2010) (alteration in original)). So, if a plaintiff "of-fers evidence that allows the jury to infer that a delay in treat-ment harmed an inmate, there is enough causation evidence to reach trial." *Gayton*, 593 F.3d at 624–25. This is true here, where the jury could infer that although Perry ultimately died of a heart condition, it was the delay in providing *any* treat-ment that caused the harm, i.e., his death on the floor of the CJF. Therefore, we reject the City's argument that there is in-sufficient evidence of causation to survive its motion for sum-mary judgment.

### e.  Qualified Immunity Inappropriate

The defendants contend that the district court properly concluded that qualified immunity barred Perry's § 1983 claims. As a question of law, we review qualified immunity determinations *de novo*. *See Estate of Clark v. Walker,* No. 16-3560, 2017 WL 3165632, at *4 (7th Cir. July 26, 2017). Qualified immunity "protects public servants from liability for reason-able mistakes made while performing their public duties." *Findlay v. Lendermon*, 722 F.3d 895, 899 (7th Cir. 2013). We en-gage in a two-part inquiry when determining whether quali-fied immunity bars suit: "(1) whether the facts, taken in the light most favorable to the plaintiff, make out a violation of a constitutional right, and (2) whether that constitutional right

was clearly established at the time of the alleged violation."
*Gill v. City of Milwaukee*, 850 F.3d 335, 340 (7th Cir. 2017) (quoting *Allin v. City of Springfield*, 845 F.3d 858, 862 (7th Cir. 2017) (internal quotation marks omitted)). Having found that the first element has been met, we now must determine whether the right was clearly established.

A right is "clearly established" if it is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (quoting *Reichle v. Howards*, 132 S.Ct. 2088, 2093 (2012) (internal quotation marks omitted)). If the right was clearly established, then qualified immunity is not a bar to suit. *Washington v. Haupert*, 481 F.3d 543, 547 (7th Cir. 2007). While the Supreme Court has warned that we must not define "clearly established law at a high level of generality," it has also instructed that there need not be a case directly on point. *Mullenix*, 136 S. Ct. at 308 (quoting *Ashcroft v. al–Kidd*, 563 U.S. 731, 741 (2011) (internal quotation marks omitted)). Nonetheless, "existing precedent must have placed the … constitutional question beyond debate." *Al-Kidd*, 563 U.S. at 741.

The defendants urge us to narrowly define Perry's right. But, in doing so, they are essentially urging us to conclude that because there is no case with the exact same fact pattern, qualified immunity applies. That is not what the qualified immunity analysis requires us to do. Rather, we find that in September 2010, it was clearly established that the Fourth Amendment governed claims by detainees who had yet to receive a judicial probable cause determination. *See Williams*, 509 F.3d at 403 ("Claims regarding conditions of confinement for pretrial detainees such as Williams, who have not yet had

a judicial determination of probable cause (a *Gerstein* hearing), are instead governed by the Fourth Amendment and its objectively unreasonable standard."). In 2007, in *Williams*, we identified the four factors later articulated in *Ortiz,* and upon which we have relied to evaluate the merits of Perry's claims. And, if by 2010, it was clearly established that an officer or prison nurse's actions were judged by the objectively reasonable standard of the Fourth Amendment, the failure to take *any* action in light of a serious medical need would violate that standard. Because Perry has met his burden at summary judgment of establishing that there was a violation of his constitutional rights and that that right was clearly established in 2010, his claims must be submitted to a jury for consideration.

### B. Perry's *Monell* Claims Fail

The district court concluded that because it found that the officers' conduct did not result in a constitutional violation, *Monell* liability could not attach. But, because we have found that the claims against the individual defendants must be submitted to a jury, we must address whether the same is true of Perry's *Monell* claims. A municipal entity may not be held liable pursuant to § 1983 solely because it employed the constitutional tortfeasor. *See Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691 (1978) (holding that liability pursuant to the doctrine of *respondeat superior* is unavailable under § 1983). Rather, a municipality can "be held liable under § 1983 only for its own violations of federal law." *Los Angeles Cty., Cal. v. Humphries*, 562 U.S. 29, 36 (2010) *(*citing *Monell*, 436 U.S. at 694). To invoke *Monell* liability, Perry must demonstrate that there was an "official policy, widespread custom, or action by an official with policy-making authority [that]

was the 'moving force' behind his constitutional injury." *Daniel v. Cook Cty.*, 833 F.3d 728, 734 (7th Cir. 2016) (quoting *Dixon v. Cty. of Cook*, 819 F.3d 343, 348 (7th Cir. 2016)).

Perry asserts that Chief Flynn and the City of Milwaukee are liable under *Monell* for two reasons. First, because the Police Department and its policymakers failed to institute an internal review of in-custody deaths and to discipline officers for their involvement in those incidents. Second, because the Police Department had an unwritten policy of ignoring its detainees' medical complaints, particularly complaints regarding trouble breathing. Perry contends that there was a *de facto* policy of failing to care for the medical needs of prisoners in the City's custody.

But to support this assertion, Perry simply refers to the allegations in his Amended Complaint that there were 12 in-custody deaths prior to the night he was taken into custody and that no investigation followed those deaths. *See, e.g.*, Appellants' Br. at 39 ("As set forth in Plaintiffs' Complaint, twelve individuals died in the City's custody from March 7, 2000 forward."). This is not sufficient to meet his burden at summary judgment, as a plaintiff must do more than simply point to the allegations in his complaint. *See, e.g.*, *Shermer v. Illinois Dep't of Transp.*, 171 F.3d 475, 478 (7th Cir. 1999) (noting that it is well-settled that "a non-moving party may not rely solely on the allegations in his complaint to defeat summary judgment.") (citing *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)). Further, it is also well-established that Perry must do more than simply rely upon his own experience to invoke *Monell* liability. *See Daniel*, 833 F.3d at 734. Therefore, Perry's *Monell* claim based upon the City's failure to adequately investigate

in-custody deaths and to discipline its officers for their involvement in these incidents fails, and summary judgment was appropriate.

Second, Perry asserts that the City and Chief Flynn are liable for enacting an unwritten policy of ignoring detainee's medical complaints. Perry contends that because Chief Flynn testified that the phrase, "If you're talking, you're breathing," was an adage that was used during training, there was a *de facto* policy of failing to provide medical attention to those who complained of difficulty breathing. But, this argument misconstrues the record evidence. The record indicates that this adage was used as part of a training program that taught City officers how to assess whether an individual had an emergent medical need. There is no evidence that this was the end of the inquiry, but rather the phrase was used as one aspect of an overall inquiry into an individual's health. While here, Officer Kroes used the adage, as discussed above, in a way that the jury might conclude was evidence of his objectively unreasonable response to Perry's complaints, a reasonable jury could not conclude that this was a City policy or custom sufficient to invoke *Monell* liability. Therefore, summary judgment is appropriate on this aspect of Perry's *Monell* claim as well.

### C. Perry's State-Law Claims Against the Nurses Withstand Summary Judgment, Not Non-Medical Defendants

The district court granted the defendants' motion for summary judgment on Perry's negligence and wrongful death claims finding that the defendants did not breach their duty to treat Perry with ordinary care. But, for the same reasons that we conclude that the district court erred in finding that

the defendants acted reasonably in their interactions with Perry, we must also find that it erred in concluding that there was no breach of a duty. Nonetheless, we agree with parts of the district court's immunity analysis.

Under Wisconsin law, the doctrine of governmental immunity is quite broad. As the Wisconsin Supreme Court noted, it "provides that state officers and employees are immune from personal liability for injuries resulting from acts performed within the scope of their official duties." *Pries v. McMillon*, 784 N.W.2d 648, 654 (Wis. 2010) (citing *Kimps v. Hill*, 546 N.W.2d 151, 156 (Wis. 1996)). There are four exceptions to this broad doctrine: "(1) the performance of ministerial duties; (2) the performance of duties with respect to a 'known danger;' (3) actions involving medical discretion; and (4) actions that are 'malicious, willful, and intentional.'" *Bicknese v. Sutula*, 660 N.W.2d 289, 296 (Wis. 2003).

Here, Perry asserts that governmental immunity does not bar his state-law claims because they involve the application of medical discretion,[9] an exception first recognized by the Wisconsin Supreme Court in *Scarpaci v. Milwaukee County*, 292 N.W.2d 816 (Wis. 1980). In *Scarpaci*, the plaintiffs brought suit against the medical examiner's office after an autopsy was performed on their deceased child against their express wishes. The Wisconsin Supreme Court concluded that the decision to conduct an autopsy was a discretionary act, because "the legislature envisioned the medical examiner as making inquiry into the facts, applying the statutes to the facts, and making a decision whether to proceed with an autopsy on the

---

[9] Perry has not asserted that any other exception might apply to his claims, and has therefore, waived any such argument.

basis of the medical examiner's subjective evaluation of the facts and the law." *Id.* at 826. Nevertheless, the court concluded that the medical examiner was not entitled to governmental immunity for his actions in performing the autopsy. While such actions, the court reasoned, were discretionary in nature, that "discretion [was] medical, not governmental." *Id.* at 827; *see also Gordon v. Milwaukee Cty.*, 370 N.W.2d 803, 806 (Wis. Ct. App. 1985) *abrogated on other grounds by Kimps v. Hill*, 523 N.W.2d 281 (Wis. Ct. App. 1994) (finding governmental immunity inapplicable to a negligence claim based upon a psychiatrist's examination and diagnosis of the plaintiff prisoner because these actions required the use of medical, not governmental discretion).

We agree with Perry that governmental immunity does not bar the claims against Nurses Virgo and Wenzel. While these two defendants were acting within the scope of their employment, they were, like the defendants in *Scarpaci* and *Gordon*, applying their medical knowledge to the facts and circumstances before them. Because they were exercising their medical discretion, pursuant to *Scarpaci*, governmental immunity does not act as a bar to suit.

However, we do find that governmental immunity bars the state-law claims against the non-medical defendants. Under Wisconsin law, the doctrine is extremely broad. And, Wisconsin courts have been unwilling to extend the reasoning of *Scarpaci* to defendants who are not medical professionals. *See, e.g., Kimps v. Hill*, 523 N.W.2d 281, 285 (Wis. App. Ct. 1994) (noting the limited reach of the medical discretion exception and declining to extend its reasoning to another setting); *see also DeFever v. City of Waukesha*, 743 N.W.2d 848, 853 (Wis. App. Ct. 2007) (noting that Wisconsin courts have repeatedly

refused to extend the *Scarpaci* exception beyond the medical context). So, we must decline Perry's invitation to expand upon it. Even though we have grave concerns about the officers' actions on the night that Perry died, the state-law claims of negligence and wrongful death must be dismissed against the non-medical defendants as these defendants are immune under Wisconsin law. Governmental immunity, as provided under Wisconsin law, however, applies only to state-law claims. It is not applicable to Perry's claims brought pursuant to 42 U.S.C. § 1983. *See Cody v. Dane Cty.*, 625 N.W.2d 630, 640 (Wis. App. Ct. 2001).

### D. Sanctions Not Appropriately Granted

The district court concluded that sanctions were appropriate pursuant to 28 U.S.C. § 1927. The court came to this conclusion for three reasons. First, because Perry's counsel should have known that his claims against the County were meritless as he was never accepted into the County's custody. Second, because Perry pursued baseless claims against two defendants—Corrections Officers Douglas and Jeff—even though these officers were only in the same room as Perry for less than 30 seconds each. Third, the district court cited to Perry's counsel's "repetitive, abusive and argumentative conduct" during deposition discovery.

We review a district court's decision to award sanctions for the abuse of discretion. *United States v. Rogers Cartage Co.*, 794 F.3d 854, 862 (7th Cir. 2015). Section 1927 permits a court to enter sanctions against a lawyer who "so multiplies the proceedings in any case unreasonably and vexatiously." 28 U.S.C. § 1927. Sanctions awarded under § 1927 are to be paid by the lawyer, who must "satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of

such conduct." *Id.* A court may impose sanctions if the attorney "acted in an objectively unreasonable manner by engaging in a serious and studied disregard for the orderly process of justice … or where a claim [is] without a plausible legal or factual basis and lacking in justification." *Lightspeed Media Corp. v. Smith*, 761 F.3d 699, 708 (7th Cir. 2014) (quoting *Walter v. Fiorenzo*, 840 F.2d 427, 433 (7th Cir. 1998) (internal quotation mark omitted)). While an attorney's subjective bad faith is sufficient to impose § 1927 sanctions, a court need not make such a finding. *Hunt v. Moore Bros., Inc.*, 861 F.3d 655, 659 (7th Cir. 2017). Rather, a finding of objective bad faith will support an award of sanctions. *Id.* (quoting *Boyer v. BNSF Ry. Co.*, 824 F.3d 694, 708 (7th Cir. 2016)).

Here, the district court, in large part, based its conclusion that sanctions were appropriate on its finding that Perry was never in the County's custody. As we have discussed at length above, the district court erred when in substituted the County's booking policy for the proper Fourth Amendment seizure inquiry. Therefore, the district court abused its discretion when it determined that the claims against the County were without a legal or factual basis.

But, we do agree that Perry's claims against Officers Douglas and Jeff were without a factual basis. Although Perry did not oppose summary judgment with regards to Corrections Officer Douglas, to this day he maintains a claim against Corrections Officer Jeff. These claims are without merit and Perry was on notice of the baseless nature of his claims once he was in receipt of the surveillance footage from the County. While we vacate the sanctions award because of the district court's reliance upon an erroneous conclusion of law, we remand with instructions to the district court to reconsider the award

in light of the entirety of this opinion. It is within the district court's discretion to determine whether the failure to dismiss these officers from the suit and/or counsel's conduct during discovery warrants an award of sanctions.

### III. CONCLUSION

For the foregoing reasons, we AFFIRM in part and REVERSE in part the district court's grant of summary judgment to the defendants. We further VACATE the district court's order awarding the County defendants sanctions and remand with instruction to reconsider the award in light of this opinion.

CERTIFIED COPY

A True Copy
Teste:

Deputy Clerk
of the United States
Court of Appeals for the
Seventh Circuit

# UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT



Everett McKinley Dirksen United States Courthouse
Room 2722 - 219 S. Dearborn Street
Chicago, Illinois 60604

Office of the Clerk
Phone: (312) 435-5850
www.ca7.uscourts.gov

**FINAL JUDGMENT**

September 18, 2017

CERTIFIED COPY

A True Copy
Teste:

Deputy Clerk
of the United States
Court of Appeals for the
Seventh Circuit

Before:    RICHARD A. POSNER, Circuit Judge*
           DANIEL A. MANION, Circuit Judge
           ANN CLAIRE WILLIAMS, Circuit Judge

| | |
|---|---|
| Nos. 16-2353 and 16-3130 | ESTATE OF JAMES FRANKLIN PERRY, et al,. *Plaintiffs - Appellants* <br><br> v. <br><br> CHERYL WENZEL, et al., *Defendants - Appellees* |
| **Originating Case Information:** | |
| District Court No: 2:12-cv-00664-RTR <br> Eastern District of Wisconsin <br> District Judge Rudolph T. Randa | |

The district court's grant of summary judgment to the defendants is **AFFIRMED** in part and **REVERSED** in part.  Further, the district court's order awarding the County defendants sanctions is **VACATED** and the case is **REMANDED** with instructions to reconsider the award in light of this opinion.  The above is in accordance with the decision of this court entered on this date. Tax any costs against the appellees.

_____

\* Circuit Judge Posner retired on September 2, 2017, and did not participate in the decision of this case, which is being resolved by a quorum of the panel under 28 U.S.C. § 46(d).

form name: **c7_FinalJudgment**(form ID: **132**)

# UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT



Everett McKinley Dirksen United States Courthouse
Room 2722 - 219 S. Dearborn Street
Chicago, Illinois 60604

Office of the Clerk
Phone: (312) 435-5850
www.ca7.uscourts.gov

## BILL OF COSTS

October 10, 2017

Taxed in Favor of: **Appellants Estate of James Franklin Perry and James F. Perry**.

| | |
|---|---|
| Nos. 16-2353 and 16-3130 | ESTATE OF JAMES FRANKLIN PERRY, et al,.<br>Plaintiffs - Appellants<br><br>v.<br><br>CHERYL WENZEL, et al.,<br>Defendants - Appellees |

| Originating Case Information: |
|---|
| District Court No: 2:12-cv-00664-RTR<br>Eastern District of Wisconsin<br>District Judge Rudolph T. Randa |

The mandate or agency closing letter issued in this cause on October 6, 2017.
BILL OF COSTS issued in the amount of: $1249.00.

| | | Cost of<br>Each Item | Total Cost<br>Each Item |
|---|---|---|---|
| 1. | For docketing a case on appeal or review or docketing any other proceeding:<br>_____ | _____ | _____ |
| 2. | For reproduction of any record or paper,<br>per page: _____ | _____ | _____ |
| 3. | For reproduction of briefs:<br>_____ | _____ | _____ |
| 4. | Corrected amount for costs_____ | $1249.00 | $1249.00 |
| | TOTAL: | | $1249.00 |

form name: **c7_BillOfCosts**(form ID: **140**)

CERTIFIED COPY
A True Copy
Teste:

Deputy Clerk
Court of Appeals for the
Seventh Circuit

# UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT



Everett McKinley Dirksen United States Courthouse
Room 2722 - 219 S. Dearborn Street
Chicago, Illinois 60604

Office of the Clerk
Phone: (312) 435-5850
www.ca7.uscourts.gov

## NOTICE OF ISSUANCE OF MANDATE

October 10, 2017

To:     Stephen C. Dries
        UNITED STATES DISTRICT COURT
        Eastern District of Wisconsin
        Milwaukee , WI 53202-0000

|  |  |
|---|---|
| Nos. 16-2353 and 16-3130 | ESTATE OF JAMES FRANKLIN PERRY, et al,.<br> Plaintiffs - Appellants<br><br>v.<br><br>CHERYL WENZEL, et al.,<br> Defendants - Appellees |

**Originating Case Information:**

District Court No: 2:12-cv-00664-RTR
Eastern District of Wisconsin
District Judge Rudolph T. Randa

Herewith is the mandate of this court in this appeal, along with the Bill of Costs, if any. A certified copy of the opinion/order of the court and judgment, if any, and any direction as to costs shall constitute the mandate.

AMOUNT OF BILL OF COSTS (do not include the $):          1249.00

DATE OF MANDATE OR AGENCY CLOSING LETTER ISSUANCE:          10/06/2017

RECORD ON APPEAL STATUS:          Entire record returned consisting of

Loose pleadings:                    4 vol. of loose pleadings on CDs

**NOTE TO COUNSEL:**

If any physical and large documentary exhibits have been filed in the above-entitled cause, they are to be withdrawn ten (10) days from the date of this notice. Exhibits not withdrawn during this period will be disposed of.

Please acknowledge receipt of these documents on the enclosed copy of this notice.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Received above mandate and record, if any, from the Clerk, U.S. Court of Appeals for the Seventh Circuit.

**Date:**                              **Received by:**

10/10/17                                s/Jelena Vekic
_____          _____

CERTIFIED COPY

A True Copy
Teste:

Deputy Clerk
of the United States
Court of Appeals for the
Seventh Circuit

form name: **c7_Mandate**(form ID: **135**)