# United States District Court
# Eastern District of Wisconsin

## Estate of Perry v. Wenzel

12-CV-664



Video Deposition of

## Chief Edward Flynn

Recorded 04/02/2014 in Milwaukee, WI

9:57 am - 1:03 pm, 176 mins. elapsed

**Magne-Script**

(414) 352-5450



*20419 Standard transcript with Index*

|    |   |                                                                           |
|----|---|---------------------------------------------------------------------------|
| 1  |   | or who is in charge of the bureau of which the Police                     |
| 2  |   | Academy is?  Which do you want to know?                                   |
| 3  | Q | Let me ask you this.  Once officers are out of the                        |
| 4  |   | academy, does their training stop?                                        |
| 5  | A | No.                                                                       |
| 6  | Q | If the policies and procedures are changed after an                       |
| 7  |   | officer is outside of the academy, how are those                          |
| 8  |   | policies and procedures communicated to officers?                         |
| 9  | A | Two ways.  One is through roll-call training, which                       |
| 10 |   | takes place at every work site, and another is through                    |
| 11 |   | the annual in-service training at the Police Academy.                     |
| 12 | Q | For instance, policies and procedures were changed                        |
| 13 |   | regarding medical emergencies as it relates to inmates                    |
| 14 |   | who suffer from a medical condition.  Tell me how that                    |
| 15 |   | policy and procedure was subsequently communicated to                     |
| 16 |   | officers so they would understand their new                               |
| 17 |   | responsibilities in that regard.                                          |
| 18 | A | It was communicated through -- to all officers who                        |
| 19 |   | went through in-service training that year, which was                     |
| 20 |   | everybody, and it was also read at all the roll-calls                     |
| 21 |   | so that officers were aware that the policy had been                      |
| 22 |   | amended.                                                                  |
| 23 | Q | Is there a specific officer in your chain of command                      |
| 24 |   | that is ultimately responsible to make sure that                          |
| 25 |   | information is disseminated to all officers?                              |

1  Q  So based on the investigation that you reviewed and
2     your understanding of the sequence of events, it's
3     clear that Mr. Perry did not urinate or defecate on
4     himself before he was released from the hospital,
5     correct?
6  A  I can't say that it's clear.  I just don't recall the
7     sequence.  I don't -- I don't think he would have been
8     released from the hospital in that condition, but I
9     don't know.
10 Q  So assuming for purposes of this line of questioning
11    that Mr. Perry urinated and defecated on himself after
12    he was released from the emergency room --
13 A  Mm-hmm.
14 Q  -- and before he was taken to the Criminal Justice
15    Facility, would you agree that that could constitute a
16    change in condition for an inmate under the custody
17    and control of the Milwaukee Police Department?
18        MS. LAPPEN:  Objection to foundation.  It
19     calls for speculation.
20     But go ahead and answer.
21 A  Yeah.  Yes.
22 BY MR. GENDE:
23 Q  Would you agree that somebody who was bleeding from an
24    unknown source prior to arriving at the Criminal
25    Justice Facility, that could exhibit a change in

| | | |
|---|---|---|
| 1 | | observation, true? |
| 2 | | MS. LAPPEN: Object as to the form and the |
| 3 | | foundation. |
| 4 | | But go ahead and answer. |
| 5 | A | I know he uses the expression "hog tied." Certainly, |
| 6 | | you know, being shackled is not the same as being hog |
| 7 | | tied, and the only reason I raise that is hog tied is |
| 8 | | a very dangerous thing to do because it can cut off |
| 9 | | your breathing. |
| 10 | | Shackling your hands and shackling your feet |
| 11 | | separately, which is what did occur and can be seen on |
| 12 | | the film, is not identical with hog-tying and doesn't |
| 13 | | create a breathing hazard that hog-tying would. I do |
| 14 | | recall now, looking at this, that the investigation |
| 15 | | did indicate that when they put him into his cell that |
| 16 | | they did lose control of him and dropped him from a |
| 17 | | height of about two feet or so onto the floor. |
| 18 | | BY MR. GENDE: |
| 19 | Q | You would agree that somebody who was dropped on their |
| 20 | | face, who is being carried in the fashion that you've |
| 21 | | just described, could result in an individual bleeding |
| 22 | | from his head of an unknown origin, true? |
| 23 | | MS. LAPPEN: Objection. Form and |
| 24 | | foundation. Calls for speculation. |
| 25 | | Go ahead and answer. |

1  Q  Are you aware as to whether or not any of your
2     officers on the evening in question on duty at PPS had
3     any concern that Mr. Perry was suffering from a
4     medical emergency once he was returned from Mount
5     Sinai?
6         MS. LAPPEN: Object as to the form.
7         But go ahead and answer.
8  A  Well, as I've indicated numerous times, it appears by
9     all observations that they saw him as behaving in a
10    way consistent with the administering of a powerful
11    sedative. They had been told by the hospital there
12    was nothing wrong with him, and a powerful sedative
13    had been administered, which put him in a condition
14    that required his carrying. It was based on that
15    information that they continued to perform their
16    duties. They didn't make an independent medical
17    diagnosis. They were responding to what they had been
18    told.
19 BY MR. GENDE:
20 Q  So in answer to my prior question, I need some
21    clarification pursuant to policies and procedures for
22    the Milwaukee Police Department. In the event one of
23    your subordinate officers is concerned that an inmate
24    may be suffering from a medical emergency, number one,
25    you would expect that officer to call the fire

| | | |
|---|---|---|
| 1 | | department or an ambulance, correct? |
| 2 | A | That's correct. |
| 3 | Q | Two, to get that individual to an emergency room for |
| 4 | | treatment if there is a concern about a medical |
| 5 | | emergency, correct? |
| 6 | A | That's correct. |
| 7 | Q | Or three, because there's no medical personnel, |
| 8 | | nurses, or doctors on staff at the Milwaukee Police |
| 9 | | Department, that individual should be taken to the |
| 10 | | Criminal Justice Facility because there's nurses on |
| 11 | | staff there that are better equipped to determine the |
| 12 | | status of an inmate's health. |
| 13 | A | If you're, you know, if you have -- well, if somebody |
| 14 | | is, you know -- Initially, when he was having what |
| 15 | | apparently was a seizure and the first time he fell |
| 16 | | down, and I believe it was reported that it was |
| 17 | | believed he hit his head then too, obviously you're |
| 18 | | not going to try to take him directly to the CJF. |
| 19 | | Okay? You want to get him to a hospital. |
| 20 | | But if he is somebody who has ongoing medical |
| 21 | | issues that don't elevate to being admitted to the |
| 22 | | hospital, clearly CJF is a better place for him than |
| 23 | | PPS because it does have staff. If I'm not mistaken, |
| 24 | | if somebody is there on medication, you know, they're |
| 25 | | in a better place to -- position to deal with all of |

| | | |
|---|---|---|
| 1 | | actually reviewed the tapes and the reports at issue? |
| 2 | A | Well, this is October of 2012, which I guess is about |
| 3 | | two and a half years after the incident. I believe by |
| 4 | | that time I had seen the final reports. |
| 5 | Q | Considering Lieutenant Robbins, the supervisor at PPS |
| 6 | | on the evening Mr. Perry passed away, had stated words |
| 7 | | to the effect in front of his subordinates that if Mr. |
| 8 | | Perry was going to act like an animal, he'd be treated |
| 9 | | like a -- like he was in prison, is it your opinion |
| 10 | | that policies and procedures in that regard were |
| 11 | | followed? |
| 12 | | MS. LAPPEN: Object as to the form of the |
| 13 | | question. |
| 14 | | But go ahead and answer. |
| 15 | A | Listen, that's a self-evident answer. I certainly |
| 16 | | wasn't responding to Lieutenant Robbins's |
| 17 | | inappropriate behavior. I was talking of the behavior |
| 18 | | of the officers who had been charged with moving this |
| 19 | | prisoner about and processing him. |
| 20 | | BY MR. GENDE: |
| 21 | Q | So when you made this comment about the officers |
| 22 | | following departmental policy and procedure as it |
| 23 | | relates to Mr. Perry, that was not in association with |
| 24 | | the inhumane comment made by your supervisor on the |
| 25 | | night in question, correct? |

| | | |
|---|---|---|
| 1 | | they received these instructions when Mr. Perry was |
| 2 | | discharged.  So -- |
| 3 | A | Again, my numbers don't comport with yours.  My number |
| 4 | | 25 says, "We thank you for allowing us to assist you |
| 5 | | with your health care needs."  Is that where you are? |
| 6 | Q | Let me try and find it for you in the exhibit.  Yep. |
| 7 | | That's exactly where I'm at, Chief. |
| 8 | A | That's where you're at?  Okay. |
| 9 | Q | That's where I'm at.  It says "Patient Education" |
| 10 | | towards the top, and it says "Aurora Health Care."  It |
| 11 | | identifies Mr. Perry and the visit date.  Do you see |
| 12 | | that? |
| 13 | A | Yes. |
| 14 | Q | If we move on to page 27, it says, "Mr. Perry has been |
| 15 | | given a list of follow-up instructions, medication |
| 16 | | information, and patient education materials."  Do you |
| 17 | | see where I read that? |
| 18 | A | Mm-hmm.  Yep. |
| 19 | Q | Now, we know Mr. Perry didn't receive it because he |
| 20 | | wasn't capable of taking care of his own medical care. |
| 21 | | That information would have been provided to your |
| 22 | | police officers, true? |
| 23 | A | True. |
| 24 | Q | And you would expect that once your police officers |
| 25 | | received that information, they would provide it to |

| | | |
|---|---|---|
| 1 | | your supervisor at PPS so he would know how Mr. Perry |
| 2 | | should be handled in accord with his discharge |
| 3 | | instructions, true? |
| 4 | A | That's correct. |
| 5 | Q | Would there be some other individual other than the |
| 6 | | supervisor, Lieutenant Robbins, that should receive |
| 7 | | these discharge instructions from the emergency room |
| 8 | | as it relates to Mr. Perry? |
| 9 | | MS. LAPPEN: Objection as to form. |
| 10 | | But go ahead and answer. |
| 11 | A | Yeah. I don't think so. |
| 12 | | BY MR. GENDE: |
| 13 | Q | On page 29 of this exhibit -- |
| 14 | A | Mm-hmm. |
| 15 | Q | -- it talks about home care for Mr. Perry as it |
| 16 | | relates to potential subsequent seizure activity. We |
| 17 | | know that Mr. Perry wasn't released to his home, |
| 18 | | correct? |
| 19 | A | That's correct. |
| 20 | Q | All right. Do you know if any of your officers |
| 21 | | advised themselves of the discharge instructions as it |
| 22 | | relates to potential additional seizure activity for |
| 23 | | Mr. Perry? |
| 24 | | MS. LAPPEN: Objection as to form. |
| 25 | A | I have no reason not to. |

1           his arrival at the Prisoner Processing Section?
2                   MS. LAPPEN:  Objection to the form of the
3           question and foundation.
4    A      Yes, they did not get him any new medical attention.
5    BY MR. GENDE:
6    Q      And tell me what you understand they did to
7           distinguish whether he was faking what we've
8           previously discussed or that he needed prompt medical
9           attention because he exhibited unusual irritability,
10          drowsiness, or confusion.  What did they do to
11          distinguish those?
12                  MS. LAPPEN:  Objection as to the form and
13          foundation.
14                  Go ahead and answer.
15   BY MR. GENDE:
16   Q      If anything, Chief.
17   A      They didn't do anything to distinguish those two
18          things.
19   Q      Do you think that your officers lacked the information
20          and training on the date in question to follow
21          emergency room discharge instructions?
22   A      No, I do not.
23   Q      Do you think your officers lacked training to
24          understand the paradigm shift that struggling and
25          resistance can indicate an immediate medical emergency

>         who are complaining of shortness of breath or
>         inability to breathe.  Overwhelmingly, once they
>         settle down, they're fine.
>             There are circumstances, however, in which
>         somebody is giving evidence of having a more
>         significant crisis.  I expect us to be able to adjust
>         more quickly to that reality.  Sometimes they're going
>         to be wrong.  The vast majority of the time, they are
>         right.
>             In this case, in the Perry case, as I say, I
>         don't know what they would have said if he had said
>         that absent having just been charged -- discharged
>         from the hospital.  They might have treated it
>         differently.  I don't know.  What I do know is they
>         weren't trying to be inhumane to him.  It sounds to me
>         like they were trying to calm him down.
> Q       Tell me, as the chief, what prevented, if you know,
>         any of your officers or your supervisor on the evening
>         in question when Mr. Perry was returned from the
>         emergency room to the PPS, what prevented any
>         Milwaukee Police Department employee from requesting
>         additional medical attention for Mr. Perry?
> A       Nothing.
> Q       On the fourth page of the exhibit we marked as Exhibit
>         69, you make a comment about your officers: "They

1  Q   What appropriate treatment did your officers attempt
2      to get for Mr. Perry after he returned to PPS and
3      prior to his death at the Criminal Justice Facility?
4  A   They had already gotten him appropriate medical
5      treatment where they were told there was nothing wrong
6      with him. So subsequently, no, they did not get him
7      additional treatment.
8  Q   So after he was returned to PPS, you're not aware of
9      any of your officers' efforts to get Mr. Perry
10     appropriate medical treatment, true?
11 A   They did not seek additional treatment, no.
12 Q   You go on to state, on page 4 and the top of page 5,
13     "Our officers were told by the doctor that he'd given
14     him medication to make him sleep, so the notion that
15     he would, like, lose the ability gradually to walk,
16     that he would be gradually -- that he would gradually
17     grow less coherent and make less sense was consistent
18     to them with what they had been told by the medical
19     authorities, which is, 'We've given him a medication,
20     a sedative to make him sleep,' so they stood by with
21     him while his took effect." Was that a true statement
22     when you made it?
23 A   Yes.
24 Q   In the event that your officers understood and they
25     conveyed to you that Mr. Perry was going to lose the

1 was consistent with what they've been told, that he'd
2 been given a strong sedative." Did you make that
3 statement?
4 A Yes, I did, apparently, yep.
5 Q Tell me who was standing by Mr. Perry after he was
6 placed in the cell for observation to determine
7 whether or not the emergency room discharge
8 instructions were being followed, if you know.
9 A I don't know.
10 Q Tell me who was standing by Mr. Perry while he was
11 placed in the holding cell A3 and gradually losing the
12 ability to walk, gradually growing more incoherent and
13 making less sense, bleeding from somewhere, and having
14 urinated and defecated on himself? Who was standing
15 by then, sir?
16 A I don't know.
17 Q You further state in your interview, quote -- and
18 we're on the second paragraph of this page, "We took
19 him to the hospital in good faith, based on his self-
20 reported medical condition and his seizure. The
21 hospital released him back to us saying he was okay to
22 go back to jail." Is that a true statement?
23 A To my understanding, yes.
24 Q When Mr. Perry self-reported at PPS that he was having
25 difficulty breathing, what action was taken to get him

| | | |
|---|---|---|
| 1 | | medical attention? |
| 2 | | MS. LAPPEN: Objection. The question has |
| 3 | | been asked and answered. Foundation. |
| 4 | | But go ahead and answer. |
| 5 | A | He had just been evaluated medically. No additional |
| 6 | | effort was made to get him additional medical |
| 7 | | attention. |
| 8 | | BY MR. GENDE: |
| 9 | Q | When Mr. Perry calls out words to the effect that "I |
| 10 | | need help," do you believe that's him self-reporting a |
| 11 | | potential medical emergency? |
| 12 | A | That's what it sounds like. |
| 13 | Q | And tell me what your officers did to assist him in |
| 14 | | that regard when he said, "I can't breathe"; he called |
| 15 | | out for help; he said, "The officers are killing me"? |
| 16 | | MS. LAPPEN: Objection. Foundation and form |
| 17 | | and it's been asked and answered at least twice |
| 18 | | in this deposition already. |
| 19 | | But go ahead and answer. |
| 20 | A | They continued processing him routinely. |
| 21 | | BY MR. GENDE: |
| 22 | Q | If we move on to the next page, Chief, on the third |
| 23 | | full paragraph down, your statement is, "As I said, |
| 24 | | they had sought medical attention for him already. |
| 25 | | The next step in the transportation was to take him to |

```
 1           affirmative or negative response.
 2                   MS. LAPPEN:  Objection.  It's been asked and
 3           answered.  Form.
 4                   But go ahead and answer.
 5       A   As far as I understand your question, yes.
 6           BY MR. GENDE:
 7       Q   Thank you.  Chief, if we can go on to page 7, as a
 8           further part of your statement, and I'm looking at the
 9           first full paragraph where you describe Mr. Perry's
10           death as being a bad outcome.  Do you see where I'm
11           at?
12       A   I think at the, yeah, first full paragraph?
13       Q   Yes, sir.
14       A   Yeah.
15       Q   You go on to state, "All I'm in a position to
16           professionally evaluate is did the officers respond in
17           a way consistent with their training and policy."  Do
18           you see where I read that?
19       A   Yes.
20       Q   You agree that was part of your duties and
21           responsibilities was to make a professional evaluation
22           regarding your officers' conduct on the night in
23           question, right?
24       A   That's correct.
25       Q   Now, we've gone over several issues with the officers'
```