United States District Court
Eastern District of Wisconsin

# Estate of Perry v. Wenzel
## 12-CV-664



Video Deposition of
## Michelle Sandry
Recorded 05/27/2015 in Madison, WI

11:04 am – 2:38 pm, 198 mins. elapsed

## Magne-Script
(414) 352-5450

*20955 Standard transcript wit*

**EXHIBIT E**

Case 2:12-cv-00664-JPS   Filed 06/21/18   Page 1 of 15   Document

Case 2:12-cv-00664-JPS   Filed 02/25/19   Page 1 of 15   Document 319-5

```
 1              restraining the spit from officers, but not
 2              necessarily physical restraint.
 3              BY MR. GENDE:
 4         Q    Well, does a spit mask allow an inmate to bite an
 5              officer?
 6         A    It prevents that.
 7         Q    So it would be another form of physical restraint,
 8              true?
 9         A    True.
10         Q    So "expectorant shield" is listed under physical
11              restraint of prisoners policies and procedures, true?
12         A    Yes.
13         Q    And an expectorant shield, or spit mask, physically
14              restrains a prisoner from spitting on himself, another
15              inmate, or police officer, or a civilian, true?
16         A    Yes.
17         Q    And it further physically restrains an inmate from
18              using his mouth as a weapon, true?
19         A    Yes.
20         Q    And based on your experience, inmates use anything
21              they can get their hands on as weapons on occasion,
22              true?
23         A    Correct.
24         Q    Are you aware of inmates using their mouth as a
25              weapon, in your experience?
```

1  A  Yes.

2  Q  That's not an uncommon occurrence, correct?

3  A  It happens. I couldn't tell you how often.

4  Q  So when you say it's "oddly placed," in reality, it's not really oddly placed. It is, as an expectorant shield, one form of a physical restraint of a prisoner, along with flexicuffs, leg iron restraints, and a bodyguard restraint system, true?

9  A  True.

10 Q  Anything out of the ordinary under paragraph F of 090 sub 10, Physical Restraint of Prisoners Policy and Procedures?

13     MS. LAPPEN: Objection as to the form of the question. It's vague.

15     MR. GENDE: Well, okay.

16     MS. LAPPEN: But go ahead and answer.

17     MR. GENDE: Fair enough.

18 Q  When I say "out of the ordinary," I mean does it diverge in any significant respect from the training and curriculum that you attempt to implement and your understanding of general jail policies or correctional facility policies and procedures in the State of Wisconsin?

24 A  It does not.

25 Q  And based on your expertise in the area of

|   |   |   |
|---|---|---|
| 1 |   | corrections, why is it important to have a |
| 2 |   | subparagraph F that defines precautions for prisoners |
| 3 |   | being physically restrained or inmates being |
| 4 |   | physically restrained? |
| 5 | A | There's need to constantly be monitoring the |
| 6 |   | individuals for something that may have been caused by |
| 7 |   | the restraints. For example, the handcuffs being |
| 8 |   | placed on appropriately. |
| 9 | Q | You said "continually," correct? "Continually |
| 10 |   | monitor"? I believe those were your words. |
| 11 | A | Yes. |
| 12 | Q | What does "continually" mean? |
| 13 | A | It means while you're in the presence of the |
| 14 |   | individual, you're ensuring that they're maintaining |
| 15 |   | the ABCs: the airway, breathing, circulation. |
| 16 | Q | Tell me if you agree or disagree with this medical |
| 17 |   | definition of "continuance" -- I'm sorry, of |
| 18 |   | "continually": not interrupted, having no |
| 19 |   | interruption. |
| 20 | A | That would be a definition of "continually." |
| 21 | Q | Here's another definition. Tell me you agree or -- |
| 22 |   | whether you agree or disagree. Uninterrupted in time, |
| 23 |   | sequence, substance, or extent. |
| 24 | A | Mm-hmm. |
| 25 | Q | Yes, you agree with that? |

| | | |
|---|---|---|
| 1 | A | Yes. |
| 2 | Q | Would you change it in any material or substantive |
| 3 | | respect, that definition? |
| 4 | A | The definition of "continually"? No. |
| 5 | Q | So you agree that subparagraph F, precautions to be |
| 6 | | taken if a person is being physically restrained, |
| 7 | | whether it's flexicuffs, leg iron, bodyguard, or |
| 8 | | expectorant shield, requires continual monitoring, |
| 9 | | correct? |
| 10 | A | Yes. |
| 11 | Q | Uninterrupted in time, sequence, substance, or extent, |
| 12 | | true? |
| 13 | A | Yes. |
| 14 | Q | Did that happen with Mr. Perry while he spent one hour |
| 15 | | in his holding cell, laying in gobs of spit, blood, |
| 16 | | and fecal matter? |
| 17 | A | I believe there was -- I want to say there was video |
| 18 | | cameras. No. I don't remember. |
| 19 | Q | Did you see videotape, ma'am, of him for an hour in |
| 20 | | his cell? |
| 21 | A | No. |
| 22 | Q | Because if you did, I didn't. I'd like to see that. |
| 23 | A | No. |
| 24 | Q | Okay. So in answer to my question, you would agree |
| 25 | | that he was not continually monitored for the one hour |

1  he was in a holding cell by himself, laying in his
2  blood, spit, and fecal matter?
3       MS. LAPPEN: Objection as to the form of the
4  question and foundation.
5       Go ahead and answer.
6  A  Correct.
7  BY MR. GENDE:
8  Q  So if he was not continually monitored and he did have
9  the physical restraint of an expectorant shield on,
10 was the City of Milwaukee police officers that were
11 responsible for his monitoring in compliance with SOP
12 090, subsection 10?
13      MS. LAPPEN: Objection as to the form of the
14 question and foundation.
15 A  No.
16 BY MR. GENDE:
17 Q  He was not. You did have an opportunity to review the
18 document generated by the Milwaukee Police Department
19 as it relates to Mr. Perry's monitoring on the night
20 in question where he was put in a holding cell by
21 himself, correct?
22 A  Yes.
23 Q  And that document is part of your file?
24 A  Yes.
25 Q  Can you locate it, please? I have it here, ma'am.

1  Q  Do you remember the question?

2  A  Yes.  If someone were to be constantly next to him, there is a -- it was a more probable chance to have noticed.

5  Q  And I don't mean constantly next to him.  Let's just use the Milwaukee Police Department's own language of "continually monitor," okay?  Because that's important in cases like these, to stick with the right vocabulary.  You agree that if Mr. Perry was continually monitored according to policies and procedures for the city, the monitoring officer would more probably than not have identified that Mr. Perry was bleeding from somewhere on his head, drooling from his mouth, and laying in his own fecal matter, true?

        MS. LAPPEN:  Objection as to the form of the question.  Calls for speculation.

        Go ahead and answer.

18  A  Yes.

BY MR. GENDE:

20  Q  Well, that policy and procedure is in place for a reason, right?

        MS. LAPPEN:  Objection.  Calls for speculation.  And foundation.

        MR. GENDE:  She's your expert.

25  Q  Are you speculating whether there's a reason for

1  Q  Did it appear that his inability to walk or ambulate
2     on his own would suggest some confusion?
3  A  Yes.
4  Q  If he was dropped on his face, that would be an
5     additional injury that should get prompt medical
6     attention considering his medical history, true?
7         MS. LAPPEN:  Objection.  Calls for
8     speculation.  And competence.  And foundation.
9  BY MR. GENDE:
10 Q  Well, all right --
11        MS. LAPPEN:  Go ahead and answer.
12 BY MR. GENDE:
13 Q  -- let me ask you this way.  To comply with the DOJ
14    standards, policies, procedures, the Wisconsin
15    Constitution, and the United States Constitution, that
16    inmates, to be treated humanely, must be given prompt
17    medical attention in the event of a medical emergency.
18    You agree with that concept, right?
19 A  Mm-hmm.  Yes.
20 Q  And somebody who had a seizure, like Mr. Perry, had
21    discharge instructions that said "Get prompt medical
22    attention in these situations," right?  You're with me
23    so far?
24 A  Yes.
25 Q  And it specifically sets forth when prompt medical

1 attention should be sought for Mr. Perry relative to
2 his prior seizure, his medications, his medical
3 history, and none of the officers read or understood
4 that, right?
5 A Mm-hmm.
6 Q You agree with that so far?
7 A Yes.
8 Q Does that comply with Wisconsin Department of Justice
9 policies and procedures, the Wisconsin Constitution,
10 and the United States Constitution as it relates to
11 humanely treating a prisoner by getting him prompt
12 medical attention in the event that a medical
13 emergency arises?
14 MS. LAPPEN: Objection as to form, and it's
15 multiple. And there's foundational issues as
16 well, and competence issues as well as to some
17 aspects of the question.
18 But go ahead and answer the question.
19 A No.
20 BY MR. GENDE:
21 Q Let's move on to the next page. It sets forth,
22 looking at Bates 32, the lower right-hand corner?
23 A Yes.
24 Q In bold capital letters and underlined, it says, "What
25 to watch for for possible side effects and additional

| | | |
|---|---|---|
| 1 | A | It does not change all of my opinions, no. They |
| 2 | | should have read the discharge instructions and, |
| 3 | | again, we don't know if they did. They didn't put it |
| 4 | | in the report, and I understand if it's not in the |
| 5 | | report, it didn't happen. I've heard that phrase |
| 6 | | before. But they did obtain assistance to get him to |
| 7 | | the hospital, and so that was appropriate. |
| 8 | | BY MR. GENDE: |
| 9 | Q | If we can constrain your answer to the question that's |
| 10 | | being asked. I'm not asking if all of your opinions |
| 11 | | changed. I'm asking -- |
| 12 | A | Okay. |
| 13 | Q | -- if any of your opinions are different, as we sit |
| 14 | | here today, being a member of the Department of |
| 15 | | Justice, under oath, relative to an in-custody death, |
| 16 | | and considering the fact that these discharge |
| 17 | | instructions for Mr. Perry were not relayed to the |
| 18 | | Milwaukee Police Department personnel who were in |
| 19 | | charge of Mr. Perry's health, safety, and welfare |
| 20 | | while he was in custody. And your answer can be yes |
| 21 | | or no to that. |
| 22 | | MS. LAPPEN: Objection as to form and |
| 23 | | foundation. It calls for speculation. |
| 24 | | Go ahead and answer. |
| 25 | A | I believe that there should have been further |

1 monitoring on Mr. Perry while he was in the single
2 cell.
3 BY MR. GENDE:
4 Q When you say "further monitoring," what you mean is
5 continuous monitoring in accord with the policy and
6 procedures under SOP 090, physical restraints, and the
7 precautions to be taken related thereto, right?
8     MS. LAPPEN: Objection as to form and to
9 foundation as well.
10     Go ahead and answer.
11 A Yes.
12 BY MR. GENDE:
13 Q Do you know or have any information that Mr. Perry was
14 being disciplined for any of his behaviors while he
15 was at the Prisoner Processing Section?
16 A I don't believe he was.
17 Q Were you asked not to render any opinions regarding
18 the county's conduct as it relates to Mr. Perry in
19 this case?
20 A No.
21 Q Did you and Ms. -- I'm sorry. Go ahead.
22 A It was not mentioned, no.
23 Q You had no discussions with Ms. Lappen about what
24 occurred after Mr. Perry was transferred to the
25 Criminal Justice Facility for the County of Milwaukee?

| | | |
|---|---|---|
| 1 | A | There's no certification involved. |
| 2 | Q | But "awareness" means they're supposed to have an |
| 3 | | understanding, or do you have some other definition? |
| 4 | | And when I say "they," I'm talking about Milwaukee |
| 5 | | police officers. |
| 6 | A | That would be within the academy, so whoever goes |
| 7 | | through the Recruit Academy, Milwaukee police |
| 8 | | officers, they would have that. It's just a little |
| 9 | | bit of information of each thing, so enough to know |
| 10 | | that there is something that they need to look for and |
| 11 | | then get further assistance if -- |
| 12 | Q | Well, that's covered in your next sentence. Can you |
| 13 | | read that into the record? |
| 14 | A | "The jail healthcare course focuses on how to |
| 15 | | recognize injury and illness in others and when to |
| 16 | | obtain medical assistance." |
| 17 | Q | And tell me how any of the Milwaukee Police Department |
| 18 | | officers did that in Mr. Perry's case after he was |
| 19 | | returned from PPS and until he passed away in their |
| 20 | | custody on the floor of the county's facility. |
| 21 | | MS. LAPPEN: Objection as to form and |
| 22 | | foundation. |
| 23 | | But go ahead and answer. |
| 24 | A | They did not obtain further medical assistance. |
| 25 | | BY MR. GENDE: |

1  Q  How did they attempt to recognize an injury on Mr.
2     Perry's behalf?
3  A  During their checks that they did, they were unable to
4     view any injuries from that. From -- there were no
5     observations listed, so...
6  Q  Well, what I'm asking you --
7  A  ...I cannot conclude that.
8  Q  -- and based on your opinion in this case where you
9     say, "The jail healthcare course focuses on how to
10    recognize injury and illness in others and when to
11    obtain medical assistance," is that true?
12 A  Yes.
13 Q  And you also opine in the sentence before, that the
14    Milwaukee Police Department should have an awareness
15    of this relative to their training, right?
16 A  Yes.
17 Q  Now I'll break it down. Tell me what officer did what
18    on the evening in question to recognize that Mr. Perry
19    was suffering from an injury, or not, that resulted in
20    gobs of blood, spit, and feces on the floor of the
21    cell where he lay for an hour.
22        MS. LAPPEN:  Objection as to form and
23    foundation.
24        But go ahead and answer.
25 A  They did not.

|   |   |                                                                 |
|---|---|-----------------------------------------------------------------|
| 1 |   | BY MR. GENDE:                                                   |
| 2 | Q | Same question. Tell me what anybody did at the Milwaukee Police Department, one officer, one action, on how they recognized illness in Mr. Perry while he lay in the holding cell by himself where gobs of spit, blood, and feces were identified after he was removed. |
| 7 |   | MS. LAPPEN: Objection as to form and foundation. |
| 9 |   | But go ahead and answer. |
| 10 | A | None. |
| 11 |   | BY MR. GENDE: |
| 12 | Q | Final question and then we're done. Tell me one police officer, name or action, on the evening in question did to obtain medical assistance for Mr. Perry during either the time period before he was put into the holding cell? Let's start with that. |
| 17 | A | No one did. |
| 18 | Q | The time period while he was in the holding cell where gobs of blood, spit, and feces appeared on the floor where he lay for an hour? |
| 21 |   | MS. LAPPEN: Objection as to the form of the question, and foundation. |
| 23 |   | BY MR. GENDE: |
| 24 | Q | One officer, one action. Can you name? |
| 25 | A | No. |

1  Q  And subsequently, when he was conveyed from Prisoner
2     Processing Section to the county facility where a
3     sergeant and a nurse identified blood seeping from his
4     spit mask, tell me one Milwaukee police officer action
5     that did something to obtain medical assistance for
6     Mr. Perry at that point in time.
7            MS. LAPPEN:  Objection as to form and
8        foundation.
9     BY MR. GENDE:
10 Q  And before he died.
11           MS. LAPPEN:  But go ahead and answer.
12           MR. GENDE:  I'm sorry.
13 Q  And before he died.
14           MS. LAPPEN:  Same objection.
15 A  Other than actually transporting him to the jail where
16    there is nursing staff, nothing.
17           MR. GENDE:  Okay.  Thank you, ma'am.  I
18        appreciate your time.
19           THE REPORTER:  Off the record.
20           (Off the record 2:37 - 2:38)
21           THE REPORTER:  There being no further
22        questions, this deposition is concluded at 2:38
23        p.m.  Off the record.