UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN
MILWAUKEE DIVISION


------------------------------------------------------------

ESTATE OF JAMES FRANKLIN PERRY       )
by NATHANIAL CADE, JR.,              )
Special Administrator, and           )
JFP, Jr.,                            )
                                     )
                Plaintiffs,          )  Case No. 12-CV-664
                                     )
    vs.                              )
                                     )
RICHARD LOPEZ, et al.,               )  March 25, 2019
                                     )  8:30 a.m.
                Defendants.          )

------------------------------------------------------------




**EXCERPT TRANSCRIPT OF JURY TRIAL**

BEFORE THE HONORABLE J. P. STADTMUELLER

UNITED STATES DISTRICT JUDGE




Official Court Reporter:
Richard Derrick Ehrlich, RMR, CRR
richard_ehrlich@wied.uscourts.gov
(414) 290-2642


Proceedings reported by stenotype.
Transcript produced by computer-aided transcription.

```
 1                    A P P E A R A N C E S

 2

 3      For the Plaintiffs:

 4                         James J. Gende, II
                           Gende Law Offices, SC
 5                         N28 W23000 Roundy Drive
                           Suite 200
 6                         Pewaukee, WI 53072
                           262.970.8500
 7                         jgende@jamesgendelaw.com

 8                         Christopher P. Katers
                           Judge Lang & Katers, LLC
 9                         8112 W. Bluemound Road
                           Suite 101
10                         Wauwatosa, WI 53213
                           414.777.0778
11                         ckaters@jlk-law.com

12

13      For the City of Milwaukee:

14                         Susan E. Lappen
                           200 East Wells Street
15                         Room 800
                           Milwaukee, WI 53202
16                         414.286.2601
                           slappe@milwaukee.gov

17

18

19

20

21

22

23

24

25
```

1          MS. LAPPEN:  Good morning.  I would like to start

2     by saying that the loss of a loved one is a tragic and

3     terrible thing to go through, and on behalf of the officers

4     and myself, I want to extend nothing more but respect to the

5     family members and our deepest sympathies; however, in this

6     particular case, I'm representing 11 police officers who are

7     being accused of disregarding Mr. Perry and doing nothing,

8     and that caused his death as counsel has indicated.

9          We anticipate that the evidence that's presented

10    to you in this case will provide you with the following

11    information:  Mr. Perry was taken into custody by police

12    officers in the early morning hours of that day.  They had a

13    report of a woman whose car was stolen at gunpoint.  A car

14    matching the description of the stolen car was observed by

15    officers and pulled over.  Mr. Perry was driving that car.

16         In the course of the stop, they found the woman's

17    purse and cell phone on the front seat next to Mr. Perry.

18         In the course of speaking with him, Mr. Perry

19    admitted that he had taken that vehicle from the woman at

20    the original scene of the event that led to the call for

21    police assistance.

22         Mr. Perry was booked in, which is a process

23    whereby he was brought into the downtown police

24    administration facility jail.  It's a temporary holding

25    facility.  He was brought in and booked.  And in the process

1    of being booked, which is fingerprinted and photographed,

2    Mr. Perry, like any other prisoner, was asked a series of

3    medical screening questions to give the officers an idea if

4    there was an imminent need for any type of medical care.

5    The evidence, or information, will indicate that, yes, he

6    had indicated to the screening officer that he did suffer

7    from seizures and he took seizure medication.  The evidence

8    will also indicate that he did not ask for seizure

9    medication.  He did not indicate that he was having any

10    issue with regard to his epilepsy or seizure condition.

11          The evidence will show that Mr. Perry was

12    maintained at the PPS facility.  Again, it's a temporary

13    holding facility.

14          You will learn that prisoners who are taken into

15    custody in the context of a police investigation are kept at

16    that location.  Again, it's at 7th Street -- roughly 7th and

17    State in the City of Milwaukee because that is also where

18    the main detective bureau is located.  So having a prisoner

19    who is taken into custody while there's an ongoing

20    investigation, they will be kept at that facility until the

21    detectives feel that they no longer need to question that

22    person or perhaps have that person participate in a lineup

23    whereby the victims of crimes are brought in and asked to

24    view people and determine if that person is, in fact, the

25    person that, you know, committed the crime.  So people are

kept there. It's not a long-term facility. They're not kept there for long periods of time, but it's a temporary holding facility.

So Mr. Perry was kept at this facility. The evidence will show that at about 11:00 in the morning, he was removed from what they call the male bullpen. It's a very large room with benches and a toilet, and it's a room where prisoners are kept while they're in the process of being interviewed or while the investigation is ongoing.

In any event, Mr. Perry was removed from the bullpen at about 11:00, 11:15 in the morning. He was questioned by an investigating detective relative to his involvement in the underlying incident that led to his being taken into custody earlier in the morning.

The detective will testify that at no time during that roughly 45 minutes did Mr. Perry indicate he was having any issue, medical or otherwise. I believe the detective offered and got him a soda or Coke, something like that, to drink while they were conducting the interview. And, subsequently, the detective put Mr. Perry back into the bullpen until he was wrapping up his investigation.

There was an ongoing investigation relative to some other issues. Mr. Perry apparently was in the company of another man; that other man struck the woman, who had a car stolen, with a pistol. And there were a lot of players

1    and information that they're going through, but, ultimately,

2    they would be moving Mr. Perry, they knew, to the criminal

3    justice facility.

4           The criminal justice facility is literally located

5    about a block from the downtown PPS, the city jail, and that

6    is where prisoners are brought for longer term

7    incarceration.  So they all knew that that is ultimately

8    where Mr. Perry would be brought.

9           About 2:30 or so in the afternoon, the evidence

10   will show you that Mr. Perry did suffer a seizure while he

11   was in that bullpen area; that as soon as officers observed

12   that, an ambulance was called.  Paramedics arrived.  They

13   provided care to Mr. Perry.  He acknowledged that he did

14   suffer from seizures.  He was what they call postictal.  So

15   after he had the seizure, he had this affect of being

16   sluggish and tired, but he could respond to questions

17   appropriately.  He knew his name.  He knew the date.  He

18   knew he could answer those basic questions.  So he was

19   conscious, talking, and aware.  And the paramedics took

20   Mr. Perry to Sinai Samaritan Hospital, which was a couple of

21   blocks from the city jail downtown.

22          The evidence will show -- and we'll have the

23   treating practitioner; so the two docs that treated him at

24   the hospital.

25          We'll have a video of the nurse that was his

primary caregiver, and, of course, Officers Kroes and Jacks,
who were the transporting officers.  They will testify that
while Mr. Perry was at the Sinai Samaritan emergency room,
he sustained two additional significant seizures, one
lasting over five minutes long.  While he was there, when he
first arrived, the initial treating doctor will indicate
that what he did was he had ordered up some medication --
it's called Dilantin -- which is a very commonly used
medication to treat seizure activity; that he had ordered up
some Dilantin for Mr. Perry, but he also had blood drawn
because he wanted to find out if there was any of
Mr. Perry's medication already existing in his bloodstream.
He didn't want to give him more than what was necessary for
treatment.

       While the toxicology of the blood test results
were coming back, Mr. Seizure -- Mr. Perry sustained one of
his additional seizures.  He was given a dose of what is
called Ativan.  That is a medication that they give to
people who are in the course of having a seizure, and the
purpose of giving him that medication is to reduce the
affects of the seizure.  So he was given this Ativan.  Then
they were going to give him intravenously the Dilantin.

       What they learned from the blood test results was
that Mr. Perry did have some of his Dilantin, some of his
own anti-seizure medication still in his bloodstream.  So

1  then Dr. Coogan, who was his treating practitioner, reduced

2  the amount that he ordered Mr. Perry to be given from 1 gram

3  to 750 milligrams; reduced it by about a quarter.

4        While the nurses were attempting to put that

5  medication into Mr. Perry's system intravenously, they had a

6  flareup.  Apparently the vein got enlarged, what they call

7  it being infiltrated.  So they could not successfully get

8  that medication into him.  They had to try some different

9  veins, some different things.  But, ultimately, they did get

10  the IV into Mr. Perry.  They did give him the full dose that

11  the doctor had ordered of the Dilantin.

12        Mr. Perry had a second seizure; this one lasting

13  about five minutes long.  He got a second dose of Ativan

14  with regard to that second seizure.

15        So all told, during the three hours that Mr. Perry

16  was at the hospital, he sustained two additional significant

17  seizures, and he was given three different doses of

18  anti-seizure medication.

19        Dr. Coogan will indicate that those medications

20  can have a cumulative -- I can't say the word.  An effect

21  where the total of the three is greater than the sum.  So,

22  in other words, the cumulative effect -- there you go -- and

23  that anticipated effects of that medication would be that

24  the person would be very sleepy, sluggish, and have that

25  type of physical responses.  There would be relaxing of

musculature in the body.

The evidence will tell you that when Mr. Perry had his last of the medication into his system -- this was about 5:45 in the evening -- Officer Kroes and Officer Jacks were told that he was ready to be released.  They were a little concerned because of the fact that when Mr. Perry came into the facility, he was able to answer their questions.  He appeared to understand what they were saying to him.  He could walk on his own pretty well.  Now they had a man in his hospital room who was having difficulty walking.  They walked with him to the bathroom, one officer on each side, because he was very wobbly.

When they were speaking with him, he was drooling. They were talking to him, and it didn't seem to the officers like he was understanding fully what it was they were asking him about, so they raised these concerns to the nurse and said, "Hey, are you sure this guy is ready to go?"

And the nurse left and came back and gave them information indicating that, yes, what they were seeing was Mr. Perry under the influence of this medication, that he was fine, that he could stay in the ER another hour or so just to make sure there wasn't any kind of adverse reaction to the medication going on, then the doctor was releasing him.  He would be released to go.

In the meantime, Dr. Coogan had left for the

night. Dr. Jahnke became the treating practitioner. She came into the hospital and into the sequence of events at about the time Mr. Perry was getting the last of the Dilantin into his system.

Dr. Jahnke will indicate that she did not physically touch Mr. Perry. She did not speak with him. She will indicate that she did receive information from Dr. Coogan about his status; that Dr. Coogan told her that once Mr. Perry got this medication, he would be free to be released from the hospital back into the officers' custody. And she will indicate that she did see Mr. Perry in the emergency room area as he was walking to the restroom, and she could see that Mr. Perry was wobbling, and that there was an officer on each side arguably helping him to walk in a more controlled fashion, but that will be the extent of her testimony.

In any event, the officers were still somewhat concerned for Mr. Perry. They called Lieutenant Robbins, their supervisor. They indicated, "Hey, you know, he was in this condition when we brought him in. He's been treated and medicated. Now we see him in this state. What should we do?"

And Lieutenant Robbins indicated, "Well, if the doctor has released him, you can rely on that information. Bring him back to PPS. We'll finish his paperwork, and then

1    we'll bring him to CJF."

2         So that is what the officers did.  It took about a

3    couple of minutes to get from the hospital back to the city

4    jail, the PPS building.

5         When they got there, Mr. Perry was resistive to

6    getting out of the squad car.  He was somewhat kicking, not

7    responding to what the officers were telling him.  The

8    officers then notified their supervisor of this, and two

9    additional officers were called to help, Officers Bungert

10   and Santiago.

11        So they met Officers Kroes and Jacks in the

12   garage, which is on the main floor of the city jail

13   building; and, ultimately, they had to assist Mr. Perry for

14   his security and safety.  For their own security and safety,

15   they essentially carried him into the elevator so that he

16   wouldn't kick, he wouldn't resist.

17        All the officers, believing that he was a man who

18   had just been medically cleared from the hospital, that he

19   was under the influence of anti-seizure medication, that he

20   had sustained several seizures that day, and they accounted

21   for that as being a cause behind the behaviors that they

22   were observing.

23        The officers will tell you that they received

24   first responder training.  So our police officers are not

25   medical doctors.  They do receive a basic CPR training so

1    they can operate an AED, or the -- you know, the device used

2    to shock an individual's heart. They have that basic first

3    responder training. They are trained that when they observe

4    something that appears to be medical going on in their

5    presence with a prisoner, with a citizen, with a coworker,

6    that they should -- first of all, if it seems to be an

7    emergency call for help, then assist the person the best

8    that they can until more advanced medical practitioners like

9    EMTs or paramedics arrive on the scene.

10          They will indicate that with regard to what they

11    observed with Mr. Perry from the point in time that he got

12    out of the hospital and was medically cleared to the point

13    in time when he was being brought up to the PPS, they didn't

14    observe anything which indicated to them that he was

15    experiencing a medical emergency. What they observed was

16    someone who they thought was under the influence of

17    medication, and, again, suffering from the aftereffects of

18    seizure activity.

19          So they brought him upstairs. You will see

20    videotape of that. You will see video images of the

21    officers bringing him down a hallway, keeping him at the end

22    of the hallway.

23          They indicated that they -- or will indicate that

24    they sat him on the floor because they were concerned --

25    earlier in the day, when he was in the bullpen and had a

1   seizure, he had fallen off a bench, and one of the inmates

2   had reported that he thought Mr. Perry had hit his head.  So

3   they didn't want that to happen again, so they sat him on

4   the floor.

5          They will indicate to you that they stood around

6   him, they held him upright, that he wanted to go over to the

7   floor.  It was like he wanted to go to sleep or lay down.

8   They wanted to keep him upright.  They wanted him to breathe

9   well.  They wanted his diaphragm to be open and upright.

10  They were talking with him trying to calm him while

11  decisions were being made by Lieutenant Robbins and other

12  jail staff as to what cell to put him in and how he would be

13  processed further.

14         While he was seated on the floor, Mr. Perry, who

15  had been drooling at the hospital, did begin to spit.  The

16  officers will tell you that they are trained relative to

17  being aware of biohazards, of bloodborne pathogens.

18         In response to a prisoner spitting, they get a

19  paper towel, like a mesh spit mask, and put it over him.

20  They did that with Mr. Perry.  They could see him through

21  the mesh.  And, yes, there was mesh, but they could see him.

22  They could see his chest rising.  They could hear him.  He

23  was talking with them.  He was answering their questions and

24  so forth.  But they put the spit mask on, not to be

25  inhumane, not to punish him.  It was just simply a biohazard

protection for anyone who would be either transporting or
touching or interacting with Mr. Perry while he was there.

While he was on the floor, yes, there was this
point in time when he did say, "I can't breathe."  It was
shortly after this paper and mesh spit mask was put over his
head.  And the officers will indicate to you that is a
common response from people when they get the spit mask over
their head.  But the officers reassured him, "No, if you're
talking, you're breathing," which is something they had
learned through their EMS training.  And not once again did
Mr. Perry complain about having difficulty breathing.  Not
once did they -- in this whole course of events did they
observe that Mr. Perry appeared to be using his muscles on
his neck or his shoulders or chest in order to breathe.  He
appeared to be breathing normally.  So they didn't conclude
that there was anything wrong with his breathing.  They
didn't conclude that there was anything else going on.  They
will tell you that there was no complaint of chest pain, of
arm pain.  They did not observe a drooping face during the
point in time when Mr. Perry's face was unobstructed.

So, in any event, ultimately, he was put in cell
A3.  He was put in that cell because it doesn't have a bench
from which he could fall.  They moved him into that cell
block area.

The officers will tell you that they did not drop

him.  They carried him in a seated position with his body
and torso upright and perpendicular to the floor and his
butt and legs parallel to the floor.  He may have been put
down on his butt while they were opening the door before
they carried him in, but he was not dropped.  And in the
process of moving him from the spot in the hallway to his
jail cell, you will learn that primarily Officer Kroes,
Officer Jacks, Officer Santiago, and Officer Bungert had
assisted with carrying him.  As they were walking along the
hallway, Officer Lee saw they were carrying this man.  He
came in and helped with the carrying process.

You will see from the videos that Lieutenant
Robbins was present.  He was watching what was going on.  He
was working in his office trying to expedite Mr. Perry being
brought to the county facility.  He knew that Mr. Perry had
been at the hospital.  He knew he had seizures, but
Lieutenant Robbins will tell you that he also knew that
there were trained nurses who were employed at the county at
the CJF.  The city jail does not have medical staff.  So he
knew that if he could process him, get his paperwork
together, once he got to the CJF, if Mr. Perry needed more
medication, if he was having an adverse reaction down the
road, it would be good for him to be there because, again,
there were trained people there.

So Officer Diaz-Berg, Officer Ayala were both

1    assigned to the jail.  They will indicate to you that,

2    ultimately, after about an hour, the paperwork was located.

3    They were ready to transport him.  And then Officer Salinsky

4    and Lopez were assigned to do the transport.

5              Could we put up photograph 1137B?

6              So you will see videotape.  There's some from the

7    hallway.  There's some video cameras that were in some of

8    the rooms along the way.  There was a video camera that was

9    located in the elevator, and we took some stills from that

10   video.  And the photo that I'm going to have brought up is a

11   photo of Mr. Perry as he's on his way to the CJF.

12             So he had been medically clearly at Sinai.  He had

13   been brought back to the city jail.  He was kept in a cell

14   for about an hour and 15 minutes while the paperwork was

15   completed.  This is Mr. Perry at that point in time.  So

16   he's a couple minutes away from being brought to the CJF.

17             As you can see, and the officers will describe for

18   you, he is wearing the spit mask.  The blocking material is

19   like a paper towel-like material.  It is not wet.  It is not

20   saturated.  Mr. Perry's face can be seen in the mesh.  He is

21   breathing.  He is standing.  He is bearing his own weight.

22             Yes, officers were assisting him.  Officer Ayala

23   and Officer Lopez were helping him on either side, and

24   Officer Salinsky was helping him to the rear.  Mr. Perry had

25   these oversized pants that some men wear, and the officer

1   was concerned that they would fall down and he would trip on

2   them.  So Officer Salinsky was actually holding up his

3   blue jeans to keep them from falling down so he could walk

4   easily.

5       But this is a photo.  There's no blood on his

6   shirt; no staining on his shirt.  There is no feces on the

7   exterior of his clothing; no feces on his spit mask.  And so

8   Officer Ayala and Officer Diaz-Berg, who were present when

9   Mr. Perry came in and were present when he was being

10  transferred, will tell you that he actually appeared to get

11  better.  It seemed to them that the affects of the

12  medication were wearing off because while he had to be

13  carried in to the PPS, he was walking out.

14      After he was brought down through the elevator,

15  Mr. Perry was then transported over to the CJF.  Again, it's

16  literally, like, a block, block-and-a-half from the PPS.  It

17  took maybe a minute or two to drive over there.

18      The officers will tell you that when they got

19  there, they pulled into the sally port, which is, like, this

20  parking area for the entranceway to the jail facility.  And

21  they parked.  They got out.  They removed Mr. Perry.

22      Officer Salinsky will tell you that during

23  transport, there was a big plexi window.  He could look

24  through that window.  He was seated in the front passenger

25  seat.  He was looking through the window and monitoring

1    Mr. Perry visually for the whole ride.  Officer Lopez was

2    driving.  And they will tell you that when they got there,

3    deputy sheriffs came and helped them remove Mr. Perry from

4    the vehicle.  Again, a concern in a law enforcement setting,

5    as was throughout this course of events, is security and

6    safety for everyone.  So other officers came to help.

7         You will see video, other video, from the jail

8    facility that shows when Mr. Perry walks through the

9    entranceway, he is carrying his own weight.  He's taking

10   steps.

11        After he comes through the facility a few steps,

12   you will see that his knees buckle.  When his knees buckle,

13   the officers bring him over to the nurse's station, and they

14   get the nurses involved with evaluating him.

15        The officers will tell you that at no time -- and

16   this is all of the 11 officers -- at no time did they

17   believe during any event that day, after Mr. Perry was

18   medically cleared and released from the hospital, that he

19   was suffering from a medical emergency.

20        They will tell that you at no time did they think

21   that there was anything going on which necessitated them to

22   call an ambulance or get him back to the hospital.  What

23   they perceived was they were dealing with somebody who,

24   again, was dealing with aftereffects of seizure activity

25   that day and seizure medication.

They will tell you that their training provided
that if there was an emergency, something like a seizure, a
heart attack, a stroke, obvious shock, obvious allergic
reaction, they would call an ambulance.  That's not a
problem; in fact, they had done that earlier in the day for
Mr. Perry.  But at no time after he was medically cleared
from the hospital did they perceive that he was in need of
emergency medical care.

You will see a videotape from a now-deceased
deputy sheriff, Deputy Kleckbush.  She will testify that
when Mr. Perry came into the facility, she, a trained law
enforcement officer, did not perceive that he was suffering
from a medical emergency.

The two nurses who treated Mr. Perry --
Nurse Virgo and Nurse Wenzel -- will tell you when he first
came in, they thought that, yeah, he should probably go back
to the hospital to be checked out because they felt
uncomfortable about what he was presenting, because by then
his knees had buckled.  He was not responding to their
questions verbally.  When they asked his name, he nodded.
When he was asked if he had seizures, he nodded.  But they
were concerned.  They will tell you that even at that point,
they did not believe that he was suffering from a medical
emergency.  It was only until Nurse Wenzel, after he had
been in the facility for several minutes, she had his mask

1 removed, and she wanted to wipe his face because by then,

2 they had noted some kind of frothy sputum.  And in wiping

3 his face, she had eye contact with him, and suddenly his

4 eyes rolled back, and he became unresponsive.  And, at that

5 point, she believed a medical emergency was occurring.

6    By then, though, an ambulance had already been

7 called to transfer Mr. Perry back to the hospital.  But they

8 will tell you, again, trained medical professionals, that

9 even they did not believe that Mr. Perry, when he came in

10 the CJF building, was experiencing a medical emergency which

11 required an ambulance to come and transport him to the

12 hospital, get him more advanced medical care.

13    You will hear from other witnesses.  You'll hear

14 from Mr. Puechner, who was a retired janitor at the jail

15 facility, that when he was doing his janitorial duties,

16 Mr. Perry was in his cell.  And at one point in time,

17 Mr. Perry had put his face to the opening in the cell door

18 and asked him what time it was.

19    So he will tell you that while Mr. Perry was in

20 PPS, he had talked to him and asked him about the time and

21 appeared to be fine.

22    You will hear from a variety of other witnesses

23 and whatnot, but I think I provided you with essentially a

24 roadmap to follow as we present the witnesses to you

25 throughout the course of this trial.

1          So, again, it's the position of the officers that,

2     yes, the loss of life is tragic, and it's regrettable, and

3     they have sympathy for the family.  But in this particular

4     set of circumstances, we will present to you witnesses and

5     evidence which establishes that when they were interacting

6     with Mr. Perry along the course of his processing that day,

7     that once he had been medically cleared at the hospital,

8     they believed that he was simply under the affects of

9     medication.  It's much like if they would have somebody who

10    was intoxicated.  You know the person is drunk.  You know

11    that they're walking awkwardly, slurring their speech, maybe

12    spitting or drooling, but officers would have a belief, a

13    reasonable belief that eventually that alcohol is going to

14    wear off and the person is going to get better.  It was the

15    same perspective with regard to Mr. Perry.  They felt that

16    he was under the influence of these medications.  And as

17    you'll see from the video information, including the still

18    that we have in front of us here, by the time he was

19    transported from the prisoner processing section to the CJF,

20    he was carrying his own weight.  He was standing.  There was

21    no evidence of any kind of spit or blood or vomit or

22    anything on his face, facial mask, nothing on the exterior

23    of his clothing.  And, in fact, they felt that he was, as I

24    said earlier, getting better; that the affects of the

25    medication were wearing off and that he was fine to

1       transport to the criminal justice facility.

2              I thank you for your attention.

3              As the judge indicated, because we're the Defense,

4       we present our evidence second.  So I ask that you keep an

5       open mind throughout the plaintiff's case and realize that

6       there is another side to the story and not make a decision

7       in this matter until you've heard from everybody.

8              Thank you.

9          (Excerpt concluded.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          C E R T I F I C A T E

2

3          I, Richard D. Ehrlich, a Registered Merit Reporter

4    and Certified Realtime Reporter, certify that the foregoing

5    is a true, complete, and accurate transcript of the

6    proceedings ordered to be transcribed in the above-entitled

7    case before the Honorable J.P. Stadtmueller, an jury, in

8    Milwaukee, WI, on March 25, 2019.

9

10   s/Richard D. Ehrlich  March 26, 2019
     _____
11   Richard D. Ehrlich, Official Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25